### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| Voxer, Inc. and Voxer IP LLC | |
| Plaintiffs, | Civil Action No. 6:20-cv-00011 |
| v. | |
| Facebook, Inc. and Instagram LLC | Jury Trial Demanded |
| Defendants. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs Voxer, Inc. and Voxer IP LLC (collectively "Voxer") assert the following claims for patent infringement against Defendants Facebook, Inc. ("Facebook") and Instagram LLC ("Instagram"), and allege as follows.

## INTRODUCTION

1.     Voxer brings this action to redress Facebook and Instagram's extensive unauthorized use of its patented communications technologies.

2.     Tom Katis is Voxer's co-founder and served as CEO until 2015.  He reenlisted in the United States Army after the attacks of September 11, 2001, and served as a Special Forces Communications Sergeant in a combat deployment to Afghanistan.  When his combat unit was ambushed in Kunar Province in 2003, Mr. Katis coordinated medevac, tactical reinforcements, and close air support under enemy fire.  He completed his mission but experienced the shortcomings of existing communications systems.  These systems could operate only in real-time or after complete message composition, and were ill-suited for time-sensitive communications with multiple groups in a highly disruptive environment.

3.      Mr. Katis and his team began developing communications solutions in 2006 to remedy these shortcomings.  The new technologies enabled transmission of voice and video communications with the immediacy of live communication and the reliability and convenience of messaging.  The technologies allowed transmission and reception under poor and varying network conditions and regardless of recipient availability.

4.      Voxer launched the Voxer Walkie Talkie app in 2011.  It became an immediate success and was named Best Overall App in the First Annual Silicon Valley Business App Awards in 2013.

5.      Facebook approached Voxer about a potential collaboration soon after the app's launch.  By February 2012, Voxer had disclosed its patent portfolio and proprietary technology to Facebook.  When early meetings did not result in an agreement, Facebook identified Voxer as a competitor although Facebook had no live video or voice product at the time.  Facebook revoked Voxer's access to key components of the Facebook platform and launched Facebook Live in 2015 followed by Instagram Live in 2016.  Both products incorporate Voxer's technologies and infringe its patents.

## NATURE OF THE ACTION

6.      This is a civil action for infringement under the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*

7.      Voxer is the owner of all rights, title, and interest in U.S. Patent Nos. 8,180,030; 9,634,969; 10,109,028; 10,142,270; and 10,511,557 (collectively, the "Asserted Patents").

8.      Defendants have infringed and continue to infringe, directly and indirectly, one or more claims of Voxer's Asserted Patents by making, using, selling, and offering to sell the Facebook and Instagram mobile applications, mobile devices running the Facebook or Instagram mobile applications, and systems, servers, and services used with Facebook Live or Instagram

Live in the United States, including in this District.  Voxer seeks injunctive relief and monetary damages.

**THE PARTIES**

9.      Plaintiff Voxer, Inc. is a Delaware corporation with its principal place of business at 1185 Mission St., San Francisco, California.  Plaintiff Voxer IP LLC is a Delaware limited liability company and the legal owner by assignment of the Asserted Patents, which were duly and legally issued by the United States Patent and Trademark Office ("USPTO").  Voxer IP LLC is a wholly owned subsidiary of Voxer, Inc.

10.      Defendant Facebook is a Delaware corporation with a principal place of business at 1 Hacker Way, Menlo Park, California.  Facebook maintains offices in Austin, Texas, operates and owns the facebook.com and instagram.com websites, and markets, offers, and distributes the Facebook Live and Instagram Live services, as well as the Facebook and Instagram applications for mobile and other devices throughout the United States including in this District.

11.      Defendant Instagram is a Delaware limited liability company.  Instagram is a wholly owned subsidiary of Facebook that operates and owns the instagram.com website.  It markets, offers, and distributes the Instagram Live service and the Instagram application for mobile and other devices throughout the United States including in this District.

12.      Each of the Defendants directly and indirectly develops, designs, manufactures, distributes, markets, offers to sell, and sells infringing products and services in the United States, including in this District, and otherwise purposefully directs infringing activities to this District in connection with the facebook.com and instagram.com websites, the Facebook Live and Instagram Live services, the Facebook and Instagram applications for mobile and other devices, and devices running the Facebook or Instagram applications.

13.     Defendants have been and are acting in concert, and are otherwise liable jointly, severally, or otherwise for relief related to or arising out of the same transaction, occurrence, or series of transactions or occurrences related to the making, using, selling, offering for sale, or otherwise distributing the facebook.com and instagram.com websites, the Facebook Live and Instagram Live services, the Facebook and Instagram applications for mobile and other devices, and devices running the Facebook or Instagram applications in this District.

14.     In addition, this action involves questions of law and fact that are common to all Defendants.  For example, Facebook and Instagram use at least some common servers and software to provide the infringing Facebook Live and Instagram Live services.  As another example, in 2014, Facebook migrated Instagram data from third party servers onto its own data centers.[1]  Accordingly, Facebook is acting in concert with Instagram in connection with the provision of their live messaging services.

## JURISDICTION AND VENUE

15.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.  This Court has subject matter jurisdiction over the matters asserted in this Complaint under 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. §§ 271 *et seq*.

16.     This Court has personal jurisdiction over Facebook in accordance with due process and/or the Texas Long Arm Statute because, in part, Facebook "recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state."  Tex. Civ. Prac. & Rem. Code § 17.042(3).

17.     This Court has personal jurisdiction over Facebook, in part because Facebook does continuous and systematic business in this District, including by providing infringing

---

[1]  Instagram Engineering, *Migrating from AWS to FB* (June 25, 2014), https://instagram-engineering.com/migrating-from-aws-to-fb-86b16f6766e2.

products and services to residents of this District that Facebook knew would be used within this District, and by soliciting business from residents of this District.

18.     For example, Facebook is subject to personal jurisdiction in this Court because, *inter alia*, it has a regular and established place of business at its offices in this District, including Facebook offices located in Austin, Texas, and elsewhere in Texas.[2]  The Facebook Austin location is its fourth-largest office, and Facebook employs more than 1,200 people in Austin.[3] The Travis County Appraisal District website indicates that Facebook owns property in this judicial district appraised at a total of $26,976,598 at the following addresses: 300 West 6th Street 1000, Austin, Texas 78701; 600 Congress Avenue 1700, Austin, Texas 78701; 221 West 6th Street 300, Austin, Texas 78701; 11601 Alterra Parkway 1000, Austin, Texas 78758; and 11801 Domain Drive Floor 2, Austin, Texas 78758.[4]

19.     Facebook's Austin offices are a regular and established places of business at least because these locations include many members of Facebook's important teams, including Software Engineering, Legal, Finance, Facilities & Admin, Enterprise Engineering, People & Recruiting, Design & User Experience, Infrastructure, Data & Analytics, Sales & Marketing,

---

[2]   The Facebook Austin office expanded to a large office building known as "Third + Shoal" and has multiple addresses listed, including 607 West 3rd Street, Austin, Texas 78701.  *See* Cindy Widner, *Facebook's New Austin Office Has 14 Art Installations and a Jam Room* (Sept. 11, 2019), https://austin.curbed.com/2019/9/4/20849712/facebook-new-office-austin-open. Facebook takes up "most of the space" in this 29-story building, an estimated 256,500 square feet of office space of the 345,000 square feet available.  *Id.*  Facebook maintains, or previously maintained, a number of additional offices in this judicial district, including at 300 West 6th Street, Austin, Texas 78701, 11601 Alterra Parkway, Austin, Texas 78758, and 13011 McCallen Pass, Building D, Austin, Texas 78753.

[3]   *Id.*

[4]   *Property Search Options*, Travis CAD, http://propaccess.traviscad.org/clientdb (search in search bar for "Facebook") (last visited Jan. 6, 2020).

WhatsApp, and Global Operations.[5]  Facebook is currently advertising approximately 110 jobs in Austin.[6]

20.    Based on publicly-available information, since 2012, Facebook has been the employer of approximately 125 recipients of H-1B visas who work and reside in Austin.[7]

21.    Facebook, directly and through agents, regularly conducts, solicits, and transacts business in this District and elsewhere in Texas, including through the facebook.com and instagram.com websites, the Facebook Live and Instagram Live services, the Facebook and Instagram applications for mobile and other devices, and devices running the Facebook or Instagram applications.

22.    In particular, Facebook has committed and continues to commit acts of infringement in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, and sold infringing products in Texas, including in this District, and engaged in infringing conduct within and directed at or from this District.  The infringing facebook.com and instagram.com websites, the Facebook Live and Instagram Live services, the Facebook and Instagram applications for mobile and other devices, and devices running the Facebook or Instagram applications have been and continue to be distributed to and used in this District.[8] Facebook's acts cause injury to Voxer, including injury suffered within this District.

---

5   *See Jobs in Austin, TX*, Facebook, https://www.facebook.com/careers/locations/austin (last visited January 6, 2020).

6   *Id.*

7   *Facebook*, H-1B Data, https://h1bdata.info/index.php?em=facebook&job=&city=austin&year=All+Years (last visited Jan. 6, 2020).

8   For example, the City of Austin hosted a "Facebook Live Panel Discussion" from Austin City Hall in April 2019.  Press Release, City of Austin, City of Austin to Host Facebook Live Panel Discussion on Venue Sustainability, (Apr. 25, 2019), http://austintexas.gov/news/city-austin-host-facebook-live-panel-discussion-venue-sustainability.

23.     This Court has personal jurisdiction over Instagram in accordance with due process and/or the Texas Long Arm Statute because, in part, Instagram "recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state."  Tex. Civ. Prac. & Rem. Code § 17.042(3).

24.     This Court has personal jurisdiction over Instagram, in part because Instagram does continuous and systematic business in this District, including by providing infringing products and services to the residents of this District that Instagram knew would be used within this District, and by soliciting business from the residents of this District.  For example, Instagram is subject to personal jurisdiction in this Court because, *inter alia*, Instagram directly and through agents regularly conducts, solicits, and transacts business in this District and elsewhere in Texas, including through the instagram.com website, the Instagram application, and devices running the Instagram application.

25.     In particular, Instagram has committed and continues to commit acts of infringement in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, and sold infringing products in Texas, including in this District, and engaged in infringing conduct within and directed at or from this District.  The infringing instagram.com website and Instagram application have been and continue to be distributed to and used in this District.  Instagram's acts cause injury to Voxer, including within this District.

26.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants have committed acts of infringement in this District and have a regular and established place of business in this District.

27.     In particular, Facebook has a regular and established place of business located at 607 West 3rd Street, Austin, Texas 78701.

28.     Instagram is a wholly owned subsidiary of Facebook.  Facebook does not separately report revenue from Instagram in its filings to the Securities Exchange Commission, but rather reports combined revenue from its various products including Facebook and Instagram.  Market analysis indicates that Facebook and Instagram and their respective products are viewed in the market as an integrated package with each of the products benefiting from substantial network effects.[9]

29.     On information and belief, Facebook not only "owns" but also "operates" Instagram, including the cooperative development, improvement, and support of Instagram's services.  Instagram's Data Policy describes "the information [Instagram] process[es] to support Facebook, Instagram, Messenger, and other products and features offered by Facebook."[10]  On further information and belief, Facebook and Instagram have endeavored to integrate their products from a technical standpoint, including, but not limited to:  linking Instagram and Facebook accounts;[11] allowing users to double-post Instagram stories directly to Facebook from the Instagram app;[12] offering a unified messages inbox that lets businesses see and reply to their

---

[9]   *See* Max A. Cherney, *The YouTube and Instagram Secret that Google and Facebook Don't Want You to Know* (Jan. 29, 2018), https://www.marketwatch.com/story/the-youtube-and-instagram-secret-that-google-and-facebook-dont-want-you-to-know-2018-01-26 ("For some analysts, the question of breaking out revenue for Instagram is moot, however, because the company essentially sells ads for Facebook and Instagram as a single package . . . .").

[10]   *See* Instagram, Data Policy (Apr. 19, 2018), https://help.instagram.com/155833707900388.

[11]   *See* Instagram, Linking Accounts, https://help.instagram.com/1094643983940381 (last visited Jan. 6, 2019).

[12]   *See* Josh Constine, *Instagram Stories Launches Cross-Posting to Facebook Stories*, TechCrunch (Oct. 4, 2017), https://techcrunch.com/2017/10/04/instaface.

Facebook, Messenger, and Instagram interactions in one place;[13] providing cross-application notifications for Facebook, Messenger, and Instagram;[14] and using at least some common servers and software to provide the infringing Facebook Live and Instagram Live services.

## FACTUAL BACKGROUND

## I.   VOXER'S ORIGINS AND EARLY TECHNOLOGICAL DEVELOPMENT

30.     Tom Katis is Voxer's co-founder and served as CEO until 2015.  He reenlisted in the United States Army after the attacks of September 11, 2001, and served as a Special Forces Communications Sergeant in a combat deployment to Afghanistan.  When his combat unit was ambushed in Kunar Province in 2003, Mr. Katis coordinated medevac, tactical reinforcements, and close air support under enemy fire.  He completed his mission but experienced the shortcomings of existing communications systems.  These systems could operate only in real-time or after complete message composition, and were ill-suited for time-sensitive communications with multiple groups in a highly disruptive environment.

31.     Mr. Katis and his team began developing communications solutions in 2006 to remedy these shortcomings.  The new technologies enabled transmission of voice and video communications with the immediacy of live communication and the reliability and convenience of messaging.  The technologies allowed transmission and reception under poor and varying network conditions and regardless of recipient availability.

---

[13]  *See* Jon Fingas, *Facebook and Instagram Are Finally Integrated, Sort of*, Engadget (Nov. 15, 2016), https://www.engadget.com/2016/11/15/facebook-and-instagram-unified-business-inbox.
[14]  *See* Gordon Gottsegen, *Facebook Puts Messenger, Instagram Notifications in One Place*, CNET (May 19, 2017), https://www.cnet.com/news/facebook-messenger-instagram-cross-notifications.

32.    Voxer launched the Voxer Walkie Talkie app in 2011, and it became an immediate success.  Users soon numbered over seventy million, and it was named Best Overall App in the First Annual Silicon Valley Business App Awards in 2013.[15]

## II.    VOXER'S PATENTS

33.    Voxer applied for and has been granted over 70 United States patents since the company's inception.

34.    U.S. Patent No. 8,180,030 (the "'030 patent") is entitled "Telecommunication and multimedia management method and apparatus" and issued on May 15, 2012.  A true and correct copy of the '030 patent is attached as Exhibit A to this Complaint.  Voxer IP LLC is the owner of all rights, title, and interest in and to the '030 patent, with the full and exclusive right to file suit to enforce the '030 patent, including the right to recover for past infringement.  The '030 patent is valid and enforceable under United States patent laws.

35.    The '030 patent claims are directed to a patent-eligible, non-abstract idea.  They address, among other things, a specific improvement to the way computers operate, including by progressively transmitting streaming media over a network as the streaming media is created and persistently stored, therefore enabling hybrid digital communications that can be both real-time and time-shifted; and by allowing a progressive media stream which can be sent synchronously while another stream is received.

36.    U.S. Patent No. 9,634,969 (the "'969 patent") is entitled "Real-time messaging method and apparatus" and issued on April 25, 2017.  A true and correct copy of the '969 patent is attached as Exhibit B to this Complaint.  Voxer IP LLC is the owner of all rights, title, and

---

[15]  Voxer, *Voxer Business Named Best Overall App in the First Annual Silicon Valley Business App Awards* (Nov. 18, 2013), https://www.voxer.com/blog/voxer-business-named-best-overall-app-in-the-first-annual-silicon-valley-business-app-awards/.

interest in and to the '969 patent, with the full and exclusive right to bring suit to enforce the '969 patent, including the right to recover for past infringement.  The '969 patent is valid and enforceable under United States patent laws.

37.     The '969 patent claims are directed to a patent-eligible, non-abstract idea.  They address, among other things, a specific improvement to the way computers operate, including by utilizing a late-binding communication system where a sender has the ability to transmit video media before or at the same time as an active delivery route over a communication network to the recipient is discovered; by enabling the progressive transmission of video media to the recipient without first requiring a synchronous connection over the network between the sender and recipient; and by progressively transmitting the video media over the network as hops along the delivery route to the recipient are discovered.

38.     U.S. Patent No. 10,109,028 (the "'028 patent") is entitled "Embeddable communications software module" and issued on October 23, 2018.  A true and correct copy of the '028 patent is attached as Exhibit C to this Complaint.  Voxer IP LLC is the owner of all rights, title, and interest in and to the '028 patent, with the full and exclusive right to bring suit to enforce the '028 patent, including the right to recover for past infringement.  The '028 patent is valid and enforceable under United States patent laws.

39.     The '028 patent claims are directed to a patent-eligible, non-abstract idea.  They address, among other things, a specific improvement to the way computers operate, including by utilizing an embeddable communications software module with an application programming interface that allows outgoing media to be progressively transmitted to an external communications device while the outgoing media is being created by the user; and by using a message behavior policy to control how the embeddable communications software module

responds to incoming messages or to control how to render incoming messages in a near real time mode or a time-shifted mode.

40.    U.S. Patent No. 10,142,270 (the "'270 patent") is entitled "Telecommunication and multimedia management method and apparatus" and issued on November 27, 2018.  A true and correct copy of the '270 patent is attached as Exhibit D to this Complaint.  Voxer IP LLC is the owner of all rights, title, and interest in and to the '270 patent, with the full and exclusive right to bring suit to enforce the '270 patent, including the right to recover for past infringement. The '270 patent is valid and enforceable under United States patent laws.

41.    The '270 patent claims are directed to a patent-eligible, non-abstract idea.  They address, among other things, a specific improvement to the way computers operate, including by progressively transmitting streaming media over a network as the streaming media is created and persistently stored, therefore enabling hybrid digital communications that can be both real-time and time-shifted; and by delivering video communication without first establishing an end-to-end connection over the network between the sender and receiver.

42.    U.S. Patent No. 10,511,557 (the "'557 patent") is entitled "Telecommunication and multimedia management method and apparatus" and issued on December 17, 2019.  A true and correct copy of the '557 patent is attached as Exhibit E to this Complaint.  Voxer IP LLC is the owner of all rights, title, and interest in and to the '557 patent, with the full and exclusive right to bring suit to enforce the '557 patent, including the right to recover for past infringement. The '557 patent is valid and enforceable under United States patent laws.

43.    The '557 patent claims are directed to a patent-eligible, non-abstract idea.  They address, among other things, a specific improvement to the way computers operate, including by progressively transmitting streaming media over a network as the streaming media is created and

persistently stored, therefore enabling hybrid digital communications that can be both real-time and time-shifted; by generating two or more degraded versions of a streaming video message and transmitting an appropriate degraded version to each recipient; and by trans-coding the video media of a video message.

44.     Voxer's Asserted Patents claim, among other things, a specific implementation of a solution to a problem in the software arts, including the deficiencies in earlier forms of communications.  For example, the patents identify numerous specific advantages that Voxer's claimed techniques provide compared to traditional forms of communication.  *See*, e.g., Ex. A, '030 patent at 6:10-7:10.  Further, the claimed technologies cannot be performed as mental steps by a human, nor do they represent the application of a generic computer to any well-known method of organizing human behavior.

45.     The Asserted Patents claim inventive concepts that are significantly more than any patent-ineligible, abstract idea.  In particular, the claimed technologies, including individual limitations as well as ordered combinations of limitations, were not well-understood, routine, or conventional, and cover multiple advantages, and combinations of advantages, that were not well-understood, routine, or conventional.  *See*, e.g., Ex. A, '030 patent at 3:66-4:26; 6:10-7:10; 9:7-20; 9:38-42; 10:24-37; 14:8-15:42; 17:3-18:20; 21:7-22:42; 22:44-23:58.

## III.   DEFENDANTS' USE OF VOXER'S PATENTS

46.     In early 2012, representatives from Facebook contacted Voxer to discuss potential collaboration.  The parties conducted a series of meetings during which various possibilities were considered, including a license to Voxer's patented technologies.  Voxer repeatedly disclosed the existence and nature of Voxer's patent portfolio in these meetings.  The discussions did not lead to any agreement between the parties.

47.     Facebook identified Voxer as a competitor at or around the time of these meetings.  In January 2013, Facebook revoked the Voxer app's access to key components of the Facebook platform, including removing access to the Find Friends feature that would allow users to connect with their existing Facebook friends.[16]  This measure curtailed user growth for Voxer's app.

48.     Facebook launched its Facebook Live product to select users in August 2015.  Over the following months, Facebook released Facebook Live to the general public, including to all U.S. iPhone users in January 2016.

49.     In early 2016, Voxer met with senior executives from Facebook and shortly after sent Facebook a Patent Overview and IP Statement.  The Patent Overview and IP Statement disclosed the existence and nature of Voxer's patent portfolio, and specifically referenced the patent families of all of the Asserted Patents.

50.     In late February 2016, Mr. Katis had a chance meeting with a senior product manager of Facebook Live.  Mr. Katis raised the issue of Facebook Live's infringement of Voxer's patents and encouraged the product manager to follow up with the senior executives Mr. Katis had recently met with.  Facebook declined to enter any agreement with Voxer regarding its continued use of Voxer's patented technologies, and Defendants launched the Instagram Live product in November 2016.

---

[16]  On September 13, 2019, the United States House of Representatives identified Facebook's exclusion of Voxer in its investigation of Facebook's anticompetitive activities.  *See* Letter from U.S. House of Representatives Committee on the Judiciary to Mark Zuckerberg, CEO, Facebook, Inc. (Sept. 13, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/Facebook%20R FI%20-%20Signed.pdf.

51.     Facebook has prioritized live video messaging since the launch of Facebook Live and Instagram Live, with one report identifying Facebook Live as Facebook's "top priority."[17] Facebook has noted that "on average people watch a live video more than three times longer when it is live compared to when it is not live."[18]  As of this date, there have been billions of Facebook Live and Instagram Live broadcasts.[19]

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 8,180,030

52.     Voxer incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

53.     Defendants have directly infringed, continue to infringe, and have induced or contributed to the infringement of at least claim 1 of the '030 patent by making, using, selling, and offering for sale, without authority or license, the facebook.com and instagram.com websites, the Facebook Live and Instagram Live services, the Facebook and Instagram applications for mobile and other devices, and devices running the Facebook or Instagram applications (collectively, "the '030 Accused Products") in violation of 35 U.S.C. § 271(a).  The '030 Accused Products are non-limiting examples that were identified based on publicly available information, and Voxer reserves the right to identify additional infringing activities, products, and services, including, for example, on the basis of information obtained during discovery.

---

[17]   Deepa Seetharaman, *Facebook, Rushing into Live Video, Wasn't Ready for Its Dark Side*, Wall St. J. (Mar. 6, 2017), https://www.wsj.com/articles/in-rush-to-live-video-facebook-moved-fast-and-broke-things-1488821247.
[18]   Vadim Lavrusik & Dave Capra, *Bringing Facebook Live to Android and More Countries* (Feb. 26, 2016), https://newsroom.fb.com/news/2016/02/bringing-facebook-live-to-android-and-more-countries.
[19]   99firms.com, *28 Facebook Live Stats to Know in 2019* (May 13, 2019), https://99firms.com/blog/facebook-live-stats/.

54.     Defendants also actively, knowingly, and intentionally induce infringement of one or more claims of the '030 patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, and offer to sell in the United States, the '030 Accused Products or products containing the infringing components of the '030 Accused Products.

55.     Defendants further contribute to the infringement of one or more claims of the '030 patent under 35 U.S.C. § 271(c) by offering to sell and selling a component of the '030 Accused Products, or a material or apparatus for use in practicing a process claimed in the '030 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '030 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

56.     By at least February 12, 2012, Voxer disclosed in meetings with Facebook the existence and nature of Voxer's patent portfolio.  By the end of February 2012, Facebook knew of the existence of the applications that led to the '030 patent.  Facebook communicated this knowledge to Instagram.  The '030 patent issued on May 15, 2012.

57.     In early 2016, Voxer met with senior executives from Facebook and shortly after sent Facebook a Patent Overview and IP Statement.  The Patent Overview disclosed the existence and nature of Voxer's patent portfolio, and specifically mentioned the family of patents that included the '030 patent.  The IP Statement also disclosed the existence and nature of Voxer's patent portfolio, and specifically mentioned the '030 patent by number.  Facebook communicated this knowledge to Instagram.  In late February 2016, Mr. Katis also directly raised the issue of Facebook Live's infringement of Voxer's patents with a senior representative of Facebook.

58.     Thus, at the times that Facebook Live launched (August 5, 2015) and Instagram Live launched (November 21, 2016), Defendants had knowledge of the '030 patent and that their activities infringed the '030 patent.  At the times that Facebook Live launched and Instagram Live launched, Defendants also knew or should have known that their users were infringing the '030 patent.

59.     Moreover, by at least January 7, 2020, Voxer disclosed, at least by filing this Complaint, the existence of the '030 patent and identified at least some of Defendants' and others' activities that infringe the '030 patent.  Thus, based on this disclosure, Defendants had knowledge of the '030 patent and that their activities infringe the '030 patent since at least January 7, 2020.  Based on Voxer's disclosures in this Complaint, Defendants have also known or should have known since at least January 7, 2020 that their users were infringing the '030 patent.

60.     The '030 Accused Products meet all the limitations of at least claim 1 of the '030 patent.  Specifically, claim 1 of the '030 patent recites: A computer readable application embedded in a non-transitory computer readable medium and intended to run on a communication device, the application comprising: a storage module configured to progressively and persistently store streaming media created using the communication device as the streaming media is created; a transmission module configured to progressively transmit the streaming media over a network as the streaming media is created and persistently stored; a network receive module cooperating with the storage module to progressively and persistently store streaming media received over the network from a remote communication device as the streaming media is received; and a rendering module configured to provide rendering options to selectively render the received streaming media, for the first time, in both a real-time mode as the

streaming media is received over the network and in a time-shifted mode by retrieving and rendering the retrieved streaming media from persistent storage.

61.     The '030 Accused Products are, or contain, a computer readable application embedded in a non-transitory computer readable medium and intended to run on a communication device.  For example, the Facebook and Instagram mobile applications are stored in flash memory on mobile communication devices.

62.     The '030 Accused Products include a storage module configured to progressively and persistently store streaming media created using the communication device as the streaming media is created.  For example, the Facebook and Instagram mobile applications contain software configured to progressively and persistently store video media created using a mobile communication device as Facebook Live or Instagram Live video media is created.

63.     The '030 Accused Products include a transmission module configured to progressively transmit the streaming media over a network as the streaming media is created and persistently stored.  For example, the Facebook and Instagram mobile applications contain software configured to transmit Facebook Live or Instagram Live streaming video media using the RTMP protocol as the video media is created.

64.     The '030 Accused Products include a network receive module cooperating with the storage module to progressively and persistently store streaming media received over the network from a remote communication device as the streaming media is received.  For example, the Facebook and Instagram mobile applications contain software configured to progressively and persistently store Facebook Live or Instagram Live video media received over the network in MPEG-DASH format from a remote communication device as the streaming video media is received.

65.     The '030 Accused Products include a rendering module configured to provide rendering options to selectively render the received streaming media, for the first time, in both a real-time mode as the streaming media is received over the network and in a time-shifted mode by retrieving and rendering the retrieved streaming media from persistent storage.  For example, the Facebook and Instagram mobile applications contain software configured to allow users to view Facebook Live or Instagram Live streaming video media in real-time as the streaming media is received over the network, or in a time-shifted mode by retrieving and rendering the retrieved streaming media from persistent storage.

66.     The foregoing allegations are based on publicly available information and a reasonable investigation of the structure and operation of the '030 Accused Products.  Voxer reserves the right to modify this description, including, for example, on the basis of information about the '030 Accused Products that it obtains during discovery.

67.     Defendants' infringement has damaged and continues to damage Voxer in an amount yet to be determined, of at least a reasonable royalty and the lost profits that Voxer would have made but for Defendants' acts of infringement.

68.     This is an exceptional case.  Voxer is entitled to attorneys' fees and costs under 35 U.S.C. § 285 as a result of the infringement of the '030 patent by Defendants.

### COUNT II: INFRINGEMENT OF U.S. PATENT NO. 9,634,969

69.     Voxer incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

70.     Defendants have directly infringed, continue to infringe, and have induced or contributed to the infringement of at least claim 1 of the '969 patent by making, using, selling, and offering for sale, without authority or license, the facebook.com and instagram.com websites, the Facebook Live and Instagram Live services, the Facebook and Instagram

applications for mobile and other devices, and devices running the Facebook or Instagram applications (collectively, "the '969 Accused Products") in violation of 35 U.S.C. § 271(a).  The '969 Accused Products are non-limiting examples that were identified based on publicly available information, and Voxer reserves the right to identify additional infringing activities, products, and services, including, for example, on the basis of information obtained during discovery.

71.    Defendants also actively, knowingly, and intentionally induce infringement of one or more claims of the '969 patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, and offer to sell in the United States, the '969 Accused Products or products containing the infringing components of the '969 Accused Products.

72.    Defendants further contribute to the infringement of one or more claims of the '969 patent under 35 U.S.C. § 271(c) by offering to sell and selling a component of the '969 Accused Products, or a material or apparatus for use in practicing a process claimed in the '969 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '969 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

73.    By at least February 12, 2012, Voxer disclosed in meetings with Facebook the existence and nature of Voxer's patent portfolio.  By the end of February 2012, Facebook knew of the existence of the applications that led to the '969 patent.  Facebook communicated this knowledge to Instagram.

74.    Additionally, in early 2016, Voxer met with senior executives from Facebook and shortly after sent Facebook a Patent Overview and IP Statement.  Both documents disclosed the existence and nature of Voxer's patent portfolio, and specifically mentioned the family of patents

that included the '969 patent.  Facebook communicated this knowledge to Instagram.  In late February 2016, Mr. Katis also directly raised the issue of Facebook Live's infringement of Voxer's patents with a senior representative of Facebook.

75.     Facebook Live launched on August 5, 2015.  Instagram Live launched on November 21, 2016.  The '969 patent issued on April 25, 2017.  At least since April 25, 2017, based on Defendants' previous knowledge of Voxer's patent portfolio and pending patent applications, Defendants had knowledge of the '969 patent and knowledge that their activities infringed the '969 patent.  Defendants also knew or should have known since at least April 25, 2017, that their users were infringing the '969 patent.

76.     Moreover, by at least January 7, 2020, Voxer disclosed, at least by filing this Complaint, the existence of the '969 patent and identified at least some of Defendants' and others' activities that infringe the '969 patent.  Thus, based on this disclosure, Defendants had knowledge of the '969 patent and that their activities infringe the '969 patent since at least January 7, 2020.  Based on Voxer's disclosures in this Complaint, Defendants have also known or should have known since at least January 7, 2020 that their users were infringing the '969 patent.

77.     The '969 Accused Products meet all the limitations of at least claim 1 of the '969 patent.  Specifically, claim 1 of the '969 patent recites: A method performed at a node on a network for progressively receiving, storing and forwarding a video message from a sender to a recipient over the network, comprising: receiving at the node an identifier contained in a message header of the video message, the identifier identifying a recipient of the video message; ascertaining an address for identifying a communication device associated with the recipient on the network from the identifier contained in the message header of the video message;

progressively receiving video media contained in a message body of the video message as the video media is created and progressively transmitted by the sender; progressively and persistently storing the video media contained in the message body as the video media is received at the node; and starting progressive transmission of the video media of the video message to the recipient as the video media is received and persistently stored, before the video media contained in the message body is complete, using a deliver route for delivering the video media over the network to the communication device associated with the recipient that is discovered using the ascertained address for the communication device.

78.    Defendants practice a method performed at a node on a network for progressively receiving, storing and forwarding a video message from a sender to a recipient over the network. For example, Defendants operate Facebook Live and Instagram Live services at server nodes on the Internet.  The Facebook Live and Instagram Live services progressively receive, store, and forward video messages from senders to recipients over the Internet.

79.    Defendants receive at the node an identifier contained in a message header of the video message, the identifier identifying a recipient of the video message.  For example, Facebook Live and Instagram Live video messages are configured with message headers that include identifiers identifying a recipient of the video message, such as Facebook or Instagram users or groups of users.

80.    Defendants ascertain an address for identifying a communication device associated with the recipient on the network from the identifier contained in the message header of the video message.  For example, Defendants ascertain an IP address that identifies a communication device associated with a recipient on the Internet from the identifier contained in the message header of the Facebook Live or Instagram Live video message.

22

81.     Defendants progressively receive video media contained in a message body of the video message as the video message is created and progressively transmitted by the sender.  For example, the Facebook Live and Instagram Live services progressively receive Facebook Live or Instagram Live video media using the RTMP protocol as the video message is created and progressively transmitted by the sender.

82.     Defendants progressively and persistently store the video media contained in the message body as the video media is received at the node.  For example, the Facebook Live and Instagram Live services progressively and persistently store the video media on Facebook and Instagram servers, as well as on content delivery network servers, as the video media is received by the Facebook Live or Instagram Live services.

83.     Defendants start progressive transmission of the video media of the video message to the recipient as the video media is received and persistently stored, before the video media contained in the message body is complete, using a delivery route for delivering the video media over the network to the communication device associated with the recipient that is discovered using the ascertained address for the communication device.  For example, the Facebook Live and Instagram Live services deliver Facebook Live and Instagram Live videos to recipients in real-time before the videos are complete, using a delivery route of sequential hops over hosts on the Internet to the communication device associated with the recipient, where the route is discovered using the IP address for the recipient communication device.

84.     The foregoing allegations are based on publicly available information and a reasonable investigation of the structure and operation of the '969 Accused Products.  Voxer reserves the right to modify this description, including, for example, on the basis of information about the '969 Accused Products that it obtains during discovery.

85.     Defendants' infringement has damaged and continues to damage Voxer in an amount yet to be determined, of at least a reasonable royalty and the lost profits that Voxer would have made but for Defendants' acts of infringement.

86.     This is an exceptional case.  Voxer is entitled to attorneys' fees and costs under 35 U.S.C. § 285 as a result of the infringement of the '969 patent by Defendants.

### COUNT III: INFRINGEMENT OF U.S. PATENT NO. 10,109,028

87.     Voxer incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

88.     Defendants have directly infringed, continue to infringe, and have induced or contributed to the infringement of at least claim 1 of the '028 patent by making, using, selling, and offering for sale, without authority or license, Live Video APIs or other streaming video software libraries used by the Facebook application, Instagram application, or third-party software applications; third-party software applications that employ Facebook or Instagram's Live Video APIs or other streaming video software libraries; devices running third-party software applications that employ Facebook or Instagram's Live Video APIs or other streaming video software libraries; the facebook.com and instagram.com websites; the Facebook Live and Instagram Live services; the Facebook and Instagram applications for mobile and other devices; and devices running the Facebook or Instagram applications (collectively, "the '028 Accused Products") in violation of 35 U.S.C. § 271(a).  The '028 Accused Products are non-limiting examples that were identified based on publicly available information, and Voxer reserves the right to identify additional infringing activities, products, and services, including, for example, on the basis of information obtained during discovery.

89.     Defendants also actively, knowingly, and intentionally induce infringement of one or more claims of the '028 patent under 35 U.S.C. § 271(b) by actively encouraging others to

make, use, sell, and offer to sell in the United States, the '028 Accused Products or products containing the infringing components of the '028 Accused Products.

90.    Defendants further contribute to the infringement of one or more claims of the '028 patent under 35 U.S.C. § 271(c) by offering to sell and selling a component of the '028 Accused Products, or a material or apparatus for use in practicing a process claimed in the '028 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '028 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

91.    In early 2016, Voxer met with senior executives from Facebook and shortly after sent Facebook a Patent Overview and IP Statement.  The Patent Overview disclosed the existence and nature of Voxer's patent portfolio, and specifically mentioned the family of patents that included the '028 patent ("P039: Voxer SDK").  The IP Statement also disclosed the existence and nature of Voxer's patent portfolio, and specifically mentioned U.S. Patent Application No. 14/597,153, which became the '028 patent.  Facebook communicated this knowledge to Instagram.  In late February 2016, Mr. Katis also directly raised the issue of Facebook Live's infringement of Voxer's patents with a senior representative of Facebook.

92.    Facebook Live launched on August 5, 2015.  Instagram Live launched on November 21, 2016.  The '028 patent issued on October 23, 2018.  At least since October 23, 2018, based on Defendants' previous knowledge of Voxer's patent portfolio and U.S. Patent Application No. 14/597,153, Defendants had knowledge of the '028 patent and knowledge that their activities infringed the '028 patent.  Defendants also knew or should have known since at least October 23, 2018 that their users were infringing the '028 patent.

93.     Moreover, by at least January 7, 2020, Voxer disclosed, at least by filing this Complaint, the existence of the '028 patent and identified at least some of Defendants' and others' activities that infringe the '028 patent.  Thus, based on this disclosure, Defendants had knowledge of the '028 patent and that their activities infringe the '028 patent since at least January 7, 2020.  Based on Voxer's disclosures in this Complaint, Defendants have also known or should have known since at least January 7, 2020 that their users are infringing the '028 patent.

94.     The '028 Accused Products meet all the limitations of at least claim 1 of the '028 patent.  Specifically, claim 1 of the '028 patent recites: An embeddable communications software module that allows a software application to access a communications system providing both time delayed and near real time communication, the embeddable communications software module stored in a non-transitory tangible computer readable storage medium, wherein the embeddable communications software module is arranged to: provide an application programming interface (API) that allows the embeddable communications software module to receive API inputs from the software application, the embeddable communication software module and the software application communicating through the API; receive an incoming message behavior policy from the software application, wherein the incoming message behavior policy controls how the embeddable communications software module responds to incoming messages; receive an incoming message from [a] remote communications device; progressively store the incoming message as it is received; in response to the received message, send a notification to the software application based on the incoming message behavior policy; selectively render the incoming message in a near real time mode, wherein the near real time mode involves progressively rendering the incoming message as it is received; selectively render

the incoming message in a time-shifted mode, wherein the time shifted mode involves rendering the incoming message after the incoming message has been received and stored; and determine whether to render the incoming message in the near real time mode or the time-shifted mode based at least in part on the incoming message behavior policy, wherein the software application is separate from the communication system that is accessed through the embeddable communications software module.

95.     The '028 Accused Products are, or contain, an embeddable communications software module that allows a software application to access a communications system providing both time delayed and near real time communication, the embeddable communications software module stored in a non-transitory tangible computer readable storage medium.  For example, the Live Video API or other streaming video software libraries provided by Facebook or Instagram may be stored in flash memory, and allow a software application, including the Facebook and Instagram mobile applications, as well as third-party software applications, to access the Facebook Live or Instagram Live communications systems, which provide both time delayed and near real time communication.

96.     The '028 Accused Products are, or contain, an embeddable communications software module arranged to provide an application programming interface (API) that allows the embeddable communications software module to receive API inputs from the software application, the embeddable communication software module and the software application communicating through the API.  For example, the Live Video API or other streaming video software libraries provided by Facebook or Instagram provide an API that allows them to receive API inputs from, and communicate through the API with, the Facebook and Instagram mobile applications, as well as third-party software applications.

97.     The '028 Accused Products are, or contain, an embeddable communications software module arranged to receive an incoming message behavior policy from the software application, wherein the incoming message behavior policy controls how the embeddable communications software module responds to incoming messages.  For example, the Live Video API or other streaming video software libraries provided by Facebook or Instagram receive an incoming message behavior policy from the Facebook and Instagram mobile applications, as well as third-party software applications.  The policy controls how the embeddable communications software module responds to incoming Facebook Live or Instagram live video messages.

98.     The '028 Accused Products are, or contain, an embeddable communications software module arranged to receive an incoming message from [a] remote communications device.  For example, the Live Video API or other streaming video software libraries provided by Facebook or Instagram receive incoming Facebook Live or Instagram Live video messages from remote communications devices used by other Facebook or Instagram users.

99.     The '028 Accused Products are, or contain, an embeddable communications software module arranged to progressively store the incoming message as it is received.  For example, the Live Video API or other streaming video software libraries provided by Facebook or Instagram progressively store incoming Facebook Live or Instagram Live video messages as they are received.

100.     The '028 Accused Products are, or contain, an embeddable communications software module arranged to, in response to the received message, send a notification to the software application based on the incoming message behavior policy.  For example, the Live Video API or other streaming video software libraries provided by Facebook or Instagram, in

response to a received Facebook Live or Instagram Live video message, send a notification to the Facebook or Instagram application, or a third-party software application, based on the incoming message behavior policy.

101.    The '028 Accused Products are, or contain, an embeddable communications software module arranged to selectively render the incoming message in a near real time mode, wherein the near real time mode involves progressively rendering the incoming message as it is received.  For example, the Live Video API or other streaming video software libraries provided by Facebook or Instagram selectively render an incoming Facebook Live or Instagram Live video message in a near real time mode, wherein the near real time mode involves progressively rendering the incoming Facebook Live or Instagram Live video message as it is received.

102.    The '028 Accused Products are, or contain, an embeddable communications software module arranged to selectively render the incoming message in a time-shifted mode, wherein the time shifted mode involves rendering the incoming message after the incoming message has been received and stored.  For example, the Live Video API or other streaming video software libraries provided by Facebook or Instagram selectively render an incoming Facebook Live or Instagram Live video message in a time-shifted mode, wherein the time shifted mode involves rendering the incoming Facebook Live or Instagram Live video message after it has been received and stored.

103.    The '028 Accused Products are, or contain, an embeddable communications software module arranged to determine whether to render the incoming message in the near real time mode or the time-shifted mode based at least in part on the incoming message behavior policy.  For example, the Live Video API or other streaming video software libraries provided by Facebook or Instagram determine whether to render an incoming Facebook Live or Instagram

Live video message in the near real time mode or the time-shifted mode based at least in part on the incoming message behavior policy.

104.     In the '028 Accused Products, the software application is separate from the communication system that is accessed through the embeddable communication software module.  For example, the Facebook mobile application, Instagram mobile application, or third-party software application that employs Facebook or Instagram's Live Video APIs or other streaming video software libraries is separate from the communication system that is accessed through the Live Video API or other streaming video software libraries provided by Facebook or Instagram.

105.     The foregoing allegations are based on publicly available information and a reasonable investigation of the structure and operation of the '028 Accused Products.  Voxer reserves the right to modify this description, including, for example, on the basis of information about the '028 Accused Products that it obtains during discovery.

106.     Defendants' infringement has damaged and continues to damage Voxer in an amount yet to be determined, of at least a reasonable royalty and the lost profits that Voxer would have made but for Defendants' acts of infringement.

107.     This is an exceptional case.  Voxer is entitled to attorneys' fees and costs under 35 U.S.C. § 285 as a result of the infringement of the '028 patent by Defendants.

**COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,142,270**

108.     Voxer incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

109.     Defendants have directly infringed, continue to infringe, and have induced or contributed to the infringement of at least claim 1 of the '270 patent by making, using, selling, and offering for sale, without authority or license, the facebook.com and instagram.com

websites, the Facebook Live and Instagram Live services, the Facebook and Instagram

applications for mobile and other devices, and devices running the Facebook or Instagram

applications (collectively, "the '270 Accused Products") in violation of 35 U.S.C. § 271(a).  The

'270 Accused Products are non-limiting examples that were identified based on publicly

available information, and Voxer reserves the right to identify additional infringing activities,

products, and services, including, for example, on the basis of information obtained during

discovery.

110.    Defendants also actively, knowingly, and intentionally induce infringement of one

or more claims of the '270 patent under 35 U.S.C. § 271(b) by actively encouraging others to

make, use, sell, and offer to sell in the United States, the '270 Accused Products or products

containing the infringing components of the '270 Accused Products.

111.    Defendants further contribute to the infringement of one or more claims of the

'270 patent under 35 U.S.C. § 271(c) by offering to sell and selling a component of the '270

Accused Products, or a material or apparatus for use in practicing a process claimed in the '270

patent, that constitutes a material part of the inventions, knowing the same to be especially made

or especially adapted for use in an infringement of the '270 patent, and is not a staple article or

commodity of commerce suitable for substantial noninfringing use.

112.    By at least February 12, 2012, Voxer disclosed in meetings with Facebook the

existence and nature of Voxer's patent portfolio.  By the end of February 2012, Facebook knew

of the existence of the applications that led to the '270 patent.  Facebook communicated this

knowledge to Instagram.

113.    Additionally, in early 2016, Voxer met with senior executives from Facebook and

shortly after sent Facebook a Patent Overview and IP Statement.  Both documents disclosed the

existence and nature of Voxer's patent portfolio, and specifically mentioned the family of patents that included the '270 patent.  Facebook communicated this knowledge to Instagram.  In late February 2016, Mr. Katis also directly raised the issue of Facebook Live's infringement of Voxer's patents with a senior representative of Facebook.

114.    Facebook Live launched on August 5, 2015.  Instagram Live launched on November 21, 2016.  The '270 patent issued on November 27, 2018.  At least since November 27, 2018, based on Defendants' previous knowledge of Voxer's patent portfolio and pending patent applications, Defendants had knowledge of the '270 patent and knowledge that their activities infringed the '270 patent.  Defendants also knew or should have known since at least November 27, 2018 that their users were infringing the '270 patent.

115.    Moreover, by at least January 7, 2020, Voxer disclosed, at least by filing this Complaint, the existence of the '270 patent and identified at least some of Defendants' and others' activities that infringe the '270 patent.  Thus, based on this disclosure, Defendants had knowledge of the '270 patent and that their activities infringe the '270 patent since at least January 7, 2020.  Based on Voxer's disclosures in this Complaint, Defendants have also known or should have known since at least January 7, 2020 that their users were infringing the '270 patent.

116.    The '270 Accused Products meet all the limitations of at least claim 1 of the '270 patent.  Specifically, claim 1 of the '270 patent recites: A video communication method performed over a network, comprising: receiving an identifier identifying a recipient of a video communication, the identifier received over the network from a sending communication device; using the identifier to ascertain a delivery location on the network for a second communication device associated with the recipient; receiving the video communication over the network from

the sending communication device; storing the video communication; and delivering portions of the video communication to the second communication device over the network using the delivery location, the delivery enabling the video communication to be at least partially rendered at the second communication device while the video communication is transmitted by the sending communication device, wherein the video communication is received from the sending communication device without first establishing an end-to-end connection over the network between the sending and second communication devices.

117.   Defendants practice a video communication method performed over a network. For example, Defendants operate Facebook Live and Instagram Live video communication services over the Internet.

118.   Defendants receive an identifier identifying a recipient of a video communication, the identifier received over the network from a sending communication device.  For example, Defendants' Facebook Live and Instagram Live services receive an identifier identifying a recipient of a Facebook Live or Instagram Live video communication, such as a Facebook or Instagram user or group of users, the identifier received over the Internet from a sending communication device, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application.

119.   Defendants use the identifier to ascertain a delivery location on the network for a second communication device associated with the recipient.  For example, defendants use the Facebook or Instagram user or group of users to ascertain an IP address delivery location on the Internet for a second communication device associated with the recipient, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application.

120.    Defendants receive the video communication over the network from the sending communication device.  For example, Defendants' Facebook Live and Instagram Live services receive a Facebook Live or Instagram Live video communication over the Internet using the RTMP protocol from a sending communication device, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application.

121.    Defendants store the video communication.  For example, the Facebook Live and Instagram Live services store the Facebook Live or Instagram Live video communication on Facebook and Instagram servers, as well as on content delivery network servers.

122.    Defendants progressively and persistently store the video media contained in the message body as the video media is received at the node.  For example, the Facebook Live and Instagram Live services progressively and persistently store the video media on Facebook and Instagram servers, as well as on content delivery network servers, as the video media is received by the Facebook Live or Instagram Live services.

123.    Defendants deliver portions of the video communication to the second communication device over the network using the delivery location, the delivery enabling the video communication to be at least partially rendered at the second communication device while the video communication is transmitted by the sending communication device.  For example, the Facebook Live and Instagram Live services deliver portions of the Facebook Live or Instagram Live video communication to the second communication device, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application, over the Internet via the MPEG-DASH protocol using the IP address delivery location, the delivery enabling the Facebook Live or Instagram Live video communication to be at least partially rendered at the second communication device while the video communication is transmitted by

the sending communication device, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application.

124.    Defendants receive the video communication from the sending communication device without first establishing an end-to-end connection over the network between the sending and second communication devices.  For example, the Facebook Live and Instagram Live services receive the Facebook Live or Instagram live video communication via the RTMP protocol from the sending communication device, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application, without first establishing an end-to-end connection over the Internet between the sending and second communication devices.

125.    The foregoing allegations are based on publicly available information and a reasonable investigation of the structure and operation of the '270 Accused Products.  Voxer reserves the right to modify this description, including, for example, on the basis of information about the '270 Accused Products that it obtains during discovery.

126.    Defendants' infringement has damaged and continues to damage Voxer in an amount yet to be determined, of at least a reasonable royalty and the lost profits that Voxer would have made but for Defendants' acts of infringement.

127.    This is an exceptional case.  Voxer is entitled to attorneys' fees and costs under 35 U.S.C. § 285 as a result of the infringement of the '270 patent by Defendants.

**COUNT V: INFRINGEMENT OF U.S. PATENT NO. 10,511,557**

128.    Voxer incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

129.    Defendants have directly infringed, continue to infringe, and have induced or contributed to the infringement of at least claim 1 of the '557 patent by making, using, selling,

and offering for sale, without authority or license, the facebook.com and instagram.com websites, the Facebook Live and Instagram Live services, the Facebook and Instagram applications for mobile and other devices, and devices running the Facebook or Instagram applications (collectively, "the '557 Accused Products") in violation of 35 U.S.C. § 271(a).  The '557 Accused Products are non-limiting examples that were identified based on publicly available information, and Voxer reserves the right to identify additional infringing activities, products, and services, including, for example, on the basis of information obtained during discovery.

130.    Defendants also actively, knowingly, and intentionally induce infringement of one or more claims of the '557 patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, and offer to sell in the United States, the '557 Accused Products or products containing the infringing components of the '557 Accused Products.

131.    Defendants further contribute to the infringement of one or more claims of the '557 patent under 35 U.S.C. § 271(c) by offering to sell and selling a component of the '557 Accused Products, or a material or apparatus for use in practicing a process claimed in the '557 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '557 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

132.    By at least February 12, 2012, Voxer disclosed in meetings with Facebook the existence and nature of Voxer's patent portfolio.  By the end of February 2012, Facebook knew of the existence of the applications that led to the '557 patent.  Facebook communicated this knowledge to Instagram.

133.    Additionally, in early 2016, Voxer met with senior executives from Facebook and shortly after sent Facebook a Patent Overview and IP Statement.  Both documents disclosed the existence and nature of Voxer's patent portfolio, and specifically mentioned the family of patents that included the '557 patent.  Facebook communicated this knowledge to Instagram.  In late February 2016, Mr. Katis also directly raised the issue of Facebook Live's infringement of Voxer's patents with a senior representative of Facebook.

134.    Facebook Live launched on August 5, 2015.  Instagram Live launched on November 21, 2016.  The '557 patent issued on December 17, 2019.  At least since December 17, 2019, based on Defendants' previous knowledge of Voxer's patent portfolio and pending patent applications, Defendants had knowledge of the '557 patent and knowledge that their activities infringed the '557 patent.  Defendants also knew or should have known since at least December 17, 2019 that their users were infringing the '557 patent.

135.    Moreover, by at least January 7, 2020, Voxer disclosed, at least by filing this Complaint, the existence of the '557 patent and identified at least some of Defendants' and others' activities that infringe the '557 patent.  Thus, based on this disclosure, Defendants had knowledge of the '557 patent and that their activities infringe the '557 patent since at least January 7, 2020.  Based on Voxer's disclosures in this Complaint, Defendants have also known or should have known since at least January 7, 2020 that their users were infringing the '557 patent.

136.    The '557 Accused Products meet all the limitations of at least claim 1 of the '557 patent.  Specifically, claim 1 of the '557 patent recites: A method for operating a video message service infrastructure on a network, the method comprising: receiving, at the video message service infrastructure, a video message transmitted by a sending device, the video message

containing video media, the video media being transmitted as the video media is created; generating, by the video message service infrastructure, two or more degraded versions of the video media of the video message, where each of the two or more degraded versions is created by degrading the quality of the video media by a different amount; selecting one of the degraded versions of the video media based on an ascertained bandwidth on the network for delivering the video media from the video message service infrastructure to a recipient device on the network; and transmitting the selected degraded version of the video media from the video message service infrastructure to the recipient device so that the recipient device can render at least a portion of the video media on the recipient device, the video message service infrastructure operating so that the rendering occurs: (i) while the video media of the video message is being created and transmitted over the network by the sending device; and (ii) without having to first establish an end-to-end connection over the network between the sending device and the recipient device before the sending device begins to transmit the video media of the video message.

137.    Defendants practice a method for operating a video message service infrastructure on a network.  For example, Defendants operate Facebook Live and Instagram Live video message services over the Internet.

138.    Defendants receive, at the video message service infrastructure, a video message transmitted by a sending device, the video message containing video media, the video media being transmitted as the video media is created.  For example, Defendants' Facebook Live and Instagram Live services receive a Facebook Live or Instagram Live video message transmitted by a sending device, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application, over the Internet using the RTMP protocol, the video

message containing video media, the video media being transmitted as the video media is created.

139.   Defendants generate, by the video message service infrastructure, two or more degraded versions of the video media of the video message, where each of the two or more degraded versions is created by degrading the quality of the video media by a different amount. For example, Defendants' Facebook Live and Instagram Live services generate multiple different degraded bit rate versions of individual segments of Facebook Live and Instagram Live videos.

140.   Defendants select one of the degraded versions of the video media based on an ascertained bandwidth on the network for delivering the video media from the video message service infrastructure to a recipient device on the network.  For example Defendants' Facebook Live and Instagram Live services select a particular degraded bit rate version of a segment of a Facebook Live or Instagram Live video for delivering the video to a recipient device, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application, over the Internet using the MPEG-DASH protocol.

141.   Defendants transmit the selected degraded version of the video media from the video message service infrastructure to the recipient device so that the recipient device can render at least a portion of the video media on the recipient device.  For example, Defendants' Facebook Live and Instagram Live services transmit a particular degraded bit rate version of a segment of a Facebook Live or Instagram Live video to a recipient device, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application, over the Internet using the MPEG-DASH protocol, so that the recipient device can render the segment on the device.

142.    Defendants operate a video message service infrastructure so that the rendering occurs while the video media is being created and transmitted over the network by the sending device.  For example, a recipient can render Facebook Live and Instagram Live videos in a real-time mode while the videos are being created and transmitted over the Internet by the sending device, such as a computer running a web browser, or a mobile device running the Facebook or Instagram mobile application.

143.    Defendants operate a video message service infrastructure so that the rendering occurs without having to first establish an end-to-end connection over the network between the sending device and the recipient device before the sending device begins to transmit the video media of the video message.  For example, no end-to-end connection is ever made over the Internet between the sender of a Facebook Live or Instagram Live video and any recipient.

144.    The foregoing allegations are based on publicly available information and a reasonable investigation of the structure and operation of the '557 Accused Products.  Voxer reserves the right to modify this description, including, for example, on the basis of information about the '557 Accused Products that it obtains during discovery.

145.    Defendants' infringement has damaged and continues to damage Voxer in an amount yet to be determined, of at least a reasonable royalty and the lost profits that Voxer would have made but for Defendants' acts of infringement.

146.    This is an exceptional case.  Voxer is entitled to attorneys' fees and costs under 35 U.S.C. § 285 as a result of the infringement of the '557 patent by Defendants.

**REQUEST FOR A JURY TRIAL**

147.    Voxer requests a jury trial of all issues in this action so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Voxer respectfully requests:

A.      That Judgment be entered that Defendants have infringed one or more claims of the Asserted Patents, directly and indirectly, literally and under the doctrine of equivalents;

B.      That, in accordance with 35 U.S.C. § 283, Defendants and all its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in active concert or participation with any of them, be preliminarily and permanently enjoined from (1) infringing the Asserted Patents and (2) making, using, selling, and offering for sale the facebook.com and instagram.com websites, the Facebook Live and Instagram Live services, the Facebook and Instagram applications for mobile and other devices, and devices running the Facebook or Instagram applications;

C.      An award of damages sufficient to compensate Voxer for Defendants' infringement under 35 U.S.C. § 284, including an enhancement of damages on account of Defendants' egregious willful infringement;

D.      That the case be found exceptional under 35 U.S.C. § 285 and that Voxer be awarded its reasonable attorneys' fees;

E.      Costs and expenses in this action;

F.      An award of prejudgment and post-judgment interest; and

G.      Such other and further relief as the Court may deem just and proper.

Dated:  January 7, 2020                Respectfully submitted,


By:  /s/ Kate Kaufmann Shih
Kate Kaufmann Shih
State Bar No. 24066065
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
711 Louisiana St., Suite 500
Houston, Texas 77002
Telephone:  (713) 221-7000
Fax:  (713) 221-7100
kateshih@quinnemanuel.com

Kevin P.B. Johnson (Admission Pending)
Robert W. Stone (Admission Pending)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:  (650) 801-5000
Fax:  (650) 801-5100
kevinjohnson@quinnemanuel.com

Sam Stake (Admission Pending)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:  (415) 875-6600
Fax:  (415) 875-6700
jordanjaffe@quinnemanuel.com
samstake@quinnemanuel.com

*Attorneys for Plaintiffs Voxer, Inc. and Voxer*
*    IP LLC*