## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

Voxer, Inc. and Voxer IP LLC,

        Plaintiffs,

v.

Facebook, Inc. and Instagram LLC,

        Defendants.

Civil Action No. 1:20-cv-00655-ADA

Jury Trial Demanded

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS UNDER FED. R. CIV. P. 12(c)

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION.................................................................................................1

II.    FACTUAL BACKGROUND ...............................................................................2

III.   LEGAL STANDARD ..........................................................................................4

IV.    FACEBOOK'S MOTION FOR JUDGMENT SHOULD BE DENIED ..........................5

       A.    The '270 Patent Is Directed to Patent Eligible Subject Matter .............................5

             1.    Facebook's *Alice* Step One Analysis Grossly Oversimplifies the
                   Asserted Independent Claims .................................................................5

             2.    Facebook's *Alice* Step Two Analysis Ignores Factual Disputes ..............10

             3.    Facebook Fails to Separately Analyze the Dependent Claims .................13

       B.    The '030 Patent Is Directed to Patent Eligible Subject Matter ............................14

             1.    Facebook's *Alice* Step One Analysis Oversimplifies the Asserted
                   Independent Claims ..............................................................................14

             2.    Facebook's *Alice* Step Two Analysis Ignores Factual Disputes ..............17

             3.    Facebook Fails to Separately Analyze the Dependent Claims .................18

V.     CONCLUSION...................................................................................................20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*3G Licensing, S.A. v. HTC Corp.*,
2019 WL 2904670 (D. Del. July 5, 2019) ............................................................ 7

*A Pty Ltd. v. eBay, Inc.*,
149 F. Supp. 3d 739 (W.D. Tex. 2016) ............................................................ 10

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018) ............................................................ 2

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016) ............................................................ 10

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ............................................................ 4, 10, 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................ 4

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ............................................................ 11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................ 4

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ............................................................ 5, 10

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) ............................................................ 4

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ............................................................ 15

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ............................................................ 5, 15, 16

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ............................................................ 9

*Guidry v. Am. Pub. Life Ins. Co.*,
512 F.3d 177 (5th Cir. 2007) ............................................................ 4

*In re TLI Comm'cns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016) ............................................................ 16

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ............................................................ 10

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................ 4

*Slyce Acquisition Inc. v. Syte-Visual Conception Ltd.*,
   2020 WL 278481 (W.D. Tex. Jan. 10, 2020) ............................................................ 2, 4, 9, 11

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017) ...................................................................................10

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
   957 F.3d 1303 (Fed. Cir. 2020) ................................................................................5, 6

**Statutes**

35 U.S.C. § 101 ............................................................................................................... 4

**Rules**

Fed. R. Civ. P. 12(d) ...................................................................................................... 2

## I.      INTRODUCTION

Facebook's 12(c) motion (Dkt. 85, "Mot.") should be denied because its section 101 analysis of Voxer's '270 and '030 patents suffers two fundamental flaws: it grossly oversimplifies the asserted claims for purposes of *Alice* Step One; and it ignores factual disputes under *Alice* Step Two.   Moreover, as this Court has previously noted, resolving a patent's eligibility is rarely appropriate based solely on the pleadings.   Accordingly, because the obstacles to Facebook's motion are insurmountable, its motion should be denied.

The asserted claims of the '270 and '030 patents are directed to improvements to communication systems and computer functionality rather than any abstract ideas.  For example, Voxer's inventive architecture breaks up audio and video communications into discrete portions that can be transmitted regardless of recipient availability and rendered at recipient devices in real-time and time-shifted modes.  In its Step One analysis, however, Facebook oversimplifies the '270 patent as being akin to routing historic hard copy mailroom "messages," while, in reality, Voxer's claimed server architecture overcomes the technical challenges inherent in transmitting ***real-time*** video communication "without having to first establish an end-to-end connection."   Similarly, Facebook oversimplifies the '030 patent by comparing it to older technologies like TV and VCR, while ignoring that Voxer's claimed "progressive and persistent" storage architecture permits streaming media to be rendered in both real-time and time-shifted modes.  These technologies improve performance and enable capabilities not present in existing communication systems.

Notwithstanding its conclusory assertions and attorney arguments, Facebook also cannot prevail at *Alice* Step Two because the asserted claims recite both individual limitations and combinations of limitations that are more than well-known, routine, and conventional activities.[1]

---

[1]   And to the extent there is any doubt, Voxer submits the declaration of Dr. Michael Mitzenmacher with this brief, which confirms the innovative and unconventional nature of the

Furthermore, nothing within the scope of the pleadings suggests otherwise. Thus, because Facebook has not come close to meeting its clear and convincing evidence burden on the applicable questions of fact, its Motion should be denied.

## II.    FACTUAL BACKGROUND

Voxer's complaint alleges Facebook infringes U.S. Patent Nos. 8,180,030 (the "'030 patent"); 9,634,969; 10,109,028; 10,142,270 (the "'270 patent"); and 10,511,557.   Dkt. 1 ("Compl.") ¶ 7.   All six patents are directed to solving "deficiencies in earlier forms of communication" that Voxer's co-founder and first named inventor, Tom Katis, experienced first-hand as a Special Forces Communications Sergeant in Afghanistan, where he "coordinated medevac, tactical reinforcements, and close air support under enemy fire." *Id.* ¶¶ 30, 44.   As part of his tour of duty, Mr. Katis observed that "existing communications systems" "could operate only in real-time or after complet[ion]," but "were ill-suited for time-sensitive communications with multiple groups in a highly disruptive environment." *Id.* ¶ 30.

The patents challenged by Facebook—the '270 and '030 patents—share a common specification and are both directed to overcoming these shortcomings in existing communication systems.   The patents explain that "[t]he current state of voice communications suffers from inertia" in that it requires either "wait[ing] for a connection to be made, and then engag[ing] in a

---

asserted claims. *Slyce Acquisition Inc. v. Syte-Visual Conception Ltd.*, 2020 WL 278481, at *4 (W.D. Tex. Jan. 10, 2020) (explaining that obstacles to proving Section 101 at the pleading stage "may be insurmountable, *e.g.*, if the patentee simply included a declaration from . . . [an] expert explaining how the asserted claims are more than well-understood, routine, [and] conventional activities previously known to the industry"). The Court may consider Dr. Mitzenmacher's declaration under Fed. R. Civ. P. 12(d) by treating Facebook's request to resolve disputed factual issues "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). To the extent the Court is inclined to grant Facebook's motion without considering Dr. Mitzenmacher's declaration, Voxer requests leave to amend its complaint to incorporate facts set forth in that declaration. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126 (Fed. Cir. 2018) ("The subsequent refusal to permit an amended complaint was erroneous because at that stage there certainly were allegations of fact that . . . would preclude the dismissal.").

full-duplex, synchronous conversation" or separate and burdensome "voice mail systems." '030 patent at 1:30-55; *see also id.* at 1:60-62 ("Current telephone systems are based on relatively simplistic usage patterns: real-time live calls or disjointed voice mail messages, which are typically deleted as they are heard."). This defect is present not just in traditional telephone technology but has persisted "[i]n spite of automated switching, high bandwidth networks and technologies such as satellites, fiber optics, Voice over IP (VoIP), wireless and cellular networks." *Id.* at 1:31-34.

The '270 and '030 patents bridge these technical gaps between synchronous conversations and asynchronous messaging. Voxer's technical insights include treating communications as inherently asynchronous but capable of being rendered to provide a synchronous experience. *Id.* at 4:27-32. Instead of using separate communication technologies for real-time conversations and time-shifted messages, in the asserted patents each "conversation consists of a series of discrete recorded messages"—also called "Vox packets"—that "are recorded in a number of locations," including at the sender, intermediate server(s), and receiver. *Id.* at 4:27-32, 9:15-18.

Voxer's inventive architecture enables a host of improvements to existing communication systems. *Id.* at 6:10-7:11. The '270 and '030 patents claim some of these improvements. Thus, the '270 patent claims[2] improve existing communication systems by "delivering video communication without first establishing an end-to-end connection over the network between the sender and receiver." Compl. ¶ 41; *see also* '270 patent at 6:41-48 ("enabling users to participate in conversations without waiting for a connection to be established with another participant or the network" and "even when there is no network available, when the network is of poor quality, or other participants are unavailable"). And the '030 patent claims[3] improve existing communication

---

[2]  Independent claims 34 and 55 and dependent claims 36-38, 40-41, 43-44, 47-49, 51.

[3]  Independent claims 1 and 33 and dependent claims 4, 13, 16, 36, 38, 44, 47-48.

systems by "enabling hybrid digital communications that can be both real-time and time-shifted" and "allowing a progressive media stream which can be sent synchronously while another stream is received." Compl. ¶ 35; *see also* '030 patent at 6:17-22 ("enabling users to review the messages of conversations in either a live mode or time-shifted mode" and "to seamlessly transition a conversation between a synchronous 'live' mode and a time shifted mode'").

## III.   LEGAL STANDARD

The standard for a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss. *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A plaintiff need plead only enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). The Court must accept the complaint's factual allegations as true and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

Moreover, "[p]atents . . . are presumptively valid," and this "presumption of validity extends to patent eligible subject-matter." *Slyce*, 2020 WL 278481, at *4 (citing *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1329 (Fed. Cir. 2019)). As this Court previously explained, when mounting a section 101 challenge at the pleading stage, "the movant needs to overcome both a factual deck stacked against it <u>and</u> a heightened burden of proof" and "[i]n some cases, these dual obstacles may be insurmountable." *Slyce*, 2020 WL 278481, at *4 (emphasis in original). As discussed below, this is one such case.

Patent eligibility under 35 U.S.C. § 101 is governed by the two-step framework set forth by the Supreme Court in *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014). Under *Alice* Step One, a court must decide "whether the focus of the claims is on the specific asserted improvement in computer capabilities"—rendering them patent eligible—"or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft*

4

*Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016); *see also id.* at 1336 (finding claims patent eligible where "the plain focus of the claims is on an improvement to computer functionality itself"). *Alice* Step Two is "a question of fact": claims are patent eligible if any "claim element or combination of claim elements" requires "more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367-68 (Fed. Cir. 2018) (internal quotation marks omitted). And "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." *Id.* at 1369; *see also id.* ("The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.").

## IV.   FACEBOOK'S MOTION FOR JUDGMENT SHOULD BE DENIED

The '270 and '030 patents are directed to improvements to existing communication systems—improving how computers communicate real-time video or other media—and achieve those improvements using innovative technical solutions. Under Federal Circuit precedent, claims, like those asserted here, that improve "the functionality of [a] communication system" are patent eligible. *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020).

### A.    The '270 Patent Is Directed to Patent Eligible Subject Matter

#### 1.    Facebook's *Alice* Step One Analysis Grossly Oversimplifies the Asserted Independent Claims

The asserted independent claims of the '270 patent (claims 34 and 55) are directed to improved communication systems for transmitting real-time video—*i.e.*, video that is rendered even "while the video communication is transmitted by the sending communication device." '270 patent at 44:32-48. The claims are written from the perspective of an intermediate server that communicates with both "a sending communication device" transmitting the real-time video and "a second communication device" receiving and rendering that real-time video. *Id.* at 47:23-47,

50:3-36.  This intermediate server begins "receiving" the real-time video "independently of the location for the second communication device being ascertained,"[4] "stor[es] the video communication" at that server, and then "deliver[es] portions of the video communication to the second communication device." *Id*. at 47:32-42.  Significantly, by having an intermediate server between the sender and receiver, the claimed method allows the "sending communication device" to begin transmitting real-time "video communication" even "without having to first establish an end-to-end connection." *Id*. at 47:43-47.

The '270 patent thus claims a hybrid real-time/time-shifted communication system that allows real-time video to be transmitted **before** there is an end-to-end connection from the sender to the receiver.  The challenged claims improve upon existing communication systems, including both traditional telephones and VoIP, which required a user to "wait for a connection to be made" before "engag[ing] in a full-duplex, synchronous conversation with the dialed party." *Id*. at 1:37-44 (explaining this deficiency persisted "[i]n spite of automated switching, high bandwidth networks and technologies such as satellites, fiber optics, Voice over IP (VoIP), [and] wireless and cellular networks"); *see also id*. at 1:56-59 (describing "current voice mail systems" where "a connection must be made between the caller and the voice mail system **before** a message can be left") (emphasis added); *id*. at 2:45-46 ("If there is no radio connection between the two parties, there can be no communication.").  Thus, the claims improve the capabilities of the communication system itself, rendering the claims patent eligible under *Alice* Step One.

The Federal Circuit's analysis in *Uniloc USA* is on point.  There, the claim recited just two steps: "broadcasting a series of inquiry messages" and "adding to each inquiry message . . . an

---

[4]  This quote is from claim 34, but claim 55 similarly requires "ascertaining of the one or more locations occurring while the receiving and storing of the video communication is occurring." *Id*. at 50:19-25.

additional data field for polling at least one secondary station." 957 F.3d at 1305-06. The Federal Circuit concluded that the claim "changes the normal operation of the communication system itself" and was "directed to a specific asserted improvement to the functionality of the communication system itself." *Id.* at 1308-09. The same reasoning applies here.

In response, Facebook re-writes and grossly oversimplifies the asserted claims to conceal the technological improvements they embody. According to Facebook, "[t]he '270 patent . . . is directed to the abstract idea of routing messages to recipients identified by the sender without first requiring a direct connection between the sender and recipient." Mot. at 1. But Facebook's characterization ignores that the '270 patent claims are not directed to generic "messages" and instead require transmitting real-time "video communication." *See, e.g.*, '270 patent at 47:23. This is significant because transmitting non-real-time messages—*e.g.*, traditional e-mails—before establishing a connection to a destination is trivial, as there are no practical latency limitations. Mitzenmacher Decl. ¶ 14. The same is not true for the claims of the '270 patent, where "the delivery enabl[es] the video communication to be at least partially rendered at the second communication device *while the video communication is transmitted by the sending communication device*." '270 patent at 47:37-42 (emphasis added). Facebook's failure to correctly characterize the asserted claims of the '270 patent and their focus, as required under *Alice* Step One, is alone sufficient basis to deny Facebook's motion. *See 3G Licensing, S.A. v. HTC Corp.*, 2019 WL 2904670, at *2 (D. Del. July 5, 2019) ("While it may be possible that claim 1 could be accurately characterized as directed to some abstract idea, all I need to decide today is that the claim is not directed to the abstract idea articulated by defendant.").

*But even if* Facebook's characterization of the focus of the '270 patent were correct and the claims were directed to "routing messages to recipients identified by the sender without first

requiring a direct connection between the sender and recipient" (Mot. at 1), this concept is not an abstract idea. "[W]ithout first requiring a direct connection" is a technical concept—Facebook does not contend that network connections were a "fundamental economic practice" or "performed by a human" (Mot. at 6)—and not an abstract idea. Mitzenmacher Decl. ¶¶ 12-14. For example, the '270 patent describes how existing communication systems, including traditional telephones, VoIP, and radio communication, all required that a connection be made before any communication can take place. '270 patent at 1:37-46, 1:63-67, 2:45-46. These are all patent eligible communication technologies in their own right and not abstract ideas. Indeed, during claim construction, Facebook described "end-to-end connection" as a "technical term" (Dkt. 63 at 17-18) and Facebook's expert, Dr. Jeffay, looked to "technical dictionaries" and "a bedrock principle of modern computer networking" when construing for this term (Dkt. 60-16 ¶¶ 33-34). Accordingly, regardless of whether the "technical term" is phrased as an "end-to-end connection" or a "direct connection," enabling transmission of messages without first requiring such a connection is a technical concept and not an abstract idea.

Facebook's attempt to analogize the claims to "the long-standing practice of using a corporate mailroom" only further demonstrates that the '270 patent does not claim a patent ineligible abstract idea. Mot. at 6. According to Facebook, "[l]ong before the Internet age, office workers sent interoffice communications using 'identifiers' (such as a name or initials) specifying the intended recipient" and "[t]he corporate mailroom would then map the 'identifier' to a 'location' associated with the recipient (such as an office or inbox) and then 'deliver' the communication 'using the location.'" *Id*. This analogy is deeply flawed because Facebook's "interoffice communication[]," unlike the claimed "video communication" is not real-time: the sender writes the complete letter, that completed letter is received by the mailroom, and only then

is the mailroom tasked with ascertaining the correct destination and delivering the letter. As this Court has previously found, analogies such as the one advanced by Facebook "are often unhelpful because they abstract away important technical details that could impact the court's eligibility decision and/or are contrived, reverse-engineered analogies rather than actual 'certain methods of organizing human activity.'" *See Slyce*, 2020 WL 278481, at *7 (internal citation omitted). Here, Facebook's strained, litigation-driven analogy demonstrates the weakness of their position.[5]

Facebook also attempts to justify ignoring the "without . . . connection" limitation by arguing "the claims . . . use purely functional language to describe a desired outcome." Mot. at 8-9; *see also id.* at 6 ("The claims describe no structure for performing these functions . . . ."). This is false. For example, as discussed above, the asserted claims of the '270 patent require an intermediate server acting as a buffer between the sender and receiver, which allows the "sending communication device" to begin transmitting real-time "video communication" even "without having to first establish an end-to-end connection." '270 patent at 47:37-47. Far from just a "desired outcome," the "without . . . connection" limitation is an integral part of the claimed solution, which includes not just an outcome, but also how that outcome is achieved. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) (rejecting argument that claims are "abstract because they do not sufficiently describe how to implement that idea" because the claims "recite specific steps . . . that accomplish the desired result"). Indeed, Facebook cannot erase claim limitations that it finds unhelpful by labelling them "functional language" or "a desired

---

[5] Although it still does not capture the full breadth of the invention, a more apt analogy for the '270 patent claims might be a corporate mailroom receiving the sender's letter and delivering the same **while the sender is still writing that letter in real time**. *See, e.g.*, '270 patent, claim 34 ("the delivery enabling the video communication to be at least partially rendered at the second communication device **while the video communication is transmitted**.") (emphasis added). Of course, no such mailroom has ever existed.

outcome." *See* Mot. at 8. The asserted claims of the '270 patent must be considered as a whole.

The cases relied upon by Facebook do not compel a different conclusion. In *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, the Federal Circuit found it significant that "[t]he patent . . . does not disclose any particular mechanism for wirelessly streaming content to a handheld device." 838 F.3d 1266, 1269 (Fed. Cir. 2016). By contrast, the '270 patent claims require more than transmitting real-time "video communication," and specify how that transmission is accomplished—*i.e.*, via an intermediate server "without having to first establish an end-to-end connection." '270 patent at 47:24-47, 50:3-36. Similarly, *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017) is inapposite because there the claims were directed to "routing" or "forwarding" "streams of audio and/or visual information," but included *no* details as to how that "routing" or "forwarding" was implemented. *Id.* at 1334-35, 37.[6]

Accordingly, the '270 patent claims are patent eligible because they are directed to an improvement to existing communication systems. And even if Facebook's characterization of the "focus" of the challenged claims were accurate (it is not), that alleged focus is not an abstract idea.

## 2.    Facebook's *Alice* Step Two Analysis Ignores Factual Disputes

Facebook's challenge to the '270 patent under *Alice* Step Two requires resolving questions of fact that, at a minimum, render Facebook's motion premature. *See Berkheimer*, 881 F.3d at 1369 ("Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination."). The patent's claims include inventive concepts sufficient to confer patent eligibility, especially under the applicable pleading standard (Voxer's allegations are accepted as true) and presumption of validity (Voxer's patents are presumed valid).

---

[6] *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317-18 (Fed. Cir. 2016) and *A Pty Ltd. v. eBay, Inc.*, 149 F. Supp. 3d 739, 744-45 (W.D. Tex. 2016) are both readily distinguishable because those cases involved automating human activity or longstanding business practices, neither of which is at issue here.

First, the challenged method claims are written from the perspective of an intermediate server that, *inter alia*, receives "the video communication" and "an identifier associated with [the] video communication, "store[s] the video communication" for long enough to allow the "sending communication device" to begin transmitting even "without having to first establish an end-to-end connection," "ascertain[s] . . . a location on the network for a second communication device associated with the recipient," and then "deliver[s] portions of the video communication over the network to the second communication device" so it can be rendered in real time. '270 patent at 47:23-47, 50:3-36. As explained by Voxer's expert, Dr. Mitzenmacher, this approach is contrary to conventional wisdom in the field of real-time communication—and thus more than "well-understood, routine, conventional activity"—where existing, *e.g.*, VoIP systems performed steps recited in the claims (if at all) at an end-point instead of an intermediate server. Mitzenmacher Decl. ¶ 26-27; *see also Slyce*, 2020 WL 278481, at *4 (explaining that defendant's "dual obstacles may be insurmountable, *e.g.*, if the patentee simply included a declaration from . . . [an] expert explaining how the asserted claims are more than well-understood, routine, [and] conventional activities previously known to the industry").

Thus the '270 patent claims are comparable to the claims found patent eligible in *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016). There, even though "[f]iltering content on the Internet was already a known concept," the Federal Circuit held that performing that filtering at an "ISP server" (instead of a user computer) was "a technical improvement over prior art ways of filtering such content" and thus an inventive concept under *Alice* Step Two. *Id.* at 1349-50. Here, using an intermediate server performing the steps of the challenged claims constitutes an inventive concept, regardless of whether any of those steps individually or in isolation are inventive.

Second, the challenged claims include an inventive concept because they permit transmission of real-time "video communication" even "without having to first establish an end-to-end connection." '270 patent at 47:23-47, 50:3-36. This capability is far from "well-understood, routine, conventional activity" in the context of real-time "video communication." Mitzenmacher Decl. ¶ 28. For example, Facebook cites "prior art VoIP technology" for the proposition that "[r]eal-time communication over computer networks was not new at the time of the alleged invention." Mot. at 11 (citing '270 patent prior art description). But such "prior art VoIP technology" required establishing an end-to-end connection before allowing any "video communication" to flow over the network. Mitzenmacher Decl. ¶¶ 15-18.[7]

Unable to dispute the innovative nature of the "without having to first establish an end-to-end connection," Facebook again resorts to trying to delete that limitation from the claims, this time arguing that "th[e] limitation uses generic functional language to describe the abstract idea itself." Mot. at 11. As discussed in connection with *Alice* Step One, an "end-to-end connection" is a technical concept, not an abstract idea. Either the "without . . . connection" step is part of the focus of the '270 patent claims, in which case the claims are not directed to an abstract idea and pass muster under *Alice* Step One, or the claims are directed to a broader abstract idea, in which case "without . . . connection" supplies an inventive concept and the claims pass muster under *Alice* Step Two. What Facebook cannot do, however, is ignore this limitation under ***both*** *Alice* Step One and *Alice* Step Two. Accordingly, factual disputes regarding whether the challenged claims of the '270 patent recite an inventive concept render Facebook's motion premature.

### 3.   Facebook Fails to Separately Analyze the Dependent Claims

Facebook argues that "[t]he asserted dependent claims of the '270 patent are also invalid,"

---

[7] Moreover, the '270 Patent issued over that prior art VoIP technology, and after the Supreme Court's decision in *Alice*.

but does not perform the two-step *Alice* analysis required to demonstrate patent ineligibility.  Mot. at 11-13.  For this reason alone, Facebook's motion should be denied as to all dependent claims.

At best, Facebook contends that the dependent claims fail to add an inventive concept under *Alice* Step Two because "they only add additional abstraction, generic computer components, or insignificant post-solution activity."  Mot. at 11.  Even there, Facebook's analysis falls short.  For example, claims 37 and 38 requires "start[ing] transmission of the video communication over the network before the location for the second communication devices is ascertained" and "regardless of whether the second communication device is available or not available on the network," respectively.  '270 patent at 47:61-48:4.  These are innovate steps beyond "well-understood, routine, conventional activity" in existing communication systems, including VoIP. Mitzenmacher Decl. ¶¶ 12-18, 29.  Tellingly, Facebook asserts that these steps are "'particular choices' from the range of conventional transmission methods" (Mot. at 12), but cites **nothing** in support of that attorney argument.

As another example, dependent claims 41 and 51 require enabling a communication device to render video communication "while the second communication is sent by a remote communication device" and/or "in a time-shifted mode."  '270 patent at 48:13-23. 49:5-15. Facebook asserts that "[n]either of these claims 'enables a computer . . . to do things it could not do before'" (Mot. at 13) but does not provide any substantive analysis of these additional limitations or how they tie back to the steps required by the asserted independent claims.  As further discussed below in connection with the '030 patent, enabling hybrid real-time/time-shifted communication in the manner required by claims 41 and 51 goes beyond "well-understood, routine, conventional activity" and constitutes another inventive concept that confers patent eligibility.  Mitzenmacher Decl. ¶¶ 10-11, 19-20, 30-32.

Because Facebook failed to perform the necessary analysis, even though it bears the dual burdens of overcoming its clear and convincing evidence burden of proof and the presumption of validity, Facebook's motion should be denied.

**B.     The '030 Patent Is Directed to Patent Eligible Subject Matter**

      **1.     Facebook's *Alice* Step One Analysis Oversimplifies the Asserted Independent Claims**

Facebook's section 101 attack on the '030 patent is also fatally flawed. The asserted independent claims of the '030 patent (claims 1 and 33) are directed to an improved communication system for use in connection with streaming media. The claims require "progressively and persistently stor[ing] streaming media created using [a] communication devices as the streaming media is created." '030 patent at 43:8-26, 45:46-64. That same "streaming media" is also simultaneously "progressively transmit[ted] . . . as the streaming media is created and persistently stored." *Id.* On the receiving end, "streaming media" being received is "progressively and persistently store[d] . . . as the streaming media is received." *Id.* By "progressively and persistently" storing the streaming media, the "communication device" can "provide rendering options to selectively render the received streaming media, for the first time, in both a real-time mode as the streaming media is received over the network and in a time-shifted mode by retrieving and rendering the retrieved media from persistent storage." *Id.*

The '030 patent is thus directed to an improvement over existing communication systems: using "progressive[] and persistent[]" storage to allow selective rendering of "the received streaming media, for the first time, in both real-time mode . . . and in a time-shifted mode." *Id.* Existing communication systems did not allow the receiver of a particular "streaming media" to render that stream using "both" options. '030 patent at 1:30-50 (contrasting "[t]he current state of voice communications," which enabled "full-duplex, synchronous conversation" *or* "a one-way

14

asynchronous voice message"); Compl. ¶ 35; Mitzenmacher Decl. ¶¶ 10-11, 19-22, 31-32.

Indeed, during claim construction Facebook *agreed* that the focus of the claims was not some abstract idea, but using "persistent storage" to "improve[]" upon existing communication "systems":

> As is evident from the language of the asserted claims, *the persistent storage of messages is* <u>*central to the supposedly inventive features*</u> of the '030 Patent. The specification claims that *storing messages so that they are available for later retrieval improves upon prior art telephone and walkie-talkie systems* because a user's "attention can be temporarily diverted from the conversation and then the conversation can be later reviewed when convenient" and "the conversation can be paused for seconds, minutes, hours, or even days, and can be picked up again where left off[.]" *Id.* at 4:32-44.

Dkt. 60 at 2 (emphasis added). The '030 patent claims are thus patent eligible because they "enable[] a computer . . . to do things it could not do before" (*Finjan*, 879 F.3d at 1305): *i.e.*, "selectively render[ing] the received streaming media, for the first time, in both real time mode" and "time-shifted mode." '030 patent at 43:21-26, 45:58-64. *See also Enfish*, 822 F.3d at 1336 (finding claims patent eligible where "the plain focus of the claims is on an improvement to computer functionality itself").

The challenged '030 patent claims are also patent eligible because "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Just like in *DDR*, here the solution to the problem of rendering streaming media in both "a real time mode" and "a time-shifted mode" is necessarily rooted in computer technology, in this case communications systems. '030 patent at 3:57-62 ("[T]elephone, voicemail and tactical voice communications systems are inadequate . . . . [I]mprovements in delivering voice and other media over packet-based networks, is therefore needed"). In *DDR*, the Federal Circuit concluded that claims directed to "address[ing] a business challenge (retaining website visitors)"

were patent eligible because "it is a challenge particular to the Internet." *Id.* at 1257. Here, the '030 patent claims use "persistent storage" at sender and recipient device to address a "challenge" in user experience (rendering streaming media "in both real time mode" and "time-shifted mode"), but that challenge is particular to communication systems. The fact that the steps of the '030 patent claims are implemented in software does not make them any less patent eligible. *Enfish*, 822 F.3d at 1335 ("Software can make non-abstract improvements to computer technology just as hardware improvements can . . . .").

Facebook argues that "[t]he '030 patent . . . is directed to the abstract idea of transmitting, receiving, and storing streaming media, and rendering it either in real time or after the fact." Mot. at 1. As demonstrated above, these are not abstract ideas. Moreover, Facebook's attempt to analogize the asserted claims to broadcast television and telephonic communications (Mot. at 14-15) once again grossly oversimplifies the claimed invention in a contrived, unhelpful manner by ignoring that the claims are directed to a "communication device" that use persistent storage of both outgoing and incoming "streaming media" to enable hybrid digital communications that can be both real-time and time-shifted. '030 patent at 43:21-26, 45:58-64. Even under Facebook's characterization, existing television, VCR, and telephony technology lacked such a "communication device." Mitzenmacher Decl. ¶ 20. Moreover, Facebook relies entirely on attorney argument. There is not a single cite to support Facebook's allegations as to what constitutes "longstanding practice[s]" in those fields. Mot. at 14.

In support of its arguments, Facebook principally relies on *In re TLI Comm'cns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016), which is readily distinguishable. While the claims in that case recited steps related to storing, transmitting, and receiving digital images, "the focus of the patentee and of the claims was not on an improved telephone unit." *Id.* at 610, 613; *see also id.* at

612 ("[T]he problem facing the inventor was not how to combine a camera with a cellular telephone . . . ."). Instead, the claims were "directed to the abstract idea of classifying and storing digital images in an organized manner"—"a basic concept." *Id*. at 613. The '030 patent claims have the opposite focus: they are analogous to the "improved telephone unit" or "combin[ing] a camera with a cellular telephone" because they improve upon existing communication systems by using persistent storage to combine real-time and time-shifted communication in the form of a single "streaming media" that can be selectively rendered "in both a real-time mode . . . and in a time-shifted mode." '030 patent at 43:21-26, 45:58-64. Again, this characterization was uncontroversial during claim construction—when Facebook admitted that "the persistent storage of messages is *central*" to the claims, and that the '030 patent "improves upon prior art telephone and walkie-talkie systems" (Dkt. 60 at 2)—and demonstrates that the '030 patent claims are not directed to an abstract idea and instead patent eligible under *Alice* Step One.

## 2.      Facebook's *Alice* Step Two Analysis Ignores Factual Disputes

For *Alice* Step Two, Facebook cites to the '030 patent specification as allegedly showing that the claimed "*hardware* of a Device 13 used for storing and executing the Client application 12" was "nothing more than generic computer components" (Mot. at 17-18), but it makes no attempt to show that the "storing," "transmitting," "receiving," and "selectively rendering" steps performed by that hardware constitute "well-understood, routine, conventional activity." At best, Facebook asserts that "the claims recite generalized steps to carry out generic computer functions" with no support. *Id*. at 18. Considering Facebook faces the dual burden of the applicable pleading standard and overcoming a presumption of validity, Facebook cannot prevail based on attorney argument, hand-waving, and ignoring the actual steps performed by the claimed invention.

In any event, Facebook's conclusory assertions lack merit. "[P]rogressively and persistently stor[ing]" both outgoing and incoming "streaming media" and using that storage "to

provide rendering options to selectively render the received streaming media, for the first time, in both a real-time mode . . . and in a time-shifted mode" was far from "well-understood, routine, conventional activity"—it was inventive.   Mitzenmacher Decl. ¶¶ 10-11, 19-20, 13-32. Facebook's motion refers to VoIP, broadcast television, and telephones as examples of existing communication systems. Mot. at 14.  Yet, none of those technologies included the claimed combination of storing, transmitting, receiving, and selectively rendering required by the challenged claims. Mitzenmacher Decl. ¶¶ 20, 32.

Accordingly, even if the Court finds that the challenged claims are directed to an abstract idea under *Alice* Step One, those claims further include an inventive concept sufficient to confer patent eligibility under *Alice* Step Two. At a minimum, *Alice* Step Two presents questions of fact necessitating the denial of Facebook's motion.

### 3.      Facebook Fails to Separately Analyze the Dependent Claims

As with the '270 patent, Facebook failed to separately analyze each asserted dependent claims of the '030 patent under *Alice* (especially *Alice* Step One) and also did not attempt to show that the independent claims are representative of all dependent claims. *See* Mot. at 18-20. For that reason alone, Facebook's motion should be denied as to the dependent claims.

Facebook's arguments for the dependent claims also fall short under *Alice* Step Two. For example, dependent claims 16, 36, and 47-48 all leverage the steps of the independent claims to enable "transition[ing]" from rendering the streaming media in "the real-time mode"/ "synchronously" to rendering in "the time-shifted mode"/"asynchronously," or vice versa. '030 patent at 44:22-26, 46:8-10, 46:55-62.  These dependent claims thus add an additional capability absent from existing communication systems—you could not transition an existing telephone or VoIP call from real time to time-shifted mode and back—and constitute more than "well-understood, routine, conventional activity."  Mitzenmacher Decl. ¶ 33; *see also Finjan*, 879 F.3d

at 1305 (claim that "enables a computer . . . to do things it could not do before" is patent eligible).

Although Facebook argues that claims 16, 47, and 48 are "just as non-specific and results-oriented as the independent claims," Facebook cites **nothing** to support that assertion, and its argument is contradicted by the fact that the transitioning is enabled by the claimed persistent storage. *See* Mot. at 18. Facebook further argues "any distinction between synchronous and asynchronous communications and real-time or after-the-fact (i.e., time-shifted) rendering is immaterial for purposes of Section 101" because "the distinction between 'synchronous' and 'asynchronous' communications simply depends on the rate at which users decide to review and respond to incoming messages." Mot. at 18-19. Far from being "immaterial," using the same "streaming media" messages for both real-time and time-shifted communication is an innovative technical improvement. '030 patent at 4:27-32. Existing communication systems lacked this insight, and for that reason had a division between "synchronous conversation" and "asynchronous voice messag[ing]." *Id.* at 1:30-50.

As another example, dependent claims 13 and 44 (which further dependent from claims 12 and 43, respectively) further require "ascertain[ing] if the communication device is disconnected from the network when the streaming media is created" and "transmitting the streaming media out of persistent storage when the communication device re-connects to the network." '030 patent at 44:4-14, 46:37-48. These dependent claims are more than "well-understood, routine, conventional activity." Mitzenmacher Decl. ¶ 34. Here again Facebook relies on attorney argument that "claims 13 and 44 use purely 'result-based functional language'" and ignores that the other claim limitations **do** describe how the alleged "results" are achieved by "progressively and persistently stor[ing] streaming media created . . . as the streaming media is created." Mot. at 19-20; '030 patent at 23:49-58 (storing "media payloads . . . in multiple location" "provides the system 10 with

both resilience and operability even . . . when a Participant of a Conversation is not connected to the network). And Facebook's attempted analogies (Mot. at 20) fail to show claims 13 and 44 are directed to abstract ideas because (1) these analogies themselves rely on technical innovation; and (2) Facebook has no support for its allegations—for example, what broadcasters "typically" do. In any event, whether these alleged actions by broadcasters constitute "well-understood, routine, conventional activity" is a question of fact that cannot be resolved at the pleading stage.

As a final example, claim 38 requires "encoding the streaming media indexed media payloads" and storing them as such. '030 patent at 46:15-18. This concept is part of the implementation that permits the "streaming media" to be subsequently rendered "in both a real time mode" and "a time-shifted mode." '030 patent at 23:45-48 ("Since each packet 95 is indexed, time-stamped, and given a sequence identifier, the individual packets can be segmented into Messages. By sequentially threading the individual Messages together, Conversations may be constructed."). The use of "indexed media payloads" for this purpose constitutes more than "well-understood, routine, conventional activity." Mitzenmacher Decl. ¶ 35. In response, Facebook argues that "indexed media payloads" are "a particular, well-known type of communication," but Facebook's only support for that assertion relates to generic "packet-based communication networks" and says nothing about "indexed media payloads." Mot. 19.

Accordingly, Facebook offers only attorney argument and conclusory assertions for the challenged dependent claims, falling far short of meeting its dual burden of demonstrating that each of the dependent claims are invalid notwithstanding the applicable pleading standard and the presumption of validity.

## V.   CONCLUSION

For the foregoing reasons, Voxer respectfully requests that this Court deny Facebook's motion for judgment on the pleadings.

Dated:  April 19, 2021                    Respectfully  submitted,


                                          By:  /s/ *Sam Stake*
                                          _____
J. Mark Mann                                  Kevin P.B. Johnson
State Bar No. 12926150                        California  Bar No. 177129
G. Blake Thompson                             Robert W. Stone
State Bar No. 24042033                        California  Bar No. 163513
MANN | TINDEL | THOMPSON                       QUINN EMANUEL URQUHART &
300 West Main Street                          SULLIVAN, LLP
Henderson, Texas 75652                        555 Twin Dolphin  Drive, 5th Floor
Telephone:  (903) 657-8540                    Redwood Shores, California  94065
Fax:  (903) 657-6003                          Telephone:  (650) 801-5000
mark@themannfirm.com                          Fax:  (650) 801-5100
blake@themannfirm.com                         kevinjohnson@quinnemanuel.com
                                              robertstone@quinnemanuel.com

                                              Sam Stake
                                              California  Bar No. 257916
                                              QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP
                                              50 California  Street, 22nd Floor
                                              San Francisco, California  94111
                                              Telephone:  (415) 875-6600
                                              Fax:  (415) 875-6700
                                              samstake@quinnemanuel.com

                                              *Attorneys for Plaintiffs Voxer, Inc. and Voxer*
                                              *IP LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of April, 2021, true and correct copies of the

foregoing document were served on the following counsel of record at the addresses and in the

manner indicated:

**VIA CM/ECF**

Robert Van Nest
rvannest@keker.com
Christa Anderson
canderson@keker.com
David Silbert
dsilbert@keker.com
Eugene Paige
epaige@keker.com
Matthew Werdegar
mwerdegar@keker.com
Paven Malhotra
pmalhotra@keker.com
Shayne H. Henry
shenry@keker.com
Kristen E. Lovin
klovin@keker.com
Puja V. Parikh
pparikh@keker.com
Philip J. Tassin
ptassin@keker.com
Jee Young (Grace) Kim
gkim@keker.com
Molly Villagra
mvillagra@keker.com
Ryan Hayward
rhayward@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Tel: 415-391-5400

Michael E Jones
mikejones@potterminton.com
Patrick C. Clutter
patrickclutter@potterminton.com
POTTER MINTON, PC
110 North College, Suite 500
Tyler, Texas 75702
Tel: 903-597-8311
Fax: 903-593-0846

*/s/ Sam Stake*
Sam Stake