IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| VOXER, INC. and VOXER IP LLC, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. A:20-cv-00655-LY |
| | § | |
| v. | § | |
| | § | |
| META PLATFORMS, INC. (F/K/A | § | <u>JURY TRIAL DEMANDED</u> |
| FACEBOOK, INC.)  and INSTAGRAM | § | |
| LLC, | § | |
| | § | |
| Defendants | | |

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER
FEDERAL RULE OF CIVIL PROCEDURE 50(A)**

# TABLE OF CONTENTS

I.  LEGAL STANDARD ................................................................................................... 1

II. ARGUMENT ............................................................................................................... 1

A.  The Court Should Grant Judgment of Noninfringement on the Asserted
    Claims of the '270 and '557 Patents. ..................................................................... 1

    1.  Voxer Failed to Offer Sufficient Evidence That Defendants
        Infringe the Asserted Claims of the '270 Patent. ....................................... 2

    2.  Voxer Failed to Offer Sufficient Evidence That Defendants
        Infringe the Asserted Claims of the '557 Patent. ....................................... 4

    3.  Voxer Failed to Offer Sufficient Evidence That Defendants
        Infringe under the Doctrine of Equivalents. ............................................... 5

B.  Voxer Failed to Offer Sufficient Evidence of Willful Infringement. .................... 6

C.  The Asserted Claims of the '270 Patent Are Ineligible under Section 101. .......... 7

D.  Defendants Presented Undisputed, Clear and Convincing Evidence of the
    Invalidity of Claims 1 and 9 of the '557 Patent. ................................................... 8

    1.  Claim 1 of the '557 Patent Is Invalid as Anticipated by Seckin. ............... 9

    2.  Claim 9 of the '557 Patent Is Invalid as Obvious in View of
        Seckin. ...................................................................................................... 10

E.  Voxer, Inc. Lacks Standing and Should Be Dismissed from the Case. ............... 10

F.  Defendants Are Entitled to Judgment of No Damages Because Voxer
    Failed to Offer Sufficient Evidence to Support Its Requested Damages. ............ 11

    1.  Defendants Are Entitled to Judgment of No Damages Due to the
        Lack of Sufficient Apportionment ........................................................... 11

    2.  Mr. Ratliff's Damages Model Fails to Distinguish Among Voxer's
        Theories of Infringement, and Thus Invites the Jury to Award
        Damages for Conduct That Does Not Constitute Infringement. ............... 15

    3.  Mr. Ratliff's Use of Facebook and Instagram's Total Revenue Is
        Improper as a Matter of Law. .................................................................. 16

    4.  Mr. Ratliff's Use of Total Watch Time or Total Number of Users
        Is Improper as a Matter of Law ............................................................... 17

    5.  Mr. Ratliff's Inclusion of "Was Live" Monetization as Derivative
        Damages Is Improper as a Matter of Law ................................................ 18

    6.  Mr. Ratliff's Use of a Running Royalty Is Unsupported. ........................ 19

    7.  Mr. Ratliff's Only Properly Disclosed Damages Opinion Used the
        Incorrect Hypothetical Negotiation Date. ................................................ 19

III. CONCLUSION ......................................................................................................... 20

## TABLE OF AUTHORITIES

**Federal Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
573 U.S. 208 (2014).................................................................................................. 7

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.,*
637 F.3d 1324, 1336 (Fed. Cir. 2011)..................................................................... 5

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.,*
788 F.3d 1371, 1378 (Fed. Cir. 2015)..................................................................... 8

*ART+COM Innovationpool GmbH v. Google, Inc.,*
2016 WL 10033420, at * 2 (D. Del. Sept. 9, 2016) ................................................ 7

*Bayer Healthcare LLC v. Baxalta Inc.,*
989 F.3d 964, 987 (Fed. Cir. 2021)......................................................................... 7

*Biedermann Techs. GmbH & Co. KG v. K2M, Inc.,*
528 F. Supp. 3d 407, 431 (E.D. Va. 2021) ............................................................. 7

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209, 242 (1993).......................................................................................... 1

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.,*
809 F.3d 1295, 1301 (Fed. Cir. 2015)..................................................................... 18

*Diodem, LLC v. Lumenis Inc.,*
2005 WL 6219898, at *13 (C.D. Cal. Sept. 14, 2005)........................................... 11

*DSU Med. Corp. v. JMS Co., Ltd.,*
471 F.3d 1293, 1304 (Fed. Cir. 2006)..................................................................... 6

*Evans v. Ford Motor Co.,*
484 F.3d 329, 334 (5th Cir. 2007) .......................................................................... 1

*Huawei Techs. Co. v. T-Mobile US, Inc.,*
2017 WL 4385567, at *3–4 (E.D. Tex. Sept. 9, 2017) ........................................... 5

*Intellectual Ventures I LLC v. Capt'l One Fin. Corp.,*
850 F.3d 1332, 1341–42 (Fed. Cir. 2017)............................................................... 8

*Intellectual Ventures I LLC v. Symantec Corp.,*
838 F.3d 1307, 1316–18 (Fed. Cir. 2016)............................................................... 7

## II.    table of authorities (*continued*)

Page(s)

*Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*,
  2019 WL 1987172, at *2 (E.D. Tex. Apr. 12, 2019) ....................................................... 6

*Interactive Pictures v. Infinite Pictures*,
  274 F.3d 1371, 1385 (Fed. Cir. 2001) ..................................................................... 20

*King Pharm., Inc. v. Eon Labs, Inc.*,
  616 F.3d 1267, 1274 (Fed. Cir. 2010) ...................................................................... 8

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  694 F.3d 51, 69, 76 (Fed. Cir. 2012) ........................................................... 15, 17, 20

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301, 1323, 1324 (Fed. Cir. 2009) ....................................................... 11, 15

*MedIdea, L.L.C. v. DePuy Orthopaedics, Inc.*,
  422 F. Supp. 3d 459, 470–72 (D. Mass. 2019),
  *aff'd*, 833 F. App'x 338 (Fed. Cir. 2021) ................................................................. 5

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
  811 F.3d 1314, 1324–25 (Fed. Cir. 2016) ................................................................. 8

*Philp v. Nock*,
  84 U.S. 460, 462 (1873) ...................................................................................... 11

*Polanco v. City of Austin*,
  78 F.3d 968, 974 (5th Cir. 1996) ............................................................................ 1

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  711 F.3d 1348, 1371 (Fed. Cir. 2013) ...................................................................... 15

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  904 F.3d 965, 977 (Fed. Cir. 2018) ................................................................ 13, 14, 16

*Promega Corp. v. Life Techs. Corp.*,
  875 F.3d 651, 657 (Fed. Cir. 2017) ................................................................ 11, 14, 19

*Propat Int'l Corp. v. RPost, Inc.*,
  473 F.3d 1187, 1189 (Fed. Cir. 2007) ..................................................................... 10

*Realtime Data, LLC v. Oracle Am., Inc.*,
  2017 WL 11574028, at *5 (E.D. Tex. Mar. 30, 2017) ................................................. 15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133, 150–51 (2000) ................................................................................. 1

**II.    table of authorities (*continued*)**

Page(s)

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860, 869 (Fed. Cir. 2010).................................................................... 15

*Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*,
    2013 WL 12076934, at *3 (W.D. Tex. Nov. 8, 2013) ...................................... 20

*Senju Pharm. Co. v. Lupin Ltd.*,
    780 F.3d 1337, 1341 (Fed. Cir. 2015).................................................................. 9

*Sloan Valve Co. v. Zurn Indus., Inc,*
    33 F. Supp. 3d 984, 997 (N.D. Ill 2014) .......................................................... 18

*Tex. Instruments Inc. v. Cypress Semiconductor Corp.*,
    90 F.3d 1558, 1567 (Fed. Cir. 1996)................................................................... 6

*Travis v. Bd. of Regents of the Univ. of Tex. Sys.*,
    122 F.3d 259, 263 (5th Cir. 1997) ...................................................................... 1

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC,*
    874 F.3d 1329, 1337–38 (Fed. Cir. 2017).......................................................... 7

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292, 1301 (Fed. Cir. 2011)................................................................. 2

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308, 1329 (Fed. Cir. 2014)............................................................... 17

*WBIP, LLC v. Kohler Co.*,
    829 F.3d 1317, 1341 (Fed. Cir. 2016)................................................................. 6

*X One, Inc. v. Uber Techs., Inc.*,
    440 F. Supp. 3d 1019, 1044 (N.D. Cal. 2020) ................................................... 5

**Federal Statutes**
35 U.S.C. § 101....................................................................................................... 8
35 U.S.C. § 102....................................................................................................... 8
35 U.S.C. § 281..................................................................................................... 10
35 U.S.C. § 103....................................................................................................... 8

Defendants Meta Platforms, Inc. (f/k/a Facebook, Inc.) and Instagram LLC move for judgment as a matter of law under Rule 50(a) on all claims brought by Plaintiffs Voxer, Inc. and Voxer IP LLC because no reasonable jury could find that Defendants infringed the asserted claims, that the asserted claims are not invalid, or that Voxer is entitled to its requested damages.

## I.   LEGAL STANDARD

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "A court should grant a Rule 50(a) motion not only when the non-movant presents no evidence, but also when there is not a sufficient conflict in substantial evidence to create a jury question." *Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir. 1997) (citation omitted).

There is "substantial evidence" supporting a verdict only if "the evidence [is of] such quality that reasonable and fair-minded persons would reach the same conclusion." *Polanco v. City of Austin*, 78 F.3d 968, 974 (5th Cir. 1996). "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached…." *Evans v. Ford Motor Co.*, 484 F.3d 329, 334 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

## II.   ARGUMENT

### A.   The Court Should Grant Judgment of Noninfringement on the Asserted Claims of the '270 and '557 Patents.

Voxer has not proven that each limitation of the asserted claims is met by the accused

products.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011).

> **1.      Voxer Failed to Offer Sufficient Evidence That Defendants Infringe the Asserted Claims of the '270 Patent.**

No reasonable juror could find that the evidence Voxer presented at trial demonstrated that any of the accused products (1) receive an "identifier identifying a recipient of a video communication" or (2) ascertain a location used to deliver the video communication in response to receipt of the identifier as required by each of the asserted claims.  Further, Voxer's evidence at trial failed to provide any evidence that the Instagram privacy settings that Voxer accuses of infringement are "associated with a video communication."

Dr. Mitzenmacher asserted that the claimed "identifiers" are the Facebook and Instagram privacy settings and Instagram Direct.  Rough Trial Tr. Vol. 3 at 12:23–13:19 (Mitzenmacher). But he did not assert that they "identify[] a recipient of the video communication" as required by claim 34.  Instead, he characterized the accused "public" identifiers as something that would "make the video or communication that you're setting available to everyone."  *Id.* at 17:7–8 (Mitzenmacher).  He never testified that what he calls identifiers identify a recipient of the video, *i.e.*, a person that would actually receive the video.  Instead, he testified that "the identifier tells you who are the authorized recipients."  *Id.* at 24:3–4.  He also admitted that not everyone given access to a Facebook Live video will actually receive a copy of it.  *See id.* at 93:12–25; *id.* at 95:12–15, 96:6–9 (same); *id.* at 97:17–20 (not everyone allowed access to Instagram Live will receive a copy); *id.* at 98:10–13 (not everyone allowed access will receive a notification).  Nor would Instagram Direct identify a recipient of a live video, because the message sent by that optional function "doesn't contain the actual bits or files of the message" and delivery of the video "would require some sort of user approval which sets off that process."  *Id.* at 102:21–103:1.

Facebook and Instagram users do not know who will be a recipient of any videos they

broadcast.[1]  Instagram Direct "can't control who receives [a video] because it can't control who will actually tap on the entry point to request the live video."  Rough Trial Tr. Vol. 5 at 124:20–24 (Stinson).  Defendants' technical expert Professor Bhattacharjee also explained in unrebutted testimony that the so-called identifiers do not identify a recipient.  *Id.* at 140:5–19 (Bhattacharjee).

There was also no evidence that the location used to deliver the video is "ascertain[ed] ... **in response** to receipt of the [alleged] identifier" as required by claim 34; rather, it is ascertained (if ever) only at a later point when an HTTP GET request for the video is made.[2]  Dr. Mitzenmacher and Facebook engineers testified that the receipt of the alleged identifier triggered "a sequence of steps" that eventually might result in a location being ascertained.[3]  Professor Bhattacharjee likewise explained the video was delivered using the location ascertained from the HTTP GET request.  *See* Rough Trial Tr. Vol. 5 at 149:12–150:5 (Bhattacharjee).  But the claims are clear: the video must be "delivered ... using the location" that was "ascertain[ed]" "in response to receipt of the identifier."  And delivery using the location ascertained from an HTTP GET request is not delivery using a location ascertained "in response to receipt of the identifier."

The Instagram privacy and blocking settings that Voxer has accused of infringement are

---

[1] Rough Trial Tr. Vol. 5 at 72:2–5 (Leland) (Facebook privacy selector does not "enable broadcasters to determine who will ultimately get a copy of a Facebook Live video"); *id.* at 72:10–13 (Facebook does not "allow broadcasters to dictate the people to whom Facebook will actually send their Facebook Live video"); *id.* at 109:21–110:4 (Stinson) (Instagram users do not know who will receive videos broadcast from public accounts); *id.* at 110:12–19 (same from private accounts).

[2] Rough Trial Tr. Vol. 3 at 25:18–22 (Mitzenmacher); *id.* at 24:5–7 ("The authorized represent [sic] will then request the live video, and then Facebook and Instagram will ascertain the IP addresses accordingly."); *id.* at 35:5–7 ("The system uses that location, ascertains that location, from that request and transmits information back accordingly."); *id.* at 88:7–11 (admitting that "live video data is requested by the user's device using what are called 'HTTP GET' requests"); *id.* at 105:15–19 (admitting that "the address they use to deliver the video is the address that was in the request that came to them from the user's device").

[3] Rough Trial Tr. Vol. 3 at 25:10 (Mitzenmacher); *see also id.* at 88:21 ("that's one step in a rather significantly large process"); Rough Trial Tr. Vol. 4 at 140:23–141:3 (Larumbe) (CDN server delivers live video in response to request that includes IP address and port); *id.* at 143:4–9 (Facebook determines IP address to deliver live video at the moment of receiving segment request); Rough Trial Tr. Vol. 5 at 81:3–9 (Leland) (video sent to Facebook news feed in response to HTTP GET request).

also not "associated with a video communication." Dr. Mitzenmacher conceded that the Instagram privacy setting is a "global default" that "applies to all your content." Rough Trial Tr. Vol. 3 at 97:9–13 (Mitzenmacher). Likewise, blocking settings apply to "various content" and "becomes the default" when used. *Id.* at 98:19–99:1; *see also* Rough Trial Tr. Vol. 5 at 114:25–115:5 (Stinson) ("Neither of these settings are specific to Instagram Live videos. Those are general account privacy settings that apply to all content."); *id.* at 199:13–16 (Bhattacharjee) ("the identifier must be associated with a video communication"). But default settings that apply to every bit of content on Instagram are not "associated with" any particular video communication—it "serves to restrict who may view" all videos. *Id.* at 141:20–25 (Bhattacharjee).

The remaining asserted claims all depend from claim 34 and therefore cannot be infringed if claim 34 is not infringed. Thus, judgment as a matter of law that Defendants do not infringe the asserted claims of the '270 patent is appropriate.

### 2. Voxer Failed to Offer Sufficient Evidence That Defendants Infringe the Asserted Claims of the '557 Patent.

Claim 1 of the '557 patent covers "a method for operating a video message service infrastructure on a network" including the step of "selecting" a "degraded version of the video media based on an ascertained bandwidth on the network." Voxer asserted at trial that the "video message service infrastructure" consists of Facebook's servers. Rough Trial Tr. Vol. 3 at 45:15–18 (Mitzenmacher). And the trial evidence is clear that this "selecting" step in the accused products happens only at the ***client*** devices.[4] The ***server*** in Facebook's infrastructure does not "select" the version of the video that will be sent to the client. The unrebutted testimony

---

[4] Rough Trial Tr. Vol. 4 at 139:13–18 (Larumbe) ("[T]he viewer device is the one that selects ... the CDN just returns the file."); 139:22–24 (Q: "Does the CDN ever[] send live video without first receiving a request from the viewing device? A: No, it doesn't"); 139:25–140:9; Rough Trial Tr. Vol. 3 at 117:19–23 ("Q: And the client makes the request for the version of the video that it wants .... A: "Yeah."); 118:16–119:1.

established that the Facebook servers do not receive any information about ascertained bandwidth, and they thus could not possibly "select[] one of the degraded versions of the video media based on an ascertained bandwidth on the network."[5]  The "selecting" step happens outside the "video message service infrastructure," and claim 1 (and thus claim 9) of the '557 patent is not infringed.

Any argument that claim 1 would be infringed even if the "selecting" step happened at the client and not the server would be foreclosed as a result of the position Voxer took before the Patent Office.  In opposing institution of the IPR, Voxer *repeatedly* distinguished prior art because claim 1 of the '557 patent requires that the server must actively participate in bandwidth estimation and selection of the degraded version of the video.  Rough Trial Tr. Vol. 5 at 67:3–69:1 (Jeffay). "Federal Circuit precedent supports applying prosecution disclaimer even when an examiner rejects the patentee's argument but nonetheless allows the claims."  *X One, Inc. v. Uber Techs., Inc.*, 440 F. Supp. 3d 1019, 1044 (N.D. Cal. 2020); *see also Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) (prosecution disclaimer even though "the examiner explicitly disagreed with [the patentee's statement]").  Voxer is precluded from taking a position here contrary to what it presented to the Patent Office.  *See, e.g.*, *Huawei Techs. Co. v. T-Mobile US, Inc.*, 2017 WL 4385567, at *3–4 (E.D. Tex. Sept. 9, 2017), *report and recommendation adopted*, 2017 WL 4310161 (E.D. Tex. Sept. 28, 2017); *MedIdea, L.L.C. v. DePuy Orthopaedics, Inc.*, 422 F. Supp. 3d 459, 470–72 (D. Mass. 2019), *aff'd*, 833 F. App'x 338 (Fed. Cir. 2021).

### 3.     Voxer Failed to Offer Sufficient Evidence That Defendants Infringe under the Doctrine of Equivalents.

Dr. Mitzenmacher purported to offer opinions that Defendants infringe the asserted claims

---

[5] Rough Trial Tr. Vol. 4 at 136:6–11 (Larumbe) (Q: What role does the CDN play in deciding which version of a video to deliver to the viewer device? A: It doesn't play any role. The viewer device selects and then specifies the specific file name"); *id.* at 136:25-137:2 ("Q: When the client device estimates the network bandwidth, is that information ever transmitted back to the CDN? A: No, it's not.").

under the doctrine of equivalents.  But his analysis on each claim was superficial and general.  And the law is clear that to sustain a claim under the doctrine of equivalents, the "evidence must be presented on a limitation-by-limitation basis.  Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice."  *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

### B.    Voxer Failed to Offer Sufficient Evidence of Willful Infringement.

Plaintiffs have not presented *any* evidence that could provide a reasonable jury a legally sufficient basis to find that Defendants *willfully* infringed the asserted patents.

"Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages."  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016); *see also DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (willfulness requires knowledge of the particular patents).  And Voxer acknowledged that Facebook had no pre-suit knowledge of either of the patents-in-suit.  Rough Trial Tr. Vol. 2 at 125:10–16 (Katis) (admitting that he never named specific patents in discussions with Facebook in 2012).

Voxer rests its willfulness claim on Facebook's alleged general awareness of Voxer's "patent portfolio."  Rough Trial Tr. Vol. 2 at 119:8–22, 124:19–24, 125:24–126:23 (Katis).  But even if a reasonable jury could find that Facebook was aware of Voxer's patent portfolio generally, that cannot—as a matter of law—support a finding of willfulness because "knowledge of other patents in the same portfolios, with some of those being within the same family as the asserted patents, … [is] insufficient to defeat a motion for summary judgment for pre-suit willfulness."  *Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*, 2019 WL 1987172, at *2 (E.D. Tex. Apr. 12, 2019), *report and recommendation adopted*, 2019 WL 1979866 (E.D. Tex. May 3, 2019).  This makes sense because knowledge of a "patent portfolio" does not provide notice of any future patent application, and certainly is not notice that any patent will ever *issue*.

The filing of Voxer's complaint may have put Facebook on notice of the patents-in-suit. But simply continuing to offer an accused product during the pendency of infringement litigation does not support a finding of willfulness. *See, e.g., Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*, 528 F. Supp. 3d 407, 431 (E.D. Va. 2021). Voxer must also demonstrate that Facebook "had a specific intent to infringe at the time of the challenged conduct." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021). There is no such evidence.

### C.    The Asserted Claims of the '270 Patent Are Ineligible under Section 101.

The Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), provides a two-step analysis for determining patent eligibility in this context: (1) whether the claims are directed to an abstract idea, and if so, (2) whether there is an "inventive concept" in the claims that is "sufficient to ensure that the patent in practice amount to significantly more than a patent upon [the abstract idea] itself." *Id.* at 217–18.[6]

Under *Alice* step one, each of the asserted claims is directed to the abstract idea of routing messages to recipients identified by the sender without first requiring a direct connection between the sender and recipient. Dkt. 85 at 5; *see, e.g., Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337–38 (Fed. Cir. 2017) (routing "streams of audio and/or visual information" over a communication network was directed to an abstract idea); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316–18 (Fed. Cir. 2016) (stating that "receiving, screening, and distributing e-mail" was an abstract idea).

Under *Alice* step two, the claims of the '270 patent fail to provide an "inventive concept"

---

[6] As Defendants have explained (Dkt. 260 at 8), and as the Court indicated at the September 7 hearing, the eligibility of the asserted patents is a legal question for the Court. The Court may wish to address this issue post-trial. But it is also a permissible basis for resolution under Rule 50(a). *See ART+COM Innovationpool GmbH v. Google, Inc.*, 2016 WL 10033420, at * 2 (D. Del. Sept. 9, 2016) (Dyk, J., sitting by designation) ("Several circuits have indicated that purely legal issues may be raised in a Rule 50 motion.").

that is "significantly more" than the claimed idea. *Alice*, 573 U.S. at 218. "[C]onventional, routine and well understood applications in the art" are insufficient. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015). The asserted claims fail this second step.

Voxer admitted at trial it did not invent livestreaming video, instant messaging, text messaging, push-to-talk, live voice communications, and time-shifting of videos; instead, all of these functionalities were "conventional, routine, and well understood" at the time of the asserted patents. *Id.*; Rough Trial Tr. Vol. 2 at 140:9–141:12, 197:19–198:19. Furthermore, implementing the abstract idea on generic computer components does not transform the abstract idea into patent-eligible subject matter.[7] Moreover, Voxer failed to provide any evidence that the claims contain any technological improvement nor is there anything inventive in the way the claims organize the communication, and thus, lacks an inventive concept.

The asserted claims of the '270 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101 as a matter of law.

### D. Defendants Presented Undisputed, Clear and Convincing Evidence of the Invalidity of Claims 1 and 9 of the '557 Patent.

Defendants presented unrebutted evidence that claims 1 and 9 of the '557 patent are invalid based on U.S. Pat. App. Pub. No. 2004/0240390 ("Seckin") (DTX249). "Under 35 U.S.C. § 102 a claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." *King Pharm., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1274 (Fed. Cir. 2010) (citation and internal quotation marks omitted). The "obviousness inquiry [under 35 U.S.C. § 103]

---

[7] *Alice*, 573 U.S. at 225–26 ("implement[ing] the abstract idea ... on a generic computer" was not sufficient "to transform an abstract idea into a patent-eligible invention"); *Intellectual Ventures I LLC v. Capt'l One Fin. Corp.*, 850 F.3d 1332, 1341–42 (Fed. Cir. 2017) ("using generic computer components and conventional computer data processing activities" was not sufficient to find an "inventive concept"); *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324–25 (Fed. Cir. 2016) (generic computer components such as an "network" and "database" fail to satisfy the "inventive concept requirement").

assesses 'the differences between the subject matter sought to be patented and the prior art' to ascertain whether 'the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *Senju Pharm. Co. v. Lupin Ltd.*, 780 F.3d 1337, 1341 (Fed. Cir. 2015).

**1.    Claim 1 of the '557 Patent Is Invalid as Anticipated by Seckin.**

The trial evidence shows that Seckin discloses each element of claim 1 of the '557 patent:

| 1 Pre | Rough Trial Tr. Vol. 4 at 164:5–23; DTX249 at Fig. 2 (116, 232, 226, 218) |
|---|---|
| 1a | Rough Trial Tr. Vol. 4 at 167:25–168:24; DTX249 at Fig. 2 (Content Providers (101) sending "Live Content" to Content Management System Unit 228 ("Live Content")) |
| 1b | Rough Trial Tr. Vol. 4 at 168:25-170:16; DTX249 at Fig. 2 (Transcoders 204), ¶ 26 (identifying multiple degraded versions of the video media), ¶ 47 (describing transcoding of the media file) |
| 1c | Rough Trial Tr. Vol. 4 at 170:17–172:8; DTX249 at Fig. 2 (Streaming Servers 200), ¶ 22 (the dynamic bandwidth algorithm adjusts the bit rates being served based on the client device's available bandwidth), ¶¶ 29, 31 (describing the selection of a lower quality bitrate based on bandwidth changes) |
| 1d | Rough Trial Tr. Vol. 4 at 172:9–173:13; DTX249 at Fig. 2 (Terminal Devices 108), ¶¶ 26, 28 (the selected bit rate version of the video media is "streamed" to the receiving device 108) |
| 1e(i) | Rough Trial Tr. Vol. 4 at 173:14–174:21; DTX249 at Fig. 2 (live content from content providers 101 being delivered to terminal devices 108), ¶¶ 46–47 (same) |
| 1e(ii) | Rough Trial Tr. Vol. 4 at 174:22–175:22; DTX249 at Fig. 2 (content providers 101 and terminal devices 108 not directly connected and instead separated by the streaming system 116, storage 232, content management system 226, and first subsystem 218) |

The only element of claim 1 that Plaintiffs disputed was the disclosure of a "video message service infrastructure" or "video messages."  Rough Trial Tr. Vol. 6 at 190:9–17 (Mitzenmacher). Plaintiffs asserted that Seckin only disclosed one-way communication and hence did not disclose "video messages" or a "video message service infrastructure."  But as Plaintiffs' expert asserted, a "video message" is simply a "live stream" (Rough Trial Tr. Vol. 3 at 46:12–15), and the '557 patent itself simply defines "message" as "an individual unit of communication from one User to

9

another" (PTX004 at 8:9–10).  Plaintiffs' expert admitted that this very definition only described "one-way" communication.  Rough Trial Tr. Vol. 6 at 214:19–25.  The unrebutted evidence demonstrated that Seckin disclosed communications from one user to another.  DTX249 ¶ 35 (describing "communication of data from the content providers 101 to the client device(s) 108); DTX249 at Fig. 1 (same), ¶ 34 (noting Seckin's application to live video streams and "other type of data that can be made available via an Internet").

### 2.   Claim 9 of the '557 Patent Is Invalid as Obvious in View of Seckin.

The same is true of claim 9 of the '557 patent.

| 9 | Rough Trial Tr. Vol. 4 at 176:6–178:20 (common to build streaming systems using one protocol for ingest and another protocol for delivering video); DTX249 at Fig. 2 (showing streaming system ingesting and delivering live content), ¶ 42 (describing use of real-time transport protocol (RTP) used for streaming), ¶ 141 (noting the embodiments could be used with any protocol) |
| --- | --- |

Voxer only disputed the absence of disclosure of two real-time streaming protocols for receiving and transmitting of the video message.  Rough Trial Tr. Vol. 6 at 197:14–17 (Mitzenmacher).  But as Defendants' expert testified, the use of two real-time streaming protocols was obvious because Seckin disclosed that it could be used with a variety of protocols (¶ 141) and that use of such protocols was common knowledge among those skilled in the art as evidenced by other real-time streaming systems such as that disclosed in U.S. Patent No. 6,389,473 ("Carmel"). Rough Trial Tr. Vol. 4 at 178:6–10 (Jeffay).  Voxer's expert did not rebut this testimony regarding common knowledge or even address how that was reflected in prior art like Carmel.

### E.   Voxer, Inc. Lacks Standing and Should Be Dismissed from the Case.

"[A] suit for infringement of patent rights ordinarily [must] be brought by a party holding legal title to the patent."  *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007); *see also* 35 U.S.C. § 281 (authorizing "[a] patentee" to sue for infringement).  Plaintiffs failed to

offer any evidence that Voxer, Inc. owns the patents or that it qualifies as an exclusive licensee. Voxer, Inc. cannot rely on its parent-subsidiary relationship with Voxer IP LLP for standing, because a "parent-subsidiary relationship does not endow" either with a share in the other's title to a patent. *Diodem, LLC v. Lumenis Inc.*, 2005 WL 6219898, at *13 (C.D. Cal. Sept. 14, 2005).

### F. Defendants Are Entitled to Judgment of No Damages Because Voxer Failed to Offer Sufficient Evidence to Support Its Requested Damages.

Voxer's experts' opinions are untethered to any recognized methodology, are contrary to law, unsupported and unreliable, and are otherwise insufficient evidence from which a reasonable jury could award damages.[8]  "The burden of proving damages falls on the patentee" (*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)), and "[t]he [patentee] must show his damages by evidence" (*Philp v. Nock*, 84 U.S. 460, 462 (1873)).  Because Voxer failed to provide sufficient evidence to support its damages award, it failed to meet its burden and the Court should grant judgment of no damages as a matter of law.  *See, e.g., Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 657 (Fed. Cir. 2017) (affirming judgment of no damages as a matter of law because "a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory").

### 1. Defendants Are Entitled to Judgment of No Damages Due to the Lack of Sufficient Apportionment

Dr. Mitzenmacher's technical apportionment analysis, adopted by Mr. Ratliff in his damages model, is insufficient on multiple grounds, and cannot support *any* damages award.  The

---

[8] Defendants maintain and renew their objection to the admission of Dr. Mitzenmacher's and Mr. Ratliff's opinions, as they both fail Rule 702 and *Daubert*.  The Court should exclude that testimony under Rule 702 (*see* Dkts. 185, 189 (*Daubert* motion briefing)) and then grant judgment of no damages under Rule 50(a) because without a cognizable damages model, the jury cannot award damages.  But even if the experts' opinions remain in the record, separately and in addition to being inadmissible, those opinions are also insufficient to meet Voxer's burden of proof and therefore also warrant judgment under Rule 50(a).  *See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018).

Court should grant judgment of no damages given the lack of a cognizable apportionment analysis.

> **a)** **No Reasonable Jury Could Award Damages Based on Dr. Mitzenmacher's Subjective, Unreliable, and Unsupported "Technical Apportionment" Analysis.**

Mr. Ratliff relied entirely on the opinion of Dr. Mitzenmacher in apportioning damages, but Dr. Mitzenmacher's "technical apportionment" analysis is unreliable, subjective, and unsupported. No reasonable jury may rely on it in awarding damages. *See* Dkts. 189, 211.

Dr. Mitzenmacher assigned an arbitrary quality to the components of the accused products based on his subjective opinion as to whether the components were "basic," "medium," or "sophisticated." Rough Trial Tr. Vol. 3 at 61:16–67:21 (Mitzenmacher). He did not provide any basis for the values he assigned, or explain why he valued the components as he did.

Dr. Mitzenmacher then testified to the "technical contribution" of Voxer's patents to the accused products. He asserted that at a "maximum," Voxer's patents contributed the entirety of the Facebook Live Server's value, or 23.5% of the value of the accused product. But, to be "conservative," he decided on a "declared minimum contribution of 20 percent" (~85% of the Facebook Live Server's value). *Id.* at 69:12–16. Dr. Mitzenmacher likewise testified that Voxer's patents contributed at a "maximum" the entirety of the value of Facebook's encoding service, or 5.9% of the value of the accused product, but he then discounted that amount "down to 2.5 percent" (~42% of the encoding service's value). *Id.* at 70:4–10. In total, he asserted that Voxer's patents contributed 22.5% of the value of the accused products. *Id.* at 70:11–14 (Mitzenmacher).

These estimates are not grounded in any objective facts or data. Dr. Mitzenmacher could not point to a single other example of such a methodology being used, a published paper adopting such a methodology, or even a prior instance in which he himself used such a methodology. *Id.* at 120:6–122:18 (Mitzenmacher). Dr. Jeffay confirmed that Dr. Mitzenmacher's valuation was not supported by any academic scholarship and was untethered to any objective methodology. Rough

Trial Tr. Vol. 4 at 193:20–195:2 (Jeffay).  Dr. Jeffay was not even cross-examined on this point.

No reasonable jury could award damages based on Dr. Mitzenmacher's subjective, unreliable, and unsupported technical apportionment analysis.

> **b)**     **Dr. Mitzenmacher's Failure to Separate the Infringing and Non-Infringing Features in His Apportionment Analysis Renders Mr. Ratliff's Damages Estimate Invalid.**

Dr. Mitzenmacher's so-called technical apportionment also does not satisfy the legal standard for apportionment in patent damages such that Mr. Ratliff could rely on it because it does not identify what portion of the component of the accused product is infringing.

"[W]here multi-component products are accused of infringement, the royalty base should not be larger than the smallest salable unit embodying the patented invention."  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018).  And "[e]ven when a damages theory relies on the smallest salable unit as the basis for calculating the royalty, the patentee must estimate what *portion* of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features."  *Id.* (emphasis added).  The "fundamental concern about skewing the damages horizon—of using a base that misleadingly suggests an inappropriate range—does not disappear simply because the smallest salable unit is used."  *Id.*

The smallest salable unit ("SSU") here are the accused products, Facebook Live and Instagram Live.  And though Dr. Mitzenmacher identifies certain components of that SSU (the Facebook Live Server and the encoding service), he fails to identify the ***features*** of those components that are infringing and separate them from non-infringing features. Rough Trial Tr. Vol. 3 at 67:7–21 (Mitzenmacher).  He thus failed to perform the requisite level of apportionment necessary for an award of patent damages.  *See Power Integrations*, 904 F.3d at 977.

As Facebook's engineers and Dr. Jeffay explained, the Facebook Live Server contains all

sorts of innovative technologies that Facebook developed.  *See*, *e.g.*, Rough Trial Tr. Vol. 4 at 196:5–22 (Jeffay).  They were not cross-examined on this point, and there is no competing evidence.  It is clear and undisputed that the Facebook Live Server—even if it contains an infringing feature—contains plenty of non-infringing features that have nothing to do with Voxer's technology.  Dr. Mitzenmacher fails to discuss any of the non-infringing features of the Facebook Live Server and encoding service to explain how Voxer's patents contributed ~85% of the value of the Facebook Live Server and ~42% of the encoding service.  Rough Trial Tr. Vol. 3 at 69:12–16, 70:4–10; *see also id.* at 70:11–14 (Mitzenmacher) ("add[ing] up the contributions from the Facebook Live server and from the encoding ... gives a minimum of 22.5 percent.").

This failure by Dr. Mitzenmacher requires judgment of no damages because Mr. Ratliff relied solely on that apportionment in defining the royalty base for his damages opinion.  Rough Trial Tr. Vol. 3 at 166:17–167:3 (Ratliff); Vol. 4 at 34:1–11 (Ratliff).  Mr. Ratliff used the "technical apportionment" from Dr. Mitzenmacher's testimony that 22.5% of the ad revenue "allocable" to Facebook Live and Instagram Live can be attributed to the asserted claims of the patents-in-suit.  *Id.*  Mr. Ratliff provided no apportionment analysis himself.  *See* Dkt. 185 at 14.  Because Mr. Ratliff bases his damages opinion on Dr. Mitzenmacher's subjective, unreliable, unsupported, arbitrary, and not apportioned "technical apportionment," Mr. Ratliff's royalty base is also unreliable and unsupported; and judgment of no damages should be entered.  *See*, *e.g.*, *Power Integrations*, 904 F.3d at 977; *Promega Corp.*, 875 F.3d at 657.

c)   **Mr. Ratliff's Use of Dr. Mitzenmacher's Technical Apportionment as a Substitute for Performing an Economic Valuation is Improper as a Matter of Law.**

Mr. Ratliff's sole reliance on a technical opinion to determine the economic value of the patents is fatal, because "proof of damages" must be "carefully tie[d]" to "the claimed invention's footprint in the market place."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir.

14

2010); *see also LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) ("This complete lack of economic analysis to quantitatively support the one-third apportionment echoes the kind of arbitrariness of the '25% Rule' that we recently and emphatically rejected from damages experts."). While technical opinions "about the incremental benefit conferred by the patented features of the accused products on the technology may be an input into the damages expert's opinion about the proper apportionment value," it "may not be the final apportionment value itself." *Realtime Data, LLC v. Oracle Am., Inc.*, 2017 WL 11574028, at *5 (E.D. Tex. Mar. 30, 2017). Mr. Ratliff takes Dr. Mitzenmacher's opinions regarding the ***technical*** benefits he asserted were conferred by the patented technology, and uses it as the "final apportionment value" in his ***economic*** analysis to support his damages theory, which is impermissible as a matter of law.

2.     **Mr. Ratliff's Damages Model Fails to Distinguish Among Voxer's Theories of Infringement, and Thus Invites the Jury to Award Damages for Conduct That Does Not Constitute Infringement.**

A patentee may recover damages only for the "number of instances of actual infringing use." *Lucent Techs.*, 580 F.3d at 1323. In addition, a patentee is not "entitled to compensatory damages for injury caused by infringing activity that occurred outside the territory of the United States." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013). As a result, the jury is permitted to award damages only for 1) the instances of actual infringement 2) that occur wholly within the United States. Mr. Ratliff's damages model invites the jury to exceed both these boundaries.

For the '270 patent, Voxer argued at trial that the claimed "identifier" in claim 34 of the '270 patent could be either various privacy settings or the use of Instagram Direct. Rough Trial Tr. Vol. 3 at 12:21–14:9 (Mitzenmacher). But if the jury were to find infringement, it may not have found that *all* of them constitute identifiers. The jury could find, for example, that use of Instagram Direct is infringing, but making broadcasts available to the "public" is not. Indeed, Dr.

Mitzenmacher provided different justifications for deeming the different settings to be identifiers. *Compare*, *e.g.*, *id.* at 13:6–19, *with id.* at 13:20–14:4.

For the '557 patent, Voxer has argued that claim 1 is infringed even when the "selecting" limitation was performed on a client—namely, a smartphone or other device. As discussed above, this theory of infringement fails. And it is doubly improper because some portion of those clients performed the selection outside the United States. Rough Trial Tr. Vol. 4 at 51:6–15 (Ratliff). And while Mr. Ratliff purports to narrow his calculation to only those instances where servers are located in the United States, he made no adjustment to account for the scenario wherein clients are found to perform one or more limitations but are outside the United States.

Voxer provided the jury no way to award damages only for the conduct it found to be infringing, and only the acts of infringement that occurred within the United States. The Court should preclude the jury from considering the unlawful damages model proffered by Mr. Ratliff.

### 3.     Mr. Ratliff's Use of Facebook and Instagram's Total Revenue Is Improper as a Matter of Law.

The royalty base of a multicomponent product "should not be larger than the smallest salable unit embodying the patented invention." *Power Integrations*, 904 F.3d at 977.

Mr. Ratliff concedes the Facebook and Instagram apps are multicomponent products and that Facebook Live and Instagram Live have their own specifically tracked revenue (Rough Trial Tr. Vol. 4 at 57:3–14, 66:12–19 (Ratliff)), thus making these products the smallest salable units. Yet, Mr. Ratliff begins his calculation with ***all*** of the Facebook app and Instagram app ad revenues as his royalty base. *Id.* at 57:3–7 (using Facebook and Instagram "worldwide app advertising revenues" as his "starting point"). Mr. Ratliff does not even attempt to satisfy the strictures of the entire market value rule, nor could he. He concedes that Facebook and Instagram were popular and had valuable non-infringing features, such as video-on-demand. *Id.* at 66:12–18 (Ratliff).

16

Mr. Ratliff claims he need not use the SSU as the royalty base because Facebook has not started to fully monetize Facebook Live and Instagram Live. Rough Trial Tr. Vol. 4 at 72:13–19 (Ratliff). This is based entirely on Mr. Ratliff's unsupported speculation. Facebook Live and Instagram Live, launched in 2015 and 2016 respectively, each have their own tracked monetization methods. And as of the time Facebook studied Facebook Live's effects on the "core business model," Facebook found that Facebook Live did not "provide more revenue as a result of that additional [watch] time." Rough Trial Tr. Vol. 6 at 44:7–16 (Poffenberger).

But even if Mr. Ratliff's assertion regarding live monetization were correct, it is irrelevant, as courts have repeatedly rejected plaintiffs' attempts to "hide behind" a defendant's "sales model to avoid the task of apportionment." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014); *LaserDynamics*, 694 F.3d at 69 (rejecting claim that "assembling and selling complete laptop computers, not independent [accused components]" made basing its royalty on the price of an entire laptop computer "a practical and economic necessity"). The Court should reject Mr. Ratliff's contention that Facebook and Instagram's "business model" relieves Voxer of its obligation to "identify a patent-practicing unit, tangible or intangible, with a close relation to the patented feature." *Virnetx*, 767 F.3d at 1329.

### 4.    Mr. Ratliff's Use of Total Watch Time or Total Number of Users Is Improper as a Matter of Law.

Mr. Ratliff multiplied total ad revenue for the Facebook and Instagram apps by the fraction obtained by dividing total Facebook Live and Instagram Live watch time (*i.e.*, the total time that users spent watching live videos) by what he calls total Facebook and Instagram app "watch time" (*i.e.*, the total time users spent on each app). Rough Trial Tr. Vol. 4 at 50:6–21 (Ratliff). But he had no basis for concluding that this calculation would estimate "the incremental value that the patented invention adds to the end product." *Commonwealth Sci. & Indus. Research Org. v. Cisco*

*Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).

There is no evidence in the record supporting Mr. Ratliff's assumption that the time spent watching Facebook Live and Instagram Live (as opposed to time spent on the Facebook or Instagram platform generally) causes an increase in total Facebook and Instagram ad revenues. Rough Trial Tr. Vol. 4 at 60:16–22 (Ratliff). To the contrary, the evidence at trial established that Facebook Live and Instagram Live do not have any impact on Facebook's overall revenue. Rough Trial Tr. Vol. 6 at 44:7–16 (Poffenberger).

And Mr. Ratliff's assumption that watch time provides an appropriate basis for calculating that amount is wholly unsupported in any case. Rough Trial Tr. Vol. 4 at 60:16–22 (Ratliff). Mr. Ratliff's "methodology" does not take into account that different products monetize at different rates on the Facebook and Instagram platforms, and that time spent using Facebook Live cannibalizes higher revenues that might be earned on other parts of the platform. Mr. Ratliff simply allocated total platform advertising revenue by the percentage of Facebook Live and Instagram Live watch time—assuming, without any basis for doing so, that live video monetizes the same as other surfaces. Rough Trial Tr. Vol. 4 at 50:6–21 (Ratliff).

## 5. Mr. Ratliff's Inclusion of "Was Live" Monetization as Derivative Damages Is Improper as a Matter of Law.

Mr. Ratliff includes revenues from "was live" videos in his damages model as derivative of "is live" videos. Rough Trial Tr. Vol. 4 at 47:15–20, 80:13–20 (Ratliff). But as he admitted at trial, many "was live" videos, such as recorded videos that were never "live," existed and can exist in the absence of "is live." *Id.* at 81:17–20. Mr. Ratliff's opinions attributing "was live" revenue as derivative of "is live" sales are therefore unsupported by the evidence.

In addition, Mr. Ratliff's "but-for" reasoning is divorced from a hypothetical negotiation and is improper. In *Sloan Valve Co. v. Zurn Indus., Inc.*, the court held that a 100% upward

adjustment for the sale of collateral products was improper under *Georgia Pacific* factor 6 because it sought to circumvent the EMVR and collect lost profits. 33 F. Supp. 3d 984, 997 (N.D. Ill. 2014). While *Georgia Pacific* factor 6 allowed "qualitative[]" adjustments for collateral sales, the factor "do[es] not apply quantitively to add a specific figure to the royalty base." *Id.* Mr. Ratliff's quantitative upward adjustment here using a 1.5 times multiplier is just the sort of "quantitative" adjustment *Sloan* found improper. That multiplier was also arbitrary and unsupported.

### 6. Mr. Ratliff's Use of a Running Royalty Is Unsupported.

Mr. Ratliff does not provide any basis for selecting a running royalty rather than a lump sum in the context of a hypothetical negotiation. Mr. Ratliff opines that Voxer would have preferred and sought a running royalty based on Facebook's use of the patented technology by way of a running royalty. But as Mr. Ratliff acknowledged, there is no evidence that Facebook has ever entered into a running royalty agreement. Rough Trial Tr. Vol. 4 at 85:4–18 (Ratliff). This is yet another reason why no reasonable jury could award damages for Voxer based on the model Mr. Ratliff has presented. In addition, no reasonable jury could award a running royalty given the trial evidence. The Court should award judgement of no damages, or at least judgment of no running royalty, under Rule 50(a). *Promega Corp.*, 875 F.3d at 657.

### 7. Mr. Ratliff's Only Properly Disclosed Damages Opinion Used the Incorrect Hypothetical Negotiation Date.

Mr. Ratliff's disclosed opinions were based on a hypothetical negotiation date in August 2015. However, this date was based on a patent earlier in the priority chain, which Voxer is no longer asserting. After Voxer narrowed the case to only the '270 and '557 patents (Dkt. 287 at 1), which were issued on November 27, 2018 and December 17, 2019, respectively, the date of the hypothetical negotiation is now November 2018, which is over three years *after* August 2015. The parties agree that the correct hypothetical negotiation date is November 2018. Rough Trial Tr.

Vol. 3 at 131:16–21.

"The correct determination of [the hypothetical negotiation] date is essential for properly assessing damages," and "the date of the hypothetical negotiation is the date that infringement began." *LaserDynamics, Inc.*, 694 F.3d at 75 (alterations in original) (citation omitted). The reasonable royalty must be based on the parties' expectations *at the relevant time*. *See, e.g.*, *Interactive Pictures v. Infinite Pictures,* 274 F.3d 1371, 1385 (Fed. Cir. 2001) (stating that "the rule [] recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales"). If the wrong hypothetical negotiation date is used at trial, the Federal Circuit will "remand for a new trial on damages pursuant to the [correct] hypothetical negotiation date." *LaserDynamics, Inc.*, 694 F.3d at 76.

The Court permitted Mr. Ratliff to testify based on a *new* hypothetical negotiation date (November 2018) even though that opinion was not disclosed in his report. Rough Trial Tr. Vol. 3 at 135:11–21 (Ratliff). "Under Rule 37(c)(1), if a party fails to disclose the information required by Rule 26(a), its expert may not testify as to that information—'unless such failure is harmless.'" *Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, 2013 WL 12076934, at *3 (W.D. Tex. Nov. 8, 2013). Defendants maintain and renew their objection to Mr. Ratliff presenting an undisclosed damages opinion based on a new hypothetical negotiation. And if that new, undisclosed opinion were excluded, then Voxer would have no properly disclosed damages model, and Defendants would be entitled to judgment of no damages.

### III.   CONCLUSION

The Court should grant judgment for Defendants as a matter of law under Rule 50(a) on all the claims and issues discussed above.

September 20, 2022

Respectfully submitted,

By: *s/ Robert A. Van Nest,*
       *with permission by Michael E. Jones*
    Robert A. Van Nest
    rvannest@keker.com
    Christa M. Anderson
    canderson@keker.com
    David J. Silbert
    dsilbert@keker.com
    Eugene M. Paige
    epaige@keker.com
    Matthew W. Werdegar
    mwerdegar@keker.com
    Paven Malhotra
    pmalhotra@keker.com
    KEKER, VAN NEST & PETERS LLP
    633 Battery Street
    San Francisco, CA 94111
    Tel: 415-391-5400

    Michael E. Jones
    SBN: 10929400
    Shaun W. Hassett
    SBN: 24074372
    POTTER MINTON, PC
    110 North College, Suite 500
    Tyler, Texas 75702
    Tel: 903-597-8311
    Fax: 903-593-0845
    mikejones@potterminton.com
    shaunhassett@potterminton.com

    Attorneys for Defendants
    META PLATFORMS, INC., f/k/a FACEBOOK,
    INC. and INSTAGRAM LLC