```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3 VOXER, INC. and VOXER IP LLC,        ) AU:20-CV-00655-LY
                                        )
 4    Plaintiffs,                       )
                                        )
 5 v.                                   ) AUSTIN, TEXAS
                                        )
 6 META PLATFORMS, INC., f/k/a          )
   FACEBOOK, INC., and INSTAGRAM LLC,   )
 7                                      )
      Defendants.                       ) SEPTEMBER 13, 2022
 8

 9         ***********************************************
                   TRANSCRIPT OF JURY TRIAL
10                         VOLUME 2
                  BEFORE THE HONORABLE LEE YEAKEL
11         ***********************************************

12 APPEARANCES:

13 FOR THE PLAINTIFFS:  G. BLAKE THOMPSON
                        MANN TINDEL THOMPSON
14                      201 E. HOWARD STREET
                        HENDERSON, TEXAS 75654
15
                        MICHAEL D. POWELL
16                      SAM STAKE
                        CHRISTINE WEIJIA CHEN
17                      OGNJEN ZIVOJNOVIC
                        QUINN EMANUEL URQUHART & SULLIVAN LLP
18                      50 CALIFORNIA STREET, 22ND FLOOR
                        SAN FRANCISCO, CALIFORNIA 94111
19
                        ROBERT W. STONE
20                      QUINN EMANUEL URQUHART & SULLIVAN LLP
                        555 TWIN DOLPHIN DRIVE, 5TH FLOOR
21                      REDWOOD SHORES, CALIFORNIA 94065

22                      GAVIN SNYDER
                        QUINN EMANUEL URQUHART & SULLIVAN LLP
23                      1109 FIRST AVENUE, SUITE 210
                        SEATTLE, WASHINGTON 98101
24

25
```

```
 1   FOR THE DEFENDANTS:   MICHAEL E. JONES
                           SHAUN WILLIAM HASSETT
 2                         POTTER MINTON PC
                           110 NORTH COLLEGE, SUITE 500
 3                         TYLER, TEXAS 75702

 4                         ROBERT A. VAN NEST
                           CHRISTA M. ANDERSON
 5                         DAVID J. SILBERT
                           EUGENE M. PAIGE
 6                         PUJA V. PARIKH
                           PAVEN MALHOTRA
 7                         JASON S. GEORGE
                           SEAN M. ARENSON
 8                         VISHESH NARAYEN
                           KEKER, VAN NEST & PETERS LLP
 9                         633 BATTERY STREET
                           SAN FRANCISCO, CALIFORNIA 94111-1809
10
                           BLAINE H. EVANSON
11                         GIBSON, DUNN & CRUTCHER LLP
                           3161 MICHELSON DRIVE
12                         IRVINE, CALIFORNIA 92612

13   COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
                           501 WEST 5TH STREET, SUITE 4152
14                         AUSTIN, TEXAS 78701
                           (512) 391-8791
15

16

17

18

19

20

21

22

23

24   Proceedings recorded by computerized stenography, transcript

25   produced by computer.
```

1                          **EXAMINATION INDEX**

2    THOMAS KATIS
           DIRECT BY MR. STONE . . . . . . . . . . . . . . . . . 60
3          CROSS BY MS. ANDERSON . . . . . . . . . . . . . . . 128
           REDIRECT BY MR. STONE . . . . . . . . . . . . . . . 159
4
     MATTHEW RANNEY
5          DIRECT BY MR. STONE . . . . . . . . . . . . . . . . 162
           CROSS BY MR. PAIGE . . . . . . . . . . . . . . . . .201
6          REDIRECT BY MR. STONE . . . . . . . . . . . . . . . 210

7    MICHAEL MITZENMACHER
           DIRECT BY MR. STAKE . . . . . . . . . . . . . . . . 211
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT INDEX**

OFFD/ADM

Plaintiff

| | | | OFFD | ADM |
|---|---|---|---|---|
| 3 | 3 | | 59 | 59 |
| 4 | 4 | | 59 | 59 |
| 5 | 5 | | 59 | 59 |
| 6 | 6 | | 59 | 59 |
| 7 | 17 | | 59 | 59 |
| 8 | 18 | | 59 | 59 |
| 9 | 19 | | 59 | 59 |
| 10 | 44 | | 59 | 59 |
| 11 | 47 | | 59 | 59 |
| 12 | 54 | | 59 | 59 |
| 13 | 145 | | 59 | 59 |
| 14 | 157 | | 75 | 76 |
| 15 | 402 | | 59 | 59 |
| 16 | 426 | | 66 | 66 |
| 17 | 427 | (Not admitted) | 86 | -- |
| 18 | 433 | | 59 | 59 |
| 19 | 542 | | 59 | 59 |
| 20 | 556 | | 59 | 59 |
| 21 | 679 | | 59 | 59 |
| 22 | 681 | | 59 | 59 |
| 23 | 736 | | 118 | 119 |
| 24 | 737 | | 59 | 59 |
| 25 | 739 | (Not admitted) | 107 | --- |

**EXHIBIT INDEX (CONT'D)**

| | | OFFD/ADM | |
|---|---|---|---|
| Plaintiff | | | |
| 741 | | 102 | 102 |
| 743 | | 59 | 59 |
| 744 | | 59 | 59 |
| 746 | | 59 | 59 |
| 752 | | 59 | 59 |
| 784 | | 59 | 59 |
| 802 | | 59 | 59 |
| 803 | | 59 | 59 |
| 804 | | 59 | 59 |
| 827 | | 59 | 59 |
| 828 | | 59 | 59 |
| 832 | | 84 | 85 |
| | | | |
| Defendant | | | |
| 98 | | 59 | 59 |
| 154 | | 59 | 59 |
| 155 | | 59 | 59 |
| 156 | | 59 | 59 |
| 162 | | 59 | 59 |
| 163 | | 59 | 59 |
| 164 | | 59 | 59 |
| 165 | | 59 | 59 |
| 166 | | 59 | 59 |
| 167 | | 59 | 59 |

**EXHIBIT INDEX (CONT'D)**

                                                    OFFD/ADM

Defendant

| | | |
|---|---|---|
| 171 | 59 | 59 |
| 172 | 59 | 59 |
| 185 | 59 | 59 |
| 215 | 59 | 59 |
| 233 | 59 | 59 |
| 234 | 59 | 59 |
| 249 | 59 | 59 |
| 276 | 59 | 59 |
| 438 | 59 | 59 |
| 440 | 59 | 59 |
| 607 | 59 | 59 |
| 607-A | 59 | 59 |
| 607-B | 59 | 59 |
| 607-C | 59 | 59 |
| 618 | 59 | 59 |

| | | |
|---|---|---|
| 14:16:22 | 1 | (Open court, no jury) |
| 14:16:22 | 2 | THE COURT:  Couple of quick notes before we get |
| 14:16:23 | 3 | started with opening statements.  Back to what we talked about |
| 14:16:27 | 4 | yesterday afternoon, Meta is going to reply to the brief that |
| 14:16:30 | 5 | was filed by Voxer; is that right? |
| 14:16:32 | 6 | MR. JONES:  That's right, Your Honor. |
| 14:16:33 | 7 | THE COURT:  About when? |
| 08:39:05 | 8 | MR. JONES:  Nine o'clock tomorrow morning, if that's |
| 08:59:57 | 9 | convenient for the Court. |
| 09:04:44 | 10 | THE COURT:  That's fine.  I'm going to grant Voxer's |
| 09:04:47 | 11 | motion on, for want of a better word, logistically how we're |
| 09:04:57 | 12 | handling this with the redacted copy and what can be used. |
| 09:05:01 | 13 | Basically, the original sealed, and the redacted copy of the |
| 09:05:07 | 14 | motion will be what's in the file. |
| 09:05:08 | 15 | MR. POWELL:  Thank you, Your Honor.  Plaintiff would |
| 09:05:09 | 16 | request, then, permission to recall Mr. Katis after his direct |
| 09:05:17 | 17 | examination today, because the issues in this motion are for |
| 09:05:19 | 18 | his testimony, and he's our first witness. |
| 09:05:22 | 19 | THE COURT:  No.  As I indicated yesterday, until we |
| 09:05:23 | 20 | got through this part of it, I'm happy to juggle witnesses.  So |
| 09:05:34 | 21 | if I were to reconsider previous rulings, you'll be able to |
| 09:05:38 | 22 | recall him as a witness. |
| 09:05:39 | 23 | MR. POWELL:  Thank you very much, Your Honor. |
| 09:05:43 | 24 | THE COURT:  So with that, are we ready to proceed |
| 09:05:45 | 25 | this morning? |

09:05:45   1              MR. STONE:  We're ready to proceed, Your Honor.

09:05:48   2              MR. VAN NEST:  We're ready, Your Honor.

09:05:52   3              THE COURT:  All right.  You may bring in the jury.

09:05:54   4         (Open court, jury present)

09:05:58   5              THE COURT:  Good morning, ladies and gentlemen.

09:05:58   6    Please be seated.

09:05:58   7              Our first order of business today will be opening

09:06:01   8    statements.  So is the plaintiff ready to proceed with the

09:06:06   9    plaintiff's opening statement?

09:06:07  10              MR. STONE:  We are, Your Honor.

09:06:08  11              THE COURT:  You may proceed.

09:06:09  12                    **PLAINTIFF'S OPENING STATEMENT**

09:06:09  13              MR. STONE:  Thank you, Your Honor.  May it please the

09:06:11  14    Court:

09:06:11  15              Good morning, ladies and gentlemen.  I'm Robert

09:06:14  16    Stone, one of the lawyers representing Voxer in this trial.

09:06:58  17    And, together with my team, we're pleased to present Voxer's

09:07:04  18    case against Facebook and Instagram to you.  Now, we all know

09:07:08  19    that jury service at times can be an inconvenience, but this

09:07:11  20    dispute is very important to our client and we all greatly

09:07:14  21    appreciate your time.

09:07:15  22              Now, you may hear this is a bit of a surprise, but we

09:07:18  23    often hear that jurors actually enjoy themselves, learning how

09:07:23  24    our system works and being involved in resolving patent cases.

09:07:27  25    And while I can't promise that everything will be as

09:07:32   1   entertaining as the Texas-Alabama game was this past weekend,

09:07:40   2   at least up until the last field goal, I can promise you that

09:07:43   3   we will be respectful of your time.

09:07:45   4          Now, what I'm going to do this morning is give you a

09:07:49   5   road map for what the evidence in this case will show, and that

09:07:52   6   evidence is going to come in the form of documents and witness

09:07:56   7   testimony, both live and recorded.  And at the end of the trial

09:08:00   8   we will have a chance to speak to you directly again, and we

09:08:04   9   will show you how the evidence tracked our road map.

09:08:06   10          Now, after you hear from all the witnesses over the

09:08:08   11   course of the next several days, Voxer is confident that you

09:08:08   12   will find that Facebook and Instagram, through their Facebook

09:08:10   13   and Instagram Live video messaging services, infringed the two

09:08:17   14   patents that Voxer has asserted.  And we believe that you will

09:08:20   15   also find that Voxer is entitled to damages for that

09:08:23   16   infringement.

09:08:28   17          Now, ladies and gentlemen, let's get to the road map.

09:08:33   18   This is a case about an idea that was born on the battlefield

09:08:37   19   of Afghanistan following 9/11, and that led to the founding of

09:08:40   20   a company, Voxer, by our client, Tom Katis, and the patents

09:08:44   21   that are asserted here.

09:08:45   22          Now, let me tell you a little bit about Tom Katis.

09:08:49   23   Like I mentioned, Mr. Katis founded Voxer in 2007.  But before

09:08:53   24   that Mr. Katis was already a successful entrepreneur and a

09:08:58   25   decorated Green Beret.  Now, you will hear that, after high

09:09:02   1   school, Mr. Katis enlisted in the Army, and it turns out that

09:09:05   2   every Green Beret needs to have an area of expertise.  And

09:09:11   3   based on aptitude testing, Mr. Katis was trained to be a

09:09:14   4   communications sergeant.

09:09:16   5        Now, a communications sergeant is someone who is

09:09:19   6   responsible for everything that contains electronics on the

09:09:23   7   battlefield.  And you'll hear from Mr. Katis that the things he

09:09:28   8   was responsible for included things like satellite

09:09:32   9   communications and battlefield radios, the walkie-talkies that

09:09:35  10   you might be familiar with.

09:09:38  11        Now, after his enlistment was up, Mr. Katis went to

09:09:40  12   college, first a year at the University of North Carolina at

09:09:43  13   Charlotte, and then he transferred to Yale University.  Now,

09:09:47  14   after graduating from Yale in 1994, Mr. Katis got a job in

09:09:50  15   New York for Citicorp.  And you'll hear how Mr. Katis was one

09:09:53  16   of four people who founded the bank's Internet group.

09:09:57  17        Now, after serving as Citicorp's vice-president in

09:09:59  18   charge of Internet payments for several years, Mr. Katis then

09:10:00  19   joined an Internet startup, where he was vice-president of

09:10:02  20   business development, until shortly before the 9/11 terrorist

09:10:07  21   attacks.

09:10:09  22        Now, when 9/11 happened, you'll hear how Mr. Katis,

09:10:13  23   like others who had served before, believed that his country

09:10:17  24   needed well-trained solders to re-enlist.  And, like many brave

09:10:23  25   Americans, Mr. Katis did that, and he was deployed to

PLAINTIFF'S OPENING

09:10:27   1   Afghanistan, where he was in Kunar Province.  There he and his

09:10:31   2   men were tasked with training Afghan special forces units,

09:10:35   3   looking for Al Qaeda.

09:10:37   4         Now, you'll hear from Mr. Katis that the genesis for

09:10:40   5   his thinking that led to Voxer, the plaintiff in this case,

09:10:43   6   came during his time in Afghanistan, in particular, after this

09:10:46   7   photo here which came following a particularly grueling ambush

09:10:49   8   on January 15, 2003.

09:10:51   9         Now, on that day Mr. Katis was responsible for

09:10:56   10  coordinating his unit's communications, as he always was.  And

09:11:00   11  even though the military had access to some of the best

09:11:05   12  communication devices in the world, the $15,000 radios that

09:11:10   13  they were using in 2002 were essentially the same radios that

09:11:16   14  Mr. Katis had used when he first enlisted more than a decade

09:11:20   15  earlier.  And those radios you'll hear have limited

09:11:23   16  functionality.

09:11:24   17        Thinking about the ambush later where he had been

09:11:26   18  trying to coordinate so many different things: his team,

09:11:30   19  medevac, air support, quick-reaction forces, his commander,

09:11:37   20  Mr. Katis realized that his radio, which had separate channels

09:11:40   21  for communications that were all being broadcast

09:11:42   22  simultaneously, didn't allow him to choose which ones to be

09:11:46   23  live and which ones to deal with later.

09:11:48   24        If he changed the channel, the live broadcast would

09:11:51   25  be lost.  And his sense of frustration about this later had him

```
09:11:57   1   thinking that a two-way communications system that was both
09:12:00   2   live and recorded, something that Mr. Katis referred to as
09:12:04   3   "time-shifted," kind of like a DVR, where you might record
09:12:08   4   something and go back and watch it later, but applied to
09:12:11   5   two-way communications, would be a great improvement.  And what
09:12:16   6   he later found was that no such system existed.  But I'll talk
09:12:19   7   a little bit about that more in a minute.
09:12:24   8          Now, after Mr. Katis left the military and before he
09:12:27   9   started Voxer, he founded a company called Triple Canopy, and
09:12:31  10   that was a government contractor that provided high-threat
09:12:34  11   security overseas.  And you'll hear that Mr. Katis and his
09:12:38  12   cofounder saw a need, in light of problems by companies such as
09:12:41  13   Blackwater, for a more ethical security company.  And you'll
09:12:46  14   hear that after a number of years, that company that he and his
09:12:49  15   cofounder started was very successful.  And when it was sold,
09:12:53  16   it had more than 11,000 employees and annual revenues of
09:12:56  17   greater than $1 billion.
09:12:59  18          Now, working with Triple Canopy introduced Katis to
09:13:03  19   someone else who is going to be very important to what you're
09:13:06  20   going to be hearing over the next few days, his cofounder of
09:13:10  21   Voxer, Matt Ranney.  Now Mr. Ranney's specialty was networking,
09:13:14  22   and he was hired by Triple Canopy to help set up satellite
09:13:18  23   computer networks across Iraq.  Now, while working at Triple
09:13:22  24   Canopy, Mr. Katis and Mr. Ranney talked about the frustration
09:13:24  25   Mr. Katis had experienced with military radios, and the two of
```

PLAINTIFF'S OPENING                                          13

09:13:29  1  them began a dialogue that would ultimately lead them to Voxer.

09:13:32  2          Now, you'll hear from them that what they were

09:13:36  3  looking for was a new hybrid communications system that could

09:13:40  4  be both live and time-shifted at the same time.  And what

09:13:45  5  you'll hear from Mr. Katis is that, prior to Voxer, if you

09:13:48  6  wanted to communicate with someone, you basically had two

09:13:51  7  options:  You could have a live communication, something like a

09:13:55  8  telephone, or you could have a time-delayed communication,

09:13:59  9  something like a text or e-mail.

09:14:01  10          And as we all know, for a phone call, you have to

09:14:04  11  ring and interrupt someone, you have to set up the connection

09:14:08  12  first, and then when the other side answers, you can talk.  But

09:14:12  13  if something is missed or the call is dropped, the

09:14:14  14  communication is lost.

09:14:16  15          For e-mail, by contrast, you have to compose it

09:14:20  16  before you send it, and then when you hit send, it gets

09:14:24  17  delivered, but the communication isn't live.  You have to wait

09:14:27  18  for it to be sent.  It is recorded, though.

09:14:31  19          Now what Voxer built was a hybrid of these two

09:14:34  20  systems, a technology where you could be live without

09:14:38  21  interrupting anyone, and the live communication could also be

09:14:41  22  recorded so that it could be listened to or viewed later.

09:14:49  23  Voxer would refer to this technology as "live messaging."

09:14:53  24          Now, you'll hear from Mr. Katis that he had his

09:14:57  25  epiphany about how Voxer might offer this technology in the

```
09:14:59   1   fall of 2006.  And you can see in the timeline there's a
09:15:04   2   reference here to a white paper that Mr. Katis wrote at that
09:15:07   3   time.  And he went on to form Voxer in March of 2007.
09:15:13   4         And, from the beginning, Mr. Katis and Mr. Ranney
09:15:16   5   believed that they had developed a revolutionary technology,
09:15:20   6   and they wanted to patent it.  And they did.  They went to the
09:15:23   7   patent office, and both Mr. Katis and Mr. Ranney have received
09:15:27   8   more than 150 patents relating to live messaging technology.
09:15:32   9         Now, these are two of the patents, the two patents
09:15:35  10   that are being asserted in this case, the '270 and the '557
09:15:40  11   patent.  And we'll talk about these in detail throughout the
09:15:43  12   trial.
09:15:44  13         Now, before I start talking about patents in detail,
09:15:48  14   I just wanted to briefly focus again on what is a patent.  And
09:15:51  15   I know you saw in the video yesterday that the court played,
09:15:54  16   and that gives a good description, of course, about the laws.
09:15:58  17   Now, our Founding Fathers believed that patent rights were so
09:16:02  18   important that they wrote those rights into the first article
09:16:04  19   of the Constitution.  They wrote that Congress shall have the
09:16:07  20   power to promote the progress of science by securing for
09:16:10  21   limited times to inventors the exclusive rights to their
09:16:14  22   discoveries.
09:16:17  23         Now, the patents at issue here, they only last for
09:16:20  24   20 years, and after that the inventions are dedicated to the
09:16:24  25   world.  So that's the bargain that inventors make.  If you
```

09:16:28  1  disclose your inventions to the world by publishing them in a

09:16:32  2  patent, you get the right to prevent others from using those

09:16:36  3  inventions for 20 years without your permission.  And if

09:16:39  4  someone does use your patent without permission, then you can

09:16:42  5  come into court like Voxer has done here and seek damages for

09:16:46  6  that use, something that we call "infringement."

09:16:48  7          So patents are like property rights protected by the

09:16:52  8  Constitution.  They're like a deed you would have to your land

09:16:55  9  or to your home.  And just like people aren't allowed to

09:16:58  10 trespass on your property without permission, nobody can use

09:17:02  11 someone else's patent, no matter how big the company is, no

09:17:06  12 matter how powerful, without permission.

09:17:09  13         So let's look a little more closely at the two

09:17:12  14 patents that are at issue here.  Mr. Katis and Mr. Ranney and

09:17:15  15 the other coinventors at Voxer did what they were supposed to

09:17:18  16 do.  They went to the patent office, they told the people there

09:17:22  17 about their inventions, and the patent office then published

09:17:26  18 those disclosures to the world.

09:17:28  19         And they did this first in what you're going to hear

09:17:30  20 from Mr. Katis as a June of 2007 provisional patent

09:17:34  21 application.  And you'll hear from Mr. Katis and Mr. Ranney

09:17:36  22 about what they were thinking back then.  And, in particular,

09:17:39  23 you'll hear about their vision which they describe here:  To do

09:17:42  24 for voice and video communications what e-mail, instant

09:17:46  25 messaging, and devices like the Blackberry have done for

PLAINTIFF'S OPENING                                    16

09:17:48   1   written correspondence.  Users can send quick voice or video

09:17:53   2   messages at the click of a button to any number of users

09:17:58   3   without necessarily interrupting other conversations or waiting

09:18:02   4   for acknowledgment.

09:18:05   5        And they also wanted to have a way of organizing and

09:18:09   6   allowing people to handle those various conversations, a system

09:18:12   7   for managing them.  And you can see that's in the title of this

09:18:16   8   document.  And in point number one, they said we also want to

09:18:20   9   develop a user interface to organize and prioritize current and

09:18:24  10   past conversations, manage contacts and groups, and manage that

09:18:30  11   user's interaction with the system.

09:18:32  12        Now, Voxer also filed for a second provisional patent

09:18:35  13   application.  You can see on the timeline that that happened in

09:18:38  14   October of 2007, and that contained even more details,

09:18:42  15   including the identification of certain target markets, such as

09:18:47  16   public and social networks or media industries, including

09:18:53  17   broadcasting.

09:18:53  18        Now, ultimately, the patent office evaluated Voxer's

09:18:58  19   various applications, compared them to what had come before,

09:19:01  20   and concluded that Mr. Katis and Mr. Ranney were entitled to

09:19:04  21   patents, including the two that we have here.

09:19:09  22        So focusing on those two patents, the first is what

09:19:14  23   we call the '270 patent.  And we use the last three numbers of

09:19:18  24   the patent.  Even though you can see the longer number is

09:19:22  25   10,142,270, we'll just be referring to it during the trial as

09:19:27  1  the '270 patent.  And you can see Mr. Katis and Mr. Ranney are

09:19:31  2  named inventors on that patent, along with two of their

09:19:34  3  coinventors from Voxer.

09:19:36  4         Now, that patent is assigned to a company called

09:19:39  5  Voxer IP.  It's one of the other plaintiffs in this case, but

09:19:43  6  for your purposes they're the same company during this trial.

09:19:46  7         And you'll also hear that this patent is entitled to

09:19:49  8  a priority date going back to at least February of 2008, when

09:19:55  9  the original patent application that they filed that was the

09:19:58  10  parent of these patents being asserted was filed.

09:20:01  11         Now, you'll hear that Voxer is asserting four claims

09:20:06  12  from the '270 patent, the '270 patent.  It's Claims 34, 47, 48,

09:20:12  13  and 51, and there will be further testimony and discussion of

09:20:16  14  those patents during the trial.

09:20:18  15         Now, the second patent being asserted by Voxer is

09:20:21  16  Voxer's '557 patent.  Again, you can see that Mr. Katis and

09:20:25  17  Mr. Ranney are listed as coinventors.  That patent is also

09:20:29  18  assigned to Voxer IP, and that patent also claims priority back

09:20:35  19  to at least February 8, 2008.  And Voxer is asserting two

09:20:40  20  claims from that patent, Claim 1 and Claim 9.

09:20:44  21         Now, it's important to put us back in time a little

09:20:47  22  bit so that we all have some perspective about the world that

09:20:51  23  existed when Mr. Katis and Mr. Ranney were considering their

09:20:53  24  inventions back in 2007.  And, as you can see on the timeline,

09:21:00  25  the very first provisional that Voxer filed on June 28, 2007

PLAINTIFF'S OPENING                                                18

09:21:05   1   was the day before the first iPhone came out.

09:21:08   2          And while we're all now used to a smart phone world

09:21:13   3   where we can use our Apple iPhones or Android devices, things

09:21:18   4   were very different in the pre-smart phone world where

09:21:20   5   Mr. Katis and Mr. Ranney were considering their inventions.

09:21:24   6   And you'll hear, for example, how bandwidth and networking

09:21:27   7   conditions were much lower then, where it was a 2G world, not a

09:21:33   8   5G world, although we don't always get 5G.  But you'll hear how

09:21:38   9   the networks were very different then.

09:21:41  10          Now, like I mentioned from its founding, Voxer was

09:21:44  11   eager to seek patent protection for its inventions.  And you'll

09:21:48  12   hear that it did that because Mr. Katis and Mr. Ranney wanted

09:21:51  13   to protect themselves against the dominant players in the

09:21:54  14   marketplace.  At the time that was mobile carriers like AT&T

09:21:58  15   and Verizon, but it was also the handset companies like

09:22:02  16   Motorola, and then certainly Internet companies that moved into

09:22:07  17   telecommunication space, companies like Google and Facebook.

09:22:10  18          But, in addition to seeking patent protection, Voxer

09:22:13  19   also set out to build a world-class app, a company -- a product

09:22:16  20   that could deliver live messaging to smart phones.  And after

09:22:21  21   years of effort, building and rebuilding their server

09:22:25  22   infrastructure so they could deliver fast, seamless delivery of

09:22:29  23   live messaging to their users with what you'll hear from

09:22:34  24   Mr. Ranney was a scalable network architecture that could

09:22:37  25   accommodate millions and millions of users, Voxer rolled out

09:22:42   1   their apps for iOS and Android in 2011.  And you can see on the

09:22:48   2   timeline that their app for iOS, for iPhone, that was in May,

09:22:52   3   and their app for Android, that was in November of 2011.

09:22:57   4          Now, the Voxer logo was a picture of a smiling

09:23:03   5   walkie-talkie.  I think they called it "Walkie."  It was a nod

09:23:06   6   to some of Mr. Katis' original thinking that led to Voxer.  But

09:23:09   7   the app itself was much more than that.

09:23:11   8          Now, as many of you probably remember from being a

09:23:14   9   kid, a walkie-talkie worked where only one person could speak

09:23:19   10  at a time, it wouldn't be recorded, you needed someone else

09:23:23   11  connected to it for you to be able to transmit to them.  With

09:23:27   12  the Voxer app, by contrast, once someone started recording

09:23:31   13  their voice, that was up loaded to the Voxer servers even

09:23:34   14  before a recipient was connected and the message could be heard

09:23:38   15  live or on a recorded basis.

09:23:42   16         Now, you will hear that this first app did not have

09:23:44   17  video, and that was because, like we were talking about,

09:23:49   18  phones, the handsets didn't work that well back then, and

09:23:52   19  bandwidth constraints didn't make it viable for them to have

09:23:55   20  video at that time.  But you will hear from Mr. Ranney that the

09:23:59   21  code for using video was already written for the server at that

09:24:03   22  point.  Voxer just needed the world to catch up in terms of the

09:24:08   23  headset -- the handset devices and the networks.

09:24:12   24         Now, shortly after the Voxer app's release in late

09:24:15   25  2011, the app went viral.  You'll hear that Voxer was often the

09:24:18  1  number one app in the App Store, even ahead of Facebook, in

09:24:22  2  social networking apps.  And this was in the late 2011 time

09:24:26  3  frame.

09:24:26  4          And then in 2012, for the calendar year, it was

09:24:29  5  number 13 out of all apps in the App Store.  It was ahead of

09:24:36  6  Facebook Messenger, which you can see was number 23.  And by

09:24:43  7  the end of 2012, you'll hear from Mr. Katis that Voxer had

09:24:47  8  nearly 60 million total users.

09:24:49  9          Now, the viral success of Voxer's app caught the

09:24:52  10  attention of lots of people in technology.  Many companies

09:24:55  11  reached out to Voxer, including Facebook.  And you'll hear

09:24:59  12  that, beginning at the end of 2011, Facebook reached out to

09:25:03  13  Voxer on a number of occasions to see if they could do business

09:25:10  14  together.  And, again, for some perspective, at the end of

09:25:15  15  2011, Facebook wasn't a publicly traded company.  So it was in

09:25:18  16  a different position than, obviously, you think of Facebook

09:25:20  17  today.  Beyond, that its Facebook Messenger product didn't even

09:25:24  18  offer voice at the time that Voxer was offering voice for

09:25:27  19  theirs.

09:25:27  20          And you can see on the timeline that there was a

09:25:29  21  series of meetings beginning at the end of 2011 and going into

09:25:35  22  February and March of 2012, where Voxer met with some of the

09:25:38  23  most senior executives at Facebook, all the way up to senior

09:25:44  24  executives such as Mike Schroepfer, who was the director of

09:25:48  25  engineering, and Mark Zuckerberg himself, Facebook's CEO.

| | | |
|---|---|---|
| 09:25:50 | 1 | And you'll hear that Mr. Katis and Mr. Ranney, in the |
| 09:25:53 | 2 | series of meetings they had with these senior executives and |
| 09:25:57 | 3 | with Facebook engineers, described their live messaging |
| 09:26:02 | 4 | technology.  And you'll hear that Mr. Katis, because he was |
| 09:26:05 | 5 | concerned about his position in the marketplace, repeatedly |
| 09:26:09 | 6 | described that they had sought patent protection for the |
| 09:26:13 | 7 | various inventions that their company had. |
| 09:26:16 | 8 | Now, internal documents from Facebook showed that |
| 09:26:19 | 9 | Facebook viewed Voxer's technology very positively.  After |
| 09:26:23 | 10 | their first substantial meeting in February of 2012 with |
| 09:26:27 | 11 | Peter Deng, who was the director of product for Facebook |
| 09:26:31 | 12 | Messenger -- and you'll hear some of his testimony in this |
| 09:26:34 | 13 | trial -- Deng described Voxer as having "good product sense." |
| 09:26:37 | 14 | He described that the founders were "long-term thinkers," where |
| 09:26:42 | 15 | "their vision was to take over the space between phone-to-phone |
| 09:26:45 | 16 | and text."  And he said that they "built good technology." |
| 09:26:48 | 17 | And you can see there that he wrote, "Not only did |
| 09:26:51 | 18 | their system scale well with their hyper growth late last year, |
| 09:26:55 | 19 | but they focused on build the products -- build the products to |
| 09:27:01 | 20 | have really good flows." |
| 09:27:04 | 21 | And you can see this is an e-mail from February 8, |
| 09:27:08 | 22 | 2012, shortly after their February 6th meeting, which Mr. Deng |
| 09:27:13 | 23 | sent to mark@facebook.com, who is Mr. Zuckerberg, |
| 09:27:17 | 24 | Mike Schroepfer, and some other senior Facebook executives. |
| 09:27:22 | 25 | Now, you'll also hear what Zuckerberg himself wrote. |

09:27:25    1    And he said:  "I'm not surprised that the founders are smart.

09:27:29    2    The product seems generally well done.  It might be worth

09:27:32    3    getting them on board if the price is reasonable."

09:27:36    4            Now, at the time, Voxer was seeking funding for its

09:27:42    5    company, and you'll hear from Mr. Katis that they did actually

09:27:47    6    obtain that funding in April of 2012.  And that funding valued

09:27:51    7    Voxer at about $200 million, and internal Facebook documents

09:27:56    8    confirm that they knew that was the valuation that people were

09:28:01    9    talking about with respect to Voxer.

09:28:04   10            This is an e-mail sent from a Facebook senior

09:28:07   11    executive, Amin Zoufonoun, to Chris Daniels, talking about the

09:28:09   12    fact that they're considering Voxer for an acquisition and that

09:28:15   13    Voxer was raising funding that valued them at $200 million.

09:28:19   14            Now, as part of the series of meetings that Mr. Katis

09:28:23   15    and Mr. Ranney had, they had a meeting with Peter Deng again --

09:28:29   16    they had several meetings with him.  He was coordinating the

09:28:33   17    efforts on behalf of Facebook with respect to investigating

09:28:38   18    Voxer -- and then this meeting with Chris Daniels to discuss

09:28:44   19    the potential licensing of Voxer's technology.

09:28:47   20            And you'll hear from Mr. Ranney that at that meeting

09:28:51   21    he had a white board, and he was describing how Voxer's

09:28:55   22    technology worked.  And Mr. Ranney will testify that, during

09:28:58   23    that meeting, a number of product engineers and other engineers

09:29:03   24    and executives for Facebook came in and were asking questions

09:29:06   25    about "Could you use this live messaging technology for video?"

09:29:10  1   And both he and Mr. Katis explained that you could and how you

09:29:13  2   would do that.

09:29:14  3        Now, you're also going to hear from Mr. Katis that,

09:29:18  4   at the end of the meeting, he went up to Chris Daniels and

09:29:22  5   asked him what he thought about it.  And Chris Daniels said to

09:29:27  6   him that he thought that the meeting was great.  There was just

09:29:30  7   one thing.  Facebook was considering whether or not Voxer's

09:29:33  8   technology was core and whether or not Voxer was a competitor.

09:29:36  9        And you're going to hear from Mr. Katis that he was

09:29:39  10  troubled by this statement.  Mr. Katis was concerned that, if

09:29:43  11  Facebook determined that Voxer's technology was core and that

09:29:46  12  Voxer was a competitor, then they were going to build that

09:29:52  13  technology themselves.  They weren't going to license it from

09:29:58  14  some other company that had control over it.

09:30:01  15       Now, after that meeting, abruptly, despite months of

09:30:04  16  productive discussions, Facebook told Voxer at the end of March

09:30:09  17  that they weren't interested.  And you'll hear from Mr. Katis

09:30:12  18  that he was surprised by this; that it didn't make sense, given

09:30:16  19  the trajectory of their discussions that they'd had.

09:30:22  20       Now, what Voxer didn't know is that Facebook internal

09:30:25  21  documents will show that Facebook had been having discussions

09:30:29  22  about building a decent version of Voxer themselves in-house.

09:30:32  23       Now, fast-forward a bit to August of 2015.  Facebook

09:30:35  24  began to roll out Facebook and Instagram Live, their real-time

09:30:39  25  streaming video services.  And upon seeing this, Mr. Katis was

09:30:43  1  reminded of that discussion he had had with Chris Daniels after

09:30:47  2  their March 2012 meeting, where after discussing the video use

09:30:59  3  cases for live messaging, as well as Voxer's various patents,

09:31:04  4  Mr. Daniels said that Facebook was trying to decide if Voxer's

09:31:09  5  technology was core and if Voxer was a competitor.  And you'll

09:31:14  6  hear from Mr. Katis that, after seeing Facebook Live and

09:31:18  7  Instagram Live roll out, that Mr. Katis determined that

09:31:22  8  Facebook's answer to both those questions was yes.

09:31:25  9          Now, Mr. Katis reached out to Facebook in early 2016

09:31:29  10  after this, and he said, look, in a series -- in a meeting that

09:31:34  11  he had and in some e-mails, he said:  We think Facebook Live

09:31:40  12  looks like our patented technology, and Voxer sent materials to

09:31:44  13  Facebook describing their patents and invited Facebook to

09:31:49  14  engage in some licensing discussions.  But Facebook wasn't

09:31:54  15  interested.

09:31:54  16          And then, as Facebook enjoyed the success of Live, as

09:31:57  17  live videos grew from hundreds to thousands to tens of

09:32:02  18  thousands, to hundreds of thousands, to millions, to tens of

09:32:07  19  millions, to almost a billion live videos a month, Voxer was

09:32:12  20  compelled to bring this lawsuit to protect its patent rights.

09:32:15  21          Voxer had done the right thing.  Mr. Katis and

09:32:18  22  Mr. Ranney patented their technology, and they disclosed it

09:32:22  23  publicly.  And the evidence will show that Facebook did the

09:32:26  24  wrong thing.  They decided to use someone else's technology

09:32:29  25  rather than innovate.  Consequently, Voxer expects Facebook and

09:32:34   1   Instagram to honor Voxer's patent rights, and now they're

09:32:38   2   asking you to enforce those patents and make Facebook and

09:32:41   3   Instagram to do the right thing, too: compensate Voxer for

09:32:47   4   their use.

09:32:47   5          And that leads me to two other witnesses that you're

09:32:52   6   going to hear from in this trial.  The first is

09:32:57   7   Dr. Michael Mitzenmacher.  Dr. Mitzenmacher is Voxer's

09:33:00   8   technical expert.  He's an expert in computer networking and

09:33:04   9   multimedia processing.  He has degrees from Harvard and

09:33:08  10   Berkeley, and he's currently a tenured professor at Harvard in

09:33:10  11   the computer science department.

09:33:11  12          And he went through and carefully studied all of

09:33:18  13   Facebook and Instagram's technical documents, and he looked at

09:33:21  14   the source code, the computer code that runs Facebook and

09:33:24  15   Instagram Live, and he reviewed the various testimony of the

09:33:28  16   Facebook and Instagram witnesses who have offered testimony

09:33:31  17   about how their products operate.

09:33:33  18          And then with that information he carefully compared

09:33:37  19   Facebook and Instagram Live and their operations with each of

09:33:40  20   the elements of the claims that are being asserted in the '270

09:33:44  21   and '557 patents.  And he's going to show you the infringement

09:33:49  22   element by element.  He's going to walk you through and show

09:33:52  23   how, in the accused Facebook and Instagram products, each

09:33:56  24   element of the asserted Voxer claims are found there.

09:33:59  25          And that's Voxer's burden as plaintiff.  We can't

09:34:02  1  just come in here and say we think Facebook and Instagram are

09:34:05  2  infringing.  We have the burden of proof, and we need to show

09:34:08  3  you that, by a preponderance of evidence, the accused products

09:34:11  4  meet every element.

09:34:13  5        And the judge will instruct you that a preponderance

09:34:15  6  of the evidence simply means "more likely than not."  And

09:34:18  7  Dr. Mitzenmacher will walk you through this, and he'll testify

09:34:21  8  that, in his expert opinion, the accused Facebook and Instagram

09:34:24  9  live products meet each and every element of the six asserted

09:34:28  10  patent claims.

09:34:30  11        Now, you will also hear from Alan Ratliff.

09:34:31  12  Mr. Ratliff is Voxer's damages expert.  He's a certified public

09:34:37  13  accountant and a licensed attorney.  He's an expert in patent

09:34:42  14  damages and licensing.

09:34:45  15        Now, if you find infringement, as we believe you

09:34:48  16  will, then the judge will instruct you that you have to award

09:34:52  17  damages.  Now, the law provides that, upon finding the

09:34:57  18  claimant -- upon finding for the claimant, the court shall

09:35:01  19  award the claimant damages adequate to compensate for the

09:35:03  20  infringement but, in no event, less than a reasonable royalty.

09:35:08  21  So what Voxer is asking for is a reasonable royalty based on

09:35:10  22  the use of Voxer's invention by Facebook and Instagram in their

09:35:16  23  products Facebook and Instagram Live.

09:35:18  24        Now you'll hear from Dr. Mitzenmacher and Mr. Ratliff

09:35:20  25  that, as part of their analysis, the infringing features in

09:35:25  1  this case give great benefit to Facebook and Instagram.  And,

09:35:28  2  based on these analyses, Mr. Ratliff determined that a

09:35:32  3  reasonable royalty to date would be $174 million.  Now, you

09:35:38  4  will also hear from Mr. Ratliff that Facebook made much, much,

09:35:42  5  much more than that from Voxer's inventions.

09:35:46  6          Now, one last thing on damages:  The number that

09:35:50  7  we're asking for is only up to the date of this trial.  Now,

09:35:53  8  why is that?  That's because the patents that are in suit here

09:35:59  9  don't expire until February of 2028.  So we're going to ask

09:36:05  10  that you find the damages should be in the form of a running

09:36:09  11  royalty through the date of the trial.

09:36:11  12          And if Facebook and Instagram go on to continue using

09:36:14  13  these infringing features, they can continue to pay a royalty.

09:36:19  14  If they decide, however, going forward that they want to stop,

09:36:23  15  they can stop infringing, and they wouldn't be obligated to

09:36:25  16  pay.  And we will ask you on the verdict form which you'll see

09:36:30  17  in your binders to find damages in the form of a reasonable

09:36:33  18  royalty.

09:36:34  19          Now, what will Facebook and Instagram say?  They will

09:36:36  20  likely say they don't infringe for some number of reasons, or

09:36:39  21  that the patents, despite the presumption of validity and

09:36:42  22  despite the fact that Facebook has to prove invalidity by a

09:36:46  23  heightened clear and convincing evidence standard, they may

09:36:49  24  argue that the patent's aren't valid.  Or, that even if the

09:36:53  25  patents are valid and they are infringed, that they shouldn't

09:36:57   1   be obligated to pay very much, if anything.

09:37:00   2           But, regardless of what they say, I just ask you to

09:37:04   3   listen carefully and evaluate if what they are saying makes

09:37:08   4   sense, if it makes sense to you, in light of all of the

09:37:12   5   evidence.  You're here because of your common sense and our

09:37:14   6   system trusts that your common wisdom is the best way to weigh

09:37:18   7   the evidence and decide who is right.

09:37:20   8           So, I'd like to say thank you again for your time on

09:37:23   9   behalf of all of our team.  We very much look forward to

09:37:26   10  addressing you about Voxer's claim over the rest of the trial.

09:37:30   11          Thank you very much.

09:37:31   12          THE COURT:  Thank you.  Defendant may open.

09:37:33   13          MR. VAN NEST:  Can I just have a moment to set up,

09:37:35   14  Your Honor?

09:37:36   15          THE COURT:  You may.

09:37:37   16          MR. VAN NEST:  Your Honor, may I proceed?

09:37:38   17          THE COURT:  You may.

09:37:39   18                 **DEFENDANT'S OPENING STATEMENT**

09:37:39   19          MR. VAN NEST:  Thank you, very much.  May it please

09:37:41   20  the Court:

09:37:42   21          Good morning, ladies and gentlemen, and welcome back.

09:37:44   22  My name is Bob Van Nest, and it's a real privilege for me,

09:37:46   23  along with my team, to be here during our trial representing

09:37:53   24  Facebook, one of the most innovative American technology

09:37:56   25  companies in the world today.  I also want to begin by thanking

09:38:35  1    you for your service as jurors.  This is a very important

09:38:38  2    dispute for both parties, and we really appreciate your being

09:38:42  3    here.

09:38:42  4           We know that jury service is a burden, it's not

09:38:47  5    voluntary, and you're taking time out of your busy lives.  So

09:38:51  6    we really do appreciate the time you'll be spending with us

09:38:55  7    this week and early next.

09:38:57  8           The Facebook and Instagram products at issue in this

09:39:00  9    lawsuit, Facebook Live and Instagram Live, are not using

09:39:02 10    Voxer's patents.  The engineers that built these products will

09:39:07 11    be here to testify that they used their own ideas, their own

09:39:10 12    engineering, and, in some cases, long-standing standardized

09:39:15 13    technology for video streaming that have been around for a long

09:39:20 14    time.

09:39:20 15           None of this work was based on the Voxer patents, and

09:39:27 16    there won't be any evidence that any engineer on the Facebook

09:39:30 17    or Instagram Live development teams ever saw, used, or was even

09:39:33 18    aware of the Voxer patents.  As a matter of fact, when Facebook

09:39:39 19    Live and Instagram Live were developed, these patents did not

09:39:42 20    even exist.  They hadn't even been applied for.  They were

09:39:46 21    applied for years after these products launched.  And so

09:39:55 22    Facebook Live is very different from the Voxer patents.

09:39:58 23    Nothing was copied, and there is no patent infringement.

09:40:02 24           Now, another reason for the differences between

09:40:06 25    Facebook and Instagram Live and Voxer is that the companies

DEFENDANT'S OPENING                                             30

09:40:09   1   were trying to solve very different problems.  Voxer was trying

09:40:13   2   to improve communications where you needed to make a direct

09:40:17   3   communication to an intended recipient where guaranteed

09:40:22   4   delivery was very important.

09:40:23   5          So they built a voice walkie-talkie app where you

09:40:29   6   could send a message directly to an intended recipient and try

09:40:33   7   to ensure reliable delivery.  But it was only a voice app.  And

09:40:40   8   Voxer was never able to use its technology to build a live

09:40:44   9   streaming video product.  Never.

09:40:46  10          Now, Facebook on the other hand was trying to develop

09:40:53  11   something different.  They were aiming for a broadcast system,

09:40:56  12   where a live video could be made available to thousands or even

09:40:59  13   millions of people upon their request.  The original idea for

09:41:04  14   Facebook Live was intended for celebrities.  Facebook had a

09:41:10  15   feature, and the idea was let's give celebrities another way to

09:41:15  16   connect with their fan base by making live videos available to

09:41:22  17   fans who requested to see them.  There was no guarantee of

09:41:27  18   delivery to anyone.

09:41:29  19          Now, the Facebook engineering team took about a year,

09:41:34  20   and you'll will hear about that from the engineers that

09:41:37  21   participated in it.  And at the height of it, it involved more

09:41:42  22   than 100 Facebook engineers trying to get this product ready

09:41:45  23   for launch.

09:41:45  24          Now, when these companies met back in 2012, the focus

09:41:50  25   of the discussion was on voice communications.  At that time

DEFENDANT'S OPENING

09:41:53   1   live video streaming was not new; it had been around for a long

09:41:57   2   time.  There were other examples which we'll see in a minute.

09:42:02   3   And Voxer didn't have a live video streaming product.  They had

09:42:12   4   a voice app.  Facebook was considering adding voice to

09:42:16   5   Messenger, and so the discussions focused on that: voice

09:42:22   6   communications, not video.  But, as you saw a little bit

09:42:26   7   earlier, the technology just wasn't right for Facebook, and

09:42:29   8   they said no thanks.

09:42:31   9        Now, after Facebook launched Facebook Live in 2015,

09:42:36   10  Mr. Katis and Voxer came back to Facebook to offer to license

09:42:40   11  or sell their technology.  They didn't complain about patent

09:42:45   12  infringement.  They didn't say anything had been copied.  They

09:42:50   13  didn't contend anything was wrong.  They were there just

09:42:53   14  offering to sell or license their technology to Facebook, and

09:43:00   15  we'll see that in detail in just a minute.  But, again,

09:43:08   16  Facebook said this technology is not right for us, and the

09:43:12   17  parties went their separate ways.

09:43:15   18       It wasn't until a couple of years later that Voxer

09:43:18   19  even applied for these live streaming video patents.  That was

09:43:23   20  in 2017 and 2018, a couple of years after Facebook Live

09:43:27   21  launched.  But by that time, by the time they applied to the

09:43:31   22  patent office for these patents, Facebook Live had already been

09:43:36   23  designed, built, launched, and was fully public.

09:43:41   24       Now, Voxer technology wasn't right for Facebook, but

09:43:44   25  it wasn't right for the industry either.  After Facebook told

09:43:49   1   Voxer for the second time we're not interested, Voxer marketed

09:43:52   2   this technology and their patents to nearly 100 technology

09:43:56   3   companies, nearly 100.  Not one other company has licensed or

09:44:01   4   purchased Voxer's technology for any purpose.  They went to the

09:44:06   5   market, they offered their patents, and not a single company

09:44:11   6   was interested.  And even Voxer has not used any of the

09:44:16   7   inventions in the '270 or the '557 patents in their products.

09:44:25   8   So not even Voxer is using this technology.

09:44:28   9            So let me turn to our key points of evidence.  This

09:44:32   10  is what I'm going to outline this morning for you.  The first

09:44:39   11  key point is that Facebook engineers built Facebook Live using

09:44:43   12  their own technology, not Voxer's technology.  They did their

09:44:47   13  own work, and you're going to hear from them shortly.

09:44:51   14           Technology in Facebook Live's products is

09:44:55   15  fundamentally different from anything in the Voxer patents.

09:45:00   16  That means there is no patent infringement.

09:45:04   17           And Voxer's technology just wasn't right for Facebook

09:45:07   18  or anyone else in the industry.

09:45:09   19           Now, this is a timeline that we can use to kind of

09:45:12   20  keep the key events in focus.  And before I get into it, I want

09:45:18   21  to point out just a couple of things that we're going to be

09:45:20   22  reviewing.  First of all, neither Facebook nor Voxer invented

09:45:26   23  live streaming video or adaptive bitrate technology, which is

09:45:32   24  the subject of the '557 patent.  Neither company did that.

09:45:36   25  These technologies have been around since the '90s.

09:45:39   1          Facebook launched in 2004.  It was available then to

09:45:42   2   college students.  And since that time, long before Facebook

09:45:46   3   Live, Facebook has introduced new features along the way.

09:45:53   4          Now, when the parties first met in February, March of

09:45:57   5   2012 and had the discussions you heard about, these patents,

09:46:03   6   the '270 and the '557, they didn't exist.  They weren't applied

09:46:09   7   for, as you see on the timeline, until a couple of years later.

09:46:15   8   So Facebook Live was built and launched before these patents

09:46:20   9   were in existence.

09:46:22  10          So let's start with the timeline.  We're going to go

09:46:23  11   over to the left and pull it out and look at live streaming

09:46:30  12   video.  As you can see here, live streaming video has been

09:46:34  13   around since the '90s.  In June of 1993, a band -- and I put

09:46:39  14   that in quotes -- called Severe Tire Damage was the first to

09:46:42  15   live stream a concert.  Now, I asked the folks -- I've never

09:46:47  16   heard of these guys.  They are a bunch of computer scientists.

09:46:50  17   They're not a real band.  But they livestreamed a concert in

09:46:53  18   the early '90s.  And as you can see from the timeline, there

09:46:58  19   were a lot of developments along the way.

09:47:01  20          In '97, RealNetworks launched a RealVideo product.

09:47:06  21   By '98 this was being used so commonly that industry adopted a

09:47:10  22   protocol.  That's an industry standard protocol, real-time

09:47:12  23   streaming protocol, the RTSP.

09:47:15  24          In the 2000s this took off.  Madonna livestreamed a

09:47:18  25   concert to 9 million people.  University of Washington started

DEFENDANT'S OPENING                                    34

09:47:22   1   interactive learning.  That's like what we had to do during

09:47:25   2   COVID, the interactive learning video like COVID.  But that

09:47:30   3   with UW back in '01.  And by 2003 all the major instant

09:47:35   4   messaging systems were supporting live video.  And you can see

09:47:40   5   there on the timeline Skype was introduced and then Microsoft

09:47:44   6   had a product.  All this happened before Voxer even existed and

09:47:49   7   long before Voxer even built its first app.

09:47:51   8            And the same is true of adapted bitrate technology.

09:47:55   9   What is that?  This is technology that's relevant to the '557.

09:47:59  10   This involves your phone or your tablet or your laptop

09:48:04  11   selecting a version of video that's suitable given your

09:48:09  12   bandwidth.  You may have noticed, say, watching a Youtube

09:48:13  13   video, that sometimes you get a very good picture and sometimes

09:48:17  14   it's pretty fuzzy.  You're actually getting a different version

09:48:21  15   of the video depending on how much bandwidth you have.  So

09:48:24  16   adaptive bitrate technology, which was launched in the early

09:48:30  17   '90s, is a way of having your device select a version that's

09:48:34  18   suitable, depending on how much bandwidth you've got.

09:48:38  19            Now, this started in '92 with a paper by a man named

09:48:42  20   Delgrossi, and then the University of Carolina, Dr. Kevin

09:48:46  21   Jeffay, who is sitting here in the courtroom and will be a

09:48:48  22   witness in the case he was one of the earlier developers of

09:48:53  23   this technology and saw it along the way.  And, again, in 1998

09:48:57  24   RealNetworks introduced a product.  In 2002 Microsoft did.

09:49:05  25   This product was so commonly used that, by 2003, there was

DEFENDANT'S OPENING                                    35

09:49:09   1   already a text book that was applying the products -- applying

09:49:12   2   the technology.  And you can see in 2004 an inventor named

09:49:17   3   Seckin applied for a patent.  We're going to be talking about

09:49:21   4   her patent application in a moment.  That was years before

09:49:27   5   Voxer was even formed.

09:49:31   6          Now, I think most folks know that Facebook has many

09:49:34   7   different features.  There's a friends feature, groups.

09:49:39   8   There's many different groups you can join.  There's a feed

09:49:42   9   that people can scroll through.  You can buy things on

09:49:44   10  Facebook.  The point is there are many features on Facebook

09:49:47   11  beyond Facebook Live.  And by the time Facebook Live came

09:49:51   12  along, Facebook was already successful and had millions and

09:49:56   13  billions of users.

09:49:57   14         Here's a little timeline for Facebook which shows

09:49:59   15  that, starting in '04, they continually introduced new

09:50:02   16  features.  And then in '06 the news feed.  That's basically

09:50:07   17  your friends and groups scroll that comes on your -- on your

09:50:12   18  app.  In 2007 they adopted -- they launched video.  Now, that's

09:50:22   19  not live video.  That's prerecorded video like you see on

09:50:30   20  Youtube and so on.  But that was launched in '07.  The

09:50:34   21  Marketplace as well.  Facebook Chat in '08, Facebook Messenger

09:50:37   22  in 2011.  And, as I said, the Facebook Live product was

09:50:40   23  independently developed by Facebook engineers, not using any

09:50:44   24  Voxer patents.

09:50:46   25         Now, when these parties met and talked in 2011 and

DEFENDANT'S OPENING                                              36

09:50:50   1   '12, the focus of it was on voice messaging, not video, because

09:50:56   2   Voxer didn't have a live streaming video product.  They had a

09:51:01   3   walkie-talkie app which, as you can see from their own

09:51:06   4   material, it's an app that turns your smart phone into a walk

09:51:11   5   walkie-talkie.

09:51:13   6          It was a voice app, not a video app, and these

09:51:18   7   discussions had nothing to do with Facebook Live video or

09:51:24   8   Instagram Live video which was still off in the future.  They

09:51:30   9   had to do with the possibility of adding voice to the instant

09:51:34  10   messaging system that Facebook had at the time, which was

09:51:37  11   called Messenger.

09:51:39  12          And, in fact, as Mr. Katis is going to concede during

09:51:43  13   the trial, Voxer never did develop the ability to send

09:51:47  14   real-time video messages.  That never happened.  What Voxer was

09:51:52  15   offering, and all it has ever offered, is a voice app, not a

09:51:59  16   livestreaming video product.

09:52:01  17          And maybe the best evidence of that is this e-mail

09:52:03  18   which is an internal Facebook e-mail from that time, and you

09:52:09  19   can see that the Facebook folks are talking about what we

09:52:13  20   really want is VOIP for iOS.  VOIP is Voice over Internet.  iOS

09:52:21  21   is Apple.  That's the operating system for Apple phones.  They

09:52:25  22   were trying to develop a voice product for Apple phones.  And

09:52:31  23   they say we want to find the shortest path to that, and it

09:52:37  24   turns out we might be able to build it ourselves.  Again, we're

09:52:42  25   talking about voice technology, and they had some hesitation

09:52:46   1   about whether or not the Voxer folks could really support that

09:52:48   2   effort.  That was in 2012.  And, as you saw, Facebook told

09:52:52   3   Voxer, sorry, we're not interested.

09:52:55   4          Now let's fast-forward a little bit to 2015.  These

09:52:59   5   are two of the Facebook engineers that led the development team

09:53:02   6   that build Facebook Live, and they'll be here to testify to the

09:53:06   7   work that they and their teams did.  They'll talk about the

09:53:10   8   problems they faced, the challenges of developing a system like

09:53:14   9   this, and the solutions they adopted to overcome them.

09:53:21   10  Mr. Capra, who is an engineering manager, led the product team,

09:53:26   11  so he was developing the design, the look and feel, how do

09:53:31   12  creators use it, how do fans use it, what does it look like.

09:53:36   13  And Mr. Mathur led the infrastructure team.

09:53:38   14         They built the guts of Facebook Live.  And he'll talk

09:53:42   15  about the problems they had and how they overcame them.  But,

09:53:46   16  critically, they will testify that neither they nor anyone on

09:53:51   17  the development teams either saw, used, or had any awareness of

09:53:55   18  Voxer patents.

09:53:56   19         So what's the timeline for developing the product?

09:54:01   20  It started in 2014.  Facebook had a feature called Mentions for

09:54:06   21  Celebrities, and the folks running Mentions wanted to find a

09:54:11   22  better way for celebrities to connect with the fans.  And they

09:54:18   23  thought that a live video product might be a good way to do it.

09:54:24   24         So in April of 2015, they organized an engineering

09:54:27   25  day called "Coding Under the Stars."  A group of engineers met

DEFENDANT'S OPENING                                                38

```
09:54:32   1    on the roof of a Facebook building, and they spent a full day
09:54:36   2    trying to develop a prototype for livestreaming.  You'll hear
09:54:40   3    this referred to, ironically, as a "hackathon."  Well,
09:54:45   4    hackathon in this context doesn't mean stealing -- breaking
09:54:48   5    into somebody's computer.  It means spending a full day with a
09:54:54   6    group in trial and error trying to develop a prototype, and
09:54:57   7    they did.
09:54:57   8             And so by August of 2015 they were ready for a live
09:55:00   9    celebrity launch, which you'll see in a minute with Dwayne
09:55:03  10    Johnson, that goes by "the Rock."  And in April of 2016 they
09:55:09  11    launched publicly.  And by that I mean any user could use
09:55:12  12    Facebook Live as of then.
09:55:13  13             The big problem they were trying to solve wasn't the
09:55:16  14    basics of livestreaming video.  It was:  What do you do with
09:55:21  15    the thundering herd?  If you're going to make live video
09:55:25  16    available to thousands or millions of people, how do you set up
09:55:29  17    a system that can handle that if you've got that many people
09:55:34  18    all at once trying to watch the video?
09:55:37  19             Here's a picture of the Coding Under the Stars on the
09:55:40  20    left.  Mr. Mathur was there, and he'll be testify about that.
09:55:43  21    And on the right is the prototype that the engineers developed
09:55:47  22    that day, and Mr. Mathur is the one that will introduce that
09:55:50  23    and explain what they did.
09:55:53  24             So that was April.  By August this was good enough to
09:55:57  25    showcase with Dwayne Johnson.  And let's just watch a few
```

DEFENDANT'S OPENING                                    39

09:56:01  1  minutes of the launch, the original live launch, of the

09:56:05  2  celebrity version of Facebook Live.

09:56:08  3      (Video played)

09:56:08  4          MR. VAN NEST:  So that's The Rock.  And that was in

09:56:11  5  August of 2015, and Mr. Capra supervised that launch and he'll

09:56:17  6  be here to testify all about that.

09:56:20  7          Now, after Facebook Live launched, as you heard

09:56:23  8  little bit earlier today, Mr. Katis came back to Facebook with

09:56:27  9  this e-mail offering to sell or license the technology.  And he

09:57:00  10  says in an e-mail to Stan Chudnovsky at Facebook:  "Here's an

09:57:04  11  overview deck and a more detailed IP statement that highlights

09:57:08  12  some of our key patents.  As we discussed, we're getting

09:57:14  13  inbound interest."  That means people are pursuing us.  "But if

09:57:21  14  we go down that road, we'd rather start with someone like

09:57:24  15  yourselves that we feel we share common values and culture

09:57:29  16  with."

09:57:29  17          This was a very friendly e-mail.  We share values and

09:57:33  18  culture with you.  You don't see any claim of infringement or

09:57:36  19  claim of copying or claim that you're doing anything wrong.  We

09:57:43  20  share values with you, and we'd like to sell you our

09:57:48  21  technology.

09:57:49  22          Now, you didn't see this.  This was Mr. Stan

09:57:53  23  Chudnovsky's response.  His response was very open and candid.

09:57:56  24  His response was, "As you mentioned, you have great IP for the

09:58:03  25  space that Voxer is in.  That said, all of our properties are

DEFENDANT'S OPENING                                    40

09:58:07  1  doing something completely different, and we currently have no

09:58:11  2  plans to enter into different territories."

09:58:14  3        Very straightforward.  We're in a different space

09:58:17  4  than you are.  And Mr. Katis didn't disagree with that.  Here's

09:58:21  5  his response on the top.  "All good, Stan.  Thanks for

09:58:25  6  forwarding it on.  Would love to grab lunch again sometime."

09:58:29  7        So this wasn't anything like a claim of infringement.

09:58:34  8  This was an effort to sell or license your technology, a very

09:58:39  9  friendly exchange, indeed.

09:58:41  10        Let's go back to our timeline, because everything

09:58:44  11  we've talked about so far, the early adoption of these

09:58:48  12  technologies, the launch of Facebook, the meetings in 2012, and

09:58:54  13  the live launch, all of these things took place before either

09:58:57  14  of the two patents in this lawsuit were applied for.  So by the

09:59:02  15  time they applied for the '270 in 2017 or the '557 in 2018,

09:59:08  16  Facebook Live had been designed, launched, and built.

09:59:11  17        Our second key point of evidence is the technology in

09:59:14  18  Facebook Live's products is fundamentally different from

09:59:23  19  anything in the Voxer's patents.  There is no patent

09:59:26  20  infringement.

09:59:27  21        These companies were pursuing different goals.

09:59:31  22  Voxer's goal was to improve communications between identified

09:59:34  23  recipients, where guaranteed delivery was important.  It was a

09:59:40  24  messaging system to ensure that a message got through.  That's

09:59:43  25  not what Facebook was trying to accomplish.  Facebook's was a

09:59:49   1   broadcast system.

09:59:50   2            Facebook was trying to build a broadcasting system

09:59:54   3   that was capable of making live video available to millions of

10:00:01   4   people who could view it upon request.  There was no guarantee

10:00:04   5   that anyone would receive it.  It was available upon request,

10:00:09   6   but the user had to request it.  So, again, you see there the

10:00:17   7   user on the right is making a request.

10:00:20   8            Now, this is a patent infringement case, and you're

10:00:23   9   going to get some very detailed instructions from Judge Yeakel

10:00:27  10   later on.  But your main job is to determine whether the

10:00:30  11   Facebook or Instagram Live products infringe the patents.  And

10:00:33  12   the bottom line of that is Voxer has the burden to prove that

10:00:36  13   every element in the patent claim is found in the Facebook Live

10:00:40  14   or Instagram Live products.  Every element.

10:00:43  15            So I prepared this kind of simple example since it's

10:00:49  16   football season.  If someone has a patent on a volleyball or a

10:00:53  17   soccer ball and the elements are it's made of leather, stitched

10:00:58  18   together, filled with air, and round, then you have to show

10:01:03  19   that the defendant's product has all those elements.  Two out

10:01:06  20   of three are not enough.  Three out of four are not enough.  So

10:01:10  21   the football is made of leather, yep, stitched together, yep,

10:01:14  22   filled with air, yep, but not round.  So there's no

10:01:18  23   infringement.

10:01:18  24            That's the analysis that you're going to be applying

10:01:25  25   to this technology.  I wish it were as simple as a soccer ball

DEFENDANT'S OPENING                                              42

10:01:30  1  or football, but this is what we have, and we're going to work

10:01:33  2  through it with the experts and the testimony.

10:01:35  3          So let's talk about the two patents.  This is the

10:01:39  4  '270.  It was applied for in May of 2017, and it claims a

10:01:43  5  method for delivering video streaming to intended recipients

10:01:46  6  using a recipient identifier.

10:01:48  7          What does that mean?  Here are the claims.  There's

10:01:52  8  lots of words here, and our experts will -- will discuss them

10:01:56  9  with you.  But, as you can see from my red checkmarks, there

10:02:00  10  are three separate elements that are not found in Facebook

10:02:04  11  Live, because the patent requires sending a recipient

10:02:09  12  identifier to an intended recipient when the video is

10:02:13  13  transmitted and determining a location to which to deliver the

10:02:17  14  video using that recipient identifier.  It's a push system, if

10:02:22  15  you will.  It pushes the video out to an intended recipient to

10:02:28  16  make sure there is a reliable delivery.

10:02:31  17          That's not how Facebook Live works at all.  On the

10:02:36  18  left I'm showing the Voxer system, which is my EMT captain here

10:02:43  19  on the left, she is sending out messages to identified

10:02:46  20  recipients that are going out to their IP addresses.  It's a

10:02:52  21  push system to make sure that, in an emergency, or in battle or

10:02:57  22  wherever type of crisis you have, the message is delivered.

10:03:02  23          That's very different from Facebook Live or Instagram

10:03:04  24  Live.  That's a broadcast system.  It's a broadcast in which

10:03:09  25  the video is made available upon request, no recipient

DEFENDANT'S OPENING                                        43

10:03:14  1  identifier is used, and the video is delivered only to people

10:03:19  2  who make a request.  It's available upon request.  So you can

10:03:24  3  see it's a pull system.  You have to pull it.  That's what

10:03:30  4  we're showing on the right.  The fellow at the desk is making a

10:03:36  5  request and pulling the video to his desktop.  And there's the

10:03:39  6  other two don't care.

10:03:41  7        Now, the patent describes in detail the problem it's

10:03:45  8  trying to solve:  The need for reliable delivery of critical

10:03:49  9  messages in a crisis.  You can see there this is language from

10:03:54  10  the patent itself.  Tactical communications are therefore

10:03:57  11  plagued with several basic problems.  There's no way to

10:04:01  12  guarantee delivery of messages.  That's one of the things that

10:04:07  13  they're trying to achieve.  And the answer is:  When sending a

10:04:13  14  message as part of a conversation associated with a number of

10:04:16  15  people, all of the contacts receive the message.  The claims in

10:04:20  16  the patent, the '270, the identifier, and the identified

10:04:24  17  recipient, are intended to create reliable delivery.

10:04:28  18        So let's go back to my example.  My EMT captain is

10:04:33  19  communicating to several folks on the team, and she's using an

10:04:37  20  identifier to get a location to send the video to.  And she

10:04:43  21  pushes that video out to make sure that they -- that they

10:04:47  22  receive it.  Facebook, on the other hand, doesn't do it that

10:04:50  23  way.  It's a broadcast that's made available to millions of

10:04:55  24  people, but only those who request it and pull it to their

10:05:00  25  device will see it.  That's the way it is.

DEFENDANT'S OPENING                          44

10:05:03   1            Now, obviously, in a battlefield situation or in an

10:05:06   2   emergency, it wouldn't make sense to send a Facebook Live video

10:05:11   3   out on broadcast and simply hope that somebody decides to watch

10:05:15   4   it.  It's not intended for that purpose.  And, therefore,

10:05:20   5   because it doesn't meet all the elements of the '270, there's

10:05:24   6   no infringement.  That's the '270 patent, and you'll hear a lot

10:05:29   7   more about that.

10:05:30   8            Two '557 was applied for in 2018, even later.  It

10:05:35   9   claims a method for using what I mentioned, adaptive bitrate

10:05:41  10   streaming, in a live video system.  Now, as we reviewed

10:05:45  11   earlier, adaptive bitrate streaming has been around since the

10:05:49  12   '90s.  So there are two issues on this patent.  One issue is:

10:05:54  13   Should it even have issued from the patent office in the first

10:05:59  14   place, or did someone else do it before Voxer did?  And the

10:06:03  15   second issue is:  Even if it's valid, is Facebook or Instagram

10:06:07  16   using the technology?

10:06:08  17            Let's take that second issue first.  Here are the

10:06:11  18   claims of the '557.  The '557 claims a method for performing

10:06:16  19   this adaptive bitrate technology by selecting a video message

10:06:21  20   by the video message service infrastructure.  Now, what does

10:06:27  21   that mean?  That requires that the servers in your system that

10:06:31  22   are part of your infrastructure, they measure the bandwidth

10:06:34  23   between the servers and the user's device -- a phone, tablet, a

10:06:44  24   laptop -- and they select a version of the video that is

10:06:49  25   appropriate based on bandwidth.  If there's lots of bandwidth,

DEFENDANT'S OPENING                                45

```
10:06:53   1   you can send a very -- a high-quality video and see great
10:06:59   2   resolution.  If it's low bandwidth, you send a lower-quality
10:07:02   3   version and it's kind of fuzzy.  That's what this claim is all
10:07:07   4   about, and the patent requires that this be done by the
10:07:10   5   infrastructure of the servers themselves.  That is, again, not
10:07:13   6   how Facebook Live or Instagram Live work.
10:07:15   7          In these systems it's the client device -- your
10:07:18   8   laptop, your phone, your desktop, your tablet -- that measures
10:07:22   9   the bandwidth and selects a version of the video.  It's not
10:07:26  10   done by the Facebook servers, and the Facebook servers provided
10:07:31  11   the same service to Instagram, too.  So it's not done by
10:07:38  12   Facebook servers.  In the Facebook Live and Instagram Live
10:07:42  13   systems, it's done differently.  Why?  There's two reasons.
10:07:46  14          If you're building a broadcast system where you
10:07:48  15   intend to send and make available to people, thousands or
10:07:54  16   millions of viewers, then the Facebook servers could be
10:07:59  17   overwhelmed by folks clamoring to request the video.  That's
10:08:06  18   one reason that this task is placed on the user's device -- the
10:08:11  19   phone, the laptop, the tablet.
10:08:13  20          The second reason is the device knows best what it
10:08:17  21   needs.  Your device knows how big the screen is, how much
10:08:22  22   resolution you can accommodate, how many pixels you can
10:08:25  23   actually deal with.  So in the Facebook and Instagram system,
10:08:28  24   this task is dedicated to the client device, and that's why the
10:08:34  25   '557 patent is not practiced by Facebook Live or Instagram
```

DEFENDANT'S OPENING

46

10:08:37   1   Live.

10:08:38   2          Now, I promised a second issue on this one, and that

10:08:41   3   is that Voxer wasn't the first to develop whatever invention

10:08:45   4   there is in the '557.  Remember, the patent video that you-all

10:08:50   5   saw yesterday said that, to be entitled to a patent, you have

10:08:55   6   to be the first to invent the idea.  To get the patent, you

10:08:59   7   have to be the first.  If someone beats you to it, you can't

10:09:03   8   get a patent because it's already out there and published.

10:09:10   9          Now, what I'm showing here is a patent application by

10:09:13  10   an inventor named Seckin, and she applied for a patent and

10:09:19  11   published it back in 2004.  And there's no dispute in the case

10:09:24  12   that the Seckin patent application is earlier than Voxer.

10:09:27  13   There's no dispute that it qualifies as prior art and qualifies

10:09:30  14   as an invention, and the examiner in the patent office that

10:09:35  15   evaluated the '557 patent wasn't aware of the Seckin

10:09:39  16   application.  They weren't aware of the Seckin application, so

10:09:46  17   they didn't consider it.  You'll be the first to consider the

10:09:49  18   Seckin application in connection with the '557.

10:09:54  19          And what does it disclose?  Her's a figure from the

10:09:58  20   patent itself.  The handwriting is original.  And, as you can

10:10:02  21   see, it describes a video streaming system using adaptive

10:10:06  22   bitrate technology with every single element that Voxer is

10:10:10  23   claiming on '557.

10:10:13  24          So on the left, that cloud is a little dark, but it

10:10:18  25   says "still image audio video."  So we're talking about video.

DEFENDANT'S OPENING                                    47

```
10:10:21   1   And up there in the top left, "live content."  And we're
10:10:25   2   streaming it to devices on the right, a phone, a laptop, looks
10:10:33   3   like a desktop.  And we're doing it using adaptive bitrate
10:10:36   4   technology.  That's what's shown in the middle.  And Dr. Jeffay
10:10:41   5   will be here to explain this a little bit, but he's created
10:10:45   6   this simplified version taken right from the patent, and this
10:10:51   7   is how it works.  Seckin describes sending live content to a
10:10:56   8   transcoder that creates different versions of the video.  The
10:11:01   9   thicker the lines, the better quality, the higher resolution.
10:11:05  10   And the transcoder creates separate versions, and the server
10:11:10  11   selects a version appropriate to the device that will
10:11:12  12   ultimately receive it.  Those are the client devices on the
10:11:18  13   right.  You've got a phone, maybe a tablet, a desktop, and so
10:11:23  14   on and so forth.
10:11:25  15          This is the second invention.  It operates with all
10:11:28  16   the same elements.  It discloses all the same features of the
10:11:33  17   '557, which is why we say, and the evidence is going to show,
10:11:36  18   that Seckin was first, she was earlier, and the '557 patent is
10:11:39  19   not valid.
10:11:41  20          All right.  My last key point of evidence you've
10:11:45  21   heard a little bit about already.  The Voxer technology and
10:11:47  22   patents was not right for Facebook or anyone else in the
10:11:51  23   industry.  Let's go back to our timeline now.
10:11:57  24          After Facebook Live launched in 2015, Mr. Katis
10:12:00  25   offered to sell or license, but Facebook said we are not
```

DEFENDANT'S OPENING

| | |
|---|---|
| 10:12:08 | 1 |
| 10:12:10 | 2 |
| 10:12:15 | 3 |
| 10:12:18 | 4 |
| 10:12:25 | 5 |
| 10:12:29 | 6 |

10:12:08  1   interested.  We're doing something different than what your

10:12:10  2   patents provide.  Voxer went to the market in 2016 and '17, and

10:12:15  3   they made an effort, a big effort, to sell their technology or

10:12:18  4   license it.  They hired bankers.  They had their -- their

10:12:25  5   technology valued.  They went to the market.  But it turns out

10:12:29  6   nobody in the market was interested.

10:12:32  7        This is a partial list of the nearly 100 companies

10:12:36  8   that Voxer attempted to market its technology to.  And you can

10:12:41  9   see this is the -- this is who's who, right?  This is Cisco,

10:12:45  10  this is Google, this is Qualcomm, this is IBM, this is Yahoo,

10:12:51  11  and so on and so forth.  This isn't everybody.

10:12:55  12       But they hired bankers and valuation specialists, and

10:13:02  13  those folks approached all these people.  But not a single

10:13:05  14  company, not one, has agreed to license or purchase Voxer's

10:13:10  15  technology.  It wasn't right for the industry.  Why?  It was

10:13:14  16  really, really late.  2017 and 2018 are 20 years after, almost

10:13:19  17  30 years, after this technology first became available.

10:13:24  18       Now, before the lawsuit started and before the

10:13:27  19  parties were in court, Voxer actually had hired valuation

10:13:33  20  specialists to value this technology and what it might be worth

10:13:37  21  to Facebook Live and others, too.  In other words, before there

10:13:42  22  was a dispute, as part of their marketing, they hired folks to

10:13:47  23  value their patents, all of them, to others.  And you can see

10:13:53  24  here this is created by a company called Houlihan Lokey in June

10:14:00  25  of 2017, before the lawsuit.

DEFENDANT'S OPENING

49

| | | |
|---|---|---|
| 10:14:02 | 1 | And I've highlighted the line.  They attempted to |
| 10:14:05 | 2 | value Voxer's patent portfolio.  And with respect to Facebook |
| 10:14:09 | 3 | Live, they said -- this is Voxer's analyst, Voxer's hired |
| 10:14:15 | 4 | valuation people -- it is worth between 5- and 22.9-million, |
| 10:14:18 | 5 | all-in, all patents.  That's the value of it to the market. |
| 10:14:25 | 6 | Now, of course, even that is high because no one was willing to |
| 10:14:30 | 7 | pay even that for this technology.  But this is what Voxer |
| 10:14:38 | 8 | believed its portfolio was worth based on the analyst that they |
| 10:14:44 | 9 | retained to help them sell it. |
| 10:14:46 | 10 | There's another piece of evidence that occurred |
| 10:14:48 | 11 | before the lawsuit in the marketplace.  They offered to sell |
| 10:14:51 | 12 | the whole company, including all the technology, to Twitter for |
| 10:14:55 | 13 | less than $20 million.  This is an e-mail from a man named |
| 10:15:03 | 14 | Quincy Smith.  He worked at Code Advisors.  They were a |
| 10:15:06 | 15 | representative of Voxer trying to sell the company.  And he is |
| 10:15:09 | 16 | e-mailing a gentleman named Noto at Twitter and saying, "As a |
| 10:15:16 | 17 | favor for me on Tom Katis and Voxer.  Your team will not get |
| 10:15:19 | 18 | it, but it's simple IP, less than 20 million and game changer." |
| 10:15:25 | 19 | So, again, before the lawsuit started, Voxer itself |
| 10:15:28 | 20 | valued its technology, and all of it, at less than 20 million. |
| 10:15:32 | 21 | And, again, that was high, because Twitter wasn't interested |
| 10:15:36 | 22 | and neither was anyone else.  That's why this $174 million |
| 10:15:41 | 23 | number you heard about is absolutely unrealistic, out of touch |
| 10:15:48 | 24 | with the market evidence, and completely unreasonable.  Even |
| 10:15:55 | 25 | if -- even if you found infringement, their position on money |

DEFENDANT'S OPENING

10:15:58   1   is way out of line, because the marketplace evidence is that
10:16:02   2   the whole company was offered for less than 20 million, their
10:16:08   3   own valuation of the entire portfolio is in range of 5 to 22,
10:16:13   4   and here they are now asking you for that enormous sum of
10:16:16   5   money.
10:16:17   6           Now, before I sit down, I want to just introduce some
10:16:22   7   of the folks on my team that you'll be hearing from.  And so
10:16:31   8   I'll start with Mike Jones that you heard from yesterday.  He
10:16:34   9   was the one asking the questions.  Christa Anderson, David
10:16:38   10  Silbert, Gene Paige, Paven Malhotra, and our client
10:16:41   11  representative John Poffenberger.  And I can't leave out our
10:16:44   12  trusty legal assistants Brent Haugeberg and Laura Lind, who are
10:16:46   13  going to help us keep track of all the documents and everything
10:16:49   14  else that's coming along.
10:16:51   15          So I'll say thank you again.  But before I sit down,
10:16:54   16  I want to echo something that Judge Yeakel said yesterday, and
10:17:00   17  that is:  Please keep an open mind as you listen to the
10:17:04   18  evidence, because since Voxer is the plaintiff, they get to go
10:17:10   19  first, they have the burden of proof on infringement and so on
10:17:14   20  and so forth, and so they get the opportunity to go first.  Our
10:17:17   21  presentation will be later in the week, so please keep an open
10:17:20   22  mind until you've heard all the evidence.
10:17:22   23          And thanks once again for your time and attention and
10:17:26   24  for being here to help us.  Thank you.
10:17:30   25          THE COURT:  Thank you.  Ladies and gentlemen, this is

10:17:33  1   a convenient stopping point for our morning recess.  We'll be

10:17:36  2   in recess for 15 minutes.

18:00:00  3       (Jury recessed)

10:17:40  4       THE COURT:  All right.  You may be seated and be at

10:17:42  5   ease for just a moment before we take our recess.  I want to

10:17:46  6   get the notebooks we've been discussing distributed to the

10:17:51  7   jurors at this point as the evidence begins.  I'm going to go

10:17:55  8   ahead and do what I suggested that I might do yesterday.  We

10:17:58  9   will include the two patents, the asserted patent claims, and

10:18:43  10  the verdict form, but I'm going to omit the jury instructions

10:18:47  11  from the notebooks.  They're lengthy.  I don't have a problem

10:18:51  12  with them, but I'm afraid that the jury will get involved in

10:18:55  13  reading the jury instructions and not be involved in listening

10:18:59  14  to you-all as they should be.  And I'll have plenty of time to

10:19:04  15  read them the instructions, and they can have them at the end.

10:19:06  16       Does anybody have great outcry of not doing it that

10:19:09  17  way?

10:19:09  18       MR. VAN NEST:  We don't have any outcry, Your Honor.

10:19:11  19       THE COURT:  How about from the plaintiff?  You all

10:19:13  20  right with that?

10:19:14  21       MR. STONE:  We are, Your Honor.

10:19:14  22       THE COURT:  Okay.  Then let's get those ready so the

10:19:20  23  jurors can have them when they get back.  And then is the

10:19:23  24  plaintiff ready to call the plaintiff's first witness?

10:19:26  25       MR. STONE:  We are, Your Honor.

| | | |
|---|---|---|
| 10:19:27 | 1 | THE COURT:  All right.  Then we'll be in recess is |
| 10:19:29 | 2 | until a little after 10:30.  Thank you-all. |
| 18:00:00 | 3 | (Recess) |
| 10:19:37 | 4 | (Open court, no jury) |
| 10:19:38 | 5 | THE COURT:  Couple of quick things before we bring |
| 10:19:40 | 6 | the jurors in.  Before the plaintiff calls the plaintiff's |
| 10:19:42 | 7 | first witness, I'm going do admit the exhibits that you-all |
| 10:19:45 | 8 | have indicated in your joint notice of pre-admitted exhibits, |
| 10:27:20 | 9 | although they're not pre-admitted because I haven't admitted |
| 10:28:51 | 10 | them yet.  They're soon to be pre-admitted. |
| 10:36:13 | 11 | And then I'm also, because I do this at the beginning |
| 10:36:15 | 12 | of trial, I'm going to read your stipulated facts to the jury |
| 10:36:20 | 13 | so they will already be in evidence.  And what I'm not going to |
| 10:36:24 | 14 | read, though, is in your stipulations over on H through N, |
| 10:36:28 | 15 | which are priority dates, I'm not going to read for the purpose |
| 10:36:33 | 16 | of this litigation because I think the jury knows it's for this |
| 10:36:38 | 17 | litigation.  And I know you did that so you're not waiving that |
| 10:36:41 | 18 | for any other purpose, but I just rule right now, just because |
| 10:36:49 | 19 | I'm not going to say that doesn't mean I'm admitting the |
| 10:36:56 | 20 | stipulation for anything other than what we're doing in this |
| 10:36:59 | 21 | courtroom the next two weeks. |
| 10:37:00 | 22 | MR. POWELL:  Thank you, Your Honor. |
| 10:37:01 | 23 | MS. ANDERSON:  Thank you, Your Honor. |
| 10:37:03 | 24 | THE COURT:  Anything else we need to take up before |
| 10:37:03 | 25 | we get the jury in? |

10:37:03  1          MR. POWELL:  Your Honor, the plaintiff does.

10:37:05  2          THE COURT:  What?

10:37:05  3          MR. POWELL:  The plaintiff does.  May I be heard

10:37:07  4  quickly?

10:37:08  5          THE COURT:  Yes.

10:37:08  6          MR. POWELL:  Okay.  Sorry I'm starting to sound like

10:37:12  7  a broken record, but we've got a couple of new songs to play

10:37:15  8  this time.  Opening the door on MIL 3, here are the three ways

10:37:18  9  they did it in their opening.  They said Voxer does not use its

10:37:19  10  own video technology.  The reason they don't use it, Facebook

10:37:27  11  killed their business.

10:37:28  12          They say Facebook was able to build the video

10:37:33  13  technology quickly.  The way they did that, they stole it from

10:37:36  14  Voxer.

10:37:37  15          Third, they said Twitter only offered 20 million.

10:37:40  16  The reason they only offered 20 million, Facebook killed the

10:37:44  17  business.  How did they kill it?  They removed us from the

10:37:47  18  Facebook platform.

10:37:48  19          So we think they've opened the door.  Mr. Katis

10:37:50  20  should be allowed to testify that, following the conversations

10:37:53  21  in March of 2012, Facebook went silent, Zuckerberg went to

10:37:56  22  China, decided to copy, they built their own competing system,

10:38:00  23  they came back in January, launched it, and killed Voxer.

10:38:03  24          THE COURT:  All right.  I'm going to review the reply

10:38:06  25  brief I get in the morning at 9:00.  I'll get it at 9:00.  I'm

10:38:09  1    going to review it.  At sometime either in the morning recess,
10:38:14  2    because I might read it if I think the witnesses are
10:38:16  3    particularly boring after I get it.  Otherwise, I won't read it
10:38:20  4    until the recess.  And I will set an argument.  And if I allow
10:38:23  5    the testimony, you'll be allowed to recall your witness and
10:38:27  6    develop it.
10:38:27  7            MR. POWELL:  Thank you, Your Honor.  Two other small
10:38:29  8    issues.  Motion in Limine Number 1 had to do with excluding
10:38:34  9    reference *inter partes* reviews that were filed as to the
10:38:39  10   patents-in-suit.  The defense raised in their opening that
10:38:46  11   Seckin was not considered by the patent office.  They had every
10:38:49  12   opportunity to present Seckin to the patent office in their
10:38:52  13   *inter partes* review.  They chose not to.  We are now, I believe
10:38:55  14   fairness dictates, entitled to tell them about the IPR and
10:38:58  15   Facebook's choice, conscious choice, not to present that to the
10:39:00  16   patent office.  They participated in the prosecution history of
10:39:04  17   this patent.
10:39:04  18           THE COURT:  Response?
10:39:05  19           MR. VAN NEST:  Your Honor, I don't think Mr. Katis is
10:39:07  20   going to be talking about that.  Frankly, that's the first I've
10:39:11  21   heard that that's somehow opening the door.  Seckin wasn't in
10:39:15  22   the IPR.  It wasn't a part that was presented to the patent
10:39:18  23   office.  It wasn't something the patent office considered.  And
10:39:21  24   the basis of --
10:39:22  25           THE COURT:  I didn't think we got into what was said

| | | |
|---|---|---|
| 10:39:26 | 1 | to the IPR.  We got the Seckin patent as not having been |
| 10:39:30 | 2 | considered in the first instance by the PTO -- |
| 10:39:32 | 3 | MR. VAN NEST:  That's all I said. |
| 10:39:34 | 4 | THE COURT:  -- when the Voxer patents were up.  So |
| 10:39:36 | 5 | that's overruled at this point. |
| 10:39:39 | 6 | MR. POWELL:  We'll see what the evidence shows, |
| 10:39:41 | 7 | Your Honor. |
| 10:39:41 | 8 | THE COURT:  We will see what the evidence shows. |
| 10:39:42 | 9 | MR. POWELL:  The other request would be for leave to |
| 10:39:44 | 10 | submit a proposed jury instruction clarifying what the meaning |
| 10:39:52 | 11 | of a priority date is.  Obviously, the defense is trying to |
| 10:39:55 | 12 | confuse the jury as to what it means. |
| 10:39:56 | 13 | THE COURT:  No.  Wait a minute.  I can go along with |
| 10:40:00 | 14 | you on your arguments and examine them on the merits.  I don't |
| 10:40:03 | 15 | want you to hear you say things to me like obviously what the |
| 10:40:06 | 16 | defense is trying do. |
| 10:40:07 | 17 | MR. POWELL:  Okay. |
| 10:40:08 | 18 | THE COURT:  I tried a lot of cases, not patent cases, |
| 10:40:11 | 19 | as a lawyer.  Don't give me the lawyer banter about being |
| 10:40:15 | 20 | critical of one another.  Give me what your argument is.  I can |
| 10:40:17 | 21 | draw my own conclusions as to who I think is overreaching at |
| 10:40:19 | 22 | any given point. |
| 10:40:20 | 23 | MR. POWELL:  Thank you, Your Honor. |
| 10:40:22 | 24 | THE COURT:  Now, give me the gist of your argument. |
| 10:40:24 | 25 | MR. POWELL:  We believe that the jury is being led to |

10:40:26  1  believe that the filing of the two patents-in-suit in 2018

10:40:32  2  means that the Facebook systems that were launched in 2016 are

10:40:40  3  themselves prior art to the patents.  We think it's going to be

10:40:43  4  important to explain that continuation patents such as we have

10:40:47  5  here are deemed to have been filed in 2008 when the original

10:40:50  6  application was filed, and they get the benefit of that

10:40:55  7  priority.  And it needs to be explained to the jury that, even

10:40:59  8  though the products came out before these patents were filed,

10:41:02  9  they're deemed to have been filed earlier.

10:41:04  10        THE COURT:  I've got a whole group of smart people

10:41:06  11  sitting out here in front of me.  Take one of the smart people

10:41:09  12  from each side and have them discuss whether you can come up

10:41:11  13  with some agreed language for the Court's Charge.

10:41:13  14        MR. POWELL:  We'd be happy to do that.  Thank you,

10:41:18  15  Your Honor.

10:41:18  16        THE COURT:  All right.  Now are we ready for the

10:41:19  17  jury?

10:41:20  18        MR. STONE:  Yes, Your Honor.

10:41:20  19        THE COURT:  Bring in the jury.

10:41:23  20      (Open court, jury present)

10:41:23  21        THE COURT:  Ladies and gentlemen of the jury, you'll

10:41:24  22  notice the notebooks that we've been referring to for your use

10:41:28  23  during the trial are on your chairs.  Those are your notebooks.

10:41:31  24  You can mark on them.  You can do whatever you want to.

10:41:34  25  There's nothing magic with it.  You can search your notes in

10:41:37  1  there.  They will be taken up at the end of the trial.  They

10:42:30  2  are not souvenirs of the trial.  They are for you to use during

10:42:33  3  this trial.

10:42:33  4        Before the plaintiffs call the plaintiff's first

10:42:36  5  witness, you've heard me in giving instructions to you talk

10:42:39  6  about things that you must accept as evidence, one of those

10:42:43  7  being anything that the parties have stipulated to.  The

10:42:47  8  parties have stipulated to certain facts in this case.  I'm

10:42:51  9  going to read them to you, and you will take these facts as

10:42:55 10  true as if you heard evidence on them.

10:42:57 11        1.  This court has jurisdiction over the parties and

10:43:02 12  all claims and defenses in this action.

10:43:04 13        2.  Voxer is a Delaware -- Voxer, Inc. is a Delaware

10:43:08 14  corporation with its principal place of business at 199 Brian

10:43:12 15  Street, Suite 900, Dallas, Texas 75201-3140.

10:43:19 16        3.  Voxer IP, LLC is a Delaware limited liability

10:43:24 17  company and the legal owner by assignment of the asserted

10:43:29 18  patents.  Voxer IP, LLC is a wholly owned subsidiary of

10:43:36 19  Voxer, Inc.

10:43:38 20        4.  Meta Platforms, Inc. formally known as Facebook,

10:43:44 21  Inc., is a Delaware corporation with a principal place of

10:43:48 22  business at 1601 Willow Road, Menlo Park, California.

10:43:53 23        5.  Instagram, LLC is a Delaware limited liability

10:43:57 24  company and a wholly owned subsidiary of Meta Platforms, Inc.

10:44:04 25        6.  Defendants Meta Platforms, Inc., formally known

as Facebook, Inc., and Instagram, LLC own and operate the
facebook.com and instagram.com websites and make available the
Facebook Live and Instagram Live services, as well as the
Facebook and Instagram applications for mobile devices.

7.  The application leading to the '030 patent was
filed February 15th, 2008, and the '030 patent was issued
May 15th, 2012 by the U.S. Patent Office.

8.  The '030 patent is entitled to a priority date of
no earlier than June 28th, 2007.

9.  The application leading to the '969 patent was
filed April 6th, 2016, and the '969 patent was issued on
April 25th, 2017 by the U.S. Patent Office.

10.  The '969 patent is entitled to a priority date
of no earlier than June 28th, 2007.

11.  The application leading to the '270 patent was
filed on May 2nd, 2017, and the '270 patent was issued on
November 28th -- pardon me -- November 27th, 2017 by the U.S.
Patent Office.

12.  The '270 patent is entitled to a priority date
of no later than June 28th, 2007.

13.  The application leading to the '557 patent was
filed on October 16th, 2018, and the '557 patent was issued on
December 17th, 2019 by the U.S. Patent Office.

14.  The '557 patent is entitled to a priority date
of no earlier than June 28th, 2007.

10:46:22  1          15.  On January 7th, 2020, Voxer filed this patent

10:46:28  2  infringement action against Defendant.

10:46:30  3          At this time the plaintiff may -- well, pardon me.

10:46:35  4  Also I'm going admit for your consideration at this time

10:46:40  5  certain exhibits.

10:46:50  6          The following exhibits are admitted into evidence:

10:46:53  7          P-3, P-4, P-5, P-6, P-17, P-18, P-19, P-44, P-47,

10:47:10  8  P-54, P-145, P-402, P-433, P-542, P-556, P-679, P-681, P-737,

10:47:21  9  P-743, P-744, P-746, P-752, P-784, P-802, P-803 P-804, P-827,

10:47:38  10  and P-828.

10:47:40  11          In addition, the following exhibits are admitted into

10:47:48  12  evidence:

10:47:49  13          DTX98, DTX154, DTX155, DTX156, DTX162, DTX163,

10:48:06  14  DTX164, DTX165, DTX166, DTX167, DTX171, DTX172, DTX185, DTX215,

10:48:25  15  DTX233, DTX234, DTX249, DTX276, DTX438, DTX440, DTX607,

10:48:40  16  DTX607-A, DTX607-B, DTX607-C, and DTX-618.

10:48:52  17          Now the plaintiff may call the plaintiff's first

10:48:55  18  witness.

10:48:55  19          MR. STONE:  Your Honor, the plaintiff calls

10:48:57  20  Thomas Katis.

10:48:59  21      (Witness sworn)

10:48:59  22                   *************************

23

24

25

10:48:59   1                          **THOMAS KATIS,**

10:48:59   2   having been first duly sworn, testified as follows:

10:48:59   3                       **DIRECT EXAMINATION**

10:48:59   4   **BY MR. STONE:**

10:48:59   5   Q.   Good morning, sir.

10:49:00   6   A.   Good morning.

10:49:02   7   Q.   Would you please introduce yourself to the court and the

10:49:06   8   jury.

10:49:07   9   A.   Sure.  Thomas Katis, but everybody calls me "Tom."

10:49:11  10   Q.   And where you do currently live?

10:49:17  11   A.   Jackson Wyoming.

10:49:17  12   Q.   And how long have you lived in Wyoming?

10:49:20  13   A.   About 17 years.

10:49:21  14   Q.   And let's go back a few years to acquaint the jury how we

10:50:02  15   got here.

10:50:02  16              Before Wyoming, where did you grow up?

10:50:03  17   A.   I was born in New York, but I grew up mostly in

10:50:08  18   Connecticut.

10:50:08  19   Q.   And what did you do after high school?

10:50:10  20   A.   I enlisted in the Army.

10:50:12  21   Q.   When did you do that?

10:50:13  22   A.   March of 1988, and I served through '89 and '90.

10:50:17  23   Q.   And what did you do after you enlisted?

10:50:19  24   A.   Well, my first enlistment basically included basic

10:50:23  25   training, advance individual training in communications,

10:50:24  1   Airborne school, basic noncommissioned officer course, Special

10:50:27  2   Forces selection assessment, Special Forces qualification

10:50:30  3   course, and SERE school.

10:50:31  4   Q.   And what was your focus in Special Forces?

10:50:34  5   A.   So every Green Beret has to have one of four specialties.

10:50:42  6   Everyone is either a weapons specialist or an engineer or medic

10:50:47  7   or communications.  And based on my initial aptitude testing,

10:50:52  8   they encouraged me to go into communications, which I did.

10:50:56  9   Q.   And as a communications sergeant, what were you

10:50:59  10  responsible for?

10:51:01  11  A.   Everything on the team that involved any type of

10:51:04  12  electronics or communications of any type.

10:51:08  13  Q.   Could you give the jury some examples, please.

10:51:13  14  A.   Sure.  So I mean, obviously, programming and operating

10:51:17  15  radios, calling everything from close air support, medevac,

10:51:20  16  coordinating with other units.  The -- I learned everything

10:51:24  17  from intent theory to, you know, how to use all the different

10:51:27  18  types of frequencies, HF, UHF, VHF, sat-com, cryptography, a

10:51:33  19  lot of different systems.

10:51:34  20  Q.   Now, when did you leave your first stint?

10:51:36  21  A.   At the end of 1990.

10:51:38  22  Q.   And what did you do then?

10:51:40  23  A.   I went to college.

10:51:42  24  Q.   And where did you go?

10:51:43  25  A.   I started at the University of North Carolina at

10:51:46   1   Charlotte.  And after a year I applied to Yale and was

10:51:50   2   fortunate enough to get in.

10:51:51   3   Q.   And what did you study at Yale?

10:51:53   4   A.   I applied for a selective major that was called ethics,

10:51:59   5   politics, and economics, and I did my senior thesis on the

10:52:03   6   implications of European monetary theory.

10:52:07   7   Q.   And did you receive -- did you receive a degree.

10:52:08   8   A.   Yes, I did.  A bachelor of arts in 1994.

10:52:12   9   Q.   And what did you do after Yale?

10:52:14  10   A.   My first job after college I was a foreign exchange trader

10:52:16  11   for Citicorp.

10:52:17  12   Q.   And what was your work like in that role?

10:52:20  13   A.   So trading is quite an electronic technical activity and

10:52:24  14   pretty high-paced and high-stressed.  So I was -- I became a

10:52:26  15   senior dealer and managed a book for the bank.  But, in

10:52:30  16   addition, I really liked playing with the terminals, and I

10:52:36  17   helped the team reprogram all of our terminals for more

10:52:44  18   efficient call outs and effectiveness of the whole team.

10:52:47  19   Q.   Now, did your position at Citicorp change at some time?

10:52:49  20   A.   It did.  This is mid '90s, and so, you know, Netscape came

10:52:54  21   out, and all of sudden the Internet was sort of a thing.  And

10:52:57  22   I, you know, was sort of drawn to it like a moth to a flame.

10:53:00  23   And, you know, the bank wasn't really moving too quickly in the

10:53:05  24   area, and so some friends and I sort of agitated and eventually

10:53:09  25   ended up -- four of us ended founding the Internet group at

KATIS - DIRECT                                      63

| | | |
|---|---|---|
| 10:53:13 | 1 | Citicorp. |
| 10:53:13 | 2 | Q.   And what kind of work did you do in that group? |
| 10:53:15 | 3 | A.   I ended up in charge of Internet payment systems for the |
| 10:53:20 | 4 | bank. |
| 10:53:20 | 5 | Q.   And in that role what kind of work did you perform? |
| 10:53:23 | 6 | A.   So I led -- I led a number of pilots and programs with |
| 10:53:28 | 7 | different technology companies.  I worked with a bunch of |
| 10:53:32 | 8 | companies that were digicash, cybercash, transactor networks, |
| 10:53:36 | 9 | et cetera.  We did programs in e-cash, in secure transaction |
| 10:53:38 | 10 | protocols, and -- |
| 10:53:39 | 11 | THE COURT:  Mr. Katis, can I ask you a question -- |
| 10:53:43 | 12 | THE WITNESS:  Yes. |
| 10:53:44 | 13 | THE COURT:  -- a request.  Please just slow down just |
| 10:53:46 | 14 | a little bit.  You can talk faster than I can hear. |
| 10:53:49 | 15 | THE WITNESS:  Okay.  I'm sorry.  I'm excited to be |
| 10:53:53 | 16 | here. |
| 10:53:53 | 17 | Q.   (BY MR. STONE) How long were you in that role at Citicorp? |
| 10:53:56 | 18 | A.   Until March of '99. |
| 10:54:00 | 19 | Q.   And what did you do when you left Citicorp? |
| 10:54:04 | 20 | A.   I joined a small startup company out in Silicon Valley |
| 10:54:07 | 21 | called Netcentives. |
| 10:54:07 | 22 | Q.   And which kind of business was Netcentives? |
| 10:54:09 | 23 | A.   Netcentives was a company that was focused on, like, |
| 10:54:11 | 24 | one-to-one digital marketing systems.  We did points-based |
| 10:54:16 | 25 | programs and e-mail direct marketing. |

10:54:20  1  Q.    And what was your title there?

10:54:23  2  A.    Vice-president of business development.

10:54:28  3  Q.    How long were you there, sir?

10:54:32  4  A.    I was there until shortly before I re-enlisted in the Army

10:54:36  5  after 9/11.

10:54:37  6  Q.    And why did you re-enlist?

10:54:40  7  A.    I mean, multiple reasons.  You know, I'm originally from

10:54:43  8  New York.  I had a friend who was killed in the attacks.  And,

10:54:48  9  you know, 9/11 was kind of a Pearl Harbor type moment, and I

10:54:52 10  recognized that, because Al Qaeda that was in the mountains of

10:54:57 11  Afghanistan, the types of individuals they would need was --

10:55:00 12  was Green Berets, Special Forces.  It was exactly the type of

10:55:04 13  training and capabilities that I had been trained for.

10:55:07 14            And I also knew that, you know, it takes years to

10:55:11 15  create new Green Berets.  It takes years to recruit and train

10:55:16 16  and deploy Special Forces personnel.  And so I thought I could

10:55:20 17  sort of plug a gap.

10:55:21 18  Q.    Now, where were you deployed, sir?

10:55:25 19  A.    Afghanistan.

10:55:26 20  Q.    And over what time period?

10:55:27 21  A.    From summer of '02 through spring of '03.

10:55:32 22  Q.    And what kind of work were you performing there?

10:55:34 23  A.    Well, I was -- I was a communications sergeant on a

10:55:40 24  Special Forces team.  And more specifically while I was there,

10:55:46 25  I became very involved with standing up an Afghan special

10:55:48  1  forces unit.

10:55:49  2  Q.   What kind of work was the Afghan special forces unit

10:55:54  3  doing?

10:55:54  4  A.   It was referred to as a CTPT or counterterrorist pursuant

10:55:59  5  team.  Basically, it was an indigenous unit that you we sort of

10:56:07  6  hand picked from the across the region, put them through our

10:56:10  7  own training, and we'd lead them on long-range missions.  And

10:56:16  8  the idea, I mean, this was basically straight out of sort of

10:56:19  9  the Unconventional Warfare Doctrine.

10:56:21  10        You know, we knew that we would be going into

10:56:22  11  villages where they never met an American before, never met a

10:56:29  12  European, never met anybody who wasn't from the area.  And we

10:56:32  13  knew that if we walked in with a platoon of Rangers all in

10:56:36  14  Kevlar and helmets, we'd look like invading Martians or

10:56:41  15  something.  And so we tried to soften our image.  And so

10:56:44  16  instead of going in in force, we'd go with two or three

10:56:48  17  Americans.  We'd typically go with a force of 12 to 15 Afghans

10:56:53  18  that we trained up.  And that way as we walked into these

10:56:56  19  villages, it was -- it was an easier thing for them to -- to

10:57:01  20  welcome us and to talk with them and get to know them and build

10:57:05  21  relationships across the area.

10:57:08  22  Q.   Now, let me show you what we have previously marked as

10:57:12  23  Exhibit P-426, and it should be on the screen in front of you.

10:57:16  24  A.   Okay.  Not yet.

10:57:17  25  Q.   Mr. Katis, do you recognize P-426?

10:57:19  1   A.   It was up a second ago.

10:57:21  2   Q.   It's going to be in front of you first.  We're going to

10:57:24  3   move to have it admitted.

10:57:24  4        THE COURT:  Don't show an exhibit that the jury can

10:57:25  5   see until I've admitted it.

10:57:26  6        MR. STONE:  We understand that, Your Honor, and so it

10:57:27  7   shouldn't up on any screens, just in front of the witness.

10:57:31  8        THE COURT:  But that's all right.  As long as it's

10:57:32  9   not exhibited to the jury before you've offered it.

10:57:34  10        MR. STONE:  Thank you, Your Honor.

10:57:35  11   Q.   Mr. Katis, do you recognize Exhibit P-426?

10:57:40  12   A.   Yes, I do.

10:57:40  13   Q.   And what is that exhibit?

10:57:42  14   A.   This is a picture of me on January 15th, 2003 in

10:57:48  15   Afghanistan.  I remember this day very clearly.

10:57:50  16        MR. STONE:  And, Your Honor, we'd like to move

10:57:52  17   Exhibit P-426 into evidence.

10:57:53  18        MS. ANDERSON:  No objection, Your Honor.  Thank you.

10:57:56  19        THE COURT:  Plaintiff's Exhibit P-426 is admitted.

10:58:07  20   Q.   (BY MR. STONE) Now, when was this picture taken, sir?

10:58:13  21   A.   January 15 of 2003.

10:58:15  22   Q.   And was this picture taken after some significant event?

10:58:21  23   A.   Yes.  This was right at the tail end of the biggest ambush

10:58:26  24   we were in in Afghanistan.  We had a vehicle blown up, and I

10:58:33  25   had to medevac a couple of my teammates.  We were stuck in a

10:58:37    1    kill zone for over two hours.

10:58:39    2    Q.    Now, during your time in Afghanistan, did you receive any

10:58:43    3    commendations?

10:58:44    4    A.    I was awarded the Bronze Star.

10:58:47    5    Q.    Did any of the inspiration behind Voxer come to you during

10:58:51    6    your time there?

10:58:52    7    A.    Yes.  Very much so.  And really specifically from this

10:58:56    8    ambush and our frustrations with military communications during

10:58:59    9    it.

10:58:59   10    Q.    And could you explain how that inspiration developed?

10:59:02   11    A.    Sure.  So, you know, being the one primarily responsible

10:59:07   12    for calling close air support, calling medevac, I had a team

10:59:11   13    frequency for talking to my teammates and figuring out what was

10:59:15   14    going on.  I had to call for a quick reaction force, which was

10:59:17   15    a nearby platoon of Rangers.

10:59:19   16    Q.    And I would just slow down a little bit so the court

10:59:22   17    reporter can get it all down.

10:59:23   18    A.    So I had to call for a quick reaction force, which was a

10:59:27   19    relatively nearby platoon of Rangers.  I asked for some

10:59:30   20    assistance.  I had to keep my company commander up to date on

10:59:33   21    what's going on.  I had to keep the forward operating base and

10:59:37   22    battalion command update.

10:59:38   23           And the way that military radios work is you're one

10:59:41   24    channel at a time, sort of one frequency.  And as soon as you

10:59:45   25    flip, like if I flip from my team frequency to call close air

10:59:47   1   support, I'd have no idea what was going on on my team

10:59:50   2   frequency.  I'd miss everything.  And you never get it back.

10:59:55   3   And if somebody is trying to talk to me on my team, for

10:59:59   4   example, I have no idea because I'm talking to ATAC.

11:00:02   5         And -- so it's a very brittle, static environment

11:00:07   6   where you just -- you don't even know how much you're missing.

11:00:10   7   And -- and so -- so that's sort of the inbound side.  It's just

11:00:13   8   you're missing tons of stuff, and you can tell just

11:00:17   9   communication is sort of breaking all over the place.

11:00:19  10         And on the outbound side, every time I'd flip to a

11:00:23  11   new frequency, let's say to call for medevac, there's always

11:00:28  12   somebody talking on the channel.  And only one person can speak

11:00:32  13   at a time, and so I have to wait my turn and then exchange call

11:00:37  14   signs, and then, you know, give the information, typically

11:00:41  15   repeat it back or acknowledge.  It's a very cumbersome process.

11:00:44  16         And then flipping back to my other channels trying

11:00:48  17   to -- it just sort of repeats.  This is cycle repeats itself

11:00:51  18   again and again where I keep missing stuff.  And, you know, I

11:00:55  19   did the best I could, and I did everything as I was supposed to

11:01:01  20   have done and everything worked out.  But I just came out of

11:01:06  21   that, especially after having -- having spent some time in

11:01:08  22   Silicon Valley and being exposed to the world of software and

11:01:12  23   computing and Internet, I just thought there has to be a better

11:01:16  24   way.

11:01:16  25   Q.   Okay.  And we'll come back to this in a bit.  How long

11:01:19   1   were you in the Army for your second enlistment?

11:01:21   2   A.   I got out in the fall of 2003, two years after my

11:01:26   3   re-enlistment.

11:01:27   4   Q.   And did you form Voxer immediately after you were

11:01:30   5   discharged?

11:01:31   6   A.   No, I did not.

11:01:32   7   Q.   What did you do first?

11:01:33   8   A.   I founded a company called Triple Canopy.

11:01:35   9   Q.   And what did you do there?

11:01:36  10   A.   So Triple Canopy was a high-threat security firm.  And,

11:01:40  11   basically, while I was in Afghanistan, I was unaware that this

11:01:45  12   industry existed, but there were a few times traveling around

11:01:48  13   the country where I would run into private security guards,

11:01:50  14   typically Blackwater or some other firm.  And I -- they weren't

11:01:55  15   always the best of interactions, and I would ask my friends,

11:01:59  16   you know, I bumped into some friends, that I had known from

11:02:04  17   Special Forces previously who had gone over to the private

11:02:07  18   contracting side, and I would ask them what's going on.

11:02:11  19           And so I learned about this industry, and the sense

11:02:16  20   that I got from all my friends was that, for various reasons,

11:02:22  21   this is an important industry that needed to exist.  You know,

11:02:25  22   the -- the State Department, like any -- like any other foreign

11:02:27  23   service, is not allowed to be protected by the military,

11:02:30  24   generally.  This is a body of law called SOFA, Status of Forces

11:02:35  25   Agreements.  And so it's every city -- every major city doesn't

11:02:38  1   become a militarized zone.  Otherwise, every time the Russian

11:02:40  2   Ambassador went to New York, he would have Russian military and

11:02:42  3   the Chinese Ambassador would have Chinese military and every

11:02:46  4   city would be a military zone.  And so it's prohibited by law.

11:02:53  5            And then -- but as soon as Al Qaeda sort of showed up

11:02:57  6   on the scene and started targeting airplanes and Embassies and

11:03:03  7   diplomats, the State Department realized they needed a much

11:03:06  8   more muscular private security, and so they started looking to

11:03:09  9   private firms to hire former Special Forces personnel.

11:03:12  10  Q.    And so why did you form Triple Canopy?

11:03:15  11  A.    Because it was clear there was a real need.  The -- the --

11:03:20  12  all my friends in the community felt that something had been

11:03:22  13  lost in translation going from elite military units with a

11:03:28  14  certain cultural and ethics over in the private sector, which

11:03:32  15  was sort of the wild west.  And there were all sorts of

11:03:35  16  incidents that were happening that were working very contrary

11:03:39  17  to our foreign policy interests.

11:03:40  18  Q.    Now, ultimately, was Triple Canopy successful?

11:03:44  19  A.    It was.

11:03:47  20  Q.    What happened to Triple Canopy?

11:03:50  21  A.    Well, one of the metrics by which I judge Triple Canopy

11:03:53  22  being successful is that you don't hear about the industry

11:03:56  23  anymore.  It used to be you heard about this industry all the

11:03:58  24  time because of bad things that would happen.  And that -- you

11:04:04  25  know, I attributed that to lack of discipline and ethics and

11:04:07  1   professionalism, and I feel like we really significantly raised

11:04:11  2   the bar in the industry and transformed the industry.

11:04:13  3         And -- and because of that, we continued to get

11:04:16  4   contracts and continued to grow.  And 13 years later, it went

11:04:19  5   from me and my cofounder to over 11,000 employees and over a

11:04:23  6   billion in revenue and we sold the company.

11:04:25  7   Q.   Now, did you have any communication challenges at Triple

11:04:28  8   Canopy?

11:04:29  9   A.   Of course.  I mean, we were -- every company always has

11:04:34  10  communications challenges, and we had some particularly

11:04:38  11  challenging ones.  You know, we were trying to roll out

11:04:42  12  across -- our initial contracts, we were across twelve

11:04:45  13  different sites in Iraq in the middle of a war.  And you can't

11:04:49  14  sort of call up your local cable provider and just sort of have

11:04:53  15  them set everything up for you.

11:04:55  16        And, you know, I knew that I wanted to have a modern,

11:05:02  17  high-performance, you know, communications environment for the

11:05:06  18  company, and I knew I needed to do that via satellite.  And so

11:05:10  19  I knew that there was a -- there were a bunch of things we

11:05:13  20  needed to do to make that work properly.

11:05:16  21  Q.   So what did you do to build out that network for yourself

11:05:19  22  in Iraq?

11:05:20  23  A.   Well, the first thing I did was I -- I reached out to a

11:05:24  24  friend of mine in Silicon Valley who had worked with

11:05:27  25  Netcentives who was a brilliant networking engineer that I

11:05:29  1  knew.  He was busy with his own startup, but he said I know the

11:05:33  2  perfect guy for you, and he introduced me to Matt Ranney, who

11:05:37  3  become my cofounder of Voxer.

11:05:39  4         And we talked on the phone, hit it off immediately,

11:05:42  5  hired him that day, and we got to work.  The next day he flew

11:05:46  6  in and we got to work building out the network that we needed.

11:05:50  7  Q.    Now, did you start any companies after starting Triple

11:05:53  8  Canopy?

11:05:54  9  A.    Yes.  Voxer.

11:05:55  10 Q.    And why did you found Voxer?

11:05:56  11 A.    So, you know, Voxer originates out of the frustration I

11:06:02  12 had with military communications.  And when I started working

11:06:07  13 with Matt at Triple Canopy and we were building out, we could

11:06:11  14 buy anything we wanted in terms of communications gear.  We

11:06:15  15 could buy any military radios, we could buy any, you know,

11:06:23  16 enterprise commercial, you know, equipment.

11:06:25  17        And it was clear that even though we were doing

11:06:29  18 everything to the highest standards, you know, and everything

11:06:33  19 was working, there was something missing.  We were always like

11:06:36  20 there's got to be -- there are certain problems that are just

11:06:39  21 difficult, you know, trying to have a voice-over-IP call over

11:06:43  22 satellite across multiple sites in Iraq, you know, from D.C.

11:06:47  23 is -- you have challenges, you have issues.  And just managing

11:06:50  24 all the complexity of the operations, it was -- it was always

11:06:55  25 a -- you know, we always just thought there must be something

11:06:58   1    more that we can build or do.

11:07:00   2            And it began a multiyear conversation between me and

11:07:04   3    Matt Ranney, just sort of brainstorming about, you know, what

11:07:07   4    are the gaps?  What's missing?  Why do we still -- why do we

11:07:10   5    keep solving the same problems over and over again and it's

11:07:13   6    never as good as we want it to be?

11:07:15   7    Q.   And did you come to some epiphany at some point in time

11:07:19   8    about that?

11:07:20   9    A.   I did.  I did very much.  So it's kind of funny.  I was at

11:07:25   10   home in Wyoming, and I was just -- I don't know why, but I was

11:07:29   11   having a little thought experiment in my head of, if I was back

11:07:32   12   in that situation in the ambush scenario managing all those

11:07:37   13   channels and if I could wave a magic wand and have a magic

11:07:40   14   system that worked any way I wanted it to work, I thought, from

11:07:44   15   a human standpoint, how would it want it to work?

11:07:46   16           And I thought, from a human standpoint, everyone who

11:07:48   17   is trying to communicate with me I want to be able to pick.  I

11:07:54   18   don't want to be interrupted.  I want to be able to pick where

11:08:00   19   I'm live.  And anything that is a lower priority than that, I

11:08:03   20   want to be able to, you know, time-shift whatever amount that I

11:08:07   21   want, you know, sort of like having a buffer in all of the

11:08:11   22   inbound communication.  And so I could sort of deal with what's

11:08:14   23   most important and deal with what's second most important,

11:08:16   24   third most important, and work my way through.

11:08:18   25           And so I sort of visualized having a system that, in

11:08:21  1  the same way that it's so easy to sort of go on an app, like a

11:08:25  2  messaging app or something like that where, you know, you never

11:08:28  3  feel sort of overwhelmed -- I mean, sometimes if you have a ton

11:08:33  4  of messages, but even when you have a ton of messages, you can

11:08:37  5  sort of pick which conversation you want to go to first.  And

11:08:40  6  you can deal with those things that are most important to you

11:08:42  7  first, and you can ignore certain things for a while, knowing

11:08:45  8  you're not going to miss them.

11:08:47  9       And I wanted that type of environment for live media,

11:08:50  10  and it only existed for messaging.  It didn't exist for

11:08:53  11  anything live.  So that's on the inbound side, right?  I wanted

11:08:57  12  something that was more elegant and less interruptive and

11:09:00  13  intrusive.

11:09:01  14       And on the outbound side, I didn't want to ever have

11:09:03  15  to wait.  I didn't want to have to deal with waiting for people

11:09:07  16  to stop speaking and call signs and repeating things back.  And

11:09:13  17  I wanted to be able to, you know, speak, and if people are

11:09:16  18  listening, then they hear me live.  And if for any reason they

11:09:19  19  can't hear me live, whether that's because of their own

11:09:22  20  attention, they're distracted by something else or whether

11:09:25  21  that's because of some sort of network intermittency, they'll

11:09:30  22  still get it.

11:09:31  23  Q.   And what were your conclusions about what was wrong with

11:09:37  24  existing communications?

11:09:38  25  A.   Well, there was -- there was nothing in the existing, you

KATIS - DIRECT                                    75

| | | |
|---|---|---|
| 11:09:44 | 1 | know, world of communications that could work that way.  There |
| 11:09:48 | 2 | were plenty of live systems.  And, you know, it's -- there's -- |
| 11:09:53 | 3 | you know, TV has been around a long time.  Live streaming, as |
| 11:09:58 | 4 | they talked about in their opening, has been around a long, |
| 11:10:02 | 5 | long time.  We're not claiming to have invented live streaming. |
| 11:10:06 | 6 | The -- what I was trying to understand was how do we |
| 11:10:09 | 7 | take these live things and incorporate them into sort of more |
| 11:10:15 | 8 | of a messaging type of an environment or framework.  So, you |
| 11:10:20 | 9 | know, it's -- it's -- you know, I wanted to be able to have an |
| 11:10:23 | 10 | interactive, organized live system, a system that is live but |
| 11:10:28 | 11 | doesn't have to be, and -- and you can fall back on reviewing |
| 11:10:34 | 12 | things later and/or forwarding things, et cetera. |
| 11:10:38 | 13 | Q.   And did you write down information about your epiphany |
| 11:10:42 | 14 | after you had it? |
| 11:10:45 | 15 | A.   I did.  I did. |
| 11:10:48 | 16 | Q.   And let me show you -- this is not pre-admitted.  Let me |
| 11:10:53 | 17 | show you Plaintiff's Exhibit 157.  Mr. Katis, do you recognize |
| 11:10:57 | 18 | that on your screen? |
| 11:10:59 | 19 | A.   Yes, I do. |
| 11:11:00 | 20 | Q.   And, Mr. Katis, what do you recognize this to be? |
| 11:11:04 | 21 | A.   This is basically after I had my sort of epiphany, you |
| 11:11:11 | 22 | know, if I had a magic wand, what would it look like, you know, |
| 11:11:14 | 23 | idea, I basically grabbed my laptop, and this is sort of stream |
| 11:11:18 | 24 | of consciousness, typing things out. |
| 11:11:20 | 25 | MR. STONE:  And, Your Honor, we'd like to have |

| | | |
|---|---|---|
| 11:11:22 | 1 | Plaintiff's Exhibit 157 introduced into evidence. |
| 11:11:25 | 2 | MS. ANDERSON:  Your Honor, for Meta, Meta does not |
| 11:11:28 | 3 | object to the introduction of this particular exhibit as long |
| 11:11:31 | 4 | it is not being offered for its truth because, if it is, it is |
| 11:11:33 | 5 | hearsay statement.  But if it's not being offered for its |
| 11:11:36 | 6 | truth, we do not object and would request an instruction to the |
| 11:11:39 | 7 | jury in that regard. |
| 11:11:40 | 8 | THE COURT:  Mr. Stone? |
| 11:11:40 | 9 | MR. STONE:  Your Honor, we believe it's a preliminary |
| 11:11:46 | 10 | business document relating to Voxer's work, and it's actually a |
| 11:11:50 | 11 | business record created by Mr. Katis. |
| 11:11:53 | 12 | THE COURT:  Well, I'm going to admit it with this |
| 11:11:55 | 13 | instruction to the jury:  You are not to consider it for the |
| 11:11:58 | 14 | truth of anything that's stated in it.  The witness may be |
| 11:12:02 | 15 | questioned by you, Mr. Stone.  It is admitted merely to show |
| 11:12:05 | 16 | that this is where he memorialized his thoughts after thinking |
| 11:12:09 | 17 | about the matters that he's just testified to. |
| 11:12:12 | 18 | MR. STONE:  Very well. |
| 11:12:13 | 19 | MS. ANDERSON:  Thank you, Your Honor. |
| 11:12:16 | 20 | Q.  (BY MR. STONE) Now, Mr. Katis, when did you prepare this? |
| 11:12:18 | 21 | A.  October 4th of 2006. |
| 11:12:21 | 22 | Q.  And do you have a timeline prepared to show the jury? |
| 11:12:26 | 23 | A.  Yes, I do. |
| 11:12:28 | 24 | MR. STONE:  Can we see that, please? |
| 11:12:29 | 25 | Q.  And is this white paper reflected on the timeline? |

```
11:12:34   1   A.   Yes, it is.  It might be a little bit confusing, in that

11:12:44   2   when I first formed the business, I didn't know what to call

11:12:47   3   it.  And so I called it CommoTEK.  T-E-K are my initials.  And

11:12:52   4   everybody hated the name, including me, and so we pretty

11:12:56   5   quickly changed it.  Unfortunately, we changed it to another

11:13:00   6   name that nobody liked, which was RebelVox.  And so you'll see

11:13:03   7   the names CommoTEK and RebelVox on some things.  They're all

11:13:04   8   just Voxer.  Those are just short-term temporary names we used

11:13:08   9   while trying to find a name we all liked.

11:13:11  10   Q.   And, Mr. Katis, what did you do next in time in connection

11:13:14  11   with pursuing your ideas?

11:13:15  12   A.   I reached out to Matt Ranney.

11:13:17  13   Q.   And when did you do that?

11:13:19  14   A.   Well, very quickly, but, you know, I really wanted to meet

11:13:25  15   with him in person.  And it took us until early January of 2007

11:13:30  16   to meet in person.

11:13:31  17   Q.   And what do you remember about your discussions with

11:13:33  18   Mr. Ranney at that time?

11:13:34  19   A.   It was actually kind of funny, because, like, I love

11:13:37  20   technology but I am not engineer.  And Matt is just an

11:13:39  21   incredible networking engineer who thinks in a way that -- my

11:13:41  22   brain is slightly different.  And so you know this whole idea

11:13:42  23   sort of came from a human standpoint:  What do I want my

11:13:45  24   interaction to be with the system?

11:13:46  25          And I understood some of, you know, how the existing
```

11:13:49   1   systems worked, but I wasn't an expert in these things.  And so

11:13:59   2   I reached out to Matt, and I explained the way I wanted it to

11:14:07   3   work.  And he just said, Well, it doesn't work that way.  And I

11:14:16   4   said -- I said, I know.  I know.  But, like, you know, could

11:14:20   5   it?  Could we build a system that works this way?  And he kept

11:14:24   6   saying, Well, but it doesn't.  And he tried to explain to me

11:14:27   7   how live systems and messaging systems, they sort of teach away

11:14:29   8   from each other.

11:14:30   9         MS. ANDERSON:  Objection, Your Honor.  The witness is

11:14:31   10   testifying as to hearsay.  Move to strike.

11:14:33   11         THE COURT:  Sustained.

11:14:34   12         MR. STONE:  Very well.  I'll move on.

11:14:36   13   Q.   Did, ultimately, you and Mr. Ranney decide to form Voxer?

11:14:40   14   A.   Yes.  It was a little bit of an interesting conversation.

11:14:44   15   It was fun, but it was sort of one of those that made your

11:14:48   16   brain hurt a little bit.  But after -- after a couple of hours,

11:14:53   17   I think we were both sufficiently in a place where we were,

11:14:59   18   like, let's give it a shot.

11:15:01   19         You know, if we can build a system that has these

11:15:05   20   attributes, you know, because live systems work in a certain

11:15:09   21   way.  You know, as you said in your opening, you don't start

11:15:13   22   speaking on a phone call or when you key a push-to-talk button

11:15:16   23   on a radio, no media, no content is created prior to when

11:15:21   24   you -- prior to having everything set up.  Like you have to

11:15:25   25   have -- the person has to pick up on the other end or the

11:15:29   1   walkie-talkie has to blare out of the speaker.  And you start

11:15:33   2   speaking and it's live only, and if you miss anything, it's

11:15:36   3   gone forever.

11:15:37   4            Whereas in a messaging system, it works in a

11:15:41   5   completely different way.  Nothing is set up.  You can be on

11:15:44   6   your laptop or on your phone composing an e-mail.  Your phone

11:15:48   7   has no idea what the e-mail -- it's not trying to look up or

11:15:51   8   set up a connection while you're typing stuff.  And it's after

11:15:54   9   you've composed it and attached it, the video or picture or

11:15:58  10   whatever, when you hit "send," then it starts to figure out how

11:16:01  11   to take that totally non-live data and get it to wherever it

11:16:05  12   needs to get to.

11:16:06  13            So we were trying to build a system that had the best

11:16:09  14   attributes of both, which begs the question of where do you

11:16:11  15   start?  Do you start with a live system, or do you start with a

11:16:14  16   messaging system?

11:16:15  17   Q.   Now, Mr. Katis, let me show you what has been pre-admitted

11:16:18  18   Exhibits P-827 and P-828.

11:16:21  19            MR. STONE:  And, Mike, if we could display those side

11:16:22  20   by side.

11:16:23  21   Q.   Mr. Katis, do you recognize these photos?

11:16:25  22   A.   Yes.  I apologize for my posture.

11:16:27  23   Q.   And what are these photos of?

11:16:29  24   A.   This was early sort of white boarding and sort of, you

11:16:33  25   know, a deep dive on -- this is in my house in Jackson,

11:16:37  1   Wyoming.  And we were -- you can, you know, a white board

11:16:40  2   there.  You can see a bunch of big paper tear-offs.  And

11:16:44  3   we're -- we're trying to do a deep dive and understanding what

11:16:47  4   is this -- what is this idea?  How deep does it go?  And just

11:16:52  5   trying to understand the logic behind it.

11:16:55  6         You know, you sort of have to go from logic into,

11:16:58  7   well, how would we build it.  And then you -- it's after you

11:17:01  8   get those steps, and then you start talking about patents and

11:17:05  9   whatnot.

11:17:06  10  Q.   And is that you in the picture on the right?

11:17:09  11  A.   That is.

11:17:10  12  Q.   And who is on the picture on the left?

11:17:13  13  A.   Matt Ranney on the left and Jim Panttaja.

11:17:16  14  Q.   And you mentioned Mr. Ranney joined Voxer.  Did

11:17:18  15  Mr. Panttaja join Voxer?

11:17:19  16  A.   Yes.  Jim Panttaja and his wife Mary both joined Voxer.

11:17:23  17  Q.   And what were their roles?

11:17:25  18  A.   So I had met them both at Netcentives.  They're both

11:17:27  19  talented engineers.  Jim was a very good leader of engineers

11:17:31  20  and developers, good at building products.  And Mary was more

11:17:35  21  of a jack-of-all-trades.  She worked with me at Netcentives

11:17:41  22  typically as a sales engineer.  And they both, you know, dove

11:17:45  23  in and really helped us to figure this stuff out.

11:17:50  24  Q.   Now, were there any other early employees at Voxer?

11:17:52  25  A.   Yes.  Jim Rose.

KATIS - DIRECT

| | | |
|---|---|---|
| 11:17:54 | 1 | Q.   When did Mr. Rose join Voxer? |
| 11:17:55 | 2 | A.   From the beginning.  I started talking with him as I was |
| 11:18:00 | 3 | forming the company. |
| 11:18:00 | 4 | Q.   And what was his role? |
| 11:18:03 | 5 | A.   He was our in-house patent counsel. |
| 11:18:06 | 6 | Q.   What kind of work did he do? |
| 11:18:08 | 7 | A.   You know, he was the expert on intellectual property |
| 11:18:12 | 8 | production and patents, and so he advised us on sort of the |
| 11:18:16 | 9 | correct process to follow in terms of filing patents. |
| 11:18:19 | 10 | Q.   And what was the process that you followed? |
| 11:18:22 | 11 | A.   Well, it involved obviously a lot of discipline about |
| 11:18:26 | 12 | documenting everything, which we did rigorously.  But then on |
| 11:18:30 | 13 | top of that, he would encourage all the time and remind us all |
| 11:18:35 | 14 | the time of the need for an aggressive prior art searching. |
| 11:18:38 | 15 | Q.   And you mentioned prior art.  What does that mean? |
| 11:18:41 | 16 | A.   It just basically means searching as hard as you can to |
| 11:18:46 | 17 | try to find anything like what you're trying to patent.  Has |
| 11:18:51 | 18 | anybody done anything -- have they done this before, anything |
| 11:18:54 | 19 | like this, what are the boundaries of what people have done |
| 11:18:58 | 20 | before. |
| 11:18:58 | 21 | Q.   And what did you learn through that process? |
| 11:19:00 | 22 | A.   That no one had done this before. |
| 11:19:02 | 23 | Q.   And did you do anything as a result of coming to that |
| 11:19:06 | 24 | conclusion? |
| 11:19:06 | 25 | A.   Yes.  I mean, we set about building the business and |

```
11:19:10   1   documenting and moving forward.
11:19:11   2            MR. STONE:  If you could pull back up the timeline.
11:19:13   3   Q.   And is your first provisional reflected on the timeline?
11:19:16   4   A.   Yes, it is.
11:19:16   5   Q.   When did you file that?
11:19:19   6   A.   June 28th, 2007, the day before the iPhone came out.
11:19:23   7   Q.   Now, why were you so interested in making sure that you
11:19:26   8   had patent protection?
11:19:27   9   A.   So at this time, you know, in terms of mobile devices and
11:19:34  10   trying to figure out how to build a business rolling out
11:19:38  11   software to mobile devices, the -- the challenges were much
11:19:42  12   different and much more difficult than they are today.
11:19:45  13            You couldn't just put an app in the App Store.  You
11:19:50  14   had to not only convince, sort of, Motorola and Nokia,
11:19:55  15   Blackberry, et cetera, of the -- that they should be interested
11:19:59  16   in loading your software on their phones, but they wouldn't do
11:20:02  17   anything unless you convinced AT&T and Verizon and T-Mobile and
11:20:08  18   everybody else.  So it wasn't like we were just trying to
11:20:11  19   defend against one 800-pound gorilla.  It was a whole jungle of
11:20:15  20   800-pound gorillas.
11:20:17  21            And we just thought, you know, there's no
11:20:18  22   confidentiality agreement that's going to protect us against
11:20:24  23   all these huge players.  And we thought, you know, it's -- you
11:20:30  24   know, as a startup, as a new technology startup, you know, you
11:20:36  25   have two choices when you invent technology:  You can keep it
```

| | | |
|---|---|---|
| 11:20:39 | 1 | as a trade secret, which many companies do -- most companies |
| 11:20:42 | 2 | keep things as a trade secret.  Or you can file for patents. |
| 11:20:47 | 3 | And then, you know, there is an enormous burden |
| 11:20:51 | 4 | placed on you in terms of the documentation.  You know, you |
| 11:20:55 | 5 | have to completely spell out the nature of the invention. |
| 11:20:59 | 6 | MS. ANDERSON:  Objection, Your Honor.  The witness is |
| 11:21:00 | 7 | testifying in an expert area. |
| 11:21:02 | 8 | THE COURT:  I can't hear you.  You'll have to speak |
| 11:21:05 | 9 | into the microphone. |
| 11:21:05 | 10 | MS. ANDERSON:  The witness -- |
| 11:21:05 | 11 | THE COURT:  Wait.  Speak into the microphone. |
| 11:21:06 | 12 | MS. ANDERSON:  Oh.  Thank you, Your Honor.  The |
| 11:21:08 | 13 | witness is testifying in regard to an expert area and is |
| 11:21:10 | 14 | continuing into an area that lacks foundation. |
| 11:21:13 | 15 | THE COURT:  Sustained.  Have him testify as to |
| 11:21:14 | 16 | personal knowledge. |
| 11:21:15 | 17 | MR. STONE:  We'll move on, Your Honor. |
| 11:21:17 | 18 | Q.   (BY MR. STONE) Now, did there come a time after you filed |
| 11:21:20 | 19 | your first patent provisional that you released your first |
| 11:21:24 | 20 | commercial app? |
| 11:21:25 | 21 | A.   Yes. |
| 11:21:25 | 22 | Q.   When was that? |
| 11:21:26 | 23 | A.   2001.  So it was -- I think it was May 2011 for the iPhone |
| 11:21:33 | 24 | app and -- |
| 11:21:33 | 25 | Q.   Is that reflected on the timeline that we have up there? |

| | | |
|---|---|---|
| 11:21:37 | 1 | A.   Yes, it is. |
| 11:21:39 | 2 | Q.   And what about for Android? |
| 11:21:40 | 3 | A.   That was in November -- beginning of November of 2011. |
| 11:21:45 | 4 | Q.   And what happened after you released those apps in 2011? |
| 11:21:50 | 5 | A.   It was incredible.  We -- we grew unbelievably quickly. |
| 11:21:55 | 6 | You know, we pretty quickly achieved a growth rate of -- we |
| 11:22:01 | 7 | were adding over 100,000 new users a day on a sustained basis, |
| 11:22:06 | 8 | and the growth and engagement was wild. |
| 11:22:09 | 9 | Q.   And let me show you -- |
| 11:22:10 | 10 | MR. STONE:  And this is not pre-admitted , so let's |
| 11:22:13 | 11 | just show the witness, Mike. |
| 11:22:14 | 12 | Q.   -- what's been marked as P-832.  And, Mr. Katis, do you |
| 11:22:17 | 13 | recognize P-832? |
| 11:22:19 | 14 | A.   Yes, I do. |
| 11:22:19 | 15 | Q.   And what do you recognize that to be? |
| 11:22:22 | 16 | A.   It's a company presentation. |
| 11:22:23 | 17 | Q.   Reflecting what, sir? |
| 11:22:28 | 18 | A.   Reflecting sort of the success we had in the early days. |
| 11:22:33 | 19 | Q.   And was this prepared during the ordinary course of |
| 11:22:35 | 20 | business at Voxer? |
| 11:22:36 | 21 | A.   Yes, it was. |
| 11:22:37 | 22 | Q.   At your direction? |
| 11:22:40 | 23 | A.   Yes, it is was. |
| 11:22:40 | 24 | MR. STONE:  Your Honor, we'd move to have |
| 11:22:41 | 25 | Exhibit P-832 admitted into evidence. |

11:22:42    1             MS. ANDERSON:  No objection, Your Honor.

11:22:43    2             THE COURT:  Plaintiff's Exhibit P-832 is admitted.

11:22:46    3             MR. STONE:  And, Mike, if we could turn to the second

11:22:48    4   page, P-832-2.

11:22:50    5   Q.   Mr. Katis, what does this reflect?

11:22:55    6   A.   You can see here we are the number one social networking

11:22:58    7   app in the Apple App Store, and we're number two overall.  Some

11:23:03    8   of these -- typically, the top apps would be usually games just

11:23:14    9   for a short period of time.  We were -- so we were -- in this

11:23:19   10   particular slide, we were number one in social networking and

11:23:22   11   number two overall, of all free apps.

11:23:25   12   Q.   And for this period of time reflected, it was number one,

11:23:29   13   even over Facebook?

11:23:30   14   A.   That's correct.

11:23:32   15   Q.   Now, is this a byproduct of the Voxer app having gone

11:23:35   16   viral in late 2011?

11:23:36   17             MS. ANDERSON:  Objection, Your Honor: leading.

11:23:38   18             THE COURT:  Sustained.

11:23:39   19   Q.   (BY MR. STONE) What does this reflect here, sir?

11:23:42   20   A.   I mean, the -- the popularity of the app is because the

11:23:46   21   app went viral and grew so quickly.

11:23:49   22             MR. STONE:  Mike, if we could please show the witness

11:23:51   23   Exhibit P-427.  This is not pre-admitted.

11:23:57   24   Q.   Mr. Katis, do you recognize Exhibit P-427?

11:23:59   25   A.   Yes, I do.

11:24:00   1   Q.   And what is this?

11:24:01   2   A.   It's a presentation which includes a graphic from Apple.

11:24:06   3   Q.   And was this a document that was prepared during the

11:24:11   4   ordinary course of business at Voxer?

11:24:13   5   A.   Yes, it was.

11:24:14   6           MR. STONE:  And, Your Honor, we would like to have

11:24:20   7   Exhibit P-427 admitted to evidence.

11:24:23   8           MS. ANDERSON:  Objection, Your Honor: hearsay and

11:24:25   9   foundation.

11:24:25  10           THE COURT:  Well, ask him some follow-up questions

11:24:28  11   and lay a better predicate for this.

11:24:30  12           MS. ANDERSON:  Thank you.

11:24:31  13   Q.   (BY MR. STONE) What was the purpose of preparing this

11:24:34  14   document?

11:24:34  15   A.   We were trying to show the success of the Voxer app.

11:24:41  16   Q.   In what context?

11:24:42  17   A.   How popular it was relative to other apps in 2012.

11:24:48  18           MR. STONE:  Your Honor, we think there's sufficient

11:24:50  19   foundation to lay this in as a business record from Voxer's

11:24:53  20   production.

11:24:53  21           MS. ANDERSON:  Objection, Your Honor:  This document

11:24:57  22   is hearsay, it is undated, there's no information about its

11:25:03  23   preparation, and it appears to be a draft as well.

11:25:09  24           THE COURT:  It has not been proved as a business

11:25:10  25   record at this point, Mr. Stone, so the objection is sustained.

| | | |
|---|---|---|
| 11:25:14 | 1 | MS. ANDERSON:  Thank you, Your Honor. |
| 11:25:16 | 2 | MR. STONE:  We'll move on for now. |
| 11:25:20 | 3 | Q.   At the end of 2012, were you familiar with what Voxer's |
| 11:25:23 | 4 | position was in the App Store? |
| 11:25:25 | 5 | A.   Yes.  We were the -- according to Apple, for all of |
| 11:25:28 | 6 | calendar 2012 in the U.S., we were the 13th most popular app in |
| 11:25:34 | 7 | the U.S. |
| 11:25:35 | 8 | Q.   And was that information that you provided as part of |
| 11:25:42 | 9 | marketing materials to third parties during your tenure at |
| 11:25:46 | 10 | Voxer? |
| 11:25:46 | 11 | A.   Yes. |
| 11:25:46 | 12 | MS. ANDERSON:  Objection, Your Honor: leading. |
| 11:25:48 | 13 | THE COURT:  Sustained. |
| 11:25:49 | 14 | Q.   (BY MR. STONE) Did you provide that to third parties? |
| 11:25:53 | 15 | A.   Yes. |
| 11:25:54 | 16 | Q.   How many users did Voxer have by the end of 2012? |
| 11:25:57 | 17 | A.   In terms of total users, including anyone that had ever |
| 11:26:02 | 18 | used the app, we were around 60 million.  In terms of active |
| 11:26:06 | 19 | users, the number was around 10 million. |
| 11:26:09 | 20 | Q.   Was there a reason why it took so long between the |
| 11:26:13 | 21 | founding of Voxer and the Voxer app going viral? |
| 11:26:16 | 22 | A.   Yes.  So, you know, multiple reasons.  You know, first of |
| 11:26:20 | 23 | all, it's -- it's very difficult to launch any type of an app |
| 11:26:24 | 24 | that's going to go viral and be successful.  If it was easy, |
| 11:26:26 | 25 | anyone would do it.  And we worked for years trying to figure |

11:26:30   1   out, you know, how to make this compelling app.

11:26:36   2            But harder than that, we actually -- we invented this

11:26:39   3   new networking -- this new type communication type, and it was

11:26:43   4   really hard to figure out how to make it work.  And so the

11:26:47   5   first few years we were just trying to figure out, you know, do

11:26:51   6   we -- if it's going to be a live messaging app, you know, we

11:26:54   7   can't just use the standard things that are available, you

11:26:58   8   know, APIs on the iPhone.  Do we start with sort of a live

11:27:02   9   system and figure out how to make it reliable delivery and sort

11:27:05  10   of buffer it, or do we start with a messaging system, you know,

11:27:09  11   that's asynchronous and nonprogressive.  And do we figure out

11:27:14  12   how to make it progressive and live?  And they both sounded

11:27:15  13   hard, and we tried both ways.

11:27:18  14   Q.   What forms of communication did Voxer work with?

11:27:20  15   A.   So the system is always designed to work with, you know,

11:27:25  16   sort of all existing sort of format types.  So text, voice,

11:27:30  17   video, location, pictures.  In the early days, we -- the server

11:27:35  18   was enabled for all of those, including video.  But we didn't

11:27:41  19   enable video on the devices at that time, because in 2011 and

11:27:45  20   2012, doing sort of livestreaming video on devices was a far,

11:27:53  21   far bigger challenge than it is now, both from the standpoint

11:28:00  22   of the existing networks at the time that did not have the same

11:28:04  23   bandwidth as they do today, but also the devices themselves

11:28:07  24   just in term of the processing and rendering capabilities of

11:28:13  25   these devices.  We were -- even with voice, we were asking them

11:28:18  1   to do a reasonable amount of work.  And, with video, that would

11:28:21  2   go up significantly.

11:28:25  3          MR. STONE:  Mike, could you pull back up Plaintiff's

11:28:27  4   Exhibit P-832.

11:28:29  5   Q.   And you're familiar with the logo that Voxer used?

11:28:31  6   A.   Yes.

11:28:31  7   Q.   And what is it?

11:28:33  8   A.   So this is our little mascot called Walkie.  He's supposed

11:28:36  9   to represent, you know, a walkie-talkie.

11:28:38  10  Q.   And did Voxer operate like a walkie-talkie?

11:28:42  11  A.   No, it didn't.  You know, with that sort of like iconic

11:28:53  12  thing, the same way that Instagram, their picture, their icon

11:28:57  13  is camera, but Instagram is not a camera.  You know, we -- we

11:29:02  14  chose this as a simple, easy-to-understand icon.

11:29:05  15         And the way that people started using the app was

11:29:08  16  thinking it worked like a walkie-talkie, like a push-to-talk

11:29:15  17  walkie-talkie.  But anybody that's used one knows that when you

11:29:16  18  key the mic, it blares out other people's speakers, which is

11:29:20  19  why you see police use them, you see construction workers use

11:29:24  20  them.  You don't see people using them in an office

11:29:27  21  environment.  No one is using one here.

11:29:30  22         And so with Voxer, instead of blaring out of somebody

11:29:35  23  else's device when you spoke, it would -- you'd just get a push

11:29:40  24  notification, and you could choose to come in and consume that

11:29:43  25  live or you could choose to consume it later.

11:29:46  1   Q.   And was there anything significant about the timeline of

11:29:50  2   your inventions related to why the first Voxer app didn't have

11:29:54  3   video?

11:29:54  4   A.   Yes.  I mean, as I said before, it's -- the quality of the

11:29:59  5   networks at the time, the quality of the devices at the time.

11:30:04  6   This was -- this was very early days.

11:30:07  7   Q.   And when you say quality of the networks, what are you

11:30:11  8   referring to?

11:30:13  9   A.   You know, the bandwidth and the -- you know, the back end.

11:30:18  10  Sort of the -- you know, even as 3G started coming out, in the

11:30:23  11  same way now they talk about 5G but it's mostly 4G or 4G-plus,

11:30:26  12  back then, even when 3G was out, in most places you were really

11:30:29  13  getting 2, 2 1/2 G.  And what you didn't want to do was have a

11:30:33  14  really bad user experience.  Because as soon as you have

11:30:38  15  like -- as soon as somebody says, oh, this app doesn't work,

11:30:41  16  they're going to stop using it.

11:30:45  17        And so we didn't want to roll out video too soon and

11:30:48  18  have that bad, negative user experience.  And that was the case

11:30:51  19  for both networks and also for the devices, particularly lower

11:30:54  20  Android devices struggled.

11:30:54  21  Q.   Now, you've mentioned your provisional patent applications

11:30:54  22  a number of times.  Were you one of the named inventors on

11:30:54  23  those provisions?

11:30:54  24  A.   Yes I was.

11:30:54  25  Q.   Now, let me show you what we've had marked as Plaintiff's

| | | |
|---|---|---|
| 11:30:54 | 1 | Exhibit P-5. |
| 11:30:54 | 2 | MR. STONE:  Your Honor, this is pre-admitted. |
| 11:30:54 | 3 | Q.   Mr. Katis, do you recognize this? |
| 11:30:54 | 4 | A.   Yes, I do. |
| 11:30:54 | 5 | Q.   And what is it? |
| 11:30:54 | 6 | A.   This is our first provisional patent application. |
| 11:30:54 | 7 | Q.   And what did you intend this to cover? |
| 11:30:54 | 8 | A.   The scope of the idea, including, you know, live |
| 11:30:54 | 9 | messaging, and then multiple conversation management system. |
| 11:30:54 | 10 | Q.   And, Mr. Katis, if you could look at page P-5-4? |
| 11:30:54 | 11 | MR. STONE:  Mike, if you could pull that up. |
| 11:30:54 | 12 | Q.   And what's described there, sir? |
| 11:30:54 | 13 | A.   So you can see here we're trying to describe the nature of |
| 11:30:54 | 14 | the invention, and a key part here is what we're saying, you |
| 11:30:54 | 15 | know, to do for voice and video communications what e-mail, |
| 11:30:54 | 16 | instant messaging, and devices like Blackberry have done for |
| 11:30:54 | 17 | correspondence. |
| 11:30:54 | 18 | So this is, you know, we're trying to say prior to |
| 11:30:54 | 19 | this, you know, video is TV or, like, livestreaming something. |
| 11:30:54 | 20 | But, you know, we had a vision for something that was not that. |
| 11:30:54 | 21 | He had a vision for something that, you know, could be live but |
| 11:30:54 | 22 | didn't have to be and could be a two-way interactive thing. |
| 11:30:54 | 23 | The same way that you can, you know, on Facebook Live |
| 11:30:54 | 24 | you can type things back to the person who is streaming and be |
| 11:30:54 | 25 | interactive with that person.  It's an interactive system. |

11:30:54  1    It's not just TV or just livestreaming.

11:30:54  2    Q.   Was there another provisional patent application?

11:30:54  3    A.   Yes, there is.

11:30:54  4    Q.   Let me show you what we have marked as Plaintiff's Exhibit

11:30:54  5    P-6.

11:30:54  6             MR. STONE:  And, Your Honor, this is also

11:30:54  7    pre-admitted.

11:30:54  8    Q.   Mr. Katis, do you recognize this?

11:30:54  9    A.   Yes, I do.

11:30:54  10   Q.   And what is this?

11:30:54  11   A.   So this is -- we filed later in the year, in October of

11:30:54  12   2007.  And we expanded the team.  So it included myself and

11:30:54  13   Matt Ranney.  But the two big additions were Jim and

11:30:54  14   Mary Panttaja.

11:30:54  15   Q.   And what did you intend your second provisional to cover?

11:30:54  16   A.   This was, you know, after having, you know, multiple

11:30:54  17   months to really, like you saw the picture of us

11:30:54  18   white-boarding, we spent months really deep diving on what

11:30:54  19   is -- what's the core of the idea.  Where does -- where do all

11:30:54  20   existing technologies sort of end, and what should we -- what's

11:30:54  21   the fullest nature of this thing that we've invented and how do

11:30:54  22   we think it might be able to build it and what we should focus

11:30:54  23   on building first?

11:30:54  24            MR. STONE:  And if we could turn to page P6-13.

11:30:54  25   Q.   What are you describing here, sir?

11:30:54  1   A.    This is a target market description.  So this is just, you

11:30:54  2   know, we're looking at sort of what are the potential markets

11:30:54  3   we could go to.  So, you know, there's business and enterprise,

11:30:54  4   obviously, there's the consumer market, like social networks,

11:30:54  5   you know, media broadcasting, et cetera.

11:30:54  6         A big one at the bottom is tactical.  This was sort

11:30:54  7   of the original inspiration of the idea.  But we knew that the

11:30:54  8   idea was much bigger than tactical.  And, again, this all

11:30:54  9   started from, you know, imagining not from a technical

11:30:54  10  standpoint, but from a human standpoint, you know, how do I

11:30:54  11  want to interact?  What's the outcome human interaction method?

11:30:54  12  And that was where things started.

11:30:54  13        And then I needed someone like Matt Ranney to help

11:30:54  14  figure out how do we actually build a system that can actually

11:30:54  15  support that -- that user model.

11:30:54  16  Q.    And why did you include all these use cases?

11:30:54  17  A.    Because the provisional patent application we wanted to

11:30:54  18  lay out the range of the things that we thought were possible

11:30:54  19  to be built with this.

11:30:54  20  Q.    Now, did you do all these things?

11:30:54  21  A.    No.  Definitely not.  I mean, the first rule of startups

11:30:54  22  is that you need to focus.  You can't do everything.  If you

11:30:54  23  try to do everything, you're going to fail.  And so we chose

11:30:54  24  one thing.  We decided to do this sort of walkie-talkie style

11:30:54  25  live interaction.  But it's not a walkie-talkie.  It's this

KATIS - DIRECT

11:30:54  1  live messaging thing that we're all excited about, and this

11:30:54  2  would be the first implementation.

11:30:54  3  Q.   Did you ultimately receive patents related to your live

11:30:54  4  messaging technology?

11:30:54  5  A.   Yes, we did.

11:30:54  6  Q.   And are you a named inventor on more than one Voxer

11:30:54  7  patent?

11:30:54  8  A.   Yes, I am.

11:30:54  9  Q.   How many?

11:30:54  10  A.   More than 150.

11:30:54  11  Q.   And are you familiar with the patents being asserted in

11:30:54  12  this case?

11:30:54  13  A.   Yes, I am.

11:30:54  14  Q.   And which ones are they?

11:30:54  15  A.   We refer to them as '270 patent and the '557 patent.

11:30:54  16          MR. STONE:  Now, let's pull up Plaintiff's

11:30:54  17  pre-admitted Exhibit Number P3.

11:30:54  18  Q.   Mr. Katis, do you recognize this?

11:30:54  19  A.   Yes, I do.

11:30:54  20  Q.   And what is it?

11:30:54  21  A.   This is a '270 patent.

11:30:54  22  Q.   And are you a named inventor?

11:30:54  23  A.   Yes, I am.  Along with Jim and Mary Panttaja and

11:30:54  24  Matt Ranney.

11:30:54  25  Q.   And did you draft the claims in this patent?

11:30:54   1   A.   No, I did not.  A hired counsel to do it.

11:30:54   2   Q.   And what is the other patent being asserted?

11:30:54   3   A.   The '557.

11:30:54   4            MR. STONE:  And if we could pull up, please,

11:30:54   5   Plaintiff's Pre-admitted Exhibit P4.

11:30:54   6   Q.   Mr. Katis, do to you recognize this?

11:30:54   7   A.   Yes, I do.

11:30:54   8   Q.   And what is this?

11:30:54   9   A.   This is the '557 patent.

11:30:54  10   Q.   And are you a named inventor on the patent?

11:30:54  11   A.   Yes, I am.  Along with Jim and Mary Panttaja and

11:30:54  12   Matt Ranney.

11:30:54  13   Q.   Now, Mr. Katis, did there ever come a time when you

11:30:54  14   discussed your technology and your patents with Facebook?

11:30:54  15   A.   Yes.  Many times.

11:30:54  16   Q.   And when?

11:30:54  17   A.   So the first time -- if we refer to the timeline, the

11:30:54  18   first time we met with them was early.  It was -- you can see

11:30:54  19   here on August 17th of 2010.

11:30:54  20   Q.   And who participated in that meeting?

11:30:54  21   A.   From Voxer's side it was myself, Matt Ranney, Andy Kelly,

11:30:54  22   who is my business affairs, and Gustaf Alstromer, who was my

11:30:54  23   head of growth.

11:30:54  24   Q.   And what was Mr. Alstromer role as head of growth?

11:30:54  25   A.   So being head of growth, you basically -- it's a product

KATIS - DIRECT                                                   96

11:30:54  1  type function where you're looking at the way the product is

11:30:54  2  designed and trying to understand which aspects of it are

11:30:54  3  contributing to growth and engagement and which can be made to

11:30:54  4  contribute more or modified or improved.

11:30:54  5  Q.    And what do you recall about that meeting?

11:30:54  6  A.    So we met with Chamath Palihapitiya, who was there for

11:30:54  7  Facebooks head of growth, and Matt Papakipos, who was one of

11:30:54  8  the directors of engineering.

11:30:54  9  Q.    And what did you discuss at that meeting?

11:30:54  10 A.    So this was early on and not fully launched, a production

11:30:54  11 version of Voxer.  We had a beta.  You know, it was sort of a

11:30:54  12 working prototype.  And this was based on sort of a chance

11:30:54  13 meeting of Andy Kelly.  And they set it up, and it was just

11:30:54  14 sort of an introductory meeting.

11:30:54  15        And so we spoke at a fairly high level.  We showed

11:30:54  16 them -- we showed them the app working, and they were

11:30:54  17 intrigued.  And we talked at a high level about, well, you know

11:30:54  18 at any one of these meetings before, I would talk about our

11:30:54  19 live messaging technology, which was always exciting.  But

11:30:54  20 it's -- because most companies don't go the patent route, most

11:30:54  21 companies just use trade secrets --

11:30:54  22        MS. ANDERSON:  Objection, Your Honor:  The witness is

11:30:54  23 testifying as to matters which lack foundation.

11:30:54  24        MR. STONE:  He's testifying --

11:30:54  25        MS. ANDERSON:  Other's knowledge and what most other

11:30:54  1  companies do.  Move to strike that portion, Your Honor.

11:30:54  2           THE COURT:  Well, he had knowledge of that.  He's in

11:30:54  3  the industry.  And I don't think that's of major importance

11:30:54  4  anyway.  The objection is overruled.

11:30:54  5           MR. STONE:  Thank you, Your Honor.

11:30:54  6           MS. ANDERSON:  Thank you, Your Honor.

11:30:54  7  A.   Yeah.  So because we made this decision early on to go the

11:30:54  8  route of filing for patents, we knew that, you know, we would

11:30:54  9  have some protection there, and we knew that if we didn't tell

11:30:54  10 them that we had patents, then they would assume we didn't.

11:30:54  11 And we just wanted to be clear and up-front, you know, that

11:30:54  12 this is something that's been a core of the business from the

11:30:54  13 beginning.

11:30:54  14          So I'd always at every meeting disclose the patents

11:30:54  15 briefly and then move on and describe the nature of this new

11:30:54  16 networking type that we figured out, this new communication

11:30:54  17 type.

11:30:54  18 Q.   Did Voxer provide a demo?

11:30:54  19 A.   We did.

11:30:54  20 Q.   Now, let me show you what I've marked as Plaintiff's

11:30:54  21 Exhibit -- which we've marked as Plaintiff's Exhibit P-752.

11:30:54  22          MR. STONE:  Your Honor, this is pre-admitted.

11:30:54  23          THE COURT:  That's fine.  It's not really

11:30:56  24 pre-admitted.  It's admitted.

11:30:58  25          MR. STONE:  Your Honor, correct.

11:30:59   1            THE COURT:  Because I admitted it.

11:31:01   2            MR. STONE:  I apologize.

11:31:02   3            THE COURT:  For the jury, there's no difference

11:31:03   4    between pre-admitted exhibits, the list I read to you at the

11:31:08   5    beginning and any other exhibits.

11:31:10   6            MR. STONE:  Thank you, Your Honor.

11:31:11   7    Q.   Mr. Katis, do you recognize Exhibit P-752?

11:39:58   8    A.   Yes, I do.

11:39:58   9    Q.   And what is it?

11:39:59  10    A.   This is an e-mail from myself to the company.  Well, the

11:40:03  11    company that became Voxer.  At this point we had that

11:40:05  12    intermediate name RebelVox.

11:40:06  13    Q.   And can you please read what you wrote after Point 1.

11:40:08  14    A.   Sure.  It said:  "They love what we are doing.  Regardless

11:40:15  15    of whether anything moves forward, we are on their radar.

11:40:17  16    Their VP of Growth and Mobile kept saying 'that's so cool'

11:40:19  17    throughout the whole demo.  We were very clear that we were

11:40:23  18    still in beta.  They commented on the clunky bits, but they

11:40:27  19    were able to look past them.  The app itself worked

11:40:30  20    beautifully."

11:40:31  21    Q.   Was this your takeaway from the meeting?

11:40:37  22    A.   Yes, it was.

11:40:37  23    Q.   When did you next meet with Facebook?

11:40:39  24    A.   If we can look at the timeline?

11:40:41  25            So the next meeting with Facebook was after the

| | | |
|---|---|---|
| 11:40:43 | 1 | launch of our apps and after the viral success.  It would have |
| 11:40:47 | 2 | been on December 12th. |
| 11:40:48 | 3 | Q.   And who -- what were the circumstances that led to that |
| 11:40:51 | 4 | meeting? |
| 11:40:51 | 5 | A.   Facebook reached out to us to ask for a meeting. |
| 11:40:54 | 6 | Q.   And let me show you what we'll have marked -- what has |
| 11:41:01 | 7 | been admitted as Plaintiff's Exhibit 743. |
| 11:41:04 | 8 |      Mr. Katis, do you recognize this? |
| 11:41:06 | 9 | A.   Yes, I do. |
| 11:41:07 | 10 | Q.   And what is this? |
| 11:41:08 | 11 | A.   This is an e-mail from myself to Matt Ranney, my |
| 11:41:11 | 12 | cofounder. |
| 11:41:14 | 13 | Q.   And what are you describing here? |
| 11:41:15 | 14 | A.   Just basically letting him know that I'm getting a lot of |
| 11:41:20 | 15 | inbound interest, both from big tech companies like Facebook |
| 11:41:26 | 16 | and Google, but also from the top VCs, venture capital firms. |
| 11:41:30 | 17 | Q.   And what does top VCs refer to? |
| 11:41:33 | 18 | A.   So in Silicon Valley the primary means of funding |
| 11:41:37 | 19 | businesses is venture capitalists.  They will make an equity |
| 11:41:41 | 20 | investment in your firm.  And at the time we were looking to |
| 11:41:45 | 21 | raise some money. |
| 11:41:46 | 22 | Q.   How much money were you looking to raise? |
| 11:41:49 | 23 | A.   Around 20 million. |
| 11:41:50 | 24 | Q.   And was that 20 million based on some valuation for Voxer? |
| 11:41:54 | 25 | A.   Yeah.  It would have resulted in a valuation of around |

KATIS - DIRECT

11:41:56    1  $200 million.

11:41:57    2  Q.    And did you ultimately receive that funding?

11:42:01    3  A.    Yes, we did.

11:42:01    4  Q.    And when was that?

11:42:02    5  A.    We completed the round, all the paperwork and everything,

11:42:06    6  and were funded in April of 2012.

11:42:09    7  Q.    Now, did the meeting with Facebook in December of 2011 go

11:42:13    8  forward?

11:42:15    9  A.    Yes, it did.

11:42:16   10  Q.    Now let me show you what has been admitted as Plaintiff's

11:42:19   11  Exhibit 744.

11:42:20   12         Mr. Katis, do you recognize this?

11:42:21   13  A.    Yes, I do.

11:42:24   14  Q.    And what was this?

11:42:25   15  A.    This is another e-mail from myself to the whole company at

11:42:29   16  Voxer.

11:42:29   17  Q.    And what were you describing here?

11:42:31   18  A.    I was just trying to keep everybody in the loop.  I

11:42:35   19  describe, you know, that I had gone down and had a meeting at

11:42:38   20  Facebook that day and met with a relatively junior person in

11:42:45   21  the corp dev team.

11:42:46   22  Q.    And you say with corp dev.  What was the corp dev team?

11:42:48   23  A.    So corporate development is typically the function within

11:42:52   24  tech companies that looks at either raising money or acquiring

11:42:56   25  other companies.

11:42:56  1   Q.   And do you know who was leading the corp dev team at

11:42:59  2   Facebook in 2011?

11:43:02  3   A.   Yes.  Amin Zoufonoun.

11:43:03  4   Q.   Did you ultimately meet with Mr. Zoufonoun?

11:43:06  5   A.   I did.

11:43:07  6   Q.   Going back to the December meeting, what did you discuss

11:43:12  7   at that meeting?

11:43:13  8   A.   It was an early sort get-to-know-you thing.  It was a

11:43:16  9   relatively junior person.  And, you know, everyone typically

11:43:19  10  would, you know, ask about, you know, our viral growth.  They

11:43:23  11  would frequently ask about, you know, they'd heard we were

11:43:26  12  raising money.  And, you know, at some point I'd come around

11:43:29  13  and talk about what was core to the business, and I would

11:43:33  14  discuss or patents and our technology.

11:43:35  15  Q.   Did Facebook follow up with you after this meeting?

11:43:39  16  A.   Yes, they did.

11:43:40  17  Q.   And what did they do?

11:43:42  18  A.   If we can look at the timeline?

11:43:47  19          So on February 2nd of 2012, Peter Deng reached out to

11:43:51  20  me and requested a meeting.

11:43:53  21  Q.   Let me show you what's been admitted as Plaintiff's

11:43:56  22  Exhibit 741.

11:43:58  23          Mr. Katis, what is Plaintiff's Exhibit 741?

11:44:00  24          MS. ANDERSON:  Objection, Your Honor.  I don't

11:44:01  25  believe 741 is on our list.

| | | |
|---|---|---|
| 11:44:08 | 1 | MR. STONE:  I apologize. |
| 11:44:09 | 2 | MS. ANDERSON:  Thank you. |
| 11:44:09 | 3 | Q.  (BY MR. STONE) Mr. Katis, do you recognize what has been |
| 11:44:12 | 4 | marked as Plaintiff's Exhibit 741? |
| 11:44:14 | 5 | A.  Yes, I do. |
| 11:44:14 | 6 | Q.  And what is this? |
| 11:44:16 | 7 | A.  This was simply sort of an introductory e-mail from |
| 11:44:20 | 8 | Peter Deng to me asking for a meeting. |
| 11:44:27 | 9 | MR. STONE:  And, Your Honor, this e-mail chain |
| 11:44:29 | 10 | contains admissions from Facebook as well as a business record |
| 11:44:38 | 11 | and present-sense impressions from Voxer, and we believe it |
| 11:44:42 | 12 | should be admitted into evidence. |
| 11:44:43 | 13 | MS. ANDERSON:  Your Honor, with respect to |
| 11:44:49 | 14 | Exhibit 741, as we have informed Voxer, we do not object to the |
| 11:44:54 | 15 | initial e-mail, which is the first one in the string.  But the |
| 11:44:58 | 16 | top e-mail in this exhibit is hearsay. |
| 11:45:01 | 17 | THE COURT:  Who is Gustaf Alstromer? |
| 11:45:05 | 18 | THE WITNESS:  He was our head of growth. |
| 11:45:06 | 19 | MR. STONE:  He's an employee at Voxer, working at |
| 11:45:09 | 20 | Mr. Katis's direction. |
| 11:45:10 | 21 | THE COURT:  All right.  I do not find what their |
| 11:45:12 | 22 | internal talking to be relevant to setting up the meetings and |
| 11:45:16 | 23 | what have you with Facebook, so I will admit the exhibit except |
| 11:45:20 | 24 | for the e-mail from Gustaf Alstromer to Mr. Katis, which I do |
| 11:45:31 | 25 | not admit. |

KATIS - DIRECT

11:45:32   1          So if you want to talk to him about this and then

11:45:40   2   prepare a redacted version to show the jury at some point,

11:45:49   3   we're going to be breaking for lunch in 15 minutes, so you can

11:45:59   4   do something with that.

11:46:00   5          It's admitted except for the February 3rd, 2012

11:46:06   6   e-mail.

11:46:07   7          MR. STONE:  And, Your Honor, we really want to focus

11:46:09   8   on the Facebook admissions here anyway, so I can just show that

11:46:11   9   portion on the screen.

11:46:12  10          THE COURT:  As long as you just show that portion on

11:46:15  11   the screen, that's fine.

11:46:16  12          MR. STONE:  Great.  That's what we'll do, Your Honor.

11:46:18  13          MS. ANDERSON:  Thank you, Your Honor.

11:46:18  14   Q.   (BY MR. STONE) So, Mr. Katis, what was this e-mail?

11:46:21  15   A.   This is an e-mail from Peter Deng at Facebook to myself,

11:46:28  16   and he was -- he wanted to arrange a meeting.

11:46:30  17   Q.   And who was Peter Deng?

11:46:32  18   A.   Peter Deng was one of the people leading the Facebook

11:46:35  19   Messenger group.

11:46:36  20   Q.   Do you know what his title was?

11:46:39  21   A.   I believe his title was director of product.

11:46:55  22   Q.   And what was Facebook Messenger?

11:46:57  23   A.   Facebook Messenger was a messaging app, not unlike Voxer.

11:47:01  24   We were both messaging apps.  But Facebook Messenger didn't

11:47:07  25   have any type of voice component to it.  It was texts,

11:47:10  1  pictures, you can attach videos.  And it was relatively early

11:47:15  2  in its development.

11:47:17  3  Q.    And did you understand what Mr. Deng's role was in

11:47:21  4  connection with your interactions with Facebook?

11:47:23  5  A.    Peter Deng ended up sort of being a point person for a lot

11:47:29  6  of our interactions.  He was sort of from this point going

11:47:33  7  forward basically our point for arranging all the meetings.

11:47:39  8  Q.    Now, there's also a reference to Ben in the e-mail and in

11:47:42  9  the CC line.  Do you see that?

11:47:46  10  A.    Yes.

11:47:46  11  Q.    And who is Mr. Davenport?

11:47:47  12  A.    Ben Davenport had started a company called Beluga, which

11:47:50  13  was a small messaging app, and Facebook had acquired them and

11:47:54  14  made them the core of their Messenger team.

11:47:56  15  Q.    Did you subsequently meet with Mr. Deng and Mr. Davenport?

11:47:59  16  A.    Yes, I did.

11:48:00  17  Q.    And when did you do that?

11:48:02  18  A.    If we can look at the timeline?

11:48:05  19        So you can see here on February 8th I met with

11:48:12  20  Peter Deng and Ben Davenport, as well as Mike Schroepfer?

11:48:15  21  Q.    And where did that meeting take place?

11:48:17  22  A.    At Facebook's headquarters.

11:48:19  23  Q.    And what did you discuss at that meeting?

11:48:22  24  A.    So it was -- it was clear that they had spent a lot of

11:48:30  25  time on Voxer.  They were super intrigued by it.  It was also

11:48:36  1  clear that, initially, they had viewed really as sort of a

11:48:41  2  walkie-talkie voice -- like, live voice.  And they -- they got

11:48:44  3  that it wasn't quite a walkie-talkie, that we were doing

11:48:48  4  something different, but they didn't fully understand it.

11:48:50  5        And so, you know, as I always did, you know, I would

11:48:54  6  mention, you know -- you know, this new technology in the

11:48:59  7  context that we had from the beginning sought to patent it.

11:49:04  8  And we felt that there was this -- we had just sort of cracked

11:49:09  9  open the whole new area of communications technologies.

11:49:13  10        MS. ANDERSON:  Objection, Your Honor:  The witness is

11:49:14  11  testifying as to hearsay, as to what Voxer has said to

11:49:17  12  Facebook.

11:49:18  13        THE COURT:  Sustained.

11:49:19  14        MS. ANDERSON:  Thank you, Your Honor.

11:49:20  15  Q.   (BY MR. STONE) Mr. Katis, did you meet with anyone else in

11:49:22  16  connection with these meetings?

11:49:24  17  A.   Yes.  I met briefly with Mike Schroepfer.

11:49:27  18  Q.   And who was that?

11:49:28  19  A.   Mike Schroepfer was the director of engineering.  He

11:49:32  20  was -- my understanding is that he was basically the number two

11:49:37  21  engineer at Facebook.

11:49:38  22  Q.   Did Facebook ask you anything else during these meetings?

11:49:41  23  A.   They asked us a lot of questions, including that they were

11:49:46  24  curious about our current capital raise.  They knew that we

11:49:50  25  were out talking to venture capitalists, and they were

11:49:52  1   interested in that.

11:49:53  2   Q.   And what did you understand the next steps to be with

11:49:56  3   Facebook?

11:49:56  4   A.   They said that they would get together and discuss it and

11:49:59  5   get back to me.

11:50:01  6   Q.   And did they?

11:50:02  7   A.   Yes, they did.

11:50:03  8   Q.   And did they ask for another meeting?

11:50:05  9   A.   Yes, they did.

11:50:07  10  Q.   And where did that meeting take place?

11:50:09  11  A.   At Voxer -- excuse me.  At Facebook headquarters on

11:50:12  12  February 16th.

11:50:13  13  Q.   And when did that meeting take place?

11:50:15  14  A.   February 16th.

11:50:16  15          MR. STONE:  Your Honor, let me show the witness

11:50:18  16  what's been marked as Exhibit P-739.  It's not been

11:50:21  17  pre-admitted.

11:50:22  18  Q.   Mr. Katis, do you recognize this?

11:50:24  19  A.   Yes, I do.

11:50:25  20  Q.   And what is it?

11:50:27  21  A.   This is an e-mail from Gustaf to myself.  We were the two

11:50:31  22  who went to Facebook's headquarters for the meeting.

11:50:36  23  Q.   And when was it prepared?

11:50:39  24  A.   This was -- like immediately after the meeting.  He sent

11:50:46  25  it to myself and the senior management team.  I had asked him

11:50:50   1  to prepare a summary for us of the meeting.

11:50:56   2  Q.   And is this is summary that Mr. Alstromer prepared at your

11:50:59   3  direction following the meeting?

11:51:01   4  A.   Yes.

11:51:01   5          MR. STONE:   And, Your Honor, we'd like to have

11:51:05   6  Exhibit P-739 admitted into evidence.

11:51:10   7          MS. ANDERSON:   Objection, Your Honor:   The e-mail is

11:51:11   8  hearsay and contains hearsay within hearsay as well.   It also

11:51:14   9  has some statements in it which contain speculation and lack of

11:51:19  10  foundation.

11:51:19  11          THE COURT:   I agree.   I'm going to sustain the

11:51:22  12  objection, but I will allow you to question this witness about

11:51:30  13  his personal knowledge of what went on in the meeting and what

11:51:35  14  actions he took.

11:51:36  15  Q.   (BY MR. STONE) And, Mr. Katis, can you tell me what you

11:51:38  16  recall about that meeting?

11:51:40  17  A.   Yes, absolutely.   So I met with Peter Deng.   He took me in

11:51:48  18  to meet with Amin Zoufonoun.   So Amin Zoufonoun was Facebook's

11:51:51  19  head of corporate development.   So that sort of set the tone

11:51:57  20  for the day.   The only reason -- you know, I had already

11:52:00  21  described the function to corporate development, and so we knew

11:52:03  22  that Facebook was considering, you know, a strategic move with

11:52:07  23  us.

11:52:08  24          I had a nice introductory meeting with Amin.   He

11:52:13  25  typically asked questions that had more to do with the fact

11:52:15  1   that we were out trying to raise money and more corporate

11:52:19  2   things.  And then Peter Deng and Amin Zoufonoun took me to go

11:52:23  3   mote with Mike Schroepfer.  But on the way we were passing

11:52:27  4   Mark Zuckerberg's desk and he was there, so they introduced us.

11:52:33  5   Q.   And what did you discuss with Mr. Zuckerberg?

11:52:36  6   A.   We only had about five minutes with Mark Zuckerberg.  And,

11:52:40  7   you know, we were, you know, thrilled to meet him.  And, you

11:52:45  8   know, he -- he knew all about us.  He told us he had been using

11:52:51  9   it with his girlfriend, using Voxer with his girlfriend.  And

11:52:54  10  he asked me a question about engagement.  And Gustaf had just

11:52:59  11  given me an interesting stat that morning and I remembered, so

11:53:04  12  I -- I told him that and he seemed to be impressed.

11:53:10  13          I knew that we only had a short time, and so I sort

11:53:13  14  of made my pitches to what live messaging is.  You know, the --

11:53:18  15  everybody knew that we were this viral success, you know,

11:53:23  16  walkie-talkie app, et cetera.  What I really wanted to make

11:53:26  17  sure to get across to someone like Mark Zuckerberg was that we

11:53:29  18  felt that we had invented a new communication --

11:53:34  19          MS. ANDERSON:  Objection: hearsay statements by Voxer

11:53:37  20  to Facebook during these discussions.

11:53:39  21          MR. STONE:  He's saying what he said, Your Honor.

11:53:42  22          THE COURT:  It's just what he said.

11:53:43  23          MR. STONE:  Yes.

11:53:44  24          THE COURT:  So it's overruled.

11:53:46  25          MS. ANDERSON:  Thank you, Your Honor.

```
11:53:47   1              MR. STONE:  Thank you, Your Honor.
11:53:47   2   A.   So I told him briefly -- of course, I prefaced it with,
11:53:53   3   you know, that we have patents, intellectual property
11:53:57   4   protection, and the core of the company since its founding, and
11:54:00   5   that we feel very proud of this live messaging technology that
11:54:05   6   we've invented that's not just live or just a message, it's
11:54:07   7   this thing in between.  And, you know, I told him that, you
11:54:11   8   know, the current Voxer app, you know, employs it, but there
11:54:14   9   are many use cases and we'd love to discuss them with him.
11:54:20  10   Q.   Why did you mention your patents in this brief
11:54:24  11   conversation?
11:54:24  12   A.   I did it pretty much -- it was sort of, you know, just
11:54:28  13   practice with every single conversation I had with anybody
11:54:30  14   about the technology.  I always start with that.
11:54:33  15   Q.   And who else did you meet with during this series of
11:54:36  16   meetings?
11:54:36  17   A.   From there we went to Mike Schroepfer.  He was, again,
11:54:40  18   director of engineering.  Our understanding was he was the
11:54:45  19   number two engineer at Facebook.
11:54:47  20   Q.   And what did you discuss with him?
11:54:50  21   A.   He -- he had a few questions, but then he pretty quickly
11:54:54  22   got down to, you know, would we be interested in selling to
11:54:58  23   Facebook?
11:54:59  24   Q.   And what did you say?
11:55:00  25   A.   So it's -- it's, you know, a weighty moment when you have
```

11:55:03   1   a new business that's growing quickly and Facebook asks you

11:55:06   2   that question.  And, you know, it's certainly -- there

11:55:10   3   certainly could have been a number, but my -- I was so bold as

11:55:15   4   to suggest -- I didn't -- I never said we won't sell.  I just

11:55:20   5   said, How about -- What if we sold you the consumer business --

11:55:24   6   instead of selling you the whole company, what if we sell you

11:55:27   7   the consumer business, and you guys do consumer.  You know,

11:55:34   8   I'll license you the technology.

11:55:36   9            But Voxer, like, we really want to do tactical,

11:55:40  10   police, military, we want to enterprises.  We want to do all

11:55:44  11   these other use cases, and Facebook has no interest in these

11:55:47  12   other markets.  So I proposed that we would sell the Voxer

11:55:51  13   consumer network and license the technology.  And that way what

11:55:57  14   was left of Voxer, we would pursue these other markets that

11:55:59  15   Facebook was not interested in.

11:56:00  16   Q.   And what was Mr. Schroepfer's reaction to that?

11:56:03  17   A.   He was intrigued by it.

11:56:05  18   Q.   And what were the next steps with Facebook after this

11:56:07  19   meeting?

11:56:07  20   A.   He wanted to -- he wanted us to have a follow-up meeting

11:56:14  21   to discuss licensing, and he asked that we bring my CTO, my

11:56:19  22   cofounder, Matt Ranney, because in this meeting it was myself

11:56:23  23   and Gustaf.  So neither of us was an engineer.

11:56:25  24   Q.   And so did Facebook follow up after this meeting?

11:56:29  25   A.   Yes, they did.

11:56:31  1   Q.   Now, let me show you what's been marked as Exhibit P-737.

11:56:34  2   And this is admitted.

11:56:37  3        Mr. Katis, do you recognize this?

11:56:38  4   A.   One moment.  Yes, I do.

11:56:40  5   Q.   And what is this?

11:56:41  6   A.   So this is Chris Daniels reaching out.  So Amin Zoufonoun,

11:56:47  7   who was head of corporate development for Facebook, introduced

11:56:50  8   Chris Daniels, who is Facebook's head of business development

11:56:54  9   to me, to set up a meeting.

11:56:56  10  Q.   And did he set up such a meeting?

11:57:03  11  A.   Yes, he did.

11:57:04  12       MR. STONE:  And, Your Honor, this might be a good

11:57:05  13  time for us to break before we get into that.

11:57:12  14       THE COURT:  Ladies and gentlemen, I agree.  This is a

11:57:15  15  good time to take our noon recess.  We'll be in recess today

11:57:19  16  until 1:30.

11:57:20  17       Remember the instructions the court has previously

11:57:23  18  given you:  Do not talk about this case among yourselves or

11:57:26  19  with anyone else.  Do not read any newspaper or magazines or

11:57:31  20  any periodicals that may have information about this case.  Do

11:57:33  21  not listen to any radio or observe any television broadcasts

11:57:37  22  that may have information about this case.  Do not attempt to

11:57:39  23  find out anything about this case or any of the issues in it

11:57:44  24  through the use of any electronic device, and do not transmit

11:57:50  25  any information about this case to anyone by my electronic

| | | |
|---|---|---|
| 11:57:53 | 1 | device. |
| 11:57:54 | 2 | Please be back in your jury room a little before |
| 11:57:56 | 3 | 1:30. |
| 11:57:58 | 4 | (Jury recessed) |
| 11:57:58 | 5 | THE COURT:  We'll be in recess until 1:30. |
| 18:00:00 | 6 | (Recess) |
| 11:58:10 | 7 | (Open court, no jury) |
| 11:58:10 | 8 | THE COURT:  Good afternoon, ladies and gentlemen.  We |
| 11:58:12 | 9 | ready to proceed? |
| 11:58:13 | 10 | MR. STONE:  Yes, Your Honor. |
| 11:58:15 | 11 | MS. ANDERSON:  Yes, Your Honor. |
| 11:58:48 | 12 | THE COURT:  All right.  You may bring in the jury. |
| 11:58:53 | 13 | (Open court, jury present) |
| 11:58:54 | 14 | THE COURT:  Mr. Stone, you may continue your direct |
| 11:59:06 | 15 | examination of Mr. Katis. |
| 12:59:50 | 16 | MR. STONE:  Thank you, Your Honor. |
| 12:59:51 | 17 | Q.   And to reorient ourselves after our lunch break, if you |
| 13:08:47 | 18 | could look at the timeline, Mr. Katis? |
| 13:30:39 | 19 | A.   Yes. |
| 13:30:39 | 20 | Q.   And I think before lunch you were about to discuss or were |
| 13:30:43 | 21 | discussing some interactions that you had with |
| 13:31:15 | 22 | Mr. Chris Daniels; is that right? |
| 13:31:16 | 23 | A.   That's correct. |
| 13:31:17 | 24 | Q.   And who was Chris Daniels? |
| 13:31:20 | 25 | A.   So Chris Daniels was introduced to me as the head of |

13:31:26   1   business development.  So as opposed to Amin Zoufonoun, who was

13:31:29   2   head of corporate development, corporate development typically

13:31:32   3   is, like, raising money and acquiring companies, business

13:31:34   4   development is typically more like business deals, licensing,

13:31:38   5   and things like that.

13:31:40   6            And so in the conversation with Mike Schroepfer, the

13:31:43   7   director of engineering, he was intrigued by this concept of --

13:31:49   8   of selling just the consumer part, not the whole company, and

13:31:52   9   potentially licensing the technology.  And so because there

13:31:55  10   would be a significant licensing component, he wanted to get

13:31:58  11   Chris Daniels involved.

13:32:00  12   Q.   And so did you have on understanding you would be

13:32:05  13   discussing licensing with Mr. Daniels?

13:32:07  14   A.   Yes.  That was explicit, and he also asked to bring

13:32:12  15   Matt Ranney, my CTO.

13:32:13  16   Q.   And Matt Ranney was going to discuss what aspects?

13:32:16  17   A.   Well, we were going to a deeper dive on the technology.

13:32:19  18   Q.   And were your excited about this meeting?

13:32:22  19   A.   I was very excited.

13:32:23  20   Q.   And why was that?

13:32:24  21   A.   I mean, you know, Facebook is an incredible company that

13:32:28  22   has, you know -- you know, a lot of amazing people who work

13:32:32  23   there and incredible scale.  And the prospect of this

13:32:34  24   technology that we developed being put to use, you know, by

13:32:38  25   them was exciting.  And then it would also free us to focus on

13:32:41  1   enterprise and -- and tactical and other systems.

13:32:46  2   Q.   And did you meet with Mr. Daniels?

13:32:47  3   A.   Yes, I did.

13:32:48  4   Q.   And when did you do that?

13:32:51  5   A.   So if you look at the timeline, you'll see that we met on

13:32:55  6   March 6th of 2012.

13:32:56  7   Q.   And what was discussed at that meeting?

13:32:59  8   A.   So that meeting, all the meetings sort of increased in

13:33:04  9   enthusiasm and the numbers of people every meeting.  We met

13:33:07  10  with more and more people.  This meeting was no exception.  So

13:33:10  11  in addition to Peter Deng, who seemed to sort of come to all

13:33:13  12  the meetings, Chris Daniels sort of took the lead in organizing

13:33:17  13  this one.

13:33:18  14       But there were a lot of -- we were kind of surprised

13:33:24  15  how many engineers and product people that were in -- it was a

13:33:26  16  large conference room and a lot of people in attendance.

13:33:29  17  Q.   And when you say product people, what are you referring

13:33:33  18  to?

13:33:33  19  A.   So I think engineers is somewhat self-explanatory in terms

13:33:38  20  of they're the people that write the code and do the hard-core

13:33:40  21  engineering in the system.  Product people are people more who

13:33:43  22  design the user interaction, user interfaces, how does the

13:33:46  23  product work, how do you -- how do you -- how does it act from

13:33:49  24  a human standpoint, how does sort of the human interaction

13:33:54  25  interact with the technology.

13:33:55   1   Q.   And do you recall specific questions that were asked of

13:33:58   2   you at the meeting?

13:34:00   3   A.   Yes.  You know, it started off, you know, sort of the way

13:34:04   4   that pretty much, you know, every meeting has ever started off

13:34:07   5   with us, which is, you know, I was very proud of, you know, our

13:34:11   6   patents and would always lead with that.  And that -- and that,

13:34:14   7   you know, just for the new people that I hadn't met with yet,

13:34:18   8   bringing them up to speed that Voxer, the app we created, the

13:34:21   9   walkie-talkie app, was just the first product for us.  And what

13:34:24   10  we were -- we were really excited about was this live messaging

13:34:27   11  technology and concept that was in between synchronous and

13:34:31   12  asynchronous communications.  It was sort of that hybrid

13:34:34   13  system.

13:34:35   14          And the engineers spent quite a bit of time asking

13:34:37   15  Matt Ranney questions, and he did a lot of white-boarding.

13:34:40   16  This is the type of thing that, you know, having patents gives

13:34:44   17  you much more confidence in a situation like this because, you

13:34:51   18  know -- you know, confidentiality agreements aren't always the

13:34:58   19  best enforcement tools in Silicon Valley.  And so going in with

13:35:01   20  patents, we had much higher degree of confidence.  And -- and,

13:35:06   21  of course, you know, we wanted to -- we wanted to do a deal.

13:35:09   22  We wanted to, you know, acquire Facebook as a customer and

13:35:14   23  partner.

13:35:14   24  Q.   Did you discuss any use cases for live messaging at the

13:35:19   25  meeting?

13:35:20  1    A.   Very much.   And, in fact, the bulk of the questions that

13:35:23  2    were asked by the product people were about video.

13:35:27  3    Q.   And what did you say about that?

13:35:28  4    A.   Well, I had done an enormous amount of thinking for years

13:35:32  5    about all these different use cases, and so I spent quite a bit

13:35:35  6    of time talking them through potential use cases for live

13:35:38  7    messaging video in a social media context.

13:35:41  8    Q.   Do you recall how the meeting ended?

13:35:43  9    A.   Yes.   There was a lot of enthusiasm, and I felt great

13:35:48  10   about it.   And it took a little while for people to file out

13:35:51  11   over the conference room.   And I pulled Chris Daniels aside,

13:35:54  12   and I just asked him, How do you think it went?   You know, how

13:35:59  13   is it going?

13:36:00  14         And he said he thought it went great, and then he

13:36:04  15   said we're just -- we're just trying to decide if you guys are

13:36:11  16   a competitor and if this is a core technology.

13:36:13  17   Q.   And what was your reaction to that?

13:36:15  18   A.   I got very nervous.

13:36:17  19   Q.   Why were your nervous?

13:36:18  20   A.   I mean, we sort of know what a competitor is, and I was --

13:36:23  21   you know, clearly, we -- you know, Facebook had a messenger app

13:36:26  22   and Voxer was a messaging app.   The conversation we were having

13:36:28  23   was about can we sell the consumer network and do licensing and

13:36:32  24   stop being competitors and you guys can do consumer and we'll

13:36:36  25   do enterprise, tactical et cetera.   So I thought we'd sort of

KATIS - DIRECT

13:36:38   1   tackled that component of it.

13:36:40   2         But when he mentioned that they were discussing

13:36:41   3   whether this was a core technology, it scared me because, you

13:36:47   4   know, sort of in the -- in Silicon Valley that term is a very

13:36:52   5   specific term, which, basically, a tech company, you can

13:36:54   6   license and use stuff from other tech companies, but not -- not

13:37:00   7   if you consider it a core technology.  If something is core to

13:37:03   8   your business, you can't license it from anybody else because,

13:37:06   9   if you do, then that company gets acquired by a competitor or

13:37:12   10  something like that happens, then you can get screwed.

13:37:16   11        MS. ANDERSON:  Objection, Your Honor: move to strike

13:37:18   12  the last portion as expert opinion testimony and lacks

13:37:20   13  foundation.

13:37:21   14        THE COURT:  Sustained.

13:37:22   15        MR. STONE:  Your Honor.  I would say he's testifying

13:37:24   16  about his understanding.

13:37:25   17        THE COURT:  The jury -- the jury will accept the last

13:37:27   18  statement by the witness as only his understanding of how

13:37:29   19  things work, not as proof of how things work in Silicon Valley.

13:37:33   20        MS. ANDERSON:  Thank you, Your Honor.

13:37:35   21  Q.  (BY MR. STONE) Now, Mr. Katis, how did you leave it at the

13:37:37   22  end of the meeting?

13:37:38   23  A.  He said that he would huddle up with the team and get back

13:37:42   24  to me.

13:37:43   25  Q.  Now, did anyone at Facebook ever tell you that they were

| | | |
|---|---|---|
| 13:37:47 | 1 | looking into building a version of Voxer for themselves? |
| 13:37:53 | 2 | A.   No.   They did not. |
| 13:37:53 | 3 | MS. ANDERSON:  Objection, Your Honor: leading. |
| 13:37:53 | 4 | Q.   (BY MR. STONE) Mr. Katis, when was your next communication |
| 13:37:56 | 5 | with Facebook? |
| 13:37:56 | 6 | A.   As you can see from the timeline, on March 22nd of 2012, |
| 13:38:02 | 7 | Chris Daniels e-mailed me to tell me that they weren't |
| 13:38:04 | 8 | interested. |
| 13:38:05 | 9 | MR. STONE:  And, Your Honor, this is an exhibit |
| 13:38:06 | 10 | that's not yet admitted.  I just want to show it to the |
| 13:38:09 | 11 | witness.  It's been marked P-736. |
| 13:38:13 | 12 | Q.   And if we could break it down, Mr. Katis, if you could |
| 13:38:17 | 13 | look at the e-mail at the bottom of P-736.  Do you recognize |
| 13:38:22 | 14 | that? |
| 13:38:23 | 15 | A.   Yes, I do. |
| 13:38:23 | 16 | Q.   And what is that? |
| 13:38:26 | 17 | A.   That's an e-mail from Chris Daniels at Facebook to myself. |
| 13:38:30 | 18 | Q.   Dated?  What's the date? |
| 13:38:31 | 19 | A.   March 22nd, 2012. |
| 13:38:37 | 20 | Q.   And what did you do with that e-mail? |
| 13:38:39 | 21 | A.   I mean, I -- I read it, I shared it with the team, and I |
| 13:38:44 | 22 | responded to him. |
| 13:38:45 | 23 | MR. STONE:  Okay.  And, Your Honor, we'd like to have |
| 13:38:47 | 24 | Exhibit P-736 admitted into evidence.  It contains Facebook |
| 13:38:53 | 25 | admissions.  And the top e-mail we're not going to introduce |

13:38:56  1   for the proof -- the truth of the matter asserted.

13:39:02  2          MS. ANDERSON:  Objection, Your Honor:  Exhibit P-736

13:39:04  3   we don't have any objection to the original e-mail in the

13:39:07  4   string.  But the top two e-mails are hearsay, and we're aware

13:39:10  5   of no applicable exception.

13:39:12  6          MR. STONE:  It's reflected in the impression of the

13:39:15  7   people at the company when they received this message from

13:39:17  8   Mr. Daniels.  We're not offering it for the truth of the

13:39:21  9   matter.

13:39:22  10         THE COURT:  Well, I'm looking at the exhibit, and the

13:39:25  11  first e-mail I see at the top is from Mr. Alstromer to

13:39:28  12  Mr. Katis.

13:39:29  13         MR. STONE:  Yes.

13:39:29  14         THE COURT:  Okay.  And then the second one, I'm going

13:39:32  15  to sustain the objection as to all of the e-mails that occur

13:39:37  16  above the March 22nd, 2012 e-mail from Mr. Daniels to

13:39:40  17  Mr. Katis.

13:39:41  18         MR. STONE:  Thank you, Your Honor.

13:39:42  19         MS. ANDERSON:  Thank you, Your Honor.

13:39:43  20         THE COURT:  And, you know, you-all are very nice, but

13:39:47  21  you don't have to thank me for my rulings.  The taxpayers of

13:39:59  22  this country pay me to sit up here and make them.

13:40:08  23         MR. STONE:  We appreciate that.

13:40:12  24  Q.   So now, Mr. Katis, if you'd look at the e-mail that

13:40:15  25  Mr. Daniels sent you.

KATIS - DIRECT

| | | |
|---|---|---|
| 13:40:17 | 1 | A.   Yes. |
| 13:40:18 | 2 | Q.   And so what did Mr. Daniels tell you? |
| 13:40:20 | 3 | A.   He basically said that they weren't interested at this |
| 13:40:24 | 4 | time.  He said that, basically, they were working through their |
| 13:40:25 | 5 | product priorities and the team decided it isn't in the right |
| 13:40:30 | 6 | time integrating Voxer into the Messaging app. |
| 13:40:33 | 7 | Q.   And what was your reaction to this? |
| 13:40:36 | 8 | A.   You know, I knew that there were a couple of different |
| 13:40:42 | 9 | things going on.  One thing going on was that they were just |
| 13:40:45 | 10 | trying to figure out how to incorporate voice, like voice |
| 13:40:49 | 11 | messaging, into the Messenger app.  But I also know that we had |
| 13:40:51 | 12 | generated a lot of enthusiasm around this live messaging |
| 13:40:56 | 13 | technology.  And when he said they were trying to decide if |
| 13:40:58 | 14 | this is core, you know, that scared me.  And it's hard to go |
| 13:41:01 | 15 | from, like, trying to decide what's core to it's not a priority |
| 13:41:05 | 16 | at all.  So I just -- I was concerned.  I thought -- I thought |
| 13:41:09 | 17 | they were moving forward, and I was sad they weren't going to |
| 13:41:15 | 18 | be a part of it. |
| 13:41:15 | 19 | Q.   And did you have an understanding as to the reaction of |
| 13:41:22 | 20 | your colleagues about this? |
| 13:41:23 | 21 |        MS. ANDERSON:  Objection: lacks foundation; calls for |
| 13:41:26 | 22 | speculation. |
| 13:41:26 | 23 |        THE COURT:  He can answer it yes or no. |
| 13:41:29 | 24 | A.   Yes. |
| 13:41:29 | 25 | Q.   And what was that understanding? |

13:41:31   1          MS. ANDERSON:   Same objections, Your Honor.

13:41:32   2          THE COURT:   Sustained.

13:41:33   3   Q.   (BY MR. STONE) Mr. Katis, as of March of 2012, did Voxer

13:41:37   4   allow for live voice messaging?

13:41:38   5   A.   Yes, it did.

13:41:39   6   Q.   And did Facebook?

13:41:40   7   A.   No, it did not.

13:41:41   8   Q.   Now, after this communication in March of 2012, did there

13:41:46   9   come a time when you learned or that you were learning some

13:41:49  10   information about Facebook that made you think about your

13:41:55  11   discussion with Mr. Daniels?

13:41:57  12   A.   Yes, there was.

13:41:58  13   Q.   And when was that?

13:42:01  14   A.   If we can put up the timeline, please.

13:42:09  15          So in August of 2015, when Facebook first launched

13:42:12  16   their first instance of Facebook Live, my gut impression was

13:42:14  17   you know, there it is.   That's sort of the -- it was the --

13:42:20  18   that was what I was sort of afraid of.   You know, here's this

13:42:24  19   product that Facebook just launched that looks and acts a lot

13:42:34  20   like Voxer's live messaging technology with video, which we all

13:42:40  21   discussed with them.   And here was their launch.

13:42:48  22   Q.   And did you reach out to Facebook?

13:42:50  23   A.   Yes, I did.

13:42:51  24   Q.   And who did you reach out to?

13:42:55  25   A.   Well, the people that I had -- I had these meetings with

13:43:00  1  previously, you know, were not going to return my call at this

13:43:05  2  point.  So I met the head of Facebook Messenger, a really nice

13:43:09  3  guy by the name of Stan Chudnovsky at a ski trip in Canada and

13:43:13  4  asked if we can get together.  And we set up a meeting with him

13:43:19  5  and also with David Marcus.  So Stan was head of Facebook

13:43:23  6  Messenger, and David Marcus was head of all messaging at

13:43:29  7  Facebook, which included Messenger as well as WhatsApp.

13:43:33  8  Q.    And did you meet?

13:43:34  9  A.    Yes, I did.

13:43:35  10  Q.    Where did you meet?

13:43:36  11  A.    At Facebook headquarters.

13:43:38  12  Q.    And what did you discuss?

13:43:40  13  A.    So, you know, Facebook Live and Instagram Live, these

13:43:43  14  weren't their areas.  They were, you know, on the Messenger

13:43:47  15  side of things.  But that was -- these were the people that

13:43:51  16  were sort of as high up in Facebook as I could get to try to

13:43:55  17  have a friendly conversation.

13:43:57  18        And I congratulated them on the launch of Facebook

13:44:00  19  Live, and I basically said, you know, I know you guys weren't

13:44:04  20  here before when we had all these conversations, but there is a

13:44:08  21  little bit of history.  And we are, you know, the experts in

13:44:12  22  this area of live messaging.  We invented it.  We patented it.

13:44:19  23  And we'd love to discuss, you know, doing something with you

13:44:23  24  guys, whether that's licensing or acquisition or anything else.

13:44:27  25  We think we could add significant value.

| | | |
|---|---|---|
| 13:44:29 | 1 | Q.   And how did you end that meeting? |
| 13:44:32 | 2 | A.   I told Stan that I would send him an overview of our |
| 13:44:35 | 3 | patent portfolio, and I asked him if he would send it on to the |
| 13:44:40 | 4 | legal team at Facebook. |
| 13:44:41 | 5 | Q.   And did you do that? |
| 13:44:42 | 6 | A.   Yes, I did. |
| 13:44:43 | 7 | Q.   And when did you do that? |
| 13:44:45 | 8 | A.   The -- I don't know the exact date of the e-mail right. |
| 13:44:49 | 9 | It was right after the meeting, in early 2016. |
| 13:44:52 | 10 |        MR. STONE:  And let's pull up Exhibit P-802.  It's |
| 13:44:55 | 11 | not admitted as of yet.  Are you still objecting to this? |
| 13:44:58 | 12 |        MS. ANDERSON:  Your Honor, it is already admitted as |
| 13:45:00 | 13 | 802, 803, and 804. |
| 13:45:04 | 14 |        MR. STONE:  Okay.  How about the cover e-mail? |
| 13:45:06 | 15 | Sorry.  One second.  So if we could pull P-802.  It is |
| 13:45:14 | 16 | admitted. |
| 13:45:14 | 17 |        THE COURT:  I didn't understand you. |
| 13:45:16 | 18 |        MR. STONE:  Sorry.  We're going to pull Exhibit |
| 13:45:19 | 19 | P-802, which is now as I understand it admitted, Your Honor. |
| 13:45:24 | 20 |        THE COURT:  All right. |
| 13:45:24 | 21 | Q.   (BY MR. STONE) Mr. Katis, do you recognize this e-mail? |
| 13:45:27 | 22 | A.   Yes, I do. |
| 13:45:28 | 23 | Q.   And what is this? |
| 13:45:29 | 24 | A.   This is an e-mail right after the meeting from myself to |
| 13:45:38 | 25 | Stan Chudnovsky at Facebook on February 4th, 2016. |

13:45:41  1   Q.   And there's -- are there attachments referenced in this

13:45:45  2   e-mail?

13:45:45  3   A.   Yes, there are.  There's two.

13:45:51  4   Q.   And did you send those as well?

13:45:53  5   A.   Yes, I did.

13:45:54  6        MR. STONE:  And if we could please pull up P-803,

13:45:56  7   which is admitted.

13:45:57  8   Q.   And Mr. Katis, what is this document?

13:46:00  9   A.   So this is one of those two documents on the e-mail.  This

13:46:05  10  was sort of the overview deck of our overall patent strategies

13:46:09  11  and the various patent families.

13:46:11  12       MR. STONE:  And if we could pull up admitted Exhibit

13:46:13  13  P-804, please.

13:46:14  14  Q.   And do you recognize this?

13:46:15  15  A.   Yes, I do.

13:46:21  16  Q.   And what's this?

13:46:22  17  A.   This is a summary of our patent portfolio.  And, again,

13:46:26  18  it's broken down into patent families since they -- you know,

13:46:31  19  there were a lot of different patents that issued at different

13:46:34  20  times.  So we tried to organize them in a way that made sense

13:46:40  21  into the distinct patent families.

13:46:41  22  Q.   And did these documents specifically identify the patents

13:46:46  23  asserted here?

13:46:47  24  A.   No, they did not.

13:46:48  25  Q.   What did they identify?

13:46:50   1   A.   The -- the broader patent families.  So patents are -- you

13:46:55   2   know, you don't get all your patents all at once.  And, you

13:47:00   3   know, during the -- this is a -- you know, if you have an

13:47:04   4   aggressive patent intellectual property strategy, it involves,

13:47:07   5   you know, a series of patent families and multiple filings.

13:47:12   6   Q.   Did Facebook respond to you providing them this

13:47:14   7   information?

13:47:14   8   A.   Excuse me?

13:47:15   9   Q.   Did Facebook respond to your having provided them this

13:47:20  10   information?

13:47:21  11   A.   Yes.  Stan replied.

13:47:22  12   Q.   And did he respond favorably?

13:47:26  13   A.   No, he did not.

13:47:28  14   Q.   Let's show you what's been admitted as P-746.

13:47:31  15        And what's this?

13:47:32  16   A.   So this is -- so at the very top it's me replying to Stan.

13:47:38  17   But immediately below that is Stan replying to my e-mail.  So

13:47:42  18   he's -- he's -- you know, you can read it here.  Basically he's

13:47:48  19   saying, you know, he thinks that we have a great IP, but he

13:47:58  20   doesn't believe that they infringe and that Facebook has no

13:48:00  21   interest.

13:48:01  22   Q.   Now, when did Facebook roll out Facebook Live for

13:48:03  23   everyone?

13:48:04  24   A.   It was a couple of months after this.

13:48:08  25   Q.   And what about Instagram Live?

| | | |
|---|---|---|
| 13:48:09 | 1 | A.    It was a little while after that. |
| 13:48:12 | 2 | Q.    Now, after Facebook and Instagram Live were rolled out to |
| 13:48:15 | 3 | the public, did they ever offer to pay Voxer for a license? |
| 13:48:19 | 4 | A.    No, they did not. |
| 13:48:21 | 5 | Q.    And did you have any further interactions with Facebook? |
| 13:48:27 | 6 | A.    I did not personally. |
| 13:48:28 | 7 | Q.    Now, why did you file this lawsuit? |
| 13:48:30 | 8 | A.    I mean, you know, we believe that Facebook Live and |
| 13:48:36 | 9 | Instagram Live used Voxer's technology, and we believe that we |
| 13:48:40 | 10 | should be compensated in some way.  We believe this is sort of |
| 13:48:44 | 11 | a -- this is sort of a case that the patent system was sort of |
| 13:48:48 | 12 | made for.  And, you know, it's -- as everybody knows, it's |
| 13:48:55 | 13 | tough as a small company to compete against a company like |
| 13:49:00 | 14 | Facebook.  They're a great company. |
| 13:49:03 | 15 | MS. ANDERSON:  Objection, Your Honor: move to strike |
| 13:49:05 | 16 | as nonresponsive and 403. |
| 13:49:07 | 17 | THE COURT:  Sustained.  The jury will disregard the |
| 13:49:09 | 18 | last statement. |
| 13:49:10 | 19 | THE WITNESS:  It's -- |
| 13:49:11 | 20 | THE COURT:  Wait.  When I -- |
| 13:49:12 | 21 | MR. STONE:  There's a question pending. |
| 13:49:14 | 22 | THE COURT:  Let him come back to you and ask a new |
| 13:49:18 | 23 | question. |
| 13:49:19 | 24 | THE WITNESS:  Yes, sir. |
| 13:49:20 | 25 | Q.    (BY MR. STONE) What about -- was your decision to file the |

13:49:24   1   lawsuit related in any way to your shareholders?

13:49:27   2   A.   Yes.  Obviously, I have a responsibility to my

13:49:31   3   shareholders, so I had to hang in there and see this through to

13:49:39   4   try to -- you know, at the end of the day, it's to try to right

13:49:42   5   a wrong, you know, that we perceive.

13:49:45   6            MR. STONE:  I'm going to pass the witness,

13:49:47   7   Your Honor.

13:49:48   8            MS. ANDERSON:  Thank you, Your Honor.  If I could

13:49:50   9   have a moment to get this set up?

13:49:52  10            THE COURT:  You may.

13:49:54  11            MS. ANDERSON:  Thank you.

13:49:55  12            I'll get this higher up for Your Honor so I'm a

13:49:57  13   little louder.

13:49:59  14            THE COURT:  Well, I keep thinking I'm going to

13:50:01  15   rearrange this courtroom back to pre-plague days, but I haven't

13:50:05  16   gotten it done yet.

13:50:12  17            MS. ANDERSON:  Your Honor, may I approach with some

13:50:15  18   binders for the court and the witness?

13:50:16  19            THE COURT:  You may approach, and I will tell this to

13:50:21  20   all the lawyers.  In my court you don't have to ask to approach

13:50:24  21   the witness.  If you have business with the witness, go to the

13:50:26  22   witness, get your business over, and go back to the counsel

13:50:29  23   table.  If I think you're badgering the witness, believe me, I

13:50:48  24   won't have any hesitancy to say anything about it.  It will

13:50:51  25   just go more quickly that way.

**CROSS-EXAMINATION**

**BY MS. ANDERSON:**

Q.   All right.  Good afternoon, Mr. Katis.

A.   Good afternoon.

Q.   Good to see you again, sir.

A.   Good to see you.

Q.   Before you begin, we would like to thank you for your service, your two tours of your duty.  We thank you for the service you've given this country?

        THE COURT:  Pardon me.  Just for our record, state your name again.

        MS. ANDERSON:  Oh.  Thank you, Your Honor. Christa Anderson for Facebook and Instagram.

Q.   All right.  Mr. Katis, I'd like to begin with your patents, if you can.  And you have a binder before you.  I have some exhibits in there that I may ask you to turn to them from time to time.  And also we'll have your exhibits posted on the screen before you from time to time as well.

        MS. ANDERSON:  If we could please take a look at Exhibit P-3 and put it up please.  This is an already-admitted exhibit.

Q.   Mr. Katis, you testified earlier this is your '270 patent, correct?

A.   That is correct.

Q.   All right.  And this patent issued on November 27th, 2018,

13:52:11  1  right?  That's the date in the top, right?

13:52:18  2  A.   That is correct.

13:52:19  3  Q.   All right.  And the file date for the application for this

13:52:23  4  patent is May 2nd, 2017; is that right?

13:52:26  5  A.   I'll take your word for it.

13:52:28  6  Q.   Do you see the highlighted date at line 22?

13:52:32  7  A.   Yes, I do.

13:52:33  8  Q.   Okay.  Great.

13:52:35  9       MS. ANDERSON:  Now let's turn to Exhibit P-4, if we

13:52:37  10  may.

13:52:37  11  Q.   Exhibit P-4 is your '557 patent, right, sir?

13:52:43  12  A.   That is correct.

13:52:44  13  Q.   And the '557 patent issued on December 71th, 2019,

13:52:53  14  correct?

13:52:53  15  A.   That is correct.

13:52:55  16  Q.   All right.  And the file date for the application for the

13:52:58  17  '557 patent is October 16th, 2018; is that right?

13:53:06  18  A.   That is correct.

13:53:06  19  Q.   So these applications and patents issued between 2017 and

13:53:11  20  2019, right?

13:53:13  21  A.   That is correct.

13:53:13  22  Q.   All right.  Now, the 2012 meetings that you've testified

13:53:18  23  about in this case so far, the ones that occurred with

13:53:23  24  Mr. Schroepfer and others at Facebook, those occurred more than

13:53:27  25  five years before those dates that we've been talking about,

13:53:30   1  right?

13:53:31   2  A.   Correct.  Although we had plenty of patents back then of

13:53:36   3  these same patent families.

13:53:38   4  Q.   And, Mr. Katis, the patents we're talking about right now,

13:53:41   5  the '270, and '557, those ones issued more than five years

13:53:46   6  after the 2012 discussions, right?

13:53:48   7  A.   Yes.  But they're part of patent families.

13:53:52   8  Q.   Now, you mentioned in your earlier testimony, sir, that,

13:53:56   9  in 2012, in some of those discussions that Voxer

13:53:59  10  representatives told Facebook about applications for patents or

13:54:03  11  actual patents.  Do you recall that?

13:54:05  12  A.   Yes.

13:54:05  13  Q.   All right.  Whatever patent applications or patents you

13:54:09  14  are talking about in 2012, those did not include the ones we

13:54:13  15  just referenced in Exhibit P-3 and P-4, right?

13:54:17  16  A.   That is correct.  It's not practical to sue for 150

13:54:21  17  patents.

13:54:22  18  Q.   And, in fact, during your discussions with Facebook in

13:54:25  19  2012, you did not specify any particular patent numbers or

13:54:29  20  patent applications, right?

13:54:33  21  A.   That's correct.

13:54:33  22  Q.   You didn't call out any particular numbers for patents,

13:54:38  23  right?

13:54:39  24  A.   That's correct.

13:54:39  25  Q.   And you also said that the discussions that you had with

13:54:43   1   Facebook in the 2012 time frame, and before that, generally

13:54:50   2   concerned the Voxer app.  Do you recall your testimony?

13:54:52   3   A.   No.   That's misleading.

13:54:57   4   Q.   Okay.  Sir, did you ever discuss the Voxer app in your

13:55:01   5   2010 and 2012 discussions?

13:55:02   6   A.   Yes.

13:55:03   7   Q.   You did.  And the Voxer app that you were discussing in

13:55:06   8   that time frame was not using the inventions of the '270 and

13:55:10   9   '557 patents that have been asserted against Facebook in this

13:55:14   10  case, right?

13:55:15   11  A.   The -- these patents are part of patent families that

13:55:19   12  Voxer absolutely utilizes.

13:55:22   13  Q.   Okay.  I'd just like to clarify, sir.  I'm only talking

13:55:27   14  about the patents-in-suit in this case, the '270 and the '557,

13:55:32   15  okay?

13:55:33   16       Do you agree that the Voxer app does not practice the

13:55:38   17  '270 and '557 patent claims that have been asserted against

13:55:43   18  Facebook in this case?

13:55:45   19  A.   I disagree.

13:55:45   20       MR. STONE:  Your Honor, I object.  She's seeking what

13:55:48   21  would be expert testimony, potentially.

13:55:49   22       THE COURT:  I didn't understand you, your voice

13:55:51   23  trailed off.

13:55:52   24       MR. STONE:  Objection:  She's seeking expert

13:55:56   25  testimony.

13:55:57   1          THE COURT:  No.  She's cross-examining him, and he

13:56:02   2    knows about his patents and he testified about his patents.

13:56:05   3    The objection is overruled.  You may proceed.

13:56:07   4    A.   The -- these patents are part of families that the Voxer

13:56:11   5    app absolutely is an implementation of the technology that's

13:56:16   6    described in these patents.

13:56:18   7    Q.   Sir, I'd like you to focus on my question.  I am not

13:56:23   8    asking you about patent families.  My question to you is:

13:56:29   9    Isn't it true that the Voxer app has never practiced the

13:56:33  10    asserted claims of the '270 patent?

13:56:38  11    A.   I can't state that.  I don't agree with that statement.

13:56:41  12    Q.   You don't know either way; is that right?

13:56:44  13    A.   That would not seem to be the case to me.

13:56:46  14    Q.   All right.  Sir, I'd like you to take a look at, if you

13:56:50  15    would, in your binder an exhibit that has been marked as

13:56:53  16    DTX305.

13:56:56  17          MS. ANDERSON:  Your Honor, this is not admitted, so

13:56:58  18    if I could just publish it to the witness, that would be great.

13:57:01  19          THE COURT:  You may publish to the witness only.

13:57:05  20    Q.   (BY MS. ANDERSON) Mr. Katis, you are aware as a

13:57:07  21    representative of Voxer in this litigation that Voxer had to

13:57:10  22    answer questions put to it in the court proceedings about Voxer

13:57:13  23    and this app.  Do you recall that, generally?

13:57:15  24    A.   When was this?

13:57:16  25    Q.   Are you familiar with the fact that Voxer responded to

KATIS - CROSS

133

13:57:19    1    interrogatories in this case?

13:57:20    2    A.    I mean, this is something that happened between the

13:57:31    3    attorneys and this, right?

13:57:32    4    Q.    Okay.  So is it your testimony that you have never seen

13:57:37    5    Exhibit DTX305?

13:57:38    6    A.    I don't recall ever seeing this, yes.

13:57:43    7    Q.    All right.  Sir, do you agree with the fact that the Voxer

13:57:48    8    app has never provided the ability to send real-time video

13:57:54    9    messaging?  That's true, right?

13:57:55   10    A.    In terms of video, the -- the system can enable it, but

13:58:00   11    the apps -- it's not currently enabled in the apps.  It is --

13:58:06   12    it is built into the overall system, but we never enabled it.

13:58:12   13    Q.    So, sir, it is correct that the Voxer product never

13:58:15   14    provided the ability to send real-time video messages, right?

13:58:19   15    A.    Not to end consumers.

13:58:23   16              MS. ANDERSON:  Okay.  Can we please play the

13:58:25   17    testimony of Mr. Tom Katis, page 222, lines 4 through 21.

13:58:29   18              MR. STONE:  Can I can see it, please?

13:58:30   19              MS. ANDERSON:  Excuse me.  Page 222, lines 4

13:58:33   20    through 7.  Excuse me.

13:58:35   21              And, actually, Your Honor, I'm going to withdraw the

13:58:39   22    question.

13:58:40   23    Q.    Sir, do you agree that the Voxer app currently does not

13:58:43   24    enable the sending of real-time video messages?

13:58:48   25    A.    I agree with that.

13:58:50  1   Q.   All right.  Thank you.

13:58:53  2          Sir, real-time video communication is a requirement

13:58:56  3   for all the asserted claims in this case; is that right?

13:59:16  4   A.   Yes.  Just for point of clarification, the server

13:59:20  5   absolutely enables it.  The current implementation of the apps

13:59:24  6   does not.

13:59:24  7          MS. ANDERSON:  Move to strike as nonresponsive,

13:59:26  8   Your Honor, the clarification statement.

13:59:27  9          THE COURT:  Sustained.

13:59:29  10  Q.   (BY MS. ANDERSON) Now, Mr. Katis, you testified earlier

13:59:32  11  about a provisional application filed with the Patent and

13:59:36  12  Trademark Office in 2007.  Do you recall that?

13:59:39  13  A.   Yes, I do.

13:59:40  14  Q.   And that was Exhibit P-5?

13:59:42  15  A.   Hold on.

13:59:43  16  Q.   Do you recall that?

13:59:44  17          MS. ANDERSON:  If we could have that up on the

13:59:46  18  screen, please.  That one has been admitted.

13:59:49  19  A.   Yes.

13:59:49  20  Q.   Let's take a look at this on the screen.  Do you recall

13:59:53  21  this provisional application, sir?

13:59:55  22  A.   Yes, I do.

13:59:56  23  Q.   Thank you.  And if we could turn your attention to page 3

14:00:02  24  of the exhibit, and this exhibit is paginated at the bottom.

14:00:05  25  A.   Five, dash, 3?

14:00:06   1   Q.   Yes, please.   Five, dash, 3.

14:00:07   2            And the submission you made was entitled "Rethinking

14:00:10   3   Voice Communication," right.

14:00:17   4   A.   That's correct.

14:00:18   5   Q.   And it indicates that this paper that we're reading from

14:00:21   6   was authored by you and Mr. Ranney; is that right?

14:00:25   7   A.   That's correct.

14:00:26   8   Q.   Okay.   And if you could turn to the next page, page 4, of

14:00:32   9   your exhibit.   You see your description of your invention,

14:00:35   10  right?

14:00:35   11  A.   Yes, I do.

14:00:36   12  Q.   All right.   You authored this along with Mr. Ranney,

14:00:40   13  right?

14:00:40   14  A.   That's correct.

14:00:41   15  Q.   And you see listed on this page critical components.   Do

14:00:45   16  you see that?

14:00:46   17  A.   Yes, I do.

14:00:47   18  Q.   About the middle of the page, critical components of your

14:00:52   19  invention?

14:00:52   20  A.   Yes, I do.

14:00:53   21            MS. ANDERSON:   Could we highlight that, please?

14:00:55   22  Q.   And drawing your attention to the list of critical

14:00:58   23  components, you see the third item --

14:01:01   24            MS. ANDERSON:   If we could highlight that, please.

14:01:03   25  Q.   -- you identify as a critical component, quote, stream and

14:01:06   1    store protocol, streaming voice video or other media as quickly

14:01:10   2    as possible while still guaranteeing delivery, even when

14:01:19   3    network conditions are poor, end quote.

14:01:22   4         Do you see that?

14:01:23   5    A.    Yes.

14:01:23   6    Q.    And you identified that to the Patent and Trademark

14:01:28   7    Office, right?

14:01:29   8    A.    In our first provisional, yes.

14:01:31   9    Q.    Right.  And let's take a look at page 16 of this exhibit

14:01:35  10    as well.  So that would be page 5-16.

14:01:39  11         On this page, sir, you have identified at the top,

14:01:43  12    you call it "prototype features."  Do you see that?

14:01:46  13    A.    Correct, yes.

14:01:47  14    Q.    And these are prototype features of your invention, right?

14:01:51  15    A.    Yeah.  Potential prototype features.

14:01:53  16    Q.    Okay.  And then the third bullet point of the third

14:01:58  17    feature identified in a bullet point is here is, quote, all

14:02:07  18    communications are delivered reliably to the intended recipient

14:02:12  19    using the CT store and stream technology.  This means that all

14:02:16  20    messages will be stored on both clients and servers, though

14:02:20  21    they will be available for consumption or propagation while the

14:02:23  22    message is being received, end quote.

14:02:26  23         Do you see that?

14:02:27  24    A.    Yes, I do.

14:02:28  25    Q.    And that was another statement you submitted to the Patent

14:02:31  1   and Trademark Office, right?

14:02:33  2   A.   Yes.  And I think it does a reasonable job of describing

14:02:35  3   the nature of live messaging to some degree.

14:02:38  4   Q.   Thank you.

14:02:38  5   A.   Obviously it's a very early terminology.

14:02:41  6   Q.   Thank you.  Now, if you would, sir, we're going to take a

14:02:43  7   look at Exhibit P-6.

14:02:44  8         MS. ANDERSON:  If we could have that up, please.

14:02:46  9   Q.   This was the other provisional application you testified

14:02:50  10  about earlier, correct, sir?

14:02:51  11  A.   Yes.

14:02:52  12  Q.   Okay.  And if we could take a look at page 13, so it's

14:02:58  13  6-13 of this exhibit.  I believe you were looking at this page

14:03:02  14  earlier during your testimony; is that right?

14:03:04  15  A.   Yes.

14:03:04  16  Q.   Okay.  And it's entitled "RebelVox Market Overview," and

14:03:10  17  you talk about target market description.  Do you see that?

14:03:12  18  A.   Yes, I do.

14:03:18  19  Q.   And do you see in the second paragraph you say, "RebelVox

14:03:23  20  provides significant functionality and value to the following

14:03:26  21  markets and application spaces, including but not limited to."

14:03:30  22         Do you see that?

14:03:32  23  A.   Yes, I do.

14:03:34  24  Q.   Okay.  And then listed Number 6 --

14:03:38  25         MS. ANDERSON:  If we could highlight that, please.

14:03:40   1   Q.   -- you identify tactical communications where control,

14:03:45   2   message management, replay, pause, catch up to live, archiving,

14:03:49   3   guaranteed delivery, and sophisticated routing can enable a

14:03:53   4   more robust and safe response to tactical situations, end

14:04:02   5   quote.

14:04:03   6           I've read that correct correctly, right?

14:04:06   7   A.   Yes.

14:04:06   8   Q.   And you submitted that to the Patent and Trademark Office

14:04:10   9   as well, correct?

14:04:10  10   A.   Yes.  As part of the provisional.

14:04:12  11   Q.   Thank you.  All right.  We can set that aside now.

14:04:16  12           Now, you testified earlier about discussions

14:04:19  13   concerning the possibility of Facebook paying some form of

14:04:22  14   money for Voxer technology.  Do you recall generally your

14:04:24  15   testimony?

14:04:25  16   A.   Yes.

14:04:25  17   Q.   Back in the 2011 and 2012 time frame, Facebook was not the

14:04:30  18   only company that Voxer was willing to talk to about a possible

14:04:32  19   deal in that regard, right?

14:04:36  20   A.   I'm not sure what you're getting at.  I mean, Facebook was

14:04:43  21   the only company that had been that aggressive about pursuing

14:04:47  22   us.

14:04:47  23   Q.   Do you agree, sir, that Facebook wasn't the only company

14:04:51  24   that Voxer was willing to consider talking about a possible

14:04:56  25   money deal with about IP at the time, right?

14:05:00  1    A.    Well, I think you're specifically referring to a company

14:05:02  2    that we would sell to or do a major deal with like we

14:05:05  3    described.

14:05:06  4    Q.    Well, at the time, 2011-2012 time frame, you expected to

14:05:11  5    meet other companies who might want to purchase or otherwise

14:05:14  6    pay money to Voxer for intellectual property, right?

14:05:19  7    A.    Yes.  It was pretty much all inbound at this point because

14:05:22  8    we were such a popular app, so we were happy to talk all the

14:05:26  9    biggest tech firms.

14:05:27  10   Q.    Great.  So let's take a look at Exhibit P-743, which is

14:05:32  11   already admitted.

14:05:33  12         Mr. Katis, this is an e-mail we looked at before, an

14:05:37  13   e-mail from you to Mr. Matt Ranney.

14:05:39  14   A.    Yes.

14:05:39  15   Q.    And drawing your attention to the top e-mail where you

14:05:42  16   write, "In the next two weeks, we'll be meeting with Facebook,

14:05:46  17   Google, and most of the top VCs for initial meetings.  I don't

14:05:50  18   know where this is going to go.  I'm open to anything."

14:06:01  19         Those were your words to Mr. Ranney at the time,

14:06:07  20   right?

14:06:07  21   A.    That's correct.

14:06:07  22   Q.    And then drawing your attention down a second sentence

14:06:11  23   below, "Even if we do not want to sell ASAP, we would not want

14:06:14  24   to appear frantic."  Do you see that?

14:06:17  25   A.    Yes, I do.

14:06:18  1          MS. ANDERSON:  And if we could highlight the "even

14:06:21  2  if" sentence, Mr. Fisher, that would be great as well.

14:06:25  3          Thank you.

14:06:25  4  Q.   And that was a communication you had internally at Voxer

14:06:33  5  in the 2011 time frame, right?

14:06:35  6  A.   Yes.  This is an e-mail from me to Matt Ranney.

14:06:37  7  Q.   All right.  And at this time, in your words, you were

14:06:40  8  expecting to meet with basically the whole world about your

14:06:44  9  app, right?

14:06:48 10  A.   It appeared that way at the time.  There was a lot of

14:06:51 11  inbound.

14:06:52 12  Q.   Okay.  And specifically as related to Facebook, you've

14:06:54 13  said that you were hoping to enter a deal with Facebook, any

14:06:57 14  kind of deal, including potentially licensing intellectual

14:07:01 15  property, right?

14:07:02 16  A.   Yeah.  I wouldn't say any type of a deal, but there were

14:07:07 17  definitely deals that we would have contemplated, sure.

14:07:13 18  Q.   Right.  But not a single company has entered an agreement

14:07:16 19  to pay money for a license to Voxer's intellectual property,

14:07:20 20  right?

14:07:20 21  A.   We have lots of customers who license our technology.  I

14:07:24 22  think what you're confusing is we haven't sold the business to

14:07:27 23  anybody else.  Like, that was super-confusing in the opening

14:07:30 24  statements where you're saying "not a single."  We have

14:07:32 25  hundreds, hundreds of customers who license our technology.

14:07:36  1   Hundreds.  And what the confusion is that you're claiming that

14:07:39  2   we didn't sell the company or, like, its whole patent portfolio

14:07:44  3   to someone.  That's correct.  We didn't sell the company.  We

14:07:49  4   didn't do a deal like we contemplated with Facebook.  But we

14:07:52  5   have hundreds of companies who license our technology.

14:07:54  6   Q.   Okay.  Mr. Katis, would you please turn to Defendant's

14:07:58  7   Exhibit 609.  This is Voxer's supplemental objections and

14:08:03  8   response to Defendant Facebook's interrogatories.

14:08:06  9        Do you see that?

14:08:07  10  A.   I'm looking for it.  You said 609?

14:08:10  11  Q.   Yes.  DTX609, please.

14:08:13  12  A.   Okay.

14:08:14  13  Q.   Do you have that before you?

14:08:15  14  A.   I do.

14:08:16  15  Q.   All right.  And turning your attention to page 11 of 12,

14:08:25  16  this is a document that was submitted to Facebook in this

14:08:28  17  matter and signed by your counsel, right?

14:08:32  18  A.   That's correct.

14:08:34  19  Q.   All right.  Now, please turn, if you would, to page 5

14:08:39  20  where it says Interrogatory Number 7.  Do you see that?  Sort

14:08:48  21  of towards the bottom of that page 5.

14:08:50  22  A.   Number 7.  Yes, I do.

14:08:52  23  Q.   And do you see the question that starts, "Identify all

14:08:55  24  current and former licensees of the patents-in-suit."  Do you

14:09:00  25  see that?

KATIS - CROSS

14:09:00  1   A.   Yes, I do.

14:09:07  2   Q.   All right.  And if you would, please, sir, turn to the

14:09:11  3   next page, page 6.  Do you see where it says, "Response to

14:09:17  4   Interrogatory Number 7"?

14:09:19  5   A.   Yes.

14:09:19  6   Q.   And you see Voxer makes some statements there, but I'd

14:09:22  7   like to draw your attention to almost the end of page 6 there

14:09:26  8   where it says, quote, At present, there are no current or

14:09:29  9   former licensees of the patents-in-suit, end quote.

14:09:32  10          Do you see that?

14:09:32  11  A.   So, just to clarify, as I said before, I've never seen

14:09:36  12  this document before.

14:09:39  13  Q.   Sir?

14:09:39  14          MS. ANDERSON:  Your Honor?

14:09:40  15  A.   But it would appear to me --

14:09:42  16          THE COURT:  No.  Just answer her question.

14:09:44  17          THE WITNESS:  Sure.  Yes, sir.

14:09:45  18          THE COURT:  Your lawyer will have another opportunity

14:09:46  19  to question you if he wants to elicit more information.

14:09:49  20          THE WITNESS:  Yes, sir.

14:09:51  21  A.   So that is what it says here.

14:09:54  22  Q.   All right.  Thank you, sir.  Now, sir, in the

14:09:58  23  2010-2011-2012 time frame, you knew that there were many

14:10:02  24  reasons that a company like Facebook might decide that Voxer

14:10:05  25  technology wasn't right for it, right?

14:10:07   1   A.    Absolutely.

14:10:09   2   Q.    Okay.  And, in fact, if we could take a look at

14:10:12   3   Exhibit 752, which is already admitted, you talked about this

14:10:24   4   issue in the e-mail that you sent to Voxer employees on or

14:10:29   5   about August 17th, 2001, right?

14:10:32   6   A.    Yes.  It appears that way.

14:10:34   7   Q.    Okay.  And then drawing your attention to the paragraph

14:10:37   8   that's numbered 2, your discussing here the follow-up from a

14:10:49   9   meeting with Facebook.  You say, quote, Don't get bent out of

14:10:52  10   shape on this.  Regardless of how good a first meeting is,

14:10:59  11   these things usually go sideways for a long time.  They have a

14:11:05  12   million things to figure out for their strategy, and trying to

14:11:11  13   fit it in a brand-new technology is hard.  We will likely have

14:11:17  14   to prove things on our own before they will take a chance on

14:11:23  15   us.  But now they are aware of us and will be watching.  We

14:11:28  16   need to totally kick ass over the next few months and get the

14:11:31  17   app to a higher level, end quote.

14:11:33  18        Do you see that?

14:11:35  19   A.    Yes, I do.

14:11:36  20   Q.    All right.  So you knew at the time that there were a

14:11:38  21   million things that would have to be figured out before any

14:11:41  22   deal could be done, right?

14:11:42  23   A.    Absolutely.  Especially because this was more than a year

14:11:46  24   before we launched.

14:11:47  25   Q.    By the way, when we are still discussing this exhibit, if

14:11:51    1   I can draw your attention to the third numbered paragraph in

14:11:55    2   this e-mail you spend a moment in this e-mail to congratulate

14:11:58    3   one of your employees, right?

14:12:00    4   A.    Yes.

14:12:00    5   Q.    Yes.  So one of your employees named Andy is being

14:12:05    6   congratulated by you in this e-mail for pursuing Facebook in

14:12:09    7   order to ultimately get a meeting set up between Voxer and

14:12:14    8   Facebook in 2010.  Do you see that?

14:12:16    9   A.    Yeah.  As I think I mentioned before, this meeting was

14:12:21   10   based on a chance meeting of Andy.

14:12:23   11   Q.    And you say in your e-mail, this third paragraph you say,

14:12:26   12   quote, Andy got this meeting set up by networking with a friend

14:12:31   13   of his who works at Facebook.  This wasn't the first time Andy

14:12:34   14   went there and met with him, end quote.

14:12:36   15          Do you see that?

14:12:37   16   A.    Okay.

14:12:38   17   Q.    Do you see that, sir?

14:12:39   18   A.    I'm looking for the part --

14:12:43   19   Q.    Oh, sure.  It's the first two lines of paragraph 3?

14:12:47   20   A.    I can see that, yes.

14:12:47   21   Q.    Okay.  That's what you said to Voxer, right?

14:12:50   22   A.    Yes.

14:12:50   23   Q.    And at the end you concluded that paragraph with, quote,

14:12:55   24   Kudos to Andy for nailing this one, end quote.  Right?

14:13:02   25   A.    Yes.  And I'll point out again this was more than a year

14:13:04   1   before we launched, and this was before all the inbound.

14:13:07   2   Q.   And now even after your February 2012 meetings, you knew

14:13:13   3   it was uncertain whether a deal could be done between the

14:13:16   4   companies, right?

14:13:17   5   A.   It's always uncertain, yes.

14:13:19   6   Q.   Yeah.   And even as of early March of 2012, you were still

14:13:23   7   skeptical that any deal would work for both companies, right?

14:13:25   8   A.   In general in business, business deals generally fall

14:13:30   9   apart, and I never count on them until they happen.

14:13:34  10   Q.   Yeah.   All right.   Now lets talk a little bit about --

14:13:38  11            MS. ANDERSON:   Yeah.   we can take that down.

14:13:38  12   Q.   Let's talk a little bit about the intellectual property

14:13:41  13   that you say Voxer was trying to market to Facebook and other

14:13:46  14   companies.   There are limits to what you say Voxer claims to

14:13:50  15   have invented in communications.   Wouldn't you agree?

14:13:53  16   A.   Absolutely.

14:13:53  17   Q.   All right.   So, for example, Voxer did not invent

14:14:00  18   livestreaming video, correct?

14:14:01  19   A.   Right.

14:14:02  20   Q.   Voxer did not invent instant messaging?

14:14:05  21   A.   Correct.

14:14:06  22   Q.   Voxer did not invent SMS, which is a form of text

14:14:09  23   messaging, right?

14:14:10  24   A.   Correct.

14:14:11  25   Q.   Voxer did not invent push-to-talk, right?

14:14:13  1    A.    No.  We kind of reinvented it, but we didn't invent

14:14:16  2    push-to-talk.  There were many inventions before us.

14:14:19  3    Q.    Voxer did not invent live voice communications either,

14:14:22  4    right?

14:14:22  5    A.    No.  That's the telephone.

14:14:23  6    Q.    Right.  Voxer did not invent time-shifting of video or

14:14:27  7    recording something live and watching something later?

14:14:29  8    A.    No.  VCRs and TIVOs, yeah.

14:14:32  9    Q.    Right.  They've been around.  Voxer did not invent the

14:14:33  10   concept of turning human-readable names into a recipient's IP

14:14:38  11   address, right?

14:14:39  12   A.    No.

14:14:39  13   Q.    And, to be clear, I don't want double-negatives just in

14:14:44  14   case.

14:14:44  15   A.    So we did not invent that.

14:14:46  16   Q.    You did not invent that.

14:14:48  17   A.    To be clear, we did not invent that.

14:14:50  18   Q.    Thank you, sir.  And Voxer also didn't invent the domain

14:14:53  19   name system technology, right?

14:14:54  20   A.    We certainly did not invent that.

14:14:56  21   Q.    Okay.  Instead, when you were asked to describe what Voxer

14:15:02  22   invented before this lawsuit, you said that Voxer -- Voxer

14:15:05  23   invented turning your phone into a walkie-talkie, right?

14:15:08  24   A.    That's simplified marketing speak.  That's not -- has

14:15:13  25   nothing to do with the nature of invention.

                          KATIS - CROSS

14:15:15   1   Q.   You said that, though, right, sir?

14:15:16   2   A.   I've called the app a walkie-talkie app even though I know

14:15:23   3   it doesn't exactly work like a walkie-talkie.  And we knew it

14:15:26   4   was marketing speak and then technical speak, and then there's,

14:15:29   5   separate from that, legal documents.

14:15:31   6        MS. ANDERSON:  And if we could play clips from

14:15:34   7   FBVOX0034084, which is an interview that Mr. Katis gave at the

14:15:39   8   Le Web Conference.

14:15:40   9        MR. STONE:  We haven't seen this.

14:16:37  10     (Video played)

14:16:37  11        UNIDENTIFIED SPEAKER:  What is Voxer?

14:16:37  12        MR. KATIS:  Sure.  I mean, just simply, Voxer turns

14:16:37  13   your phone into a walkie-talkie.

14:16:37  14        What we did invent was the ability to have them both

14:16:20  15   be the same thing at the same time.  So when you're speaking if

14:16:24  16   somebody is listening to you, they hear you while you're

14:16:27  17   speaking.  They hear you live.

14:16:28  18        UNIDENTIFIED SPEAKER:  Live.

14:16:28  19        MR. KATIS:  Live.  But whether they're listening or

14:16:30  20   not, they're still getting it as a message.

14:16:33  21     (Video stopped)

14:16:33  22   Q.   (BY MS. ANDERSON) All right.  Let's move forward in time

14:16:39  23   to the 2015 time frame.  Facebook Live launched in or around

14:16:45  24   late 2015, correct?

14:16:48  25   A.   Yes.  That's correct.

14:16:50    1    Q.   And then you arranged for a meeting with Facebook

14:16:54    2    representatives sometime around mid January 2016?

14:16:58    3    A.   Sometime around then.

14:16:59    4    Q.   All right.  And you said that meeting was with Facebook's

14:17:02    5    David Marcus and Stan Chudnovsky, correct?

14:17:05    6    A.   That's correct.

14:17:05    7    Q.   And during that meeting, you congratulated Facebook on

14:17:10    8    launching Facebook Live, right?

14:17:11    9    A.   Yes.

14:17:12   10    Q.   All right.  You also told Facebook that Facebook Live

14:17:16   11    seems like a great product, right?

14:17:18   12    A.   Yes.

14:17:19   13    Q.   All right.  And, soon thereafter, you sent the e-mail to

14:17:24   14    Facebook that you described as on e-mail from yourself to

14:17:29   15    Mr. Chudnovsky dated February 4, 2016.  Do you recall that?

14:17:33   16    A.   That's correct.

14:17:33   17             MS. ANDERSON:  All right.  If we could please,

14:17:35   18    Mr. Fisher, display Exhibit P-802.

14:17:44   19    Q.   And you went over this a little earlier with your counsel

14:17:47   20    right, sir?

14:17:48   21    A.   Yes.

14:17:48   22    Q.   Exhibit P-802, this February 2016 e-mail that you sent, is

14:17:55   23    the only written documentation you know of that Voxer ever

14:18:00   24    provided to Facebook identifying any particular patent numbers

14:18:04   25    in connection with discussions, right?

14:18:06    1    A.    This is the only documentation of it, yes.

14:18:09    2    Q.    All right.  And you did make your e-mails and documents

14:18:12    3    available to your counsel to produce in this case, right?

14:18:15    4    A.    Yes.

14:18:16    5    Q.    Now, let's take a look at your correspondence in this

14:18:23    6    exhibit, drawing your attention to the two paragraphs of your

14:18:27    7    e-mail.

14:18:28    8    A.    Uh-huh.

14:18:29    9    Q.    You state, quote, Here is an overview deck and a more

14:18:34   10    detailed IP statement that highlights some of our key patents.

14:18:39   11    As we discussed, we keep getting inbound interest.  But if we

14:18:44   12    go down that road, we'd rather start with someone like

14:18:47   13    yourselves that we feel we share common values and culture

14:18:51   14    with.  I'm on Necker the next week but will follow up after.

14:18:57   15            That's what you wrote to Facebook on February 4,

14:19:01   16    2016, right?

14:19:02   17    A.    Yes.  That's correct.

14:19:03   18            MS. ANDERSON:  Could we pull blow that up, please,

14:19:08   19    Mr. Fisher so it's a little bit easier to read, that would be

14:19:10   20    great.

14:19:11   21    Q.    Now, per your statement in this exhibit, you left for a

14:19:15   22    visit to Necker after sending this e-mail; is that right?

14:19:19   23    A.    It would appear so.

14:19:20   24    Q.    And that's Richard Branson's private luxury island Necker?

14:19:24   25    Is that the one?

14:19:25  1   A.   It's also a retreat for a lot of tech people, including

14:19:28  2   Facebook and former Facebook people, who I've visited with.

14:19:31  3   Q.   But that's the island, the luxury island?

14:19:34  4   A.   That is, yes.  And where I met Stan Chudnovsky was a

14:19:38  5   similar type of a trip to a ski lodge in British Columbia with

14:19:42  6   a lot of other Facebook people there.

14:19:42  7   Q.   Respectfully, sir, please concentrate on the question.

14:19:46  8           MS. ANDERSON:  Your Honor, I move to strike,

14:19:47  9   nonresponsive.

14:19:48  10          THE COURT:  Sustained.  The jury will disregard the

14:19:50  11  last statement.

14:19:51  12          And, Mr. Katis, please just answer her questions and

14:19:56  13  don't interject anything else.

14:19:58  14          THE WITNESS:  Yes, sir.  Okay.  Yes, sir.

14:20:01  15  Q.   (BY MS. ANDERSON) Now, sir, when you returned in February

14:20:04  16  of 2016 from your trip to Necker, you went on a ski trip with a

14:20:10  17  number of entrepreneurs and other people, including Facebook

14:20:16  18  reps; is that right?

14:20:16  19  A.   There were some Facebook personnel there, yes.

14:20:19  20  Q.   Okay.  And the other Facebook representatives that were on

14:20:23  21  the ski trip were Mr. Stan Chudnovsky and Mr. Matt Pakes; is

14:20:28  22  that right?

14:20:28  23  A.   Yes.

14:20:29  24  Q.   And you flew home from that trip with Mr. Pakes, right?

14:20:36  25  A.   Yes.

14:20:37  1   Q.   And during that ride, you asked Mr. Pakes questions about

14:20:44  2   Facebook Live, right?

14:20:45  3   A.   That's correct.

14:20:45  4   Q.   All right.  And you wanted to confirm your understanding

14:20:48  5   of how it worked; is that right?

14:20:53  6   A.   Yes.

14:20:54  7   Q.   Okay.  When you returned from your ski trip, you did

14:20:57  8   ultimately get an answer from Facebook declining to enter into

14:21:03  9   an intellectual property deal with you; is that right?

14:21:06  10  A.   That's correct.

14:21:07  11  Q.   And we talked about that a bit already, right?

14:21:10  12  A.   Uh-huh.

14:21:11  13  Q.   Let's take a look at Exhibit 746, please.  So we're at

14:21:27  14  P-746, please.

14:21:29  15       Now, this is the e-mail that we have discussed

14:21:36  16  earlier in which Mr. Chudnovsky indicates that they're

14:21:41  17  declining to enter into an agreement with Voxer regarding

14:21:46  18  intellectual property; is that right?

14:21:48  19  A.   That's correct.

14:21:49  20  Q.   All right.  And in this particular e-mail, Mr. Chudnovsky

14:21:53  21  writes, quote, Hey, Tom and Irv.  Hope all is well and

14:21:59  22  apologize for the long wait.  Our guys just finished looking at

14:22:04  23  the portfolio.  As you mentioned, you have great IP for the

14:22:07  24  space that Voxer is in.  That said, all of our properties are

14:22:11  25  doing something completely different, and we currently have no

```
14:22:15    1  plans to extend into different territories.  Would be happy to
14:22:20    2  have lunch and talk more about Voxer, et cetera.  But,
14:22:23    3  currently, there isn't much appetite on our end, unfortunately.
14:22:28    4  Tom, hope Necker was fun.  Was great fun for me, end quote.
14:22:33    5       That's the message you got from Mr. Chudnovsky in
14:22:35    6  total there, right?
14:22:36    7  A.   That is correct.
14:22:37    8  Q.   All right.  Now, you responded to his message in the top
14:22:42    9  e-mail on Exhibit P-746, right?
14:22:44   10  A.   That's correct.
14:22:46   11  Q.   And in your response you do not accuse Facebook of
14:22:50   12  infringing any patents, right?
14:22:53   13  A.   No, I do not.
14:22:54   14  Q.   You don't accuse Facebook of infringing '557 or the '270
14:22:59   15  patent, right?
14:23:01   16  A.   No, I do not.
14:23:01   17  Q.   Instead, you state, "All good, Stan.  Thanks for
14:23:06   18  forwarding it on.  Would love to grab lunch again sometime."
14:23:10   19  Right?
14:23:10   20  A.   That's correct.
14:23:12   21  Q.   All right.  Now, it was after these 2016 discussions we
14:23:19   22  have just covered, Voxer moved forward and ended up submitting
14:23:27   23  applications for new patents, the application filed for the
14:23:31   24  '270 and the '557 patent, right?
14:23:34   25  A.   I believe it's a continual process.
```

14:23:36   1   Q.   But those application dates we covered at the very

14:23:39   2   beginning of your testimony, one was filed in 2017?

14:23:42   3   A.   Correct.

14:23:42   4   Q.   One was filed in 2018, right, sir?

14:23:45   5   A.   Yes.  Yes.

14:23:46   6   Q.   All right.  And in this case you agree with me, sir, that

14:23:54   7   Voxer contends that Facebook first became aware of the '270

14:23:59   8   patent and its issued claims on November 27, 2018; is that

14:24:04   9   right?

14:24:05  10   A.   Say that one more time.

14:24:07  11   Q.   In this case Voxer contends that Facebook first became

14:24:12  12   aware of the '270 patent and its issued claims on

14:24:16  13   November 27, 2018, right?

14:24:19  14   A.   Was that the published date?  I'm not sure.

14:24:23  15   Q.   That's the date of issuance?

14:24:25  16   A.   Okay.

14:24:25  17   Q.   And that's the date that Voxer claims Facebook was aware

14:24:28  18   of the patent, right?

14:24:29  19   A.   I mean, that's the date of issuance.  I'm not sure what's

14:24:33  20   been claimed in these.

14:24:34  21   Q.   Okay.  Let's take a look at DTX305 again.  All right.

14:24:46  22   And, sir, again these are responses served by Voxer to Facebook

14:24:51  23   in this case regarding the allegations made by Voxer against

14:24:55  24   Facebook, right?

14:24:57  25   A.   Yes.

14:24:58  1   Q.   All right.  Drawing your attention to a little bit farther

14:25:02  2   back in the document this time, page 33.  Are you there yet?

14:25:18  3   A.   I'm at page 33.

14:25:20  4   Q.   Wonderful.  And you see that this question generally is

14:25:24  5   asking for facts and circumstances, including without

14:25:27  6   limitation, the date on which you contend that Facebook first

14:25:30  7   became aware of the patents-in-suit and its claims.

14:25:33  8        Do you see that?

14:25:34  9   A.   Yes, I do.

14:25:34 10   Q.   All right.  If you could turn now -- there's a lot of

14:25:39 11   lawyer language in here.  But if you could turn your attention

14:25:42 12   to page 36, the second full paragraph, the second sentence,

14:25:49 13   Voxer writes, quote, Voxer contends that Facebook first became

14:25:52 14   aware of the '270 patent and its issued claims on November 27,

14:25:57 15   2018.  Right?

14:25:58 16   A.   That's what it says.

14:26:00 17   Q.   That's what it says.  And that's more than three years

14:26:02 18   after Facebook launched the Facebook Live product, right?

14:26:06 19   A.   That's correct.

14:26:07 20   Q.   Okay.  And then drawing your attention to the next page,

14:26:10 21   the first full paragraph, the second sentence, you see it says:

14:26:15 22   "Voxer contends that Facebook first became aware of the '557

14:26:19 23   patent and its issued claims on December 17th, 2019."

14:26:23 24        Do you see that?

14:26:25 25   A.   Sorry.  I was reading the sentence before it.

14:26:27  1   Q.   Oh, sure.

14:26:28  2   A.   I thought you were reading that one.

14:26:30  3        So, yes, I can see that.

14:26:32  4   Q.   And that's more than four years after Facebook Live

14:26:36  5   launched, right?

14:26:38  6   A.   Yes.

14:26:39  7   Q.   Yes.  Thank you.  All right.  You can set that aside.

14:26:43  8        Now, Mr. Katis, you are aware that, in 2012 -- jump

14:26:52  9   back in time just for a moment here.  In 2012 Voxer's head of

14:26:58  10  product management criticized Voxer for suffering from a lack

14:27:02  11  of focus, right?

14:27:04  12  A.   No.  Can you show me what you're talking about.

14:27:06  13  Q.   Are you aware of that, sir?

14:27:08  14  A.   No.  If you could show me what you're referring to?

14:27:11  15  Q.   Okay.  Sure.  Be happy to.

14:27:36  16       MS. ANDERSON:  And I'll bring a few copies for the

14:27:38  17  Court.

14:27:59  18  Q.   Okay.  I am showing you what has been marked for

14:28:02  19  identification as DTX619, Bates Number Voxer-0037499 through

14:28:16  20  37502.  Let's take a look at this for a moment, and I have a

14:28:22  21  couple of questions for you, sir.

14:28:56  22       Sir, we're not going to be publishing this e-mail,

14:28:59  23  but it's just being shown to you on the screen.  This is an

14:29:04  24  e-mail that you received from Mr. Igal Perelman on April 24,

14:29:10  25  2012, right?

14:29:11   1   A.    Uh-huh.

14:29:12   2   Q.    And Mr. Perelman was the head of product management for

14:29:15   3   Voxer back then, right?

14:29:16   4   A.    That's correct.

14:29:17   5   Q.    And drawing your attention to paragraph 4, he tells you

14:29:26   6   that, quote, While we are doing much better, we still suffer

14:29:29   7   from lack of focus, end quote.

14:29:32   8   A.    That's pretty much a problem at every company, ever.

14:29:35   9   Q.    Sir, just focus on the question.  That's what he told

14:29:39  10   you --

14:29:39  11   A.    Okay.

14:29:40  12   Q.    -- on April 24, 2012, right?

14:29:42  13   A.    Where is it that he says that, exactly?

14:29:46  14   Q.    Sure.  Paragraph 4.

14:29:47  15   A.    Okay.

14:29:47  16   Q.    The first sentence of it.  It's a numbered paragraph.

14:29:50  17   Mr. Perelman writes to you and says, quote, While we are doing

14:29:55  18   much better, we still suffer from lack of focus, end quote.

14:29:58  19         Right?

14:29:58  20   A.    Yes.

14:29:58  21   Q.    And that's what your head of product management was

14:30:01  22   telling you about the development of the product, right?

14:30:04  23   A.    Yeah.  We can always be better.

14:30:06  24   Q.    And then he says a few sentences later, quote, We cannot

14:30:10  25   have many top priorities, end quote.  Right?

KATIS - CROSS

| | | |
|---|---|---|
| 14:30:14 | 1 | A.   Correct. |
| 14:30:14 | 2 | Q.   And then drawing your attention down to the numbered |
| 14:30:19 | 3 | paragraph 5, you see where he writes, quote, At times I feel |
| 14:30:27 | 4 | that we are on an awesome use case but without an awesome |
| 14:30:32 | 5 | product yet, end quote.  Do you see that? |
| 14:30:34 | 6 | A.   Now, where was that? |
| 14:30:35 | 7 | Q.   It's the last sentence of the numbered paragraph 5.  Do |
| 14:30:38 | 8 | you see that, sir? |
| 14:30:39 | 9 | A.   Numbered paragraph -- okay.  I see -- well, on this page |
| 14:30:42 | 10 | or the next page? |
| 14:30:43 | 11 | Q.   It's the first page, sir, numbered paragraph 5. |
| 14:30:48 | 12 | A.   (Reviews document).  Okay.  Yes. |
| 14:30:54 | 13 | Q.   Okay.  And that's what he was telling you in 2012, right? |
| 14:30:57 | 14 | A.   Correct.  In an e-mail. |
| 14:31:01 | 15 | Q.   Okay.  Thank you. |
| 14:31:02 | 16 | A.   Okay. |
| 14:31:03 | 17 | Q.   You can set that aside, sir. |
| 14:31:05 | 18 | A.   Okay. |
| 14:31:05 | 19 | Q.   Mr. Katis, you have been the primary source of funds for |
| 14:31:09 | 20 | Voxer, correct? |
| 14:31:11 | 21 | A.   That's correct. |
| 14:31:12 | 22 | Q.   You have invested at least $40 million in the company, |
| 14:31:16 | 23 | right? |
| 14:31:17 | 24 | A.   As crazy as that sounds, that is the case. |
| 14:31:20 | 25 | Q.   And that money came from almost $100 million you were paid |

| | | |
|---|---|---|
| 14:31:23 | 1 | from your work with the Triple Canopy company; is that correct? |
| 14:31:29 | 2 | A.   It was probably closer to 80, but yeah. |
| 14:31:31 | 3 | Q.   And Triple Canopy was the company you were describing in |
| 14:31:34 | 4 | the testimony you gave to your counsel, right? |
| 14:31:36 | 5 | A.   That's correct. |
| 14:31:37 | 6 | Q.   Now, Triple Canopy was not in the business of offering |
| 14:31:42 | 7 | messaging apps to the public, right? |
| 14:31:44 | 8 | A.   Correct. |
| 14:31:44 | 9 | Q.   All right.  Instead, as you said, it was a private |
| 14:31:47 | 10 | security company, and it had merged with a successor entity to |
| 14:31:52 | 11 | Blackwater, right? |
| 14:31:53 | 12 | A.   So eventually we did merge after Blackwater collapsed, and |
| 14:32:00 | 13 | then they were acquired by a group of individuals in Texas who |
| 14:32:04 | 14 | they basically turned them into a training business.  They were |
| 14:32:07 | 15 | basically at that point a training site in North Carolina. |
| 14:32:10 | 16 | Q.   Okay.  Thank you, sir.  And today you're the largest |
| 14:32:14 | 17 | shareholder in Voxer, right? |
| 14:32:15 | 18 | A.   In Voxer, yes. |
| 14:32:16 | 19 | Q.   And, as a shareholder, you have a financial interest in |
| 14:32:19 | 20 | the outcome of this litigation.  Fair? |
| 14:32:21 | 21 | A.   Yes. |
| 14:32:22 | 22 | MS. ANDERSON:  All right.  Pass the witness.  Thank |
| 14:32:24 | 23 | you, sir. |
| 14:32:25 | 24 | THE COURT:  Redirect, counsel? |
| 14:32:29 | 25 | MR. STONE:  Yes, Your Honor. |

**REDIRECT EXAMINATION**

14:32:33 1

14:32:33 2 **BY MR. STONE:**

14:32:33 3 Q.   Now, Mr. Katis, do you recall some testimony that counsel

14:32:36 4 elicited about their not being licenses to the patents-in-suit?

14:32:41 5 A.   Yes.

14:32:41 6 Q.   And the patents-in-suit are the '557 and the '270 patent?

14:32:46 7 A.   Yes.

14:32:47 8 Q.   Voxer does have licenses to its live messaging technology?

14:32:51 9 A.   Yes.

14:32:52 10 Q.   Other than those patents?

14:32:53 11 A.   Yes.

14:32:54 12         MS. ANDERSON:   Objection, Your Honor:   Leading.

14:32:56 13         THE COURT:   Sustained.   Don't lead the witness.

14:33:00 14         MR. STONE:   Pardon me?

14:33:01 15         THE COURT:   Don't lead the witness.

14:33:02 16         MR. STONE:   Thank you, Your Honor.

14:33:04 17 Q.   Do you recall your testimony about what Voxer didn't

14:33:07 18 invent?

14:33:08 19 A.   What Voxer did not invent?   Yes, I recall that testimony.

14:33:11 20 Q.   Did you and Mr. Ranney and the other coinventors invent

14:33:15 21 the subject matter of the '270 patent?

14:33:18 22 A.   Yes, we did.

14:33:19 23 Q.   Did the patent office agree?

14:33:20 24 A.   Yes, they did.

14:33:21 25 Q.   And did those patents issue?

14:33:23   1   A.   Yes, they did.

14:33:24   2   Q.   And did you and Mr. Ranney and the other inventors invent

14:33:28   3   the subject matter of the '557 patent?

14:33:31   4   A.   Yes, we did.

14:33:31   5   Q.   And did the patent office agree?

14:33:33   6   A.   Yes, they did.

14:33:34   7   Q.   Now, there was a question about when Voxer contended

14:33:45   8   that -- that Facebook first become aware of the '270 patent.

14:33:49   9   Do you remember that?

14:33:50  10   A.   Yes, sir.  I remember that.

14:33:52  11   Q.   And did you see that exhibit that they put up in front of

14:33:56  12   you?

14:33:56  13   A.   Yes, I did.

14:33:57  14            MR. STONE:  And could we pull up DTX305.  And could

14:34:07  15   we pull up the page DTX305, page 36 of 100.  It's not in

14:34:18  16   evidence.

14:34:19  17   Q.   Do you have that document in front of you?

14:34:22  18   A.   I have it in front me, yes.

14:34:24  19   Q.   And what's the sentence before the sentence relating to

14:34:27  20   when Voxer contends Facebook was first aware of the '270

14:34:31  21   patent?

14:34:32  22            MS. ANDERSON:  Objection, Your Honor: foundation.

14:34:34  23   This witness doesn't have the foundation for testifying to the

14:34:37  24   previous sentence.

14:34:39  25            MR. STONE:  It's cross on the subsequent sentence,

14:34:41   1   Your Honor.  I'm just adding this for completeness.

14:34:45   2        MS. ANDERSON:  Your Honor, it is also hearsay.

14:34:47   3   They're admissions when taken on cross.  But on direct these

14:34:51   4   are hearsay, and they lack foundation for this witness.

14:34:55   5        THE COURT:  Counsel?

14:34:57   6   Q.  (BY MR. STONE) Let me ask it this way:  Did you have an

14:35:00   7   understanding that Facebook, in connection with your meetings

14:35:03   8   with them in 2012, was aware of the patents you had pending?

14:35:07   9   A.   Yes.

14:35:08  10   Q.   And what was that based on?

14:35:10  11   A.   Facebook had an incredible ability to know everything

14:35:15  12   about everyone.

14:35:16  13        MS. ANDERSON:  Objection, Your Honor: move to strike;

14:35:18  14   foundation.

14:35:18  15        MR. STONE:  Let me ask it this way.

14:35:19  16        THE COURT:  Sustained.  The jury will disregard the

14:35:21  17   witness's last comment.

14:35:23  18        Now ask your question, Mr. Stone.

14:35:25  19   Q.  (BY MR. STONE) Mr. Katis, did you tell Facebook about your

14:35:27  20   pending applications in connection with your 2012 meetings with

14:35:31  21   them?

14:35:31  22   A.   Yes.

14:35:33  23        MR. STONE:  Thank you, Your Honor.  No further

14:35:35  24   questions.

14:35:36  25        THE COURT:  Recross?

14:35:37    1          MS. ANDERSON:  No further questions, Your Honor.

14:35:39    2          THE COURT:  You may step down.

14:35:40    3          THE WITNESS:  Thank you.

14:35:41    4          MR. STONE:  Your Honor, we call Mr. Ranney.  He's not

14:35:44    5   inside the courtroom, so I'll just need a break to go get him.

14:35:47    6          THE COURT:  You may get him.

14:35:48    7      (Witness sworn)

14:37:16    8                          **MATTHEW RANNEY,**

14:37:16    9   having been first duly sworn, testified as follows:

14:37:16   10                       **DIRECT EXAMINATION**

14:37:16   11   **BY MR. STONE:**

14:37:16   12   Q.   Good afternoon, sir.

14:37:19   13   A.   Good afternoon.

14:37:20   14   Q.   And could you please introduce yourself to the jury and

14:37:23   15   Court.

14:37:25   16   A.   My name is Matthew Ranney.

14:37:27   17   Q.   And where do you currently live?

14:37:29   18   A.   In Pittsburgh, Pennsylvania.

14:37:31   19   Q.   And if we could go back a few years and acquaint the jury

14:37:35   20   with how we got here, where did you go to college?

14:37:37   21   A.   I went to Calvin University in Grand Rapids, Michigan.

14:37:42   22   Q.   What did you study there?

14:37:43   23   A.   Computer science.

14:37:44   24   Q.   And did you receive a degree.

14:37:45   25   A.   Yes.  A bachelor of science and computer science in 1994.

14:37:48  1   Q.   What kind of work did you do after college?

14:37:51  2   A.   I worked on various networking projects.

14:37:54  3   Q.   And when you say "networking," can you describe for the

14:37:58  4   jury what you mean.

14:37:59  5   A.   Sure.  So you know how there are mobile phones and there

14:38:03  6   are computers and with them you interact with systems and

14:38:07  7   services like TikTok or Twitter, and on the other end of those

14:38:12  8   services are other users on their mobile phones and computers.

14:38:16  9   Well, if you take all those devices and services together, we

14:38:19  10  call that "the network."

14:38:20  11  Q.   And are you aware of any drawings that would describe such

14:38:23  12  a network?

14:38:24  13  A.   Yes.  In figure 1 of our patents.

14:38:27  14          MR. STONE:  And if we could please pull up admitted

14:38:30  15  Exhibit 3.

14:38:32  16  Q.   And, Mr. Ranney, do you recognize what we've put on the

14:38:35  17  screen here?

14:38:36  18  A.   Yes.  This is -- this is figure 1.

14:38:39  19  Q.   And this is from which patent?

14:38:41  20  A.   This is from the '270 patent.

14:38:43  21  Q.   And what does this figure describe?

14:38:46  22  A.   This describes a network like I had just mentioned.

14:38:52  23  Around the outside you can see the phones and the computers.

14:38:57  24  Those are the clients in the network.  And in the middle you

14:39:00  25  can see the -- the servers, which is what we call, like, the

14:39:04  1  back end or the infrastructure of the network.

14:39:09  2  Q.   And the work you did after college focused on what part of

14:39:12  3  the network?

14:39:13  4  A.   So I spent most of my time working on the servers or the

14:39:16  5  back end of the network rather than the clients, although the

14:39:20  6  work is often interrelated.  For example, one of the jobs I had

14:39:24  7  was for an Internet service provider in Silicon Valley doing

14:39:29  8  global Internet routing.

14:39:31  9  Q.   Now, when did you begin working for Voxer?

14:39:34  10 A.   In 2007.

14:39:35  11 Q.   And what was your title?

14:39:37  12 A.   I was cofounder and chief technology officer.

14:39:40  13 Q.   And what were your responsibilities as chief technology

14:39:44  14 officer?

14:39:44  15 A.   I was the main person figuring out how the technology

14:39:49  16 would work, how to actually get it built and, like, what kind

14:39:54  17 of devices it could run on, given the -- the state of

14:39:58  18 technology back then.

14:39:59  19 Q.   Had you worked with Mr. Katis before you joined Voxer?

14:40:03  20 A.   Yes.  I first met Mr. Katis while working with him at

14:40:08  21 Triple Canopy, which is a defense -- or a government

14:40:13  22 contracting firm providing security services.  A mutual friend

14:40:18  23 introduced us, and Tom was looking for someone with a

14:40:21  24 networking background.

14:40:22  25 Q.   And what did you do at Triple Canopy?

RANNEY - DIRECT

14:40:25   1   A.   So I was brought in to bring modern office IT

14:40:30   2   infrastructure to the Triple Canopy sites in Iraq.  So there

14:40:36   3   was a -- there was a war going on there at the time, and so

14:40:40   4   they didn't have things like computers and printers and phones.

14:40:45   5   And so I worked to bring -- to bring those things to those

14:40:48   6   sites, and we connected them up with satellite Internet, which

14:40:53   7   didn't work very well.

14:40:54   8   Q.   Now, when did you first begin -- when did you first begin

14:40:58   9   discussing the ideas behind what ultimately became Voxer with

14:41:02  10   Mr. Katis?

14:41:03  11   A.   So Voxer officially started in 2007, but I was -- was

14:41:10  12   talking about these ideas with Tom Katis during our time

14:41:15  13   working together as Triple Canopy.

14:41:16  14   Q.   And what do you recall about that?

14:41:18  15   A.   So Tom related these.

14:41:23  16           MR. PAIGE:  Objection, Your Honor:  This is hearsay.

14:41:25  17           THE COURT:  Overruled.

14:41:28  18           THE WITNESS:  Should I proceed?

14:41:30  19   Q.   (BY MR. STONE) Please.

14:41:30  20   A.   Tom related how he had encountered some --

14:41:33  21           THE COURT:  Now it's sustained.  When he was saying

14:41:37  22   what Mr. Katis had done, it was not hearsay.  When he says what

14:41:40  23   Mr. Katis said, it is hearsay.

14:41:42  24           MR. STONE:  Thank you, Your Honor.

14:41:43  25   Q.   So what is it that Mr. Katis had done that you understood?

RANNEY - DIRECT

14:41:48  1   A.   Yes.   He had run into some problems working with military

14:41:55  2   radios in Afghanistan.   Military radios are fancy

14:41:59  3   walkie-talkies, and the problem is that you can only be on one

14:42:06  4   channel at a time.   So if you are working with two different

14:42:09  5   teams on different channels and someone sends you a message

14:42:15  6   from -- you know, the other team on the channel you're not on,

14:42:19  7   you would miss that message.   So, you know, we were just

14:42:22  8   talking about those limitations.

14:42:24  9   Q.   And did you have ideas for overcoming those limitations?

14:42:28  10  A.   Yes.   Yeah.   We talked about ways to -- to improve the

14:42:34  11  system, you know, ways to add -- to add buffering and

14:42:39  12  conversation management to -- you know, to a military radio

14:42:47  13  link.

14:42:47  14  Q.   And were military radios the only applications you were

14:42:51  15  considering?

14:42:51  16  A.   No.   We -- we quickly realized that this technology had

14:42:55  17  application well beyond military radios, so we broadened the

14:43:00  18  idea.

14:43:01  19  Q.   And what were the characteristics of this new, better

14:43:03  20  communication system you wanted to build?

14:43:06  21  A.   Well, we knew we wanted it to be live like a phone call,

14:43:12  22  but also time-shifted like e-mail.   And we knew users needed to

14:43:20  23  be able to manage multiple conversations, so we call that a

14:43:24  24  multiple conversation management system.   And we knew it needed

14:43:29  25  to support all media types, so voice, video, text, images.

RANNEY - DIRECT

14:43:35  1   Q.   And let's break that down a little bit.  When you say live

14:43:39  2   and time-shifted, what do you mean by that?

14:43:42  3   A.   Oh so live means -- it means like what you think, like

14:43:50  4   real time or as real time as the network will allow.  And

14:43:54  5   time-shifted means listen to at some time later because it was

14:44:01  6   buffered or recorded.

14:44:02  7   Q.   What was significant about the multiple conversation

14:44:05  8   management system?

14:44:06  9   A.   So in order to -- you know, to be able to solve that

14:44:10  10  original problem, I mean, you need to be able to work with two

14:44:15  11  different groups at the same time.  If someone on one

14:44:18  12  conversation or one channel, if you're communicating with them

14:44:22  13  while someone on the other conversation or channel sends you

14:44:25  14  something, you need to be able to hear that from the beginning

14:44:28  15  without missing it.

14:44:29  16  Q.   And why were you interested in all these various forms of

14:44:33  17  communication media?

14:44:35  18  A.   Well, we -- we knew we were building this kind of hybrid

14:44:40  19  communications system, and we saw voice, video, and text as --

14:44:46  20  as just very important components of this new hybrid system.

14:44:51  21  Q.   Did you pursue the development of this system that had

14:44:55  22  these characteristics?

14:44:56  23  A.   We did.

14:44:57  24  Q.   What did you call this hybrid system?

14:44:59  25  A.   We called it "store and stream" or "live messaging."

RANNEY - DIRECT

14:45:02  1  Q.   What were you trying to convey with those names?

14:45:05  2  A.   We were trying to describe this new hybrid communication

14:45:10  3  system that we were building.

14:45:11  4  Q.   And, to your knowledge, did such a hybrid exist at the

14:45:14  5  time you started to build your system?

14:45:15  6  A.   Based on the research we did and the patents we were

14:45:20  7  granted, no.

14:45:21  8  Q.   Now, what steps did you take to build live messaging

14:45:24  9  technology at Voxer?

14:45:25  10  A.   Well, several.  We started a company.  I joined Tom at the

14:45:31  11  this new company.  We called it CommoTEK.  And we started -- we

14:45:36  12  started researching the different ways, you know, the idea,

14:45:42  13  trying to get the idea into a form that we could develop.  And

14:45:47  14  when we had the idea that made sense, we started to build the

14:45:52  15  team, and then we went to get patent protection.

14:45:59  16  Q.   Did you have a number of brainstorming sessions with the

14:46:02  17  group?

14:46:02  18  A.   Certainly.

14:46:04  19           MR. PAIGE:  Objection, Your Honor: leading.

14:46:06  20           THE COURT:  Overruled.

14:46:09  21           Proceed.

14:46:10  22  A.   The research that I mentioned was largely conducted

14:46:14  23  through brainstorming sessions.

14:46:17  24  Q.   And what was your role in connection with those

14:46:19  25  brainstorming sessions?

RANNEY - DIRECT

14:46:20  1    A.   So my background in networking, particularly, you know,

14:46:27  2    for back-end systems, I knew about the different kinds of

14:46:33  3    systems that existed, the way -- the way those systems use the

14:46:37  4    network.   And, you know, Tom knew about the challenges with --

14:46:42  5    with military radios.   And so kind of together with those

14:46:45  6    two -- with our two backgrounds, we worked out an idea that

14:46:50  7    made sense.

14:46:50  8    Q.   Let's pull up Exhibit P-827.   And, Mr. Ranney, do you

14:46:58  9    recognize this?

14:46:58  10   A.   Yes.   This is an example of one of those brainstorming

14:47:03  11   sessions in Tom's apartment.

14:47:04  12   Q.   And who is pictured in the photograph?

14:47:07  13   A.   That's me on the left, and on the right is Jim Panttaja,

14:47:12  14   one of our earlier engineering hires.

14:47:15  15   Q.   And where was this picture taken?

14:47:16  16   A.   In Tom's apartment.

14:47:18  17   Q.   Now, were there other members of the team besides yourself

14:47:22  18   and Mr. Panttaja and Mr. Katis?

14:47:25  19   A.   Yes.   On the early team was also Jim's wife Mary Panttaja

14:47:30  20   and Jim Rose.

14:47:31  21   Q.   And what role did the Panttajas play?

14:47:34  22   A.   They were -- they were husband and wife engineers.   The

14:47:41  23   Panttajas, Tom and I, are named inventors on many of our

14:47:45  24   patents.

14:47:45  25   Q.   What were the Panttajas' backgrounds?

14:47:48    1  A.   Jim's background was in running engineering teams, and

14:47:52    2  Mary's background was in shipping products and user experience.

14:47:57    3  Q.   And I believe you also mentioned Jim Rose.  Who was

14:48:00    4  Mr. Rose?

14:48:01    5  A.   He was Voxer's first patent counsel.

14:48:03    6  Q.   What did he do?

14:48:05    7  A.   He helped us understand the patent landscape and helped us

14:48:11    8  file for our patents.

14:48:13    9  Q.   And why was it important to you that Voxer obtain patent

14:48:17   10  protection?

14:48:18   11  A.   Well, we knew that the industry that we were moving into,

14:48:22   12  telecommunications, has a lot of strong existing patent

14:48:26   13  portfolios, and we needed to coexist with that.  And we also

14:48:31   14  knew that the system that we were building was -- was unique,

14:48:35   15  and we wanted to protect it.

14:48:38   16  Q.   What was first thing that you did as part of efforts to

14:48:41   17  get patent protection?

14:48:43   18  A.   So we did a prior art search.

14:48:46   19  Q.   And when you say "prior art," what are you referring to?

14:48:49   20  A.   So prior art is like things that already exist in the

14:48:53   21  marketplace, things that have already been invented.

14:48:56   22  Q.   And after investigating prior art, did Mr. Rose do

14:49:00   23  anything else?

14:49:01   24  A.   Yes.  He helped us get the ideas that were out of our

14:49:07   25  heads and into patent language so that we could file our

14:49:12   1  patents.

14:49:13   2  Q.   When did Voxer release its first products?

14:49:17   3  A.   So we -- we worked for some time since founding the

14:49:21   4  company building what you might call prototypes or beta

14:49:26   5  versions.  But the first -- the first versions that we released

14:49:30   6  were in 2011.  And after we released the iOS and the Android

14:49:37   7  version, that's when the -- you know, the product went viral.

14:49:40   8  Q.   And have you prepared a timeline that shows some of the

14:49:44   9  dates?

14:49:44  10  A.   I have.

14:49:45  11  Q.   And if we could pull that up, please.  And, Mr. Ranney,

14:49:55  12  what does this timeline show?

14:49:57  13  A.   Well, you can see on May 2011, that's when the Voxer app

14:50:02  14  for iOS was released.  iOS is what Apple calls their operating

14:50:09  15  system, so that just means iPhone.  And in November 2011 is

14:50:13  16  when the Android version was released.

14:50:16  17  Q.   And was that the first version of the Voxer app for

14:50:20  18  Android?

14:50:20  19  A.   It was.

14:50:21  20  Q.   And why did it take longer for the Voxer app for Android

14:50:25  21  to come out versus for iOS?

14:50:28  22  A.   Yeah.  So, unlike developing for iOS, there is -- there's

14:50:34  23  one company that makes iOS, which is Apple.  There are many

14:50:41  24  companies that make Android devices, and they make lots of

14:50:45  25  different kinds of them, there are different flavors of

RANNEY - DIRECT

14:50:48   1   Android.  So it took us a lot longer to get a version of Voxer

14:50:52   2   for Android that worked well enough on enough devices that we

14:50:55   3   could release it.

14:50:56   4   Q.   And why did it take longer after -- or several years after

14:51:00   5   Voxer's founding before you released your first commercial

14:51:03   6   apps?

14:51:04   7   A.   Sure.  So if you -- if you think back to, you know, March

14:51:10   8   of 2007 when the company was founded, or even, you know, June

14:51:14   9   when the first provisional was filed, the world of mobile

14:51:19   10   phones was very, very different back then.  Like there was no

14:51:22   11   iPhone, there was no Android.  You know, people were using

14:51:27   12   Nokias and Blackberries if they had -- you know, if they had a

14:51:32   13   nice phone.

14:51:32   14         So it was not clear that iPhone or Android would

14:51:39   15   actually win, so we had initially targeted some other hardware

14:51:44   16   platforms.  But, eventually, after -- after it became clear

14:51:47   17   that iPhone and Android were going to be the dominant platforms

14:51:52   18   for mobile phones, we put our energy there.

14:51:54   19   Q.   And did working with those devices pose any unique

14:51:56   20   challenges?

14:52:01   21   A.   Yes.  So we had a couple of problems.  First of all, we

14:52:05   22   thought that we could make one version of the app that would

14:52:07   23   work on both Android and iPhone, and that turned out not to

14:52:11   24   work very well.  So we had to go back and do a native version

14:52:16   25   for both iPhone and native version for Android.  And a big

14:52:22  1  reason to do that was it was the only way to get access to the

14:52:25  2  live audio components we needed for our live messaging.

14:52:30  3  Q.   Now, what specific work were you doing at this point?

14:52:32  4  A.   So I was working on the back end.  I -- I wrote the first

14:52:37  5  couple of versions of the back-end computer code, you know, for

14:52:43  6  the server that saves the incoming media as it arrives and

14:52:47  7  makes it available for the clients whenever they want it.

14:52:51  8  Q.   And when you say "back end," can you explain what you

14:52:54  9  meant by that?

14:52:54  10  A.   Yeah.  The servers that are on -- you know, in the network

14:52:59  11  diagram, the things in the middle, the servers relay all of

14:53:05  12  the -- all of the media between the -- between the clients.  So

14:53:10  13  it -- you know, it had to be -- it had to be very fast because

14:53:14  14  it had to support millions of users at a time.  And, yeah, so

14:53:19  15  that's why I focused there.

14:53:21  16  Q.   Was scalability a factor that you considered?

14:53:24  17  A.   Certainly.  Scalability was incredibly important because

14:53:30  18  if we needed to be able -- like scalability is the ability to

14:53:35  19  easily expand a network system to support more load.  It was

14:53:43  20  very important that we'd be able to easily expand our system as

14:53:48  21  new users came on as opposed to having to take it down and

14:53:50  22  rewrite it and then bring it back up again and then allow more

14:53:54  23  users on.  So, yeah, it was very important to have a scalable

14:53:58  24  system.

14:53:58  25  Q.   Was the Voxer network system scalable?

RANNEY - DIRECT                                        174

14:54:01   1   A.    Indeed, it was.  It went from very few users to millions

14:54:07   2   of users in a very short time, and we did that without

14:54:11   3   rewriting it.  We just added -- added more computers.

14:54:15   4   Q.    And when you say a short time, what time period are you

14:54:19   5   talking about?

14:54:19   6   A.    Over a period of months.

14:54:22   7   Q.    Now, what forms of communication did the 2011 Voxer app

14:54:27   8   work with?

14:54:28   9   A.    It supported voice, text, and photos, and the voice could

14:54:34   10  be live or time-shifted.

14:54:35   11  Q.    And did that Voxer app allow video?

14:54:38   12  A.    It didn't.  But the back end, I wrote that from the

14:54:43   13  beginning to support video or any media type.

14:54:47   14  Q.    And why didn't it support video?

14:54:50   15  A.    So -- so, again, if you look at that timeline and you

14:54:54   16  think about the kinds of iPhones and Androids that came out

14:55:00   17  around that time, they were not very powerful.  And, indeed,

14:55:04   18  they were -- they were not powerful enough to support live

14:55:08   19  video.  And the -- the developer access, in particular, I mean,

14:55:15   20  it was very hard as a developer to write a program that would

14:55:21   21  make use of live video with those early devices.  And also the

14:55:25   22  bandwidth then was not what it is today.

14:55:27   23  Q.    And what do you mean by bandwidth?

14:55:30   24  A.    Bandwidth is a networking term.  It means, like, how fast

14:55:36   25  can your network go.

14:55:37  1  Q.   And so what was significant about bandwidth?

14:55:40  2  A.   So the -- the bandwidth available, like the speed of the

14:55:43  3  networks in 2011 compared to now, the networks were really

14:55:51  4  slow, like, really slow.  They could barely support live voice

14:55:55  5  over those data networks.  They certainly couldn't support live

14:55:59  6  video.

14:56:00  7  Q.   Now, we've heard Voxer referred to as walkie-talkie app.

14:56:03  8  Was there a reason for that?

14:56:05  9  A.   Yeah.  That was a name that resonated with our users, but

14:56:11 10  we always offered more than that.  You know, it was always more

14:56:14 11  than a walkie-talkie or cellular PTT.

14:56:17 12  Q.   And you just mentioned cellular PTT.  What do you mean by

14:56:22 13  that?

14:56:22 14  A.   Yeah.  So PTT is push-to-talk.  And so cellular PTT

14:56:28 15  systems, like Nextel is a popular one, they work like

14:56:33 16  walkie-talkies, only they happen to use the cellular network.

14:56:37 17  So you push the button on your phone, Your voice comes out the

14:56:42 18  speaker of another phone.  And so walkie-talkie over cellular.

14:56:46 19  Q.   And why wasn't Voxer like that?

14:56:47 20  A.   Well, because in a walkie-talkie you could miss a message,

14:56:51 21  and in Voxer you could always play a message again.  You can be

14:56:55 22  on more than one channel at a time.  You can have more than one

14:56:59 23  conversation going on at a time with Voxer.  And there are

14:57:04 24  multiple media types, so you could have voice, photos, and

14:57:08 25  texts.

RANNEY - DIRECT

14:57:08   1   Q.   Let me show you now what's been admitted as plaintiff's

14:57:11   2   Exhibit P-5.  Mr. Ranney, do you recognize this?

14:57:17   3   A.   Yes.  This is our first provisional patent application.

14:57:21   4   Q.   And when was that filed?

14:57:23   5   A.   You can see on the time stamp there that is June of 2007.

14:57:27   6   Q.   And what did you intend that to cover?

14:57:30   7   A.   We intended this to cover the full scope of the invention,

14:57:37   8   of our -- of our live messaging with all of the -- all of the

14:57:43   9   media types we could think of.

14:57:44   10  Q.   And is that described in the provisional?

14:57:47   11  A.   It is.

14:57:47   12  Q.   And if we could direct your attention, please, to page

14:57:50   13  P5-4, and what are you describing here, sir.

14:57:55   14  A.   Sure.  So this -- this talks about -- you know, this is,

14:58:00   15  you know, more details of the system here.  And Point Number 1

14:58:08   16  talks about the multiple conversation management system, right?

14:58:12   17  And then Points 2 and 3 are the store and stream, you know,

14:58:18   18  that we talked about before.  So you can -- you can manage

14:58:22   19  multiple conversations.  You can -- you can interact with them

14:58:27   20  in either a live or time-shifted mode.

14:58:29   21  Q.   Now, was there another provisional patent application?

14:58:32   22  A.   There was.

14:58:33   23          MR. STONE:  And if we could please pull up admitted

14:58:35   24  Exhibit P-6.

14:58:40   25  Q.   Mr. Ranney, do you recognize this?

14:58:41  1   A.   Yes.  This is our second provisional application.

14:58:45  2   Q.   And when was this filed?

14:58:47  3   A.   In October of 2007.

14:58:49  4   Q.   And are the Panttajas also named inventors on this

14:58:53  5   document?

14:58:53  6   A.   They are, along with myself and Tom Katis.

14:58:57  7   Q.   Now, what did you intend to cover with the second

14:59:01  8   provisional?

14:59:03  9   A.   This goes into more detail about -- about the system, and

14:59:08  10   it talks about the -- the use cases and target markets.

14:59:13  11   Q.   And if we could turn, please, to page 610.

14:59:20  12        And what are you describing here in Point Number 1

14:59:25  13   under to RebelVox system?

14:59:28  14   A.   Right.  And RebelVox is also another name for the company.

14:59:33  15        The conversation management system that works in the

14:59:37  16   audio, video, voice or other media.  That's the multiple

14:59:43  17   conversation management system that I mentioned before.

14:59:45  18   Q.   And there's a reference to TiVo.  What's the reference to

14:59:50  19   that?

14:59:50  20   A.   So TiVo is what -- like, if you don't remember, it's what

14:59:54  21   we now think of as digital video recorder or DVR.  It's an

15:00:00  22   example of an early time-shifting system, a reference we were

15:00:06  23   using just to help people understand what we are talking about.

15:00:10  24   So TiVo is a -- it's a device you put in your -- you know, on

15:00:15  25   your live TV feed.  You have live TV on one side, you have TiVo

15:00:19  1  on the other side, and you can do a little bit of time-shifted

15:00:22  2  TV consumption.  But it's a one-way device, and there's no

15:00:28  3  interactivity with it.  And it's a single device by itself on

15:00:31  4  your -- on your home.  But it was just to help people

15:00:35  5  understand what time-shifting meant.

15:00:36  6  Q.   And also trying to -- you were trying to describe that it

15:00:40  7  could also have application to recording of live, two-way

15:00:44  8  communications?

15:00:45  9  A.   That's -- I mean, TiVo does not allow two-way

15:00:49  10  communications, but the multiple conversation management system

15:00:53  11  certainly does.

15:00:54  12  Q.   And so if we could now direct your attention to the page

15:00:58  13  bearing 6-13 -- Exhibit 6-13.

15:01:02  14          And what are you describing here, sir?

15:01:04  15  A.   These are some of the target markets that -- you know,

15:01:10  16  where this technology could be useful: business communications,

15:01:14  17  social networks, media industries like broadcasting.

15:01:17  18  Q.   And what were you envisioning at the time in the

15:01:21  19  broadcasting context?

15:01:23  20  A.   Well, if you think about a live message, there could be a

15:01:27  21  live video, and maybe it's a really long message.  But also

15:01:34  22  that, you know, users could interact with it in a time-shifted

15:01:38  23  or live mode, but also be able to send things back the other

15:01:42  24  direction.  It could be an interactive video experience.

15:01:45  25  Q.   And what did you envision in the context of public and

```
15:01:49   1   social networks?

15:01:50   2   A.   So social network is generally a series of conversations

15:01:59   3   that people interact with, and there are multiple media types

15:02:02   4   in those conversations, in those conversations threads.  And,

15:02:08   5   you know, we can apply this technology to -- to that, you know,

15:02:13   6   multiple conversation system and add our multiple media types,

15:02:18   7   time-shifted or live, to that.

15:02:21   8            MR. STONE:  Your Honor, I'm not sure when you're

15:02:23   9   going take an afternoon break.

15:02:23  10            THE COURT:  We're going to take an afternoon break in

15:02:26  11   a little bit, but not quite now.

15:02:27  12            MR. STONE:  Okay.

15:02:28  13   Q.   Mr. Ranney, is the concept of the multiple conversation

15:02:32  14   management system reflected in your patent?

15:02:34  15   A.   Yes.

15:02:35  16   Q.   And are you a named inventor on any Voxer patents?

15:02:38  17   A.   Yes.  I am a named inventor on over 150 Voxer patents

15:02:42  18   related to live messaging.

15:02:44  19   Q.   And are you familiar with the patents being asserted in

15:02:47  20   this case?

15:02:48  21   A.   Yes.

15:02:48  22   Q.   Which ones are they?

15:02:49  23   A.   The '270 patent and the '557 patent.

15:02:53  24   Q.   And are those patents related to the provisional we just

15:02:57  25   discussed?
```

| | | |
|---|---|---|
| 15:02:58 | 1 | A.   Yes.  They build on the provisional. |
| 15:03:00 | 2 |          MR. STONE:  And let's pull up Plaintiff's P-3. |
| 15:03:03 | 3 | Q.   Mr. Ranney, do you recognize this? |
| 15:03:06 | 4 | A.   Yes.  This is the '270 patent. |
| 15:03:09 | 5 | Q.   Are you a named inventor? |
| 15:03:10 | 6 | A.   I am, along with Tom Katis, Jim Panttaja and |
| 15:03:14 | 7 | Mary Panttaja. |
| 15:03:14 | 8 | Q.   And do you understand what claims of the '270 patent Voxer |
| 15:03:17 | 9 | is asserting here today? |
| 15:03:19 | 10 | A.   There are four of them.  I forget the numbers. |
| 15:03:22 | 11 | Q.   Is this the patent that we were looking at earlier that |
| 15:03:25 | 12 | contained figure 1? |
| 15:03:26 | 13 | A.   Yes. |
| 15:03:27 | 14 | Q.   And is that on sheet 1 of 33 of this patent? |
| 15:03:30 | 15 | A.   I believe so, yes.  Yes.  There it is. |
| 15:03:32 | 16 | Q.   Now, did you assist in preparing the figures that are |
| 15:03:36 | 17 | found in the patent? |
| 15:03:37 | 18 | A.   Yes. |
| 15:03:38 | 19 | Q.   And what about the specification of the patent?  Did you |
| 15:03:43 | 20 | assist in preparing that? |
| 15:03:44 | 21 | A.   I -- I did, along with the other inventors and our patent |
| 15:03:49 | 22 | counsel. |
| 15:03:52 | 23 | Q.   Now, let me direct your attention to P-3, 43 at column 4, |
| 15:03:57 | 24 | please.  And what's described there, sir? |
| 15:04:00 | 25 | A.   This is the summary of the invention. |

15:04:03  1   Q.    And what were you trying to describe?

15:04:06  2   A.    A, you know, multiple conversation management using --

15:04:12  3   using multiple media types with, you know, live or time-shifted

15:04:18  4   interaction models.

15:04:19  5   Q.    Live messaging?

15:04:21  6   A.    Live messaging.

15:04:22  7   Q.    Now, let's turn to column 8 of the '270 patent at P-3, 45.

15:04:28  8   Do you recognize this?

15:04:30  9   A.    Yes.  This is part of the specification.

15:04:34  10  Q.    And is the multiple conversation management system

15:04:36  11  defined?

15:04:37  12  A.    It is.

15:04:39  13  Q.    And how is that defined?

15:04:41  14  A.    Yes.  So reading from the text here, it is "An application

15:04:46  15  that runs as part of a client application which enables a user

15:04:50  16  to engage in multiple conversations using a variety of media

15:04:54  17  types."

15:04:55  18  Q.    And is "media" defined?

15:04:57  19  A.    It is.

15:04:58  20  Q.    And how is that defined?

15:05:00  21  A.    It says reading -- sorry -- audio, video, text position,

15:05:06  22  and other -- you know, other data types.

15:05:09  23  Q.    So audio and video?

15:05:11  24  A.    Audio and video and texts are the main ones, but we

15:05:15  25  imagined using it for other things as well.

| | | |
|---|---|---|
| 15:05:18 | 1 | Q.   And are "conversations" defined? |
| 15:05:20 | 2 | A.   They are. |
| 15:05:20 | 3 | Q.   And how are they defined? |
| 15:05:22 | 4 | A.   As a thread of messages, you know, that you can engage in |
| 15:05:26 | 5 | a real-time or time-shifted mode. |
| 15:05:29 | 6 | Q.   Now, is there another patent being asserted in this case? |
| 15:05:32 | 7 | A.   There is.   The '557 patent. |
| 15:05:34 | 8 |         MR. STONE:   And if we could please pull that up, |
| 15:05:36 | 9 | please, Mike. |
| 15:05:38 | 10 | Q.   Mr. Ranney, do you recognize this? |
| 15:05:40 | 11 | A.   Yes.   This is the '557 patent. |
| 15:05:43 | 12 | Q.   And are you a named inventor on this patent as well? |
| 15:05:46 | 13 | A.   I am, along with Tom Katis, Jim Panttaja and |
| 15:05:49 | 14 | Mary Panttaja. |
| 15:05:50 | 15 | Q.   And do you have an understanding as to what claims are |
| 15:05:54 | 16 | being asserted? |
| 15:05:55 | 17 | A.   Yes.   Claims 1 and 9. |
| 15:05:57 | 18 | Q.   Now, is the multiple conversation management system |
| 15:06:00 | 19 | reflected in this patent as well? |
| 15:06:02 | 20 | A.   It is. |
| 15:06:04 | 21 | Q.   And if we could turn to page P-4, 45, do you recognize |
| 15:06:11 | 22 | that? |
| 15:06:11 | 23 | A.   Yes.   This is the -- the same definition from the '270 |
| 15:06:16 | 24 | patent. |
| 15:06:17 | 25 | Q.   And does this patent also contain a similar summary of |

RANNEY - DIRECT

15:06:21  1  invention?

15:06:21  2  A.    It does.   The patents share a common spec.

15:06:24  3  Q.    Now, Mr. Ranney, did there ever come a time when you came

15:06:28  4  to discuss your technology and patents with Facebook?

15:06:32  5  A.    Yes.   There were two times that I can recall, but others

15:06:39  6  at Voxer, especially Tom Katis, met with them more frequently.

15:06:44  7  Q.    And does your timeline reflect the meetings that you

15:06:48  8  attended?

15:06:48  9  A.    It does.

15:06:51  10  Q.    When was the first meeting you attended?

15:06:54  11  A.    So the first one is there on August 17 of 2010.

15:06:57  12  Q.    And who attended that meeting?

15:06:59  13  A.    From Voxer, it was me, Tom Katis, and Gustaf Alstromer.

15:07:06  14  And from Facebook it was Chamath Palihapitiya, who is VP of

15:07:14  15  growth, and Matt Papakipos, who was engineering director at

15:07:18  16  Facebook.

15:07:18  17  Q.    Now, without going into who said what about the meeting,

15:07:22  18  what do you recall about the meeting?

15:07:24  19  A.    So it was a very preliminary meeting.   We -- Tom and I did

15:07:29  20  what we always do at those meetings, which is he talks about,

15:07:35  21  you know, the origin story, you know, Afghanistan, and then he

15:07:40  22  discusses the patent strategy.   And at the time we had only

15:07:46  23  patent applications.   They weren't granted yet, but we

15:07:50  24  discussed those.

15:07:51  25           And then my role was I got into explaining the

RANNEY - DIRECT

184

| | | |
|---|---|---|
| 15:07:57 | 1 | technology.  So I would usually draw a diagram on the white |
| 15:08:01 | 2 | board and explain how technology works. |
| 15:08:03 | 3 | Q.   And did you provide a demo at this meeting? |
| 15:08:06 | 4 | A.   We did, yep. |
| 15:08:07 | 5 | Q.   And what did the demo entail? |
| 15:08:10 | 6 | A.   We demonstrated live messaging between a few devices that |
| 15:08:15 | 7 | we brought. |
| 15:08:16 | 8 | Q.   And do you recall anything about the reaction that the |
| 15:08:19 | 9 | Facebook attendees had to that demo? |
| 15:08:22 | 10 | A.   Yeah.  Their VP definitely gave us a hard time about the |
| 15:08:27 | 11 | clunky new user experience.  But once we got -- you know, once |
| 15:08:31 | 12 | the devices were signed in, the live messaging part worked |
| 15:08:37 | 13 | perfectly. |
| 15:08:37 | 14 | MR. STONE:  And if we would please pull up admitted |
| 15:08:40 | 15 | Exhibit P-752. |
| 15:08:43 | 16 | Q.   Mr. Ranney, do you recognize this? |
| 15:08:45 | 17 | A.   Yes.  This is a Voxer internal e-mail summarizing the |
| 15:08:54 | 18 | meeting that I just talked about. |
| 15:08:56 | 19 | Q.   And is the e-mail consistent with your recollection of |
| 15:08:59 | 20 | that meeting? |
| 15:08:59 | 21 | A.   It is. |
| 15:09:00 | 22 | Q.   And did it -- do you recall that the Facebook VP mentioned |
| 15:09:07 | 23 | that the technology was "so cool"? |
| 15:09:10 | 24 | A.   Yes.  That, and they were very interested in how we made |
| 15:09:16 | 25 | it so fast. |

15:09:17   1   Q.   When did you next meet with Facebook?

15:09:22   2   A.   So in 2011, when our -- when our app went viral, we

15:09:31   3   started to get a lot of attention from a lot of different tech

15:09:36   4   companies and Google and Facebook.  And Tom had met with them a

15:09:41   5   couple of times, and they requested that I come and do a more

15:09:46   6   technical conversation.

15:09:48   7   Q.   And when --

15:09:49   8   A.   So yeah.  It's on the timeline.

15:09:51   9   Q.   I was just going to ask you if it's on your timeline.

15:09:54  10        When did that meeting take place?

15:09:56  11   A.   Right.  So you can see there are a few meetings up there.

15:10:01  12   The one that I attended was on March 6, 2012.

15:10:06  13   Q.   And where did that meeting take place?

15:10:09  14   A.   That was at Facebook in Menlo Park.

15:10:13  15   Q.   And who was present from Voxer?

15:10:15  16   A.   So, from Voxer, it was me and Tom Katis.

15:10:18  17   Q.   And who was present from Facebook?

15:10:21  18   A.   So the -- the two names that I remember are Chris Daniels

15:10:27  19   an Peter Deng, but there were other engineers and product

15:10:31  20   people whose names I don't recall.

15:10:33  21   Q.   And what was your role at the meeting?

15:10:36  22   A.   So it started -- you know, we started it the same way that

15:10:41  23   we always did, like we did the previous one, and I answered a

15:10:44  24   lot of technical questions, you know, focused on scalability in

15:10:51  25   particular.  They were very interested to hear whether the

15:10:55    1    architecture was scalable.

15:10:56    2    Q.    Were there other technical questions that they had?

15:10:59    3    A.    Yeah.   They were -- they were interested, you know,

15:11:05    4    whether we could support voice, whether we could support video,

15:11:10    5    whether we could do it all at Facebook's scale.

15:11:13    6    Q.    And what did you tell them about that?

15:11:15    7    A.    So on the scale part, I mean, we had scaled it this far.

15:11:21    8    I'm sure we could scale it quite a bit further.   And on the --

15:11:26    9    the voice part, yes, we support voice.   On the video part, I

15:11:30   10    told them, you know, what I said before, which is the back end

15:11:35   11    already supports video, but the -- the phones, they don't -- we

15:11:40   12    can't do live video on the mobile phones very well yet.

15:11:44   13    Q.    Were there questions about the speed of Voxer's

15:11:47   14    technology?

15:11:48   15    A.    Yeah.   Definitely.   They were very impressed with how fast

15:11:55   16    it was, and I -- I told them that was because of our store and

15:11:58   17    stream technology, where we could -- you know, where a user

15:12:02   18    could start sending a message, maybe even without a network

15:12:06   19    connection, and then the receiver can listen to it whenever

15:12:09   20    they want.   And that makes the system seem very fast to both

15:12:14   21    the sender and the receiver.

15:12:16   22    Q.    Did you ever understand that Voxer -- or strike that.

15:12:19   23          Did you ever understand that Facebook was considering

15:12:22   24    building a version of Voxer internally?

15:12:24   25    A.    No.

15:12:25   1  Q.  Now, how did you leave this meeting with Facebook?

15:12:31   2  A.  Like how -- like what was the last thing that we said

15:12:37   3  during the meeting?

15:12:38   4  Q.  That you can recall.

15:12:39   5  A.  Yeah.  Let's see.  What was the last thing?  They were --

15:12:45   6  yeah.  They were -- we were interested in having them

15:12:49   7  license -- license the technology.  And, yeah, that was -- that

15:12:54   8  was where we left it.

15:12:55   9  Q.  And was Voxer excited about that prospect?

15:12:59  10  A.  Yeah.  That's what we were -- what we were trying to do.

15:13:03  11  Q.  Now, when did you next hear about interactions with

15:13:07  12  Facebook?

15:13:07  13  A.  Well, shortly thereafter, I -- I learned that Facebook was

15:13:11  14  not interested in licensing our technology.

15:13:14  15  Q.  And what was your reaction to that?

15:13:16  16  A.  I was surprised, because they seemed so interested and

15:13:24  17  impressed with how well it worked.

15:13:26  18  Q.  Now, as of March 2012, did Voxer allow for live voice

15:13:33  19  messaging?

15:13:33  20  A.  It did.  Voice could be live or time-shifted.

15:13:36  21  Q.  Did Facebook Messenger?

15:13:38  22  A.  No.

15:13:39  23  Q.  Now, what was your next interaction with Facebook?

15:13:42  24  A.  Well, you know, late in 2012 we started to have some

15:13:52  25  mysterious outages with our integration with Facebook.

15:13:56  1   Q.   And what were those mysterious outages?

15:14:00  2   A.   When we were -- when we were using the sign in with

15:14:03  3   Facebook functionality, and it often didn't work.

15:14:10  4   Q.   And when you say "sign in with Facebook functionality"

15:14:13  5   what are you referring?

15:14:15  6   A.   So you've probably seen how -- how in some apps that

15:14:18  7   aren't Facebook, there's a button that says "sign in with

15:14:23  8   Facebook."  And we put that button in our app.  Facebook

15:14:26  9   encouraged a lot of people to integrate with that, so we were

15:14:30  10  one of the app developers who did.  And, you know, people like

15:14:36  11  it.  It makes it easy for them.  But a lot of times we found

15:14:39  12  that it didn't work.

15:14:41  13          MR. PAIGE:  Objection, Your Honor: Motion in Limine

15:14:43  14  Number 3.

15:14:45  15          MR. STONE:  I think that goes to something that

15:14:47  16  happened later, Your Honor.

15:14:49  17          THE COURT:  Ladies and gentlemen, at this time we'll

15:14:52  18  take our afternoon recess.  We'll be in recess for 15 minutes.

18:00:00  19      (Jury recessed)

15:15:30  20          THE COURT:  All right.  Please be seated.

15:15:42  21          Let me hear your objection.

15:15:45  22          MR. PAIGE:  Your Honor, it sounds like they are

15:15:50  23  starting to talk about some sort of unfair competition or

15:15:53  24  something of that sort on the part of Facebook.

15:15:55  25          MR. STONE:  Do you want the witness here for this,

RANNEY - DIRECT

15:15:58   1   Your Honor?

15:15:58   2           THE COURT:  I don't care if the witness is here or

15:16:00   3   not.

15:16:00   4           MR. STONE:  So, Your Honor, during the fall of 2012,

15:16:06   5   Voxer did experience some mysterious outages with respect to

15:16:11   6   Facebook Connect.  This is not when they got cut off from the

15:16:15   7   Find Friends API in January of 2013, where Facebook said you're

15:16:20   8   a competitor.  This is just a situation where they experienced

15:16:23   9   some mysterious outages in the lead-up in the fall of 2012.

15:16:27  10           So I'm not going to ask him, Did you get cut off from

15:16:30  11   Facebook Find Friends?  Did they cut you off from the API?  I

15:16:34  12   was actually almost at the end of this inquiry.

15:16:36  13           THE COURT:  Then I'll let you finish this limited

15:16:39  14   inquiry.

15:16:40  15           MR. STONE:  Thank you, Your Honor.

15:16:40  16           THE COURT:  All right.  We'll be in recess until a

15:16:42  17   little after 3:30.

15:16:44  18           MR. VAN NEST:  Your Honor, excuse me.  I think we're

15:16:46  19   about to finish with Mr. Ranney here after the cross, and I

15:16:49  20   think the next witness up is Dr. Mitzenmacher.  And I have some

15:16:55  21   issues I'd like to take up with the Court before he gets on the

15:16:59  22   stand, and I can do it whenever the Court pleases, but I

15:17:01  23   thought I'd alert the Court.

15:17:02  24           THE COURT:  How long do you anticipate this cross

15:17:05  25   being?

| | | |
|---|---|---|
| 15:17:07 | 1 | MR. PAIGE:  Fifteen minutes or so, Your Honor. |
| 15:17:11 | 2 | THE COURT:  All right.  Then let me take up your |
| 15:17:13 | 3 | issues right now. |
| 15:17:15 | 4 | MR. VAN NEST:  Okay. |
| 15:17:16 | 5 | THE COURT:  Please be seated. |
| 15:17:20 | 6 | MR. VAN NEST:  Your Honor, Dr. Mitzenmacher, as you |
| 15:17:22 | 7 | heard this morning, is their technical witness on infringement. |
| 15:17:27 | 8 | And we learned in looking at the slides that he intends to |
| 15:17:37 | 9 | express a position infringement that Voxer disclaimed in the |
| 15:17:39 | 10 | IPR proceedings.  We've always known that this has to do with |
| 15:17:43 | 11 | the '557 patent, and Your Honor heard the openings this |
| 15:17:49 | 12 | morning.  The debate is whether selection and measurement is |
| 15:17:53 | 13 | done by the servers or on the client.  And we've always |
| 15:17:58 | 14 | understood that Dr. Mitzenmacher was going to express the |
| 15:18:02 | 15 | opinion that Facebook Live and Instagram Live did it on the |
| 15:18:06 | 16 | servers and as part of the server system at Facebook. |
| 15:18:12 | 17 | We now learn, looking at the slides, that he intends |
| 15:18:15 | 18 | to offer a second alternative opinion that, even if the client |
| 15:18:20 | 19 | performs the measurement and the selection, that's |
| 15:18:25 | 20 | infringement.  Now, in the IPR in which Voxer and Facebook were |
| 15:18:35 | 21 | engaged, they said in order to avoid prior art, the claimed |
| 15:18:39 | 22 | video message infrastructure must actively participate in |
| 15:18:44 | 23 | analyzing bandwidth and selecting video message bits and, |
| 15:18:48 | 24 | further, that Claim 1 requires -- |
| 15:18:51 | 25 | THE COURT:  Well, let me interrupt you right here. |

15:18:54  1          MR. VAN NEST:  Yes, sir.

15:18:55  2          THE COURT:  You say you discovered this by looking at

15:18:58  3  the slides that --

15:18:58  4          Is it Dr. Mitzenmacher?

15:19:00  5          MR. VAN NEST:  It is.

15:19:00  6          THE COURT:  -- is going to testify from.  He will not

15:19:06  7  be allowed to testify as to anything that is not in his report

15:19:09  8  that you had access to.  So did he or did he not in his report

15:19:15  9  address the points that you're telling me are in the slides?

15:19:19  10          MR. VAN NEST:  He didn't address this point directly.

15:19:22  11  He does have in his report an opinion that there is divided

15:19:27  12  infringement, which is a little bit different.

15:19:30  13          In his report he says the mere fact that the client

15:19:35  14  device is doing it doesn't constitutes divided infringement.

15:19:41  15  But that's different from saying you can infringe if the

15:19:47  16  Facebook has the client device doing the whole thing, both the

15:19:50  17  measurement and the bandwidth.  So it's quite different than

15:19:53  18  what he had in his report, and it runs right in face of what

15:19:57  19  they told the patent office Claim 1 required.

15:20:00  20          THE COURT:  I'm not worried about that.

15:20:02  21          Counsel?

15:20:03  22          MR. STAKE:  Your Honor, we strenuously disagree with

15:20:05  23  this argument.

15:20:06  24          THE COURT:  Let me ask you so we have the record

15:20:07  25  right, there are a lot of lawyers, state your name so if this

RANNEY - DIRECT                                                    192

15:20:11  1  finds its way to Washington, the Circuit will know who spoke at

15:20:13  2  any given moment during the trial.

15:20:16  3           MR. STAKE:  Sam Stake on behalf of Voxer, Your Honor.

15:20:18  4           THE COURT:  All right.  Now tell me.

15:20:20  5           MR. STAKE:  We strenuously disagree on several

15:20:22  6  counts.  This argument has been waived.  It's also baseless at

15:20:27  7  the bottom.  Contrary --

15:20:29  8           THE COURT:  Well, waiving it and being baseless are

15:20:32  9  two different things.

15:20:33  10          MR. STAKE:  Agreed, Your Honor.  And contrary to

15:20:39  11  Mr. Van Nest's argument, Dr. Mitzenmacher fully disclosed these

15:20:42  12  positions in his report last August of 2021.

15:20:45  13          THE COURT:  I'm not talking about whether he fully

15:20:47  14  described his position.  Is it disclosed in the report that he

15:20:53  15  will render an opinion on this subject?

15:20:57  16          MR. STAKE:  Yes, Your Honor.

15:20:58  17          THE COURT:  Mr. Van Nest?

15:21:00  18          MR. VAN NEST:  Again, I disagree.  There's two

15:21:02  19  issues.  One is he's got a divided infringement opinion, but

15:21:07  20  divided infringement is not an issue in the case.  He doesn't

15:21:12  21  have the opinion in his report that, if the only activity on

15:21:17  22  selection and bandwidth occurs in the client device, that's

15:21:20  23  infringement.  He doesn't have that in the report.  He has a

15:21:24  24  divided infringement opinion, but divided infringement is not

15:21:28  25  an issue now.

15:21:29   1          THE COURT:  So what conclusion do you intend to try

15:21:35   2   to elicit from Dr. Mitzenmacher in this area that Mr. Van Nest

15:21:40   3   is complaining about.

15:21:42   4          MR. STAKE:  Your Honor, Dr. Mitzenmacher will opine

15:21:44   5   that there is a selection performed by the client and that

15:21:48   6   there is a selection performed by the server.  And he has both

15:21:52   7   of these theories.  I could read directly from his report.

15:21:55   8          THE COURT:  Please do.

15:21:57   9          MR. STAKE:  Okay.  The paragraph 616 and 621 of his

15:22:02  10   report, this is where he's opined that Facebook servers will

15:22:08  11   select the corresponding video segment data from among various

15:22:12  12   transcoded versions of the video segment.

15:22:14  13          That's -- I believe that's a theory that's not

15:22:17  14   disputed as disclosed.  The second theory states, in

15:22:20  15   particular --

15:22:20  16          MR. VAN NEST:  Where are you reading, Counsel?

15:22:22  17          MR. STAKE:  Oh.  Paragraph 622.  It states, in

15:22:28  18   particular:  Facebook controls and directs client devices to

15:22:32  19   perform bandwidth estimation and then requests a particular

15:22:36  20   bitrate version of a Facebook Live or Instagram Live stream to

15:22:41  21   download.  And that's the client's opinion, Your Honor.

15:22:44  22          MR. VAN NEST:  Your Honor, that's what I'm saying is

15:22:46  23   part of the divided infringement opinion which is no longer in

15:22:50  24   the case.  That's what I'm saying.

15:22:52  25          THE COURT:  Well, wait a minute.  You say it's no

15:22:54  1  longer in the case.  If the plaintiffs intend to try to elicit

15:22:59  2  that testimony, it sounds like they disagree that it's no

15:23:05  3  longer in the case.

15:23:07  4          MR. STAKE:  Your Honor, I would argue that this is

15:23:07  5  fodder for cross-examination, if anything.

15:23:10  6          MR. VAN NEST:  It --

15:23:11  7          THE COURT:  No.  You're -- you're jumping around.

15:23:18  8          Dr. Mitzenmacher disclosed this in his opinion.

15:23:23  9  Mr. Van Nest, you-all have had his opinion.  I'm not going to

15:23:26  10 allow him to testify beyond his opinion or elaborate beyond his

15:23:31  11 opinion, but I am going to allow him to testify as to what was

15:23:34  12 in his opinion that was provided to you earlier.  No more than

15:23:40  13 that.  Do you understand that, Counsel?

15:23:43  14         MR. STAKE:  Thank you, Your Honor.

15:23:44  15         THE COURT:  And make sure he understands where the

15:23:46  16 fence comes around.

15:23:47  17         MR. VAN NEST:  Your Honor, there are two other much

15:23:49  18 shorter issues that are similar.  But these --

15:23:53  19         THE COURT:  I am always concerned when a lawyer uses

15:23:57  20 the word "shorter."  Now, I used to do that, too, but I've been

15:24:01  21 on the bench a long time and I understood where I was wrong

15:24:04  22 when I was on your side of the bench.

15:24:09  23         Take a shot at it.

15:24:11  24         MR. VAN NEST:  Issue one, he has a series of exhibits

15:24:14  25 with source code which he intends to display.  He never

15:24:20  1  identified that code specifically in his opinion as something

15:24:23  2  he was relying on.

15:24:24  3       He did have an appendix with thousands of lines of

15:24:28  4  code, but there's no discussion of these lines of codes

15:24:32  5  supporting any particular opinion in his report.  So that's

15:24:36  6  issue one.

15:24:38  7       THE COURT:  All right.  Stop right there.

15:24:39  8       MR. STAKE:  Your Honor, we disagree that he --

15:24:43  9  Dr. Mitzenmacher has failed to disclose this code.  He has

15:24:47  10  provided the code file names in his expert report, and he's

15:24:51  11  described the functions in that code.  He hasn't copied all the

15:24:55  12  code, but they come from three very, very short file -- files

15:24:59  13  that were requested by Voxer.  One is one page, one was two

15:25:02  14  pages, and one was four pages.  He didn't copy all of that code

15:25:06  15  into his report, but he'll be pulling a small snippet of each

15:25:11  16  of those small files and displaying those into a demonstrative.

15:25:18  17       Now, I think it's notable that the functions he

15:25:21  18  describes there, it's not disputed is my understanding that

15:25:25  19  he's described those functions accurately.  This is Facebook

15:25:29  20  code.

15:25:29  21       MR. VAN NEST:  But he never -- he never in the report

15:25:32  22  discloses as to those functions or any others that this

15:25:35  23  particular code is what he's relying on.  That's my -- he's

15:25:39  24  trying to dress up this opinion as something better than it is

15:25:43  25  by now attaching source code to it, which he never did in the

15:25:47   1   report.

15:25:47   2             THE COURT:  You will be allowed to thoroughly

15:25:49   3   cross-examine on whether he provided you with that information

15:25:52   4   ahead of time, but I'm going to allow him to testify as to what

15:25:56   5   he relied on.

15:25:57   6             Now, something I need to bring up since you-all

15:26:01   7   didn't start out in my court.  You came down the road from

15:26:07   8   Waco, and I want to make sure because I didn't take this up

15:26:10   9   sooner and I don't think that I understood this was happening

15:26:14   10  before.  Some judges, and I believe my colleague in Waco is

15:26:18   11  one, allows demonstrative exhibits to go to the jury room.  In

15:26:22   12  my court demonstrative exhibits do not go to the jury room.

15:26:26   13            So, if he's using this as demonstrative, you may

15:26:29   14  cross-examine him on it, but it's not to be considered as

15:26:32   15  evidence and it will not go to the jury room.

15:26:34   16            MR. VAN NEST:  Fine, Your Honor.

15:26:37   17            THE COURT:  Try number three on me.

15:26:39   18            MR. STAKE:  Your Honor, on that note we've come to

15:26:42   19  appreciate Your Honor's procedures.  And in this vein we do

15:26:45   20  have three exhibits that we understand are not objected to on

15:26:50   21  their admission.  Would Your Honor be amenable to those being

15:26:54   22  admitted now, perhaps, or how would Your Honor like to do that?

15:26:57   23            THE COURT:  Whatever is easiest, but I want to finish

15:26:59   24  with Mr. Van Nest.  He says he's got one left that we're all

15:27:05   25  hopeful is shorter than even the last one.  But he was honest

15:27:09  1  about that one.  That was not long.  So give me the third one,
15:27:12  2  and then we'll go to the exhibit situation.
15:27:14  3          MR. VAN NEST:  He intends to make an argument about
15:27:18  4  what Claim 1 of the '557 patent requires that he never made in
15:27:26  5  his report.  And I can take that on the fly if you wish,
15:27:30  6  Your Honor, but he's making an argument about what the claim
15:27:33  7  requires in Slide 84 of his deck that was never made in the
15:27:39  8  report.
15:27:40  9          MR. STAKE:  Your Honor, as I just explained, he has
15:27:43  10  offered both of these opinions.  He'll be bound by that.  In
15:27:46  11  fact, it's -- respectfully, it's an argument that will respond
15:27:52  12  directly to Mr. Van Nest's opening argument, an argument that
15:27:56  13  Mr. Van Nest made about claim language.
15:27:59  14          THE COURT:  It doesn't matter what argument he made.
15:28:02  15  When we're dealing with an expert, it is -- he doesn't get to
15:28:05  16  go outside his report.  No matter what Mr. Van Nest said in his
15:28:10  17  opening statement or whatever he said to the jury, that doesn't
15:28:13  18  alter the parameters of what we use expert reports for.
15:28:16  19          So the question is:  Address exactly what
15:28:21  20  Mr. Van Nest said, and is that included in the report?
15:28:24  21          MR. STAKE:  Yes, Your Honor.  Dr. Mitzenmacher will
15:28:28  22  be opining that the client's device performs the selection, and
15:28:34  23  he will be -- in providing that opinion, he needs to be able to
15:28:40  24  explain that that's consistent with the claim language.  That's
15:28:44  25  exactly what he's done in his report and what he will be doing

15:28:48    1   today.

15:28:48    2           MR. VAN NEST:  That's the second part of that where

15:28:50    3   this cat jumped back in the bag.  I don't have any objection to

15:28:53    4   his describing what the client device does because we're in

15:28:57    5   large agreement on that.  But it's where he describes why

15:29:00    6   that's okay in terms of the claim he never did in the report,

15:29:06    7   and I haven't yet heard a paragraph where he did.

15:29:11    8           MR. STAKE:  In the report, this paragraph 622 comes

15:29:18    9   underneath this claim language that he'll be explaining.  He'll

15:29:22   10   be explaining that this selection by the client performs the

15:29:25   11   claim language.  I don't believe he'll be going beyond anything

15:29:29   12   in the report.

15:29:31   13           MR. VAN NEST:  If he's -- I'll take counsel's word.

15:29:33   14   If he's not going to go beyond what's in the report, then he

15:29:37   15   won't be able to use slide 84, at least as I understand what

15:29:40   16   he's planning.

15:29:41   17           MR. STAKE:  We'll take a close look at that slide.

15:29:44   18           MR. VAN NEST:  Thank you.

15:29:44   19           THE COURT:  All right.  Take a close look at that.

15:29:46   20           Now, the question of other exhibits?

15:29:50   21           MR. STAKE:  Yes, Your Honor.  There are three

15:29:51   22   exhibits, P-14, P-830, and P-792.  Our understanding is that

15:30:04   23   Facebook has no objection to the admission of these three

15:30:05   24   exhibits.

15:30:05   25           They're each -- one is Dr. Mitzenmacher's CV, and the

| | | |
|---|---|---|
| 15:30:09 | 1 | other two are Facebook or Instagram documents. |
| 15:30:14 | 2 | MR. VAN NEST:  This is the first I'm hearing of it, |
| 15:30:16 | 3 | Your Honor.  I'll be happy to meet with counsel. |
| 15:30:18 | 4 | THE COURT:  Why don't you take a look at that, and we |
| 15:30:21 | 5 | will -- if they're not objected to, we'll admit them without |
| 15:30:24 | 6 | them needing to be sponsored in front of a witness at a |
| 15:30:27 | 7 | convenient time to get them in the record. |
| 15:30:31 | 8 | MR. VAN NEST:  Normally I'm not accustomed to having |
| 15:30:33 | 9 | CVs go into evidence, just like expert reports. |
| 15:30:37 | 10 | THE COURT:  That's -- if he wants to offer it, you |
| 15:30:40 | 11 | get to object or agree. |
| 15:30:41 | 12 | MR. VAN NEST:  Thank you. |
| 15:30:42 | 13 | THE COURT:  Then I'll make a decision.  If your |
| 15:30:44 | 14 | decision is to object, I'll make -- I will tell you I've seen |
| 15:30:51 | 15 | it both ways, but I consider CVs different from reports.  CVs |
| 15:30:56 | 16 | are more a summary of what he's going to testify to on the |
| 15:31:00 | 17 | stand about how great he is.  A report is a whole lot different |
| 15:31:03 | 18 | because it contains a whole lot of hearsay and whole lot of |
| 15:31:06 | 19 | other things. |
| 15:31:07 | 20 | MR. VAN NEST:  Sure.  Thank you. |
| 15:31:08 | 21 | THE COURT:  So, anyway, just think about that. |
| 15:31:09 | 22 | All right.  We will be in recess for 15 minutes. |
| 15:31:12 | 23 | We'll be until 3:45 because we took up a little time.  Let the |
| 15:31:17 | 24 | jury know that the court had some discussions with the lawyers, |
| 15:31:21 | 25 | so they can extend their recess until 3:45.  Court's in recess. |

| | | |
|---|---|---|
| 18:00:00 | 1 | (Recess) |
| 15:50:50 | 2 | (Open court, jury present) |
| 15:50:50 | 3 | THE COURT:  Mr. Stone, you may continue your direct |
| 15:50:53 | 4 | examination of Mr. Ranney. |
| 15:50:55 | 5 | MR. STONE:  Thank you, Your Honor. |
| 15:50:56 | 6 | Q.   Before we took our break, just to reorient the jury, we |
| 15:51:02 | 7 | were having a discussion about some mysterious outages.  Do you |
| 15:51:07 | 8 | recall that? |
| 15:51:07 | 9 | A.   Yes. |
| 15:51:07 | 10 | Q.   I have just one last question for you about that, which |
| 15:51:12 | 11 | is:  Approximately how many of your users did those outages |
| 15:51:15 | 12 | impact? |
| 15:51:15 | 13 | A.   Well, it was different every day, but on a bad day it |
| 15:51:19 | 14 | could be as many as 10 percent of our new users were unable to |
| 15:51:24 | 15 | sign up. |
| 15:51:25 | 16 | Q.   Now, why are you here today? |
| 15:51:27 | 17 | A.   We spent a lot of time, money, and effort, you know, |
| 15:51:32 | 18 | building -- building the system, and I'm just here to describe |
| 15:51:36 | 19 | what we build. |
| 15:51:37 | 20 | Q.   Are you currently employed by Voxer? |
| 15:51:39 | 21 | A.   No. |
| 15:51:39 | 22 | Q.   Are you being paid to testify? |
| 15:51:41 | 23 | A.   No. |
| 15:51:41 | 24 | Q.   Do you have stock in Voxer? |
| 15:51:43 | 25 | A.   No. |

15:51:44   1   Q.   Do you have options?

15:51:45   2   A.   Yes.

15:51:45   3   Q.   What are they worth today?

15:51:47   4   A.   I don't know.  I don't know how many I have or -- or what

15:51:51   5   they're worth.

15:51:51   6   Q.   Why did you receive them?

15:51:53   7   A.   Well, my founder options expired after -- after I had left

15:51:57   8   the company, and I have another full-time job.  So that I'd be

15:52:03   9   able to assist the company in that situation, they gave me the

15:52:07   10  options.  And assist includes this litigation.

15:52:10   11  Q.   And are you taking vacation days to be here?

15:52:13   12  A.   I am, yeah.  I'm taking vacation from my full-time job to

15:52:17   13  be here.

15:52:17   14            MR. STONE:  No further questions.  Pass the witness.

15:52:23   15            MR. PAIGE:  Your Honor, may I approach the witness?

15:52:35   16            THE COURT:  Remember what I told you earlier?

15:52:37   17            MR. PAIGE:  Thank you, Your Honor.

15:53:14   18            May I proceed, Your Honor?

15:53:15   19            THE COURT:  You may.  And please state your name for

15:53:17   20  the record.

15:53:18   21            MR. PAIGE:  Gene Paige on behalf of Facebook and

15:53:20   22  Instagram, Your Honor.

15:53:22   23                       **CROSS-EXAMINATION**

15:53:22   24  **BY MR. PAIGE:**

15:53:22   25  Q.   Good afternoon, Mr. Ranney.

15:53:24  1   A.   Hello.

15:53:25  2   Q.   My name in a Gene Paige.   We haven't met before, have we?

15:53:29  3   A.   I don't believe so.

15:53:30  4   Q.   Okay.   Now, you testified that you participated in some

15:53:33  5   meetings with Facebook, correct?

15:53:35  6   A.   Uh-huh.   Yep.

15:53:36  7   Q.   Now, Voxer didn't share any of Voxer's source code with

15:53:40  8   Facebook at either of the meetings you participated in,

15:53:44  9   correct?

15:53:44  10  A.   Source code?   No.

15:53:45  11  Q.   And Voxer didn't share any technical documents with

15:53:48  12  Facebook in either of the meetings you attended, correct?

15:53:51  13  A.   It was all on the white board.

15:53:53  14  Q.   And Facebook Live and Instagram Live, those didn't exist

15:53:59  15  at the time of those meetings, correct?

15:54:01  16  A.   That's true, yeah.

15:54:02  17  Q.   And there was no discussion of either Facebook Live or

15:54:05  18  Instagram Live at those meetings, right?

15:54:09  19  A.   That's right.

15:54:09  20  Q.   Now, you left Voxer in September of 2014, correct?

15:54:13  21  A.   Yeah.   That's correct.

15:54:14  22  Q.   And that was around two years after your meetings with

15:54:18  23  Facebook, right?

15:54:18  24  A.   Yep.

15:54:19  25  Q.   At the time you left Voxer, Voxer had not successfully

RANNEY - CROSS

15:54:25  1  enabled live video broadcasting in its app, correct?

15:54:31  2  A.   That is true.  But, as I said, the server supported it,

15:54:34  3  but the app did not.

15:54:35  4  Q.   And at the time of your deposition in 2021, you were still

15:54:39  5  using the Voxer app, were you not?

15:54:41  6  A.   Yeah.

15:54:42  7  Q.   And at the time of your deposition in 2021, you didn't

15:54:46  8  know whether Voxer enabled live video functionality since you

15:54:50  9  left the company, right?

15:54:51  10  A.   That's right, yeah.  I -- it's not functionality that I

15:54:55  11  personally use very often.

15:54:58  12  Q.   Okay.  Voxer didn't invent live audio streaming over the

15:55:02  13  Internet, correct?

15:55:03  14  A.   Live audio streaming?  Yeah.  It existed before we came

15:55:08  15  along, yep.

15:55:09  16  Q.   And Voxer did not invent live video streaming over the

15:55:12  17  Internet, right?

15:55:13  18  A.   Yeah.  That's -- that's true.  We did not invent that

15:55:16  19  either.

15:55:16  20  Q.   Skype is one example of a system that was capable of live

15:55:21  21  streaming video over the Internet before Voxer was founded,

15:55:24  22  correct?

15:55:25  23  A.   Yep.

15:55:26  24  Q.   And Voxer didn't invent time-shifting for video, right?

15:55:30  25  A.   Yeah.  As I said earlier, TiVo was an example of a simple

RANNEY - CROSS

15:55:35  1  time-shifting system.

15:55:36  2  Q.   And Voxer didn't invent adaptive bitrate streaming,

15:55:40  3  correct?

15:55:40  4  A.   That's correct.  We did not invent that either.

15:55:43  5  Q.   Voxer didn't invent producing multiple bitrate versions of

15:55:49  6  a media stream, correct?

15:55:51  7  A.   In -- yeah, in isolation, that is not a thing that we --

15:55:55  8  that we invented either.

15:55:56  9  Q.   And Voxer didn't invent communication systems where a

15:56:01  10  server sits between a sending device and the receiving device,

15:56:05  11  correct?

15:56:05  12  A.   Yeah.  That's correct.

15:56:06  13  Q.   Okay.  Now, I think you mentioned, before you left Voxer

15:56:10  14  in 2014, you had received some Voxer stock options, right?

15:56:15  15  A.   Before I left?

15:56:18  16  Q.   You said you had founders --

15:56:19  17  A.   Yeah, yeah.  Sorry.  Yes.  When we started the company,

15:56:23  18  I -- I received a number of options, yeah.

15:56:26  19  Q.   And stock options, those are the right to buy stock for a

15:56:30  20  certain price --

15:56:31  21  A.   That's right.

15:56:32  22  Q.   -- right?

15:56:32  23  A.   Yep.

15:56:33  24  Q.   And those stock options expired, right?

15:56:35  25  A.   They did, yeah.  At a time after I left the company, they

15:56:38    1    expired.

15:56:39    2    Q.    Yeah.   And that meant you no longer had the right to buy

15:56:43    3    Voxer stock at that price, right?

15:56:44    4    A.    That's right.

15:56:45    5    Q.    Now, in 2020, six years after you left the company, Voxer

15:56:51    6    issued you new stock options, correct?

15:56:53    7    A.    That's right.

15:56:54    8    Q.    Okay.   You were granted those new stock options in May or

15:56:59    9    June of 2020, right?

15:57:00   10    A.    It sounds about right.   I can't remember the exact time.

15:57:03   11    Q.    Okay.   And Mr. Irv Remedios told you around that time that

15:57:08   12    you would be receiving grant stock options, correct?

15:57:12   13    A.    Yes.

15:57:13   14    Q.    And Mr. Remedios, he was the CEO of Voxer in 2020, right?

15:57:17   15    A.    Yeah.   That's right.

15:57:19   16    Q.    Now, Voxer provided you with a stock option agreement in

15:57:22   17    connection with those 2020 stock options, right?

15:57:25   18    A.    Yep.

15:57:26   19    Q.    Okay.   Could I ask you to open your binder to DTX618.

15:57:36   20          MR. PAIGE:   And, Your Honor, this is in evidence.

15:57:38   21    A.    Okay.   Yep.   I have that.

15:57:42   22    Q.    Now, this is a stock option agreement that Voxer provided

15:57:45   23    you in 2020, correct?

15:57:46   24    A.    Yes.   This looks like -- this looks like the agreement.

15:57:49   25    Q.    Okay.   And that's your name on the signature line of

15:57:51  1  page 1, right?

15:57:56  2  A.   Yeah.   That's my electronic signature where I click the

15:58:01  3  thing.   That's no my handwriting.   But I did click the

15:58:01  4  electronic agreement and agree to it.

15:58:03  5  Q.   You signed it?

15:58:04  6  A.   I did, yes.   I'm just saying that's not my signature, my

15:58:07  7  handwriting signature.

15:58:08  8  Q.   Fair enough.   Now the agreement, the options, were granted

15:58:16  9  June 4th, 2020, right?

15:58:17  10  A.   Yeah.   That's what it says.

15:58:18  11  Q.   And June 2020 is around the time that Mr. Remedios told

15:58:22  12  you that Voxer would be granting you new options, right?

15:58:24  13  A.   Yeah.   Yeah.

15:58:25  14  Q.   And this agreement, it grants you 1 million Voxer stock

15:58:33  15  options over time, right?

15:58:34  16  A.   Yeah.   That's what it says.

15:58:35  17  Q.   An each option, that allows you to purchase a share of

15:58:38  18  Voxer stock for one penny, right?

15:58:40  19  A.   Yeah.   One penny, yep.

15:58:42  20  Q.   Okay.   And the agreement, it incorporated the applicable

15:58:46  21  documents available for download and connection with the equity

15:58:50  22  award, right?

15:58:51  23  A.   Yeah.   Yeah.   For sure.

15:58:53  24  Q.   Okay.   And there are three plan options, documents, listed

15:58:58  25  on this page, right?

| | | |
|---|---|---|
| 15:58:59 | 1 | A.   Yeah. |
| 15:58:59 | 2 | Q.   In the blue there? |
| 15:59:01 | 3 | A.   Yeah, yeah, yeah. |
| 15:59:01 | 4 | Q.   And one of those is a 2012 equity incentive plan, right? |
| 15:59:06 | 5 | A.   Yeah. |
| 15:59:07 | 6 | Q.   Can you turn a few pages and look at that, the 2012 equity |
| 15:59:12 | 7 | incentive plan, please? |
| 15:59:15 | 8 | A.   Is that on page 6 of 44? |
| 15:59:17 | 9 | Q.   Page 6.  Yes, sir. |
| 15:59:19 | 10 | A.   Yeah.  Yep. |
| 15:59:22 | 11 | Q.   Now, the first paragraph there is entitled "Purpose," |
| 15:59:25 | 12 | right? |
| 15:59:25 | 13 | A.   Yeah. |
| 15:59:26 | 14 | Q.   And an it says:  "The purpose of this plan is to provide |
| 15:59:30 | 15 | incentives to attract, retain, and motivate eligible persons |
| 15:59:37 | 16 | whose present and potential contributions are important to the |
| 15:59:40 | 17 | success of the company, its parents, and subsidiaries by |
| 15:59:46 | 18 | offering eligible persons an opportunity to participate in the |
| 15:59:49 | 19 | company's future performance through the grant of awards |
| 15:59:53 | 20 | covering shares."  Right? |
| 15:59:55 | 21 | A.   Uh-huh.  Yep. |
| 15:59:55 | 22 | Q.   And you weren't employed by Voxer when you received this |
| 15:59:59 | 23 | option grant in 2020, right? |
| 16:00:00 | 24 | A.   That's correct. |
| 16:00:01 | 25 | Q.   You weren't working as a consultant for Voxer in 2020, |

RANNEY - CROSS

| | | |
|---|---|---|
| 16:00:05 | 1 | right? |
| 16:00:05 | 2 | A.   By then I had not -- I hadn't been doing -- I hadn't been |
| 16:00:09 | 3 | talking to them too much.  Irv and I had many conversations |
| 16:00:12 | 4 | over the years about different projects, you know, and checking |
| 16:00:15 | 5 | in.  But, yeah, I wasn't -- I was not what you would call a |
| 16:00:18 | 6 | consultant for Voxer anymore. |
| 16:00:20 | 7 | Q.   And you weren't a contractor? |
| 16:00:21 | 8 | A.   Not a contractor.  I wasn't working for Voxer anymore. |
| 16:00:24 | 9 | Q.   Okay.  In fact, you were working full-time for Uber in |
| 16:00:27 | 10 | June of 2020, right? |
| 16:00:29 | 11 | A.   Yeah.  That's right. |
| 16:00:30 | 12 | Q.   So the purpose of this option grant in 2020 was not to |
| 16:00:33 | 13 | retain you, correct?  You weren't working there? |
| 16:00:35 | 14 | A.   That's right, yeah. |
| 16:00:36 | 15 | Q.   And you didn't formally provide any services to Voxer in |
| 16:00:39 | 16 | 2020, right? |
| 16:00:41 | 17 | A.   True. |
| 16:00:42 | 18 | Q.   So the purpose of this grant was not to attract you |
| 16:00:45 | 19 | either, right? |
| 16:00:46 | 20 | A.   Yep. |
| 16:00:47 | 21 | Q.   Okay.  And, again, the first sentence begins:  "The |
| 16:00:50 | 22 | purpose of this plan is to provide incentives to attract, |
| 16:00:53 | 23 | retain, and motivate eligible persons whose present and |
| 16:00:57 | 24 | potential contributions are important to the success of the |
| 16:01:01 | 25 | company."  Right? |

RANNEY - CROSS

| | | |
|---|---|---|
| 16:01:01 | 1 | A.   Yeah.  I see that, yep. |
| 16:01:03 | 2 | Q.   Okay.  Now, the stock option agreement on that first page |
| 16:01:09 | 3 | has a space to list the grant reason on the first page, right? |
| 16:01:12 | 4 | A.   Oh, okay. |
| 16:01:13 | 5 | Q.   You see that up at the top? |
| 16:01:18 | 6 | A.   Option, grant holder, grant reason.  None entered.  Yes. |
| 16:01:23 | 7 | I see that. |
| 16:01:24 | 8 | Q.   That was my next question.  In red letters "none entered" |
| 16:01:27 | 9 | for reason? |
| 16:01:27 | 10 | A.   Yeah.  Yeah. |
| 16:01:28 | 11 | Q.   Okay.  But when you discussed why Voxer was granting these |
| 16:01:33 | 12 | stock options to you with Mr. Remedios, Mr. Remedios said that |
| 16:01:37 | 13 | it was because Voxer hoped that it could count on your help if |
| 16:01:40 | 14 | we need it, correct? |
| 16:01:42 | 15 | A.   That's right, yeah. |
| 16:01:42 | 16 | Q.   Okay.  You hadn't asked for those additional stock |
| 16:01:45 | 17 | options, correct? |
| 16:01:46 | 18 | A.   No, I did not. |
| 16:01:47 | 19 | Q.   And prior to 2020, Voxer had not reached out to you to |
| 16:01:50 | 20 | grant you additional stock options since you left Voxer, right? |
| 16:01:54 | 21 | A.   Nope. |
| 16:01:54 | 22 | Q.   And sometime after this lawsuit was filed, Mr. Katis, he |
| 16:01:59 | 23 | told you you might be called on to testify in this case, right? |
| 16:02:03 | 24 | A.   Yeah.  Yeah. |
| 16:02:04 | 25 | Q.   Okay.  Now, the stock option agreement states on page 1 |

16:02:08   1   the board approved the option grant on June 4, 2020, right?

16:02:12   2   A.   Yeah.   That's what it says.

16:02:14   3   Q.   Let's look at page 2 to see when the stock options began

16:02:18   4   to vest.   What's the first date the stock options began to vest

16:02:22   5   according to that page, vesting start?

16:02:24   6   A.   Vesting start, January 6, 2020.

16:02:28   7   Q.   And you're aware this lawsuit was filed on January 7th,

16:02:31   8   2020, aren't you?

16:02:32   9   A.   Yeah.

16:02:35  10   Q.   Thank you, Mr. Ranney.

16:02:37  11            MR. PAIGE:   I pass the witness.

16:02:39  12            MR. STONE:   Just a few questions, Your Honor.

16:02:40  13            THE COURT:   You may proceed.

16:02:42  14                    **REDIRECT EXAMINATION**

16:02:42  15   **BY MR. STONE:**

16:02:42  16   Q.   Mr. Ranney, you were asked about what it was that Voxer

16:02:46  17   didn't invent.   Do you recall that?

16:02:48  18   A.   Oh, yeah.

16:02:48  19   Q.   Did Voxer invent the subject matter of the '270 patent?

16:02:52  20   A.   Yes.

16:02:53  21   Q.   Did Voxer invent the subject matter of the '557 patent?

16:02:57  22   A.   Yes.

16:02:58  23   Q.   The patent officer agreed?

16:03:00  24   A.   Yes.

16:03:00  25   Q.   And did Voxer invent the subject matter of another 148

16:03:04   1    patents that you're a named inventor on?

16:03:06   2    A.   Yes.

16:03:07   3              MR. STONE:  No further questions.

16:03:09   4              THE COURT:  Any recross?

16:03:11   5              MR. PAIGE:  No, Your Honor.  Thank you.

16:03:12   6              THE COURT:  You may step down.

16:03:14   7              THE WITNESS:  Okay.

16:03:23   8              MR. STAKE:  Voxer calls Professor

16:04:19   9    Michael Mitzenmacher.

16:04:19   10             THE COURT:  All right.  And please again state your

16:04:21   11   name for the record.

16:04:22   12             MR. STAKE:  Sam Stake on behalf of Voxer.

16:04:56   13        (Witness sworn)

16:04:56   14                        **MICHAEL MITZENMACHER,**

16:04:56   15   having been first duly sworn, testified as follows:

16:04:56   16                        **DIRECT EXAMINATION**

16:04:56   17   **BY MR. STAKE:**

16:04:56   18   Q.   Good afternoon, Dr. Mitzenmacher.

16:04:59   19   A.   Good afternoon.

16:04:59   20   Q.   State your full name and where you currently live.

16:05:01   21   A.   Michael David Mitzenmacher.  I live in Lexington,

16:05:04   22   Massachusetts.

16:05:04   23   Q.   And what is your job?

16:05:05   24   A.   I'm a professor at Harvard University.

16:05:09   25   Q.   What are you here to testify about today?

212

16:05:12  1  A.   I'm here to testify today, I guess, about the infringement

16:05:16  2  of the two patents that we've talked about and some related

16:05:19  3  issues.

16:05:20  4  Q.   Have you prepared a set of slides to share with the jury?

16:05:26  5  A.   Yes.  I prepared a set of slides, demonstratives, to share

16:05:31  6  with the jury as I discuss this.

16:05:32  7  Q.   And these are your slides up here?

16:05:34  8  A.   Yes.

16:05:34  9  Q.   Okay.  Before we turn to Voxer's patents, I'd like to ask

16:05:42  10  you a few questions about your background.  Could you please

16:05:43  11  tell us about your education.

16:05:45  12  A.   Sure.  I got my undergraduate degree at Harvard University

16:05:49  13  in 1991, where I majored in mathematics and computer science.

16:05:54  14  I then got to go for a year on a fellowship to the University

16:05:58  15  of Cambridge in England to study mathematics.  I received what

16:06:02  16  they call a certificate of advanced study.  It's sort of the

16:06:06  17  equivalent to a master's.  And then I came back to Berkeley,

16:06:10  18  where I got my Ph.D. in computer science in 1996.

16:06:14  19  Q.   Thank you.  What kind of thesis work did you do?

16:06:17  20  A.   My Ph.D. thesis involved load balancing for large-scale

16:06:22  21  systems.  So, in particular, it would apply to various sorts of

16:06:27  22  networking systems and web-based traffic systems.

16:06:30  23  Q.   When did you become a professor at Harvard?

16:06:38  24  A.   I started in January 1999.  After I graduated, I went

16:06:40  25  to -- I actually worked at a research lab for a couple of years

| | | |
|---|---|---|
| 16:06:42 | 1 | at Digital Systems Research Center and then joined Harvard in |
| 16:06:46 | 2 | 1999.  And I've been there since. |
| 16:06:47 | 3 | Q.   Do you teach any courses at Harvard? |
| 16:06:50 | 4 | A.   Yes, I do.  I teach both undergraduate and graduate |
| 16:06:53 | 5 | courses. |
| 16:06:54 | 6 | Q.   And are there any particular courses that you teach? |
| 16:06:57 | 7 | A.   Yeah.  So my undergraduate course is on algorithms and |
| 16:07:03 | 8 | data structures.  It's one of the core courses in the |
| 16:07:05 | 9 | curriculum.  My graduate courses, the one I'm teaching now this |
| 16:07:09 | 10 | semester, relates to networks and, in particular, algorithms |
| 16:07:14 | 11 | and data structures for improved networks and network |
| 16:07:18 | 12 | efficiency.  And my other graduate class that I teach in other |
| 16:07:20 | 13 | years is on randomized algorithms and probabilistic processes. |
| 16:07:26 | 14 | Q.   Do you have any industry experience? |
| 16:07:27 | 15 | A.   Yes, I do.  So besides, you know, working at Harvard, I've |
| 16:07:34 | 16 | also obviously done some work as an expert witness in the past. |
| 16:07:40 | 17 | I've also done some consulting at companies.  Again, I work at |
| 16:07:43 | 18 | Digital and consulted for them for a bit.  After I left, |
| 16:07:49 | 19 | Microsoft, a company called Digital Fountain, eHarmony, Akamai, |
| 16:07:54 | 20 | Adverplex. |
| 16:07:54 | 21 | Q.   Can you give us some examples of the kind of work you've |
| 16:07:58 | 22 | done for these companies? |
| 16:07:59 | 23 | A.   Sure.  So eHarmony is always a fun one to talk about.  If |
| 16:08:04 | 24 | people remember, eHarmony was one of the matchmaking companies. |
| 16:08:07 | 25 | And there's actually -- I got to be on their science board for |

16:08:11   1   a few years, a there's actually a lot of algorithmic work.  You

16:08:14   2   know, there's the sort of psychology aspect of trying to figure

16:08:17   3   out the matches, but then there's the algorithmic work of,

16:08:21   4   well, if there's one popular person, you don't want to match

16:08:24   5   them with everybody, so how do you manage the matches to sort

16:08:27   6   of spread them out and evenly distribute them among everyone.

16:08:33   7   Q.   Are you the author of any books or publications?

16:08:37   8   A.   Yeah.  So I have, for instance, written a textbook that

16:08:43   9   has to do with my graduate course on probability computing,

16:08:47   10  randomization and probabilistic techniques and algorithms and

16:08:48   11  data analysis.

16:08:48   12        And I also, you know, I should say, as a professor,

16:08:55   13  you know, you have a variety of jobs.  Obviously, one job is

16:08:56   14  teaching students, which is something I do greatly enjoy.  And

16:09:00   15  another big part of the job at a research university is

16:09:04   16  continuing to do original research.  So at this point in my

16:09:07   17  career, I've published over 250 academic papers.

16:09:14   18  Q.   Are you the inventor on any patents?

16:09:15   19  A.   Yes, I am.  I'm also listed as an inventor and coinventor

16:09:18   20  on 19 issued patents.

16:09:24   21  Q.   What currently is your main research area?

16:09:25   22  A.   Yes.  So currently my research area, there's sort of two

16:09:28   23  things that are my main areas that I have grants on, for

16:09:31   24  instance.  One of them has to do with, actually, as you might

16:09:35   25  imagine, algorithms and data structures for networking

16:09:39   1   applications.  So there I'm actually working at Harvard with --

16:09:42   2   this is a joint grant with the networking faculty, and we're

16:09:46   3   working together on a variety of problems, many related to

16:09:49   4   network telemetry.  So that telemetry is measuring the network,

16:09:55   5   what's going on in network, trying to find where problems are,

16:09:58   6   where issues are in advance by taking these measurements as

16:10:02   7   things are going through the network.

16:10:03   8           My other research grant is on kind of a new area that

16:10:07   9   I'm at the beginning of called algorithms with predictions.  So

16:10:14   10  the idea here is, can we take predictions from things like

16:10:16   11  machine learning tools or machine learning algorithms and use

16:10:20   12  them to get better algorithms and data structures that we can

16:10:23   13  use, you know, for real applications.

16:10:32   14  Q.   Professor Mitzenmacher, have you received any awards?

16:10:35   15  A.   Yeah.  So back in college I received a Hoopes prize.  This

16:10:37   16  is a prize given to, you know, the top senior thesis in the

16:10:42   17  various areas.  When I started my career as a professor, the

16:10:45   18  National Science Foundation, that's one of the government

16:10:50   19  groups that funds research, particularly for people in

16:10:54   20  universities and elsewhere, I got what's called a CAREER award.

16:10:58   21  That's an award given to, you know, young promising faculty to

16:11:04   22  help them at the start of their careers.

16:11:06   23          Very recently I was honored to share the ACM Paris

16:11:13   24  Kanellakis Theory and Practice Award.  So this had to do

16:11:16   25  actually for my work on load balancing.  And, you know, the

MITZENMACHER - DIRECT                                    216

16:11:21   1   award there is designed to -- for work that has had an impact

16:11:26   2   on both theory and practice.  And I've also won various Best

16:11:30   3   Papers awards at conferences and so on, and some of them are

16:11:35   4   listed here.

16:11:36   5   Q.   Are you being compensated for your work on this case?

16:11:39   6   A.   Yes.  I am being compensated for my work.  My standard

16:11:43   7   rate of $900 an hour.

16:11:46   8   Q.   Is your compensation tied in any way to the results of

16:11:50   9   this case?

16:11:50  10   A.   No.  I'm only getting paid for my time.

16:11:54  11        MR. STAKE:  Your Honor, at this time Voxer tenders

16:11:56  12   Dr. Mitzenmacher as an expert in the fields of computer

16:11:59  13   networking and multimedia processing.

16:12:02  14        MR. VAN NEST:  No objection, Your Honor.

16:12:03  15        THE COURT:  All right.  The witness may testify and

16:12:05  16   express opinions in his area of expertise, as described by

16:12:10  17   counsel.

16:12:17  18   Q.   (BY MS. STAKE) Now you mentioned that you analyzed two

16:12:19  19   Voxer patents.  What conclusions did you reach?

16:12:22  20   A.   Yes.  So I'll be discussing today in my discussion of the

16:12:25  21   patents the '270 patent that we've been talking about today.

16:12:29  22   I'll be discussing infringement of Claims 34, 47, 48 and 51.

16:12:35  23   And it is my opinion that those claims are infringed.  For the

16:12:39  24   '557 patent, I'll be offering my opinion that Claims 1 and nine

16:12:45  25   are infringed.

16:12:46   1          I will also discuss some aspects that relate to

16:12:50   2    something call technical apportionment.  I'll describe that

16:12:54   3    more in detail later.  That's looking at the process to try and

16:12:57   4    provide sort of a technical basis for what the underlying value

16:13:01   5    is to the products -- of the patents to the Facebook products.

16:13:06   6          And I may also come back later in these proceedings,

16:13:11   7    I understand, you know, after I present argument, as the Court

16:13:16   8    has said, you know, Facebook will come up and present their

16:13:19   9    argument.  And on some of the issues such as, you know, some

16:13:27  10    issues may be reached on infringement or responding to validity

16:13:31  11    or noninfringing alternatives and licenses, I may come back and

16:13:35  12    provide some opinions.

16:13:37  13    Q.   Now, briefly, what materials did you consider in forming

16:13:42  14    your opinions?

16:13:45  15    A.   So when you're doing this job as an expert witness, you

16:13:48  16    sort of look at everything you can get your hands on.  So, you

16:13:52  17    know, obviously a starting point is my own experience both in

16:13:56  18    industry and as an academic.  But then starting with the case,

16:14:01  19    obviously, you start with the patents, and you look at the

16:14:05  20    patents themselves, but also the histories of the patents.

16:14:09  21    Those are called the file histories.  We've heard the inventors

16:14:11  22    talking about dating all the way back to these provisional

16:14:14  23    patents, which is where it started.

16:14:16  24          Besides that you look at the documents that are

16:14:20  25    produced in the case, in particular, the documents produced by

| | | |
|---|---|---|
| 16:14:24 | 1 | Facebook.  So Facebook has a variety of technical documentation |
| 16:14:29 | 2 | describing both the Facebook Live product and the Instagram |
| 16:14:33 | 3 | Live product that I examined and studied.  I also got to look |
| 16:14:37 | 4 | at the source code.  I also, you know, did some testing of |
| 16:14:41 | 5 | the -- of the accused products and, in particular, focusing on |
| 16:14:44 | 6 | the accused functionality related to the patent claims. |
| 16:14:49 | 7 | Finally, there are a number of documents that are |
| 16:14:52 | 8 | given or presented by the court.  So there's something called a |
| 16:14:56 | 9 | claim construction order where the court may define some of the |
| 16:14:59 | 10 | terms of the claims that need defining.  There's depositions. |
| 16:15:03 | 11 | So, you know, the attorneys for Voxer got to essentially |
| 16:15:09 | 12 | interview or ask questions of the Facebook engineers, and I |
| 16:15:13 | 13 | looked at their testimony and utilized that. |
| 16:15:16 | 14 | There's various other documentation that, you know, I |
| 16:15:20 | 15 | think we've already seen in these proceedings where the lawyers |
| 16:15:23 | 16 | can ask questions to the other side and get back responses, so |
| 16:15:28 | 17 | I looked at those.  And, of course, I considered the expert |
| 16:15:31 | 18 | reports, you know, given by the other side and their experts as |
| 16:15:35 | 19 | well. |
| 16:15:36 | 20 | Q.  Are you going to present to the jury here today all of the |
| 16:15:39 | 21 | evidence you saw that Facebook infringes Voxer's patents? |
| 16:15:43 | 22 | A.  No.  But simply because we just don't have time.  You |
| 16:15:47 | 23 | know, there's a limited amount of time set for the case.  You |
| 16:15:50 | 24 | know, we don't want to keep you here for a month.  I don't |
| 16:15:53 | 25 | think you want to be here for a month.  So I had to go through |

16:15:56   1   and try and pick out, you know, what I thought was compelling

16:16:01   2   evidence or the best evidence for you.

16:16:03   3   Q.   You mentioned claim construction.  What construction did

16:16:11   4   you apply when analyzing the claims of the '270 and '557

16:16:15   5   patents?

16:16:19   6   A.   So I utilized the plain and ordinary meaning.  Well, in

16:16:22   7   particular, there was a specific term used in the patent claims

16:16:28   8   that the court construed, "end-to-end connection."  And the

16:16:30   9   court said that term should have its plain and ordinary

16:16:34   10  meaning.  And for all other terms, I also used the plain and

16:16:36   11  ordinary meaning.  And, again, one understands that's in the

16:16:39   12  context of the patents and how they're used there.

16:16:45   13  Q.   Is there any dispute that all the terms of these patents

16:16:49   14  should be given their plain and ordinary meaning with Facebook?

16:16:51   15  A.   No.  Not that I'm aware of.

16:16:59   16  Q.   Could you tell us a bit about the two patents you'll be

16:17:01   17  discussing today.

16:17:01   18  A.   Yes.  So, as you've seen before, the patents are

16:17:04   19  10,142,270, and we'll just refer to that as the '270 patent,

16:17:10   20  10,511,557, that's the '557 patent.  They both share a title

16:17:17   21  "Telecommunication and Multimedia Management Method and

16:17:20   22  Apparatus."  And they share the inventors, some of whom we've

16:17:25   23  already heard from.

16:17:28   24  Q.   Now, I want you to take us back to the state of computer

16:17:33   25  communications at the time that the '270 and '557 patents were

16:17:38  1   filed.  What year was that?

16:17:39  2   A.   They were filed, as we've heard, in 2007.

16:17:42  3   Q.   I see on this slide you refer to real-time media and

16:17:46  4   time-shifted media.  What do you mean by the word "media" here?

16:17:50  5   A.   So, as we've heard, again, "media" can refer to different

16:17:56  6   types of information, in particular, the ones of most issue

16:17:59  7   here are audio and video, although, again, texts and other

16:18:03  8   things can be media as well.

16:18:05  9   Q.   Now, how was the way that computers communicated media in

16:18:09  10  2007 different than today?

16:18:11  11  A.   Well, so as the patent describes, you know, in the 2007 or

16:18:17  12  so time frame, you know, there were really two main ways that

16:18:22  13  you would see in systems for dealing with media.  So one is

16:18:27  14  something that we'll refer to as real time.  And the idea

16:18:31  15  there, as we've heard, is that real time is supposed to be sort

16:18:36  16  of as it's happening, as you're generating, say, the video gets

16:18:40  17  sent and received by the other side.  And, again, we do keep in

16:18:44  18  mind real time is like best effort, right?  It can't just

16:18:48  19  instantaneously get there, but it will get there as fast as the

16:18:51  20  network reasonably can get it.

16:18:53  21        And the way real-time media would work, though, is --

16:18:57  22  you know, again it's the sort of telephone analogy, that in

16:19:01  23  order to send this real-time media, you know, we'd first have

16:19:05  24  to establish a connection.  You'd have to be like, okay, let's

16:19:10  25  get ourselves set up.  We're going to set up a phone call.

16:19:12   1   That can be done, you know, for instance, through network

16:19:17   2   protocols.  We set up a connection, and then once the

16:19:19   3   connection is set up and everyone is ready, then I can start

16:19:23   4   sending a you video.

16:19:25   5           And that way -- and, again, that can be

16:19:27   6   one-directional or bidirectional, and bidirectional we might be

16:19:32   7   trying to exchange messages in real time.

16:19:35   8   Q.   And in time-shifting media?

16:19:37   9   A.   In time-shifting media, that's more of an e-mail analogy,

16:19:39  10   that you'd have to -- like, I might prepare a video in advance,

16:19:43  11   record the whole thing, and then it's, like, okay, I've got my

16:19:46  12   message.  Now I'm just going to send it to you some way.  You

16:19:49  13   know, there are various network protocols for that, or, in some

16:19:52  14   cases, you can even send it as, like, an e-mail type

16:19:55  15   attachment.

16:19:56  16   Q.   Were there any drawbacks of these pre-2007 computer

16:20:02  17   communication methods?

16:20:04  18   A.   Yeah.  I mean, each of them -- and, again, these are sort

16:20:07  19   of described and discussed in the patents in the background.

16:20:11  20   You know, each of them had their own problems.  So if you're

16:20:15  21   doing real time, you know, you'd have to establish this

16:20:19  22   end-to-end connection.  You'd have to get both parties together

16:20:22  23   on the system, agree to get going, and then, you know, once the

16:20:26  24   connection is established, you could start.

16:20:28  25           And, you know, so everything relied on that

16:20:31  1  connection.  And, in particular, if that connection was broken

16:20:34  2  in some way or if the connection was lost, you know, that was

16:20:37  3  it.  You were stuck.  The media would drop, and you would have

16:20:41  4  to try again.

16:20:43  5          For time-shifted, what you're losing there, what the

16:20:46  6  drawback is, is that it's a one-way type system.  You don't get

16:20:51  7  that benefit of interactivity.  You don't get that it's, you

16:20:55  8  know, you're seeing what's happening in real time.  And there

16:20:59  9  are various aspects of, you know, the time-shifted type systems

16:21:03  10 that were both burdensome and time-consuming, again, like

16:21:07  11 having to set up or record everything in advance.

16:21:10  12 Q.  Now, in your review of the materials that you considered,

16:21:13  13 were the Voxer inventors aware of these problems in prior -- in

16:21:18  14 prior computer communications systems?

16:21:21  15 A.  Yes.  I mean, this is -- these are the sorts of things

16:21:24  16 that they talk about in the patent, and these are the problems

16:21:27  17 that they state that they were aiming to solve.

16:21:30  18 Q.  Now, at a high level, how did Voxer improve upon these

16:21:34  19 preexisting methods?

16:21:36  20 A.  So at a high level, what they were trying to do is build a

16:21:44  21 sort of hybrid system that would give us the best of both of

16:21:46  22 these worlds, right, that would allow for you to do a real-time

16:21:50  23 communication without having to do this sort of setting up to

16:21:53  24 begin with.  Ideally, you know, we hear this push-to-talk where

16:21:59  25 you just push a button.  You know, you can push a button and

MITZENMACHER - DIRECT

16:22:02  1  just start, and it just appears instantaneous.  There's no wait

16:22:07  2  or delay because you're not having to set up this sort of

16:22:09  3  connection.  But, at the same time, you know, maybe the other

16:22:12  4  person is not even on the network right now, right?  So you

16:22:15  5  have things like that that the data would be recorded and kept,

16:22:18  6  and so someone could come back and look at it later.

16:22:22  7          So the idea was to create a sort of seamless, natural

16:22:26  8  hybrid specifically for computer communication and, in

16:22:28  9  particular, video type and audio messages, you know, that

16:22:34  10  would -- that would give the benefits of both and take away the

16:22:37  11  problems of each.

16:22:39  12  Q.  Now, we'll get more into the details of Voxer's solutions

16:22:44  13  when we analyze their claimed inventions.  But, for now, did

16:22:49  14  you prepare an animation to explain Voxer's patented technology

16:22:52  15  at a high level?

16:22:53  16  A.  Yeah.  So before we get sort of diving in.  And, trust me,

16:22:57  17  I think we're going to spend plenty of time getting into the

16:23:01  18  detailed actual elements of the claim, I want to try and

16:23:04  19  present things at a high level to ground us when we get to that

16:23:07  20  point.

16:23:07  21  Q.  So what are the components that you included in your

16:23:10  22  animation here?

16:23:12  23  A.  So my animation the idea is we have a sender, someone who

16:23:15  24  is going to want to send a video.  We have multiple recipients,

16:23:19  25  here labeled A and B, who are going to at the end of this

16:23:25  1  receive the video.  And we have, you know, the servers in the

16:23:28  2  middle that are going to help manage and handle the data in

16:23:32  3  order to -- in order to relieve the issues that we've been

16:23:37  4  talking about from the point of view of the sender and the

16:23:39  5  receiver.

16:23:40  6  Q.    Now, have you identified several hallmarks of Voxer's

16:23:46  7  technology?

16:23:47  8  A.    Yes.  And I'll discuss -- again, this is at a high level.

16:23:49  9  We'll get into how these relate to the claims in a minute.

16:23:53  10  But, again, just to ground us, you know, what I consider some

16:23:55  11  of the hallmarks of Voxer's technology.

16:23:58  12  Q.    Okay.  What was first key feature of Voxer's technology?

16:24:02  13  A.    Right.  So one of the key features is this idea that we

16:24:05  14  can send the media before ascertaining the location of the

16:24:09  15  identified recipient.  Okay.  This is the idea that the sender

16:24:13  16  again can just start, and we don't have to have this end-to-end

16:24:16  17  connection set up.  I don't have to know where you are or where

16:24:20  18  the information is going because I'm sending it first to this

16:24:24  19  intermediate server who will manage a lot of that process.

16:24:30  20  Q.    And what is an example of recipient location?

16:24:34  21  A.    So a recipient location, we'll talk about this more in the

16:24:36  22  claims, an example of that would be what's called, like, an IP

16:24:41  23  address.  So IP stands for Internet Protocol, and there's an

16:24:45  24  object called the Internet protocol address.  So in the sort of

16:24:49  25  standard version, this looks like a collection of numbers, and

16:24:56   1   those numbers represent an address or a way to route that

16:24:59   2   information to a user.

16:25:03   3   Q.    Okay.   What's the second key feature of Voxer's

16:25:06   4   technology?

16:25:06   5   A.    So another key feature is generating what is called

16:25:09   6   transcoded and degraded versions of the media.   So the

16:25:13   7   transcoding here just means you're getting the data in say one

16:25:17   8   format and you might transcode it or put it into other formats.

16:25:22   9   In particular, you know, it might be even the same,

16:25:24  10   quote/unquote, format, but different bitrates, different

16:25:27  11   qualities.

16:25:29  12          And the reasons that you would do this, there are --

16:25:32  13   there are variety of reasons.   One of the key ones that comes

16:25:36  14   up in the patent is, you know, the network conditions may make

16:25:39  15   it difficult to send, like, a very high quality video to a user

16:25:43  16   at a given time, right?   If they're off in the middle of the

16:25:49  17   city, they may not have great Internet connection, you may want

16:25:53  18   to -- they may need to get a lower quality video, something

16:25:56  19   that takes less bits, less information to send, so that they

16:25:59  20   can still receive it in a timely fashion.   Whereas someone with

16:26:02  21   a really good connection might be able to get, you know,

16:26:05  22   something of higher quality, and there may be a range in

16:26:08  23   between.

16:26:09  24   Q.    What are the third and fourth key features of Voxer's

16:26:13  25   technology that you've identified?

```
16:26:15   1   A.   So one of the features -- again, this is just sort of key
16:26:20   2   basic feature -- is the ability to stream real-time media.  You
16:26:23   3   know, part of the design is that it would allow both a
16:26:27   4   real-time streaming component and, you know, again this
16:26:32   5   time-shifted component so that if you're not available now, you
16:26:35   6   may see it later.
16:26:36   7        Related to that -- that aspect is this no end-to-end
16:26:40   8   connection.  What they wanted to be able to provide to users is
16:26:45   9   that you would have streaming, but you wouldn't have to first
16:26:48  10   set up this one-on-one -- or this connection between the users
16:26:52  11   in order to achieve that.
16:26:55  12   Q.   What are the challenges of transmitting and receiving
16:26:58  13   real-time media?
16:27:00  14   A.   There are many challenges in streaming.  You know, we've
16:27:04  15   already talked about how it relates to one is, like, how do you
16:27:07  16   get the user something of good quality.  But there are lots of
16:27:11  17   challenges or issues related to how you get it there in a
16:27:15  18   timely fashion so that, to the user, it seems like a clear and
16:27:19  19   seamless experience.
16:27:20  20   Q.   Finally, what is the fifth hallmark of Voxer's technology
16:27:25  21   that you've identified?
16:27:27  22   A.   So the last one is enabling the rendered media in a
16:27:36  23   time-shifted mode.  So, again, we heard this from the
16:27:38  24   inventors, it's one of the key descriptions in the patent.  You
16:27:42  25   want to have this ability to both send in real time, but also
```

16:27:46  1  allow for time-shifting, that is, allow it to be accessed later

16:27:51  2  for users that may have joined after the video is over and they

16:27:55  3  want to access it at a later time.

16:27:59  4  Q.    Thank you.  And when we combine all of these hallmarks,

16:28:03  5  what are the benefits of Voxer's patented technology?

16:28:07  6  A.    So there are a number of benefits.  Here I'm going to

16:28:12  7  highlight what I think are some of the most important ones and,

16:28:15  8  in particular, ones related to the claims we'll be talking

16:28:18  9  about.

16:28:19  10        You know, you have this real-time ability that

16:28:22  11  enables senders and recipients to interact in a real-time

16:28:26  12  fashion.

16:28:26  13        You have scalability.  So by using these intermediate

16:28:31  14  servers, okay, you can imagine that a problem is, if I'm taking

16:28:35  15  my phone and I want to send audio or video out to -- to

16:28:39  16  millions of users, and, you know, I have to set up a separate

16:28:43  17  connection with each of these users, you know, my phone is

16:28:46  18  going to get overwhelmed pretty quickly.  It's not going to be

16:28:50  19  able to manage all those different connections.

16:28:52  20        So by using this intermediate server system in order

16:28:55  21  to handle and manage the load, you're able to create what we've

16:28:59  22  heard of as scalability, the ability to handle more users and,

16:29:03  23  in particular, more simultaneous users in a natural and ready

16:29:09  24  fashion.  So this sort of approach allows scalability to

16:29:12  25  support, you know, in cases up to millions or larger recipients

MITZENMACHER - DIRECT                                        228

| | | |
|---|---|---|
| 16:29:16 | 1 | at the same time. |
| 16:29:17 | 2 | Another feature is that it makes the system more |
| 16:29:22 | 3 | adaptable.  And, in particular, the claims are worried about |
| 16:29:24 | 4 | adaptation to things like network quality.  Again, what is the |
| 16:29:28 | 5 | bandwidth, what level of traffic is your device currently able |
| 16:29:33 | 6 | to handle according to the network, and it also relates to -- |
| 16:29:37 | 7 | to adaptability of device capabilities. |
| 16:29:40 | 8 | There's flexibility.  So because we don't have to set |
| 16:29:43 | 9 | up any sort of end connection before the transmission starts, I |
| 16:29:47 | 10 | can -- someone can start a live video and people can join in to |
| 16:29:51 | 11 | that live video even if it's already started as long as it's |
| 16:29:56 | 12 | still going. |
| 16:29:56 | 13 | And then, finally, the time-shifted nature means |
| 16:29:59 | 14 | people can, you know, join or at least watch the video or hear |
| 16:30:04 | 15 | the audio even after it's done, right?  So after it's done, |
| 16:30:09 | 16 | it's saved, and it can be accessible to users after the fact. |
| 16:30:13 | 17 | Q.   Okay.  Thank you. |
| 16:30:15 | 18 | Turning towards Voxer's asserted claims of its |
| 16:30:20 | 19 | patents, let's begin with the '270 asserted claims.  How are |
| 16:30:25 | 20 | the hallmarks of Voxer's technology reflected in its patent |
| 16:30:32 | 21 | claims? |
| 16:30:33 | 22 | A.   And, again, we'll be going through this in more detail, |
| 16:30:36 | 23 | but I wanted to, sort of as a starting point, show that these |
| 16:30:39 | 24 | hallmarks are related to the claim language of various claims. |
| 16:30:43 | 25 | So in particular for the '270, there are aspects that |

16:30:46  1  you can see, you know, related to real-time media.  So it talks

16:30:51  2  here about being able to -- you know, people on the receiving

16:30:54  3  side receiving the data while it's still being sent by the

16:30:58  4  sender side.  That deals with the real-time media.

16:31:01  5       You know, no end-to-end connection.  Again, there's

16:31:05  6  part of the claim language that specifically talks about having

16:31:08  7  no end-to-end connection.  Ascertaining location, there's

16:31:12  8  language related in this case specifically to ascertaining

16:31:16  9  locations, and so on.

16:31:19  10 Q.  Let's turn to the '557 patents.  How are Voxer's hallmarks

16:31:26  11 reflected in the asserted claims of the '557 patents?

16:31:31  12 A.  And, again, this is more just an overview slide to show

16:31:34  13 that these sorts of hallmarks exist in the claims.  Again, we

16:31:41  14 see real-time media so that the rendering, that is, the showing

16:31:46  15 of the video, occurs while the message, if you look at number

16:31:52  16 one down there, the message is being created and transmitted.

16:31:56  17 So that's an example of real time.  There are claim elements

16:31:59  18 that use the exact phrasing of real time.

16:32:00  19      No end-to-end connection, again, in the number down

16:32:04  20 at the bottom, again, it specifically says "without having to

16:32:07  21 establish an end-to-end connection," and so on for other

16:32:10  22 aspects of the claim language.

16:32:12  23 Q.  Now, the '557 patent, the claims refer to a video message

16:32:19  24 service infrastructure and to video messages.  What is your

16:32:22  25 understanding of that term?

16:32:23  1   A.   Right.  So we saw an earlier testimony that the patent

16:32:29  2   itself discusses what a message is.  You know, it's an

16:32:32  3   individual unit of communication from one user to another.  It

16:32:36  4   talks about, you know, the ability to have this notion of,

16:32:39  5   like, conversations and so on.

16:32:41  6         So when we talk about a video message service

16:32:43  7   infrastructure, again, this is talking about an infrastructure

16:32:49  8   that allows the passing of video messages.  But it's not just

16:32:54  9   like -- you know, it's not, for instance, like the broadcast TV

16:32:57  10  that you get on your television set.  The idea is that this

16:33:01  11  goes beyond that, and that's reflected in the "phrase video

16:33:04  12  message" and, in particular, "video message service

16:33:07  13  infrastructure."  That at least allows, architecturally, you

16:33:14  14  know, for this sort of interactivity or users to send from one

16:33:16  15  to another.

16:33:17  16  Q.   And have you included a definition of the term "message"

16:33:20  17  here, and where is that from?

16:33:23  18  A.   Right.  As we saw earlier, this is, you know, "message" is

16:33:26  19  explicitly described or defined in the '557 patent as an

16:33:32  20  individual unit of communication from one user to another.

16:33:36  21  Q.   Let's turn to the Facebook products at issue in this case.

16:33:47  22  What Facebook products did you evaluate with regard to

16:33:50  23  infringement of the two Voxer patents?

16:33:52  24  A.   We will be discussing Facebook Live and Instagram Live.

16:33:55  25  Q.   What is Facebook Live?

16:33:57  1   A.   So Facebook Live is, you know, a part of the larger

16:34:04  2   Facebook social network.  Facebook Live in particular refers to

16:34:08  3   the technology that they use to do live streaming.  So Facebook

16:34:13  4   Live allows user to, again, record themselves on their devices

16:34:18  5   and make it available as a live stream to other users.

16:34:23  6   Q.   What devices does Facebook Live work on?

16:34:27  7   A.   Facebook Live works on a variety of devices.  It works on

16:34:32  8   iOS devices, in particular, iPhones.  It works on Android

16:34:37  9   devices, in particular, Android phones.  You know, it also

16:34:40  10  works -- you can, you know, watch videos off the Facebook

16:34:45  11  Live -- or sorry -- off of Facebook web page.  And, similarly,

16:34:49  12  you can construct videos even off the Facebook -- a Facebook

16:34:55  13  web page.

16:34:55  14  Q.   And what is Instagram Live?

16:34:58  15  A.   So Instagram Live, you know, this is a product, you know,

16:35:05  16  similar to a social network.  It's meant to share messages and,

16:35:09  17  in particular, videos on the live version or aspect.  There are

16:35:15  18  aspects of it that are very much similar to the Facebook

16:35:18  19  product, but there are also differences.

16:35:21  20       For the most part, they are very similar with regard

16:35:27  21  to many of the infringement issues I'll discuss, including

16:35:29  22  their architecture, which is a shared architecture.  But there

16:35:37  23  are some differences in things like the user interface, like

16:35:38  24  what the user can do or how the user sets things up or what's

16:35:41  25  available to them.  And I'll discuss those, you know,

16:35:45    1    particular differences when they're relevant to the

16:35:48    2    infringement discussion.

16:35:50    3    Q.    And on which particular devices is Instagram Live

16:35:53    4    available?

16:35:54    5    A.    Okay.   Instagram Live would be available on, you know,

16:35:59    6    your iOS devices, iOS phones, Android devices, Android phones.

16:36:06    7    You can also watch, like, Instagram Live videos on the web, but

16:36:11    8    the Instagram web page isn't set up so that you can create

16:36:15    9    videos.

16:36:20   10    Q.    Now, have you prepared a demonstrative of the end user

16:36:23   11    experience for Facebook Live?

16:36:24   12    A.    Yeah.   Before we get into the claims, I think it's very

16:36:28   13    useful to have an understanding of how the products work with

16:36:33   14    regard to, you know, the Facebook Live, in particular, how it

16:36:38   15    relates to much of the discussion we'll have about the claims.

16:36:41   16    So I just want to present a bit about the user interface so

16:36:46   17    that you have an idea of what that interaction looks like from

16:36:49   18    the point of view, in particular, of a sender.

16:36:55   19    Q.    Great.   You said from the perspective of a sender.   What

16:36:59   20    does that refer to in this slide?

16:37:01   21    A.    Right.   So a sender is someone who is going to create and

16:37:04   22    post a video.   And so maybe we can just start, but where that

16:37:08   23    starts, you know, a user on Facebook has something called a

16:37:13   24    "feed," right?   And a feed is where, you know, the information

16:37:18   25    Facebook has for you is posted, so you'll see users can post,

16:37:23  1  like, like little snippet stories, they can post videos, they

16:37:27  2  can post pictures.  You know, Facebook's ads that they put onto

16:37:35  3  the system show up on the feed and so on.  So the feed is sort

16:37:38  4  of like your starting point where, as a user, you sort of see

16:37:42  5  what Facebook is giving you.

16:37:47  6  Q.   And if you want to start a Facebook Live transmission,

16:37:50  7  where do you go from the news feed?

16:37:54  8  A.   Right, from feed you can say, well, I want to start a

16:37:56  9  post.  I want to create something I can distribute onto

16:38:00  10  Facebook.  And, again, there are different types of posts you

16:38:03  11  could put.  You could put up things like photos and so on.  But

16:38:07  12  one of the things that you can create when you do a post is a

16:38:11  13  live video.  And if you look at the user interface, I'm just

16:38:15  14  speaking of user interfaces.  I'm just going to try this right

16:38:20  15  there.  You can see the live video on the user interface.

16:38:28  16  Q.   Now, how does a Facebook user decide who is going to get

16:38:32  17  their video -- their live video?

16:38:34  18  A.   Okay.  So part of the user interface in Facebook Live is

16:38:38  19  that you can choose the audience, right?  So you can say who is

16:38:42  20  going to be the audience of, in particular, this video that I'm

16:38:46  21  creating.  So there are variety of choices that you can have.

16:38:51  22          So you can send it to -- or you can -- yeah.  You can

16:38:55  23  send it to your friends, right?  So your friends -- so friends

16:39:00  24  are something that you set up on Facebook.  You can say, oh,

16:39:06  25  I'm going to connect with someone.  I'm going to list them as

16:39:08   1   one of my friends, right?  That's sort of a special grouping

16:39:11   2   that Facebook has available.

16:39:15   3          But maybe you don't want to send a video you're

16:39:18   4   creating to all your friends, right?  Maybe this isn't a video

16:39:22   5   I want to share with everyone, just with some people.  So you

16:39:25   6   can also share it with specific friends.  That's one of the

16:39:29   7   options.  There's one for "friends except," right?  So you can

16:39:32   8   say I'm going to take off some of my friends.  You know, I

16:39:36   9   don't want this -- my mom to see this video or something like

16:39:40  10   that.

16:39:41  11          You know, there's also an option to send it to

16:39:44  12   public, which just sort of means that it's available

16:39:48  13   essentially to all of Facebook, and through various ways, might

16:39:54  14   even be accessible to people off of Facebook.

16:39:56  15          You can see there is lists.  You can create other --

16:39:59  16   other lists of possible people you want to send to.  You can

16:40:03  17   sort of construct your own list.  There are other parts of the

16:40:06  18   interface that may let you also share it to specific pages or

16:40:11  19   groups.  There are certain groups you can send it to as well.

16:40:16  20   Q.   And what happens after this selection is made?

16:40:19  21   A.   All right.  So you can go to -- you know, after you've

16:40:23  22   decided who you might send it to, it will show you a screen

16:40:26  23   where it's ready to -- you know, where you're ready to record.

16:40:31  24   So you would hit this recording button by hitting "go live,"

16:40:36  25   and then your device will start recording and start shipping

16:40:40  1    the video out to others or, in particular, to the Facebook

16:40:45  2    system to distribute to others.

16:40:47  3    Q.    How does a stream end?

16:40:49  4    A.    So, well, this I think actually shows the streaming.  This

16:40:56  5    is very boring video, I think.  Sorry can you go back one.

16:41:01  6    This is very boring video of a pen.  But, you know, there are

16:41:05  7    various ways that you can introduce or get interactivity

16:41:09  8    through the Facebook system.  One of them you can see at the

16:41:12  9    bottom, it says "comments will appear here."  One of the ways

16:41:16  10   that you can have interactivity is that people can comment on

16:41:20  11   your video, and you'll see those comments.

16:41:22  12            So, again, it's a system that allows, because you're

16:41:28  13   going in real time, you can comment on things as they are

16:41:32  14   happening or you could comment later after it's already

16:41:36  15   finished.

16:41:37  16   Q.    And I jumped ahead a little.  My apologies.  And what

16:41:44  17   happens when a stream ends?

16:41:45  18   A.    So once you end the stream, you can push a button and say,

16:41:48  19   like, I'm done and end the stream.  You know, your broadcast

16:41:52  20   ends, and you have the option to, you know, post the stream

16:41:57  21   itself, that is, you can convert and say, okay, I want the

16:42:00  22   stream to be saved and made available to people later.

16:42:05  23            So this is -- you know, there are different

16:42:08  24   terminology for it.  In Facebook they call it for instance a

16:42:12  25   "was live video."  So the idea is that it was a live video, now

16:42:17    1    it's not.  So it's "was live."  These are also sometimes called

16:42:21    2    video-on-demand type videos.  Someone can come ask for them

16:42:26    3    later.  So you have the ability to say, okay, I would like this

16:42:29    4    to made available to people later.

16:42:32    5    Q.   And where are "was live" videos made available to users?

16:42:37    6    A.   Right.  So they're stored within the Facebook system, and

16:42:42    7    users can -- again, they may see them on their feed.  There are

16:42:46    8    variety of ways they can access them.  They could say, oh, let

16:42:50    9    me find recent videos from this user.  There are a variety of

16:42:53   10    interfaces that they might use on Facebook to find that video.

16:42:57   11    Q.   Now, we've focused so far on the sender's perspective for

16:43:02   12    Facebook Live.  I'd like to turn with you to the recipient's

16:43:06   13    perspective.  What does Facebook Live look like from a

16:43:10   14    recipient's point of view?

16:43:13   15    A.   So, again, one of the ways that you can -- you know, that

16:43:16   16    a recipient will see a live video is it can show up in their

16:43:21   17    feed.  So some videos that they may start to play the first few

16:43:26   18    seconds automatically so that you can see what they're doing.

16:43:29   19    Others may just say, you know, here's this live video.

16:43:33   20         Again, there are other ways to access live videos

16:43:36   21    besides the feed.  You know, there are pages that have live

16:43:39   22    videos or groups and so on.  I'll focus on feed because that's

16:43:43   23    one of the most natural interactions in Facebook.  But you may

16:43:48   24    see, you know, there's a live video on your feed and then you

16:43:51   25    say, okay, yeah, let's watch.  And so you, you know, click or

16:43:55   1   just push on the screen and then the video will appear.

16:44:00   2           And then, as the video appears, the video will be on

16:44:04   3   or while it's going on, you can see here also you can write a

16:44:09   4   comment, you'll see some of the comments that are going on.

16:44:12   5   Again, it provides this the, sort of, interactivity.

16:44:20   6   Q.   Thank you.  Let's turn over to Instagram Live, and let's

16:44:25   7   start again from the sender's perspective of sending Instagram

16:44:28   8   Live video.  What's shown here?

16:44:33   9   A.   So there's a similar set of shots that I have, again,

16:44:37  10   showing the user interface.  And, again, this is a place where

16:44:43  11   I can show some of the similarities and the differences in

16:44:47  12   terms of the user interface.  But, at a high level, it works in

16:44:51  13   a very similar fashion.

16:44:53  14           So, in particular, for Instagram, again, users have a

16:44:56  15   feed, and feeds contain, you know, what they call stories or,

16:45:01  16   again, we might also call posts.  You know, those are things

16:45:05  17   that your friends or people that you follow are showing on

16:45:11  18   Instagram.

16:45:13  19   Q.   Can an Instagram user also specify who is going to get the

16:45:17  20   live video?

16:45:18  21   A.   Yeah.  There are multiple, different ways -- and I'll

16:45:23  22   discuss this in more depth again as we go forward -- of

16:45:27  23   Instagram being able to determine who will -- who can see the

16:45:31  24   video.  So one of the ways is there is a privacy setting.  So

16:45:38  25   you can choose the privacy setting for your account.  The

MITZENMACHER - DIRECT

16:45:42  1  privacy setting here is just to make it either private or

16:45:44  2  public.

16:45:45  3          So if you make it a private account, that means that

16:45:48  4  only the people who are following you, that is, like only the

16:45:52  5  people who you're connected to, will be able to see the things

16:45:56  6  that you post or, in particular, the video -- the live videos

16:46:00  7  that you post.

16:46:02  8          You can also say, no, I don't need this to be

16:46:06  9  private.  I'm happy to have my account be public.  And then,

16:46:09  10  you know, essentially, any Instagram user has access to your

16:46:14  11  videos.

16:46:15  12  Q.  And on the option of sending to followers, does a user

16:46:19  13  have control over his or her followers?

16:46:22  14  A.  Yes.  A user would have control over his or her followers.

16:46:27  15  So, for instance, you would have to accept someone to have them

16:46:28  16  be one of your followers.  You can also block followers in

16:46:33  17  various ways through the user interface.

16:46:35  18  Q.  And who receives the Instagram Live video if the sender's

16:46:39  19  account is set to public?

16:46:41  20  A.  Anyone will receive it.

16:46:47  21  Q.  How does a user then start an Instagram Live video?

16:46:51  22  A.  So, again, there's a part of the user interface you can go

16:46:58  23  to, and you see down here on the bottom, again, you're creating

16:47:01  24  a new story, and you can set it to live.  And then the little

16:47:07  25  button there on the bottom, you hit the button and then you're

16:47:09   1   starting your live video.  And, again, this is a very boring

16:47:12   2   video of a pen, you know, but that would be something that you

16:47:16   3   could record and start sending out to people.

16:47:20   4   Q.   Okay.  And what happens when you select this live option?

16:47:23   5   A.   Again, it just starts recording and sending out.  And you

16:47:27   6   can see here in the interface there's both various ways that

16:47:33   7   you can see a notification happening and various ways that, you

16:47:39   8   know, you can see interaction happening.

16:47:42   9          So one of the -- you know, you see here the interface

16:47:46   10  on the bottom, it says we're telling you followers that you're

16:47:49   11  starting a live video, and so your followers would be informed

16:47:53   12  of your live video.  Again, very similar to Facebook, there's

16:47:59   13  the ability to do comments.  So you can have comments back and

16:48:03   14  forth.

16:48:03   15         You know, there's also an option here -- and there's,

16:48:07   16  again, sort of similar things or ideas in Facebook.  But, you

16:48:14   17  know, in particular here, you can add a guest to be in your

16:48:17   18  live video.  So you can -- what that does is, if you set

16:48:22   19  someone up to be a guest, it actually shows the two of you

16:48:25   20  together or both of your videos.

16:48:28   21  Q.   Thank you.  And I see a triangle icon in the lower, right.

16:48:32   22  What does that button do?

16:48:34   23  A.   Oh, okay.  So, yeah, if you look at the very lower right,

16:48:39   24  I could -- let me see if I can use my other toy here.  Right

16:48:45   25  down there at the bottom there, there is a pair of triangles.

16:48:51   1   I think it's actually supposed to be a paper airplane from what

16:48:55   2   I understand.  So this is called Direct Messaging.  So you can

16:49:02   3   specifically say, like, I want a notification sent to some of

16:49:07   4   my followers, you know, because I really want them to know that

16:49:11   5   this video is there or I want to encourage them to hop on this

16:49:15   6   video.

16:49:15   7   Q.   Could you please explain how Instagram Direct Messaging

16:49:20   8   operates?

16:49:21   9   A.   So when a direct message comes up, you know, you would get

16:49:25  10   a list of your followers and you can sort of pick out one or

16:49:28  11   more of them that you want, say, notify, and they'll receive a

16:49:34  12   notification saying, like, yep, okay, this person is sending a

16:49:36  13   video.

16:49:37  14   Q.   Okay.  Once a sender is done sending a live video in

16:49:41  15   Instagram, what happens from there?

16:49:42  16   A.   So, once again, you can end the video, and once the video

16:49:46  17   ends, you have an option to -- to share it, to make it

16:49:51  18   available later.  So, once again, in that case it would be

16:49:59  19   saved in its final form in a way so that people can access it

16:50:02  20   later.  So it turns it into a video on demand.

16:50:06  21   Q.   Thank you.  And, briefly, can you take us through the

16:50:14  22   recipient's perspective of someone receiving an Instagram Live

16:50:18  23   video?  Can you take us through that perspective?

16:50:21  24   A.   Yeah.  Again, you would see it either in your feed or

16:50:24  25   through some form of notification.  You would accept or

16:50:27  1  click -- you know, push something and say, yep, I'll see the

16:50:30  2  video and it will pop up on your screen.  And, again, you can

16:50:34  3  then see the video, and there are various ways of interacting.

16:50:38  4  You can comment.  Instagram has this notion of badges, so like

16:50:48  5  you send people badges that you've bought.  And that I think is

16:50:51  6  one of their newer systems for arranging for people who are

16:50:55  7  creating live videos to essentially be remunerated.

16:50:59  8  Q.    And, to confirm, Instagram Live videos, can they be

16:51:02  9  received in the feed?

16:51:04  10  A.    Yes.  One of the ways that you would get them is they

16:51:07  11  would show up in your feed, like, here's a live video.

16:51:10  12  Q.    And for the clarity of the record, is the feed also

16:51:13  13  referred to as the "news feed" in both Facebook and Instagram?

16:51:17  14  A.    Yes.  At least at times that's what it's referred to.

16:51:20  15  Q.    Now, we've been focusing on the user's perspective for

16:51:23  16  Facebook Live and Instagram Live.  I'd like to move under the

16:51:27  17  hood, so to speak.  Are these two systems, are they implemented

16:51:31  18  using different systems?

16:51:33  19  A.    No.  They share the same fundamental architecture.

16:51:38  20  There's a few places where my understanding is they use, you

16:51:42  21  know, different servers for some tasks.  Like if they're

16:51:45  22  keeping track of, you know, who you've identified to watch the

16:51:51  23  video, that those might be kept in different machines.  But

16:51:55  24  this part that I'm showing, like the underlying architectural,

16:51:58  25  the step-by-step, they really share the same architecture and

| | | |
|---|---|---|
| 16:52:03 | 1 | they work and function in the same way. |
| 16:52:05 | 2 | Q.   Okay.  And what is the diagram? |
| 16:52:10 | 3 | A.   So this is a diagram from one of the Facebook documents |
| 16:52:16 | 4 | that I examined in the course of the case.  This is their -- |
| 16:52:20 | 5 | you know, a description of what they call the media-streaming |
| 16:52:24 | 6 | pipeline.  And it sort of shows the steps, shows the framework, |
| 16:52:29 | 7 | that's being used, you know, what I would call a description of |
| 16:52:32 | 8 | the architecture, that's used to manage and process videos. |
| 16:52:38 | 9 | Q.   And, for the record, this diagram is from Exhibit P-14. |
| 16:52:43 | 10 |      Did you create this diagram? |
| 16:52:45 | 11 | A.   No.  To be clear, again, this came from a Facebook |
| 16:52:49 | 12 | document, and I'm just using it to help in my explanation. |
| 16:52:56 | 13 | Q.   Can you please walk the jury through what happens under |
| 16:52:59 | 14 | the hood when a user starts to record a Facebook or Instagram |
| 16:53:03 | 15 | live video? |
| 16:53:04 | 16 | A.   Sure.  So in -- in this picture, in this slide, things |
| 16:53:10 | 17 | start with the client.  Okay.  So the client is all the way on |
| 16:53:14 | 18 | the left over there.  So the client -- where it says the client |
| 16:53:19 | 19 | here, that's the device that's creating the video.  So you can |
| 16:53:23 | 20 | think of that as like that's my phone, and I'm starting to |
| 16:53:27 | 21 | record myself.  That would be the client. |
| 16:53:31 | 22 | Q.   Okay.  What happens next in the flow from sender to |
| 16:53:35 | 23 | recipient? |
| 16:53:35 | 24 | A.   Okay.  So from the client it goes to the intake system of |
| 16:53:42 | 25 | Facebook.  So the first thing it has to do is Facebook has to |

16:53:45   1   essentially have some sort of intake process for the video.

16:53:49   2   That happens at -- they call that part of the system right

16:53:52   3   there "EdgeTee."  So you can see we have the arrow going from

16:53:57   4   client to the EdgeTee.  The A, slash, V my understanding is

16:54:00   5   that stands for audio/video.

16:54:03   6            There's some stuff underneath here, FBVP and RTMP.

16:54:10   7   Those refer to what are called network protocols.  So that's

16:54:15   8   sort of the, you know, network language or the network system,

16:54:21   9   you know, how to format the data so that you can send it from

16:54:25  10   one to the other over the network.

16:54:27  11            FBVP should be sort of the Facebook Video Protocol.

16:54:35  12   That's something that they developed inside -- inside Facebook,

16:54:40  13   and, you know, someone will correct me or my lawyer will

16:54:43  14   correct me if I mess up an acronym.  There are so many acronyms

16:54:49  15   in the case.  But Facebook Video Protocol.  RTMP is Real-time

16:54:53  16   Messaging Protocol.  These are both protocols that are used to

16:54:57  17   transfer information from the client to the EdgeTee.

16:55:00  18   Q.   What is a protocol in this situation?  What does that

16:55:03  19   mean?

16:55:03  20   A.   Yeah.  So you can think of a protocol as sort of rules or

16:55:07  21   a language that is used to encode information so that both

16:55:11  22   sides sort of know what they're getting, so they know what the

16:55:15  23   setup is.

16:55:15  24   Q.   Okay.  And what happens in the next step of sending a

16:55:19  25   Facebook Live or Instagram Live video?

MITZENMACHER - DIRECT                                    244

```
16:55:22   1  A.    Okay.   So EdgeTee goes to what they've marked here as
16:55:29   2  FBLS.   That's the Facebook Live service or I also will refer to
16:55:35   3  as Facebook Live servers.   So this is like, you know, sort of
16:55:39   4  the meat of where the Facebook processing, I guess, happens.
16:55:46   5  Like, after the intake stage, this is where they start to
16:55:50   6  manage and process the video and get it ready for consumption
16:55:54   7  for the people on the other side.
16:55:57   8  Q.    Okay.   And what happens next in this flow?
16:56:02   9  A.    All right.   So one of the things the Facebook Live servers
16:56:07  10  do, or the Facebook Live service does, is send things over to
16:56:11  11  up here we see something called the encoding service.   Okay.
16:56:14  12  So the Facebook will get the video in some sort of format,
16:56:18  13  whatever format you set it up.   Facebook wants to have it in
16:56:22  14  its own formats, or, in particular, it wants to, you, know have
16:56:27  15  some sort of standard format.
16:56:29  16        And it also, as we've talked about or will come into
16:56:33  17  issue with the claims, it will want to create different
16:56:37  18  versions of the video, these sort of multiple versions designed
16:56:42  19  for different possible devices on different network conditions
16:56:45  20  or different network settings.
16:56:47  21        So this is called the encoding service.   That process
16:56:50  22  is, again, called transcoding.   And, you know, so Facebook
16:56:54  23  takes it and puts it into, you know, these variety of formats.
16:57:00  24  Q.    And what happens next?
16:57:03  25  A.    Right.   So after the encoding stage, the encoded videos
```

16:57:12   1   are sent to what over here we see is called CDN.  That stands

16:57:17   2   for content delivery network.  So a content delivery network is

16:57:24   3   generally a large collection of servers that's designed

16:57:28   4   specifically for the task of getting the video to the end

16:57:31   5   users.  So it handles the task of connecting to the end users

16:57:37   6   who are going to get the video.

16:57:38   7           And, you know, as part of this sort of process,

16:57:41   8   somewhere in here you can see also down here on the bottom, you

16:57:45   9   know, these videos will get stored.  So down here it says "oil

16:57:54  10   cache."  The particular thing when you see one of these

16:57:57  11   cylinder type things in an architecture diagram, the standard

16:58:01  12   for that is that means storage.  A cylinder is used to mean

16:58:05  13   storage.  So that's memory.  That's somewhere where things are

16:58:08  14   going to be stored.

16:58:09  15   Q.   And to wrap up this flow, what is the final step in

16:58:13  16   sending to this player?

16:58:15  17   A.   Right.  So we see here selected video encoding, and that's

16:58:19  18   going to go to, you know, the other side, which is called the

16:58:23  19   player.  It's called the player in this slide.

16:58:27  20           And there's two more things I want to quickly add.

16:58:30  21   First of all, I want to apologize.  At times I'll also talk

16:58:32  22   about "client," and it's, like, the client usually refers or

16:58:38  23   often refers to, you know, sort of the program on your phone.

16:58:41  24   It's also called an application.  So here it says player.

16:58:45  25   Sometimes I might use "client" to mean, yeah, and I'm meaning

| | | |
|---|---|---|
| 16:58:49 | 1 | the player.  That's also a client. |
| 16:58:51 | 2 | The other thing I guess I want to point out is down |
| 16:58:54 | 3 | here again we see another protocol that's used.  That's called |
| 16:58:59 | 4 | DASH.  DASH stands for dynamic adaptive streaming over HTTP. |
| 16:59:06 | 5 | Okay.  So that's another protocol that's used in particular to |
| 16:59:11 | 6 | send information, and frequently for streaming video |
| 16:59:15 | 7 | information, in order to get video information to users in a |
| 16:59:20 | 8 | timely and effective fashion.  So that will also come up later |
| 16:59:24 | 9 | in our discussions. |
| 16:59:25 | 10 | Q.   So just the player here refers to what? |
| 16:59:30 | 11 | A.   Right.  The player here refers to the device that's going |
| 16:59:33 | 12 | to play the video, the end user of it wanting to watch. |
| 16:59:37 | 13 | MR. STAKE:  And I'm mindful of the hour.  This would |
| 16:59:41 | 14 | be a good place to pick up tomorrow, I believe. |
| 16:59:44 | 15 | THE COURT:  It appears that way.  Ladies and |
| 16:59:45 | 16 | gentlemen, we'll take our evening recess at this time.  Please |
| 16:59:48 | 17 | remember the instructions the court has previously given you: |
| 16:59:52 | 18 | Do not talk about this case among yourselves or with |
| 16:59:55 | 19 | anyone else.  Do not read any publications that may contain any |
| 17:00:01 | 20 | information about this case.  Do not listen to or observe any |
| 17:00:03 | 21 | radio or television news broadcasts that may have information |
| 17:00:06 | 22 | about this case.  Do not attempt to find out anything about any |
| 17:00:10 | 23 | of the parties or the issues or anything about this case |
| 17:00:13 | 24 | through the means of any electronic device, and do not transmit |
| 17:00:18 | 25 | any information about this case to anyone through any |

17:00:21   1   electronic device.

17:00:22   2          Please drive carefully.  Be back in your jury room a

17:00:25   3   little bit before nine o'clock.

17:00:59   4      (Jury recessed)

17:00:59   5          THE COURT:  Everybody good for the evening?

17:01:06   6          MR. VAN NEST:  Your Honor?

17:01:06   7          THE COURT:  I knew it was too good to be true.

17:01:11   8          MR. VAN NEST:  Your Honor, following up on our

17:01:13   9   discussion earlier about Dr. Mitzenmacher, we'd like leave to

17:01:17  10   file a bench brief concerning prosecution waiver, IPR waiver,

17:01:26  11   estoppel.  They should be estopped from asserting positions

17:01:31  12   inconsistent with that what they asserted in the IPR.

17:01:37  13          THE COURT:  Has the plaintiff had an opportunity to

17:01:40  14   see the --

17:01:40  15          MR. VAN NEST:  No.

17:01:40  16          THE COURT:  All right.  Then what I would like for

17:01:42  17   you to do is hang on to it.  When can you give them a copy, and

17:01:47  18   when can you have a response to that?

17:01:49  19          MR. POWELL:  Two days, Your Honor, I believe.

17:01:57  20          THE COURT:  Yeah.  I'd like to get something by the

17:02:00  21   close of business tomorrow.  It may involve needing to call the

17:02:04  22   witness back.  But if I'm going to get things during the middle

17:02:07  23   of trial, I'm not going to take them home and do them tonight.

17:02:14  24          MR. POWELL:  And, Your Honor, we only saw this

17:02:14  25   argument a couple of days ago, and so we aren't even sure of

17:02:16   1   the exact argument that's going to be made.

17:02:18   2          THE COURT:  Well, take a look at it.  We'll take it

17:02:20   3   up before I bring the jury back in the morning and talk about

17:02:23   4   it a little bit.

17:02:23   5          MR. VAN NEST:  Thank you, Your Honor.

17:02:24   6          All right.  We done now?

17:02:28   7          MR. STAKE:  Yes, Your Honor.

17:02:30   8          THE COURT:  What?

17:02:31   9          MR. STONE:  We're done.

17:02:33   10          MR. VAN NEST:  And we are as well.

17:02:34   11          THE COURT:  All right.  We'll be in recess until

17:02:36   12   nine o'clock.

18:00:00   13          (End of transcript)

14

15

16

17

18

19

20

21

22

23

24

25

1   **UNITED STATES DISTRICT COURT       )**

2   **WESTERN DISTRICT OF TEXAS          )**

3       I, Arlinda Rodriguez, Official Court Reporter, United

4   States District Court, Western District of Texas, do certify

5   that the foregoing is a correct transcript from the record of

6   proceedings in the above-entitled matter.

7       I certify that the transcript fees and format comply with

8   those prescribed by the Court and Judicial Conference of the

9   United States.

10      WITNESS MY OFFICIAL HAND this the 18th day of

11  September 2022.

12

13                                  /S/ Arlinda Rodriguez
                                    Arlinda Rodriguez, Texas CSR 7753
14                                  Expiration Date:  10/31/2023
                                    Official Court Reporter
15                                  United States District Court
                                    Austin Division
16                                  501 West 5th Street, Suite 4152
                                    Austin, Texas 78701
17                                  (512) 391-8791

18

19

20

21

22

23

24

25