```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3  VOXER, INC. and VOXER IP LLC,        ) AU:20-CV-00655-LY
                                         )
 4      Plaintiffs,                      )
                                         )
 5  v.                                   ) AUSTIN, TEXAS
                                         )
 6  META PLATFORMS, INC., f/k/a          )
    FACEBOOK, INC., and INSTAGRAM LLC,   )
 7                                       )
        Defendants.                      ) SEPTEMBER 20, 2022
 8

 9         ***********************************************
                    TRANSCRIPT OF JURY TRIAL
10                         VOLUME 7
                  BEFORE THE HONORABLE LEE YEAKEL
11         ***********************************************

12  APPEARANCES:

13  FOR THE PLAINTIFFS:  G. BLAKE THOMPSON
                         MANN TINDEL THOMPSON
14                       201 E. HOWARD STREET
                         HENDERSON, TEXAS 75654
15
                         MICHAEL D. POWELL
16                       SAM STAKE
                         CHRISTINE WEIJIA CHEN
17                       OGNJEN ZIVOJNOVIC
                         QUINN EMANUEL URQUHART & SULLIVAN LLP
18                       50 CALIFORNIA STREET, 22ND FLOOR
                         SAN FRANCISCO, CALIFORNIA 94111
19
                         ROBERT W. STONE
20                       QUINN EMANUEL URQUHART & SULLIVAN LLP
                         555 TWIN DOLPHIN DRIVE, 5TH FLOOR
21                       REDWOOD SHORES, CALIFORNIA 94065

22                       GAVIN SNYDER
                         QUINN EMANUEL URQUHART & SULLIVAN LLP
23                       1109 FIRST AVENUE, SUITE 210
                         SEATTLE, WASHINGTON 98101
24

25
```

```
 1  FOR THE DEFENDANTS:   MICHAEL E. JONES
                          SHAUN WILLIAM HASSETT
 2                        POTTER MINTON PC
                          110 NORTH COLLEGE, SUITE 500
 3                        TYLER, TEXAS 75702

 4                        ROBERT A. VAN NEST
                          CHRISTA M. ANDERSON
 5                        DAVID J. SILBERT
                          EUGENE M. PAIGE
 6                        PUJA V. PARIKH
                          PAVEN MALHOTRA
 7                        JASON S. GEORGE
                          SEAN M. ARENSON
 8                        VISHESH NARAYEN
                          KEKER, VAN NEST & PETERS LLP
 9                        633 BATTERY STREET
                          SAN FRANCISCO, CALIFORNIA 94111-1809
10
                          BLAINE H. EVANSON
11                        GIBSON, DUNN & CRUTCHER LLP
                          3161 MICHELSON DRIVE
12                        IRVINE, CALIFORNIA 92612

13  COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
                          501 WEST 5TH STREET, SUITE 4152
14                        AUSTIN, TEXAS 78701
                          (512) 391-8791
15

16

17

18

19

20

21

22

23

24  Proceedings recorded by computerized stenography, transcript

25  produced by computer.
```

1                            **INDEX**

                                                     PAGE
2   COURT'S CHARGE . . . . . . . . . . . . . . . . . . . .  57

3   PLAINTIFF'S CLOSING  . . . . . . . . . . . . . . . . .  91

4   DEFENDANT'S CLOSING  . . . . . . . . . . . . . . . . .  113

5   PLAINTIFF'S REBUTTAL . . . . . . . . . . . . . . . . .  150

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:36:44 | 1 | (Open court, no jury) |
| 09:36:44 | 2 | THE COURT:  The record will reflect that the jury is |
| 09:36:47 | 3 | not present in the courtroom.  We have a couple of matters to |
| 09:36:51 | 4 | do before we bring the jury back this afternoon. |
| 09:36:55 | 5 | I think that order of play will be I'll take up the |
| 09:37:01 | 6 | Rule 50(b) motions first.  After ruling on those, we'll see |
| 09:37:06 | 7 | where we are and then consider the jury charge.  Does that work |
| 09:37:13 | 8 | for everybody else? |
| 09:37:15 | 9 | MR. STONE:  Yes, Your Honor. |
| 09:37:17 | 10 | MR. SILBERT:  Yes, Your Honor. |
| 09:37:17 | 11 | THE COURT:  All right.  Then I will take up the |
| 09:37:30 | 12 | defendant's motion first.  Ms. Anderson? |
| 09:37:41 | 13 | MS. ANDERSON:  Good morning, Your Honor. |
| 09:37:43 | 14 | Christa Anderson for Meta. |
| 09:37:45 | 15 | Your Honor, we submitted to the Court a written |
| 09:37:48 | 16 | Rule 50 motion on many issues in this case, and that should be |
| 09:37:52 | 17 | with Your Honor.  The only -- |
| 09:37:54 | 18 | THE COURT:  I'll bet, had I just done this orally |
| 09:37:57 | 19 | earlier in the week, I wouldn't have gotten 20 pages. |
| 09:38:03 | 20 | MS. ANDERSON:  Well, you know, more fun, Your Honor. |
| 09:38:06 | 21 | The only item that we would request brief oral |
| 09:38:09 | 22 | argument with the Court on is the issue of willfulness, and |
| 09:38:14 | 23 | that's because the issue would affect the verdict form, |
| 09:38:17 | 24 | Your Honor.  The rest we would submit on the papers to the |
| 09:38:19 | 25 | Court. |

09:38:19  1          THE COURT:  All right.

09:38:21  2          MS. ANDERSON:  All right.  Your Honor, with respect

09:38:22  3  to Rule 50 and willfulness, the defendants submit this motion

09:38:29  4  to the Court for judgment as a matter of law on willfulness.

09:38:32  5          There are two things required for a finding of

09:38:34  6  willfulness: knowledge of the patents-in-suit and a specific

09:38:39  7  intent to infringe those patents at the time of the challenged

09:38:45  8  conduct, such as in situation where you have an accusation of

09:38:48  9  infringement of the actual patents-in-suit.  Neither of those

09:38:53  10  two elements are present in this case.  They have not been

09:38:56  11  proven.

09:38:57  12          First, as to the knowledge of patents, we know from

09:38:59  13  Federal Circuit precedent that knowledge of the patent alleged

09:39:02  14  to be willfully infringed is a prerequisite to enhanced

09:39:06  15  damages.  That's the *WBIP* case from 2016.

09:39:11  16          As a corollary to that rule, Your Honor, knowledge of

09:39:16  17  other patents in the same portfolio, with some of those being

09:39:21  18  within the same family as the asserted patents, is insufficient

09:39:26  19  to defeat a motion for summary judgment or, as in the case,

09:39:31  20  motion for judgment as matter of law on willfulness.  We know

09:39:33  21  that from the Intell Ventures case cited to the Court.

09:39:37  22          Another corollary, knowledge of a patent application

09:39:40  23  is sufficient for the same reasons.  We have cited to the Court

09:39:44  24  cases like *Maxell* or the *Conopco* case from the Federal Circuit

09:39:49  25  in 1994.  We have the *State Industrial* case from 1985 also from

09:39:53   1   the Federal Circuit, and a number of other cases we've cited in

09:39:58   2   our papers, Your Honor.

09:40:00   3           This rule makes sense.  Courts recognize that

09:40:05   4   knowledge of a patent portfolio does not provide notice of any

09:40:09   5   future patent application, and knowledge of a patent

09:40:12   6   application can't provide notice of a future patent because

09:40:15   7   there is no guarantee that any patent will ever issue or in

09:40:21   8   what particular claim.

09:40:22   9           In this case Voxer seeks to rely on willfulness

09:40:27   10  evidence that is insufficient as a matter of law under these

09:40:31   11  doctrines.  Voxer is pointing to evidence about the 2012

09:40:34   12  discussions.  The patents had not even been applied for in

09:40:38   13  2012, not for another more than five years before the first

09:40:42   14  application would show up.  Mr. Katis himself admitted he never

09:40:46   15  referenced any specific patent numbers or applications during

09:40:51   16  those discussions.

09:40:52   17          Voxer also points to the 2016 correspondence from

09:40:55   18  Voxer to Facebook.  That correspondence does not list the

09:40:59   19  application for the '270 or the '557 patents, much less the

09:41:03   20  patent themselves, because they did not yet exist.

09:41:08   21          Voxer also points to a provisional application from

09:41:10   22  2007.  The provisional application contains no claim language

09:41:16   23  whatsoever, certainly not the specific claims at issue in this

09:41:20   24  case that were submitted to the Patent and Trademark Office

09:41:24   25  years after Facebook Live and Instagram Live had launched.

09:41:29  1          There is simply no evidence in this case of awareness

09:41:34  2  of the specific patents-in-suit until suit was filed in 2020.

09:41:39  3  And, under the law, that is insufficient.  And we have cited to

09:41:42  4  the Court the *Biedermann* case as well as *Intell*.

09:41:45  5          The evidence presented shows, at most, that notice --

09:41:50  6  that Facebook had notice of certain Voxer patents listed in

09:41:54  7  that 2016 e-mail correspondence, but Plaintiffs have not

09:41:58  8  identified a single case holding that knowledge of other

09:42:01  9  patents in a patent portfolio could arise to the level of

09:42:05  10  substantial evidence to support a jury finding of willfulness.

09:42:10  11          Moving on, Your Honor, to the second element of

09:42:13  12  willfulness, intent.  Knowledge of the patent-in-suit is

09:42:16  13  necessary but not sufficient.  You also have to show specific

09:42:19  14  intent that often comes in the form of some specific accusation

09:42:23  15  of infringement.  We know that from the *Bayer* case, Federal

09:42:26  16  Circuit 2021.

09:42:28  17          There is literally no evidence in this case of

09:42:31  18  specific intent to infringe.  And how could there be?  The

09:42:35  19  patents did not even exist when Facebook Live and Instagram

09:42:40  20  Live were developed and launched.

09:42:42  21          Therefore, Your Honor, Defendants respectfully move

09:42:45  22  the Court for a judgment as a matter of law on the issue of

09:42:48  23  willfulness in favor of defendants.

09:42:51  24          Thank you, Your Honor.

09:42:51  25          THE COURT:  Thank you.  I'll hear a response to that

09:42:56  1  argument.

09:42:58  2          MR. STAKE:  Thank you, Your Honor.  Sam Stake on

09:43:02  3  behalf of Voxer.

09:43:05  4          There is abundant evidence in the trial record

09:43:08  5  showing Defendant Facebook's willful infringement, and their

09:43:12  6  motion for judgment as a matter of law should be denied.

09:43:16  7          As Mr. Katis, Voxer's founder, testified, obtaining

09:43:19  8  strong patents was always core to Voxer's business strategy.

09:43:23  9  In a summary of a patent portfolio that Voxer shared with

09:43:28  10  Facebook in 2016 they stated:  Patents and intellectual

09:43:32  11  property have been integral to Voxer since the inception of the

09:43:36  12  company in 2007.  That document was shared with Facebook just

09:43:41  13  days and very shortly after the launch of Facebook Live, the

09:43:46  14  accused product in this case.  And that document referenced the

09:43:50  15  immediate parents of the two patents-in-suit here.

09:43:56  16          Now, starting in 2010, we saw abundant evidence in

09:44:01  17  the trial record of Voxer and Facebook having a history of

09:44:05  18  discussions -- business discussions.  And Facebook took an

09:44:09  19  interest in either acquiring Voxer or in licensing its patented

09:44:14  20  technology.

09:44:16  21          In a series of meetings in early 2012, the evidence

09:44:19  22  that we heard shows that Voxer's founders, Tom Katis and

09:44:24  23  Matt Ranney repeatedly disclosed to Facebook and described in

09:44:29  24  detail the core patented live messaging and storing stream

09:44:33  25  technology.  That included video live messaging technology at

09:44:37   1   issue in this case.

09:44:40   2          They further disclosed that Voxer had both issued

09:44:44   3   patents and patent applications.  That's what the testimony

09:44:48   4   reflects.  Those patents and patent applications have -- have a

09:44:54   5   near identical specification and disclosure as the two patents

09:44:59   6   at issue in this suit.

09:45:03   7          Mr. Katis further testified that at every meeting

09:45:06   8   with Facebook, including in meetings with Facebook CEO

09:45:11   9   Mark Zuckerberg, CTO Mike Schroepfer, and other senior

09:45:15   10  leadership, that he always at every meeting disclosed the

09:45:18   11  patents.

09:45:19   12         Testimony from Facebook witnesses and internal

09:45:23   13  Facebook documents that have been introduced into evidence

09:45:26   14  confirm that Facebook evaluated Voxer's patents and patented

09:45:31   15  technology favorably and that it investigated Voxer's patent

09:45:37   16  portfolio.

09:45:38   17         As Peter Deng testify -- this was on Friday

09:45:41   18  afternoon.  He is the director of product and responsible for

09:45:44   19  the messaging applications at Facebook he testified -- pardon

09:45:49   20  me.  The transcript from that testimony reflects:

09:45:53   21         "Question:  Well, you appear to have written an

09:45:56   22  e-mail from Mr. Deng -- from yourself to Mr. O'Rourke on

09:46:01   23  February 9th, 2012 with the subject 'Voxer patents,' right?"

09:46:04   24         And then Mr. Deng's answer was:  "That's what this

09:46:07   25  suggests."

09:46:08   1            And a further question was:  "So this suggests that

09:46:11   2   you knew that Voxer had patents in 2012, right?"

09:46:14   3            Answer:  "Yeah."

09:46:15   4            And, as Your Honor will remember, there was a lengthy

09:46:18   5   discussion about the contours of privilege and that Facebook

09:46:21   6   had asserted privilege.  We're of course not invading those

09:46:27   7   discussions, but this just reflects that it's rare to have

09:46:29   8   evidence of a smoking gun in cases like this.

09:46:32   9            Instead we know that there is ample circumstantial

09:46:35   10  evidence, at a minimum, that Facebook was aware of these patent

09:46:38   11  families and patents and patented technologies for years

09:46:43   12  leading up to this lawsuit.

09:46:46   13           And then what happened next that we heard was that

09:46:50   14  Facebook chose instead to build its infringing messaging

09:46:55   15  platforms rather than license this technology from Voxer.  In

09:46:59   16  2016, after Facebook Live and Instagram Live launched, Voxer

09:47:04   17  sent Facebook a detailed patent program and strategy document

09:47:07   18  as well as a summary of Voxer's patent portfolio.

09:47:11   19           Now, this is all -- those are unrebutted facts that

09:47:15   20  show Facebook was aware of Voxer's patents, including patents

09:47:19   21  and patent applications showing the same specifications, same

09:47:23   22  inventors, and same assignee, Voxer, which is what we heard

09:47:27   23  from Ms. Lawton just yesterday.  But they chose instead to

09:47:32   24  build its infringing platforms rather than engage Voxer.

09:47:37   25           I mentioned that there are cases that discuss the

09:47:40  1  rarity of smoking gun evidence and instead affirm that

09:47:44  2  circumstantial evidence is sufficient.  And these cases

09:47:46  3  specifically address the sufficiency of similar and identical

09:47:54  4  patent specifications in parent applications and parent

09:47:56  5  patents.

09:47:57  6       We have several of these cases and are happy to

09:48:02  7  address those further if Your Honor so wishes.  But, for the

09:48:05  8  record they include the Federal Circuit's decision in

09:48:12  9  *Commscope Techs*, T-e-c-h-s, which is a Northern -- pardon me.

09:48:16  10  That's the Northern District of Texas decision at 2020 WL

09:48:21  11  11626079.

09:48:24  12       And in that case, as the Northern District of Texas

09:48:29  13  wrote, "There is also evidence that Dali knew or should have

09:48:32  14  known that its actions infringed the '747 patent," which was

09:48:35  15  the patent-in-suit there, "including that, in 2010, Dali had

09:48:39  16  knowledge of the parent to the '747 patent which shares the

09:48:42  17  same specification, inventor, and assignee as the '747 patent."

09:48:46  18       And then just two more cases for the record.  One is

09:48:50  19  a Federal Circuit decision *K-TEC v. Vita-Mix Corp.*, which is

09:48:53  20  696 F.3d 1364.  And in that one the Federal Circuit affirmed

09:49:00  21  the sufficiency of a willfulness finding where the infringer

09:49:05  22  had notice of a patent when it issued because the infringer had

09:49:10  23  notice of the patent's parent application and notice of the

09:49:15  24  patent's pending application in affirming a finding of

09:49:16  25  willfulness.

09:49:18 1         And then finally, an Eastern District of Texas case

09:49:21 2    from 2010.  This is *Synqor*, S-y-n-q-o-r, *v. Artesyn Techs*,

09:49:28 3    that's A-r-t-e-s-y-n.  And that's at 2010, WL 11534393.  And

09:49:37 4    there the court wrote:  "While plaintiff may not have direct

09:49:41 5    evidence of each Defendant's knowledge of each patent,

09:49:45 6    Plaintiff has established that each defendant was familiar with

09:49:47 7    its products, technologies, and other patents."

09:49:49 8         So those cases confirm that it's rare to have smoking

09:49:52 9    gun evidence, but that the type of evidence we have here, which

09:49:55 10   span a number of years and repeated disclosures to Facebook is

09:49:58 11   sufficient for a reasonable jury to find willful infringement

09:50:02 12   and that Facebook's Rule 50 motion should be denied.

09:50:05 13        Thank you, Your Honor.

09:50:06 14        THE COURT:  Ms. Anderson, do you desire to respond?

09:50:08 15        MS. ANDERSON:  Very briefly, Your Honor.

09:50:13 16        Christa Anderson for Meta.

09:50:15 17        Your Honor, the testimony that counsel has pointed to

09:50:18 18   all concern discussions before the patents in-suit ever issued.

09:50:24 19   For the reasons I discussed earlier, these are not sufficient

09:50:26 20   to satisfy the standard.

09:50:29 21        What counsel would have the jury do is speculate in

09:50:32 22   the absence of any evidence that, somehow, Facebook and

09:50:34 23   Instagram had internally tracked the patents and forecast and

09:50:39 24   knew that specific patent claim language would issue in the

09:50:42 25   future, and developed Facebook Live and Instagram Live based on

09:50:46  1   unissued patent claims.  That is pure speculation, Your Honor,

09:50:50  2   and not permissible under governing law regarding willfulness.

09:50:55  3         With respect to the cases that have been cited by

09:50:57  4   counsel, counsel cited the *Commscope* matter.  That case is

09:51:02  5   distinguishable on its facts from this case.  In that matter

09:51:06  6   the defendant's CEO testified he actually knew about the

09:51:10  7   patents-in-suit before the lawsuit.

09:51:14  8         The *K-TEC* matter that counsel referenced is also

09:51:19  9   distinguishable.  In that matter Plaintiff provided actual

09:51:21  10  notice that defendant's product was infringing a parent patent

09:51:25  11  and actual notice that Defendant's product was infringing the

09:51:29  12  claims of a pending patent which then issued.  Those facts are

09:51:32  13  not present in this case.

09:51:35  14        Last, the *Synqor* case to which counsel cited is a

09:51:43  15  very lightly reasoned case.  There is not a lot of analysis in

09:51:47  16  that matter.  It is difficult to assess what facts were before

09:51:47  17  the court from the opinion itself.  But that particular case

09:51:54  18  from 2010 does not warrant departing from settled Federal

09:51:57  19  Circuit precedent governing how willfulness matters should be

09:52:01  20  resolved.

09:52:02  21        Thank you, Your Honor.

09:52:03  22        THE COURT:  Thank you.

09:52:07  23        Mr. Stake, Ms. Anderson indicated to the Court that

09:52:12  24  she will rely on the written motion for the other arguments

09:52:16  25  under 50(a).  Do you care to be heard on any of those, or do

09:52:22  1  you -- are you comfortable with the court just relying on the

09:52:28  2  written motion in making the court's decision?

09:52:31  3          MR. STAKE:  Your Honor, on the other bases for the

09:52:34  4  motion, we would just like to state for the record that those

09:52:37  5  should all be denied.  In fact, we moved that, instead,

09:52:45  6  judgment as a matter of law should be entered for infringement

09:52:48  7  and for validity.  And we've provided in this morning's papers

09:52:53  8  the evidentiary basis for the converse findings.  And we

09:52:57  9  believe that is -- should get us most of the way there.

09:53:02  10          I would just add for the record that we heard

09:53:07  11  detailed element-by-element analysis.

09:53:09  12          THE COURT:  I'm going to hear you on your motions, so

09:53:10  13  you don't have to bring those up.  I'm just wanting to know if

09:53:13  14  you want -- and if this is argument against her motion, that's

09:53:17  15  fine.  But you don't have to argue your motions at this time.

09:53:21  16          MR. STAKE:  Okay.  Your Honor, nothing else at this

09:53:25  17  time.  We believe that the record amply shows the sufficiency

09:53:31  18  of our experts' infringement analyses, validity analyses, ample

09:53:39  19  testimony on the unconventionality of Voxer's patents to defeat

09:53:45  20  the 101 motion, as well as detailed damages analysis by

09:53:50  21  Mr. Ratliff to defeat the damages motions.

09:53:56  22          Your Honor has already denied motions on lack of

09:53:59  23  standing as well as on Section 101.  We believe that those

09:54:05  24  issues have been sufficiently briefed for Your Honor, and the

09:54:08  25  same conclusions should stand.  And I think we are satisfied

09:54:18  1  with this statement of our position.

09:54:20  2          THE COURT:  Thank you.  Ms. Anderson, I'll give you

09:54:24  3  another opportunity if you want to say anything about your

09:54:25  4  motion.

09:54:26  5          MS. ANDERSON:  Nothing further, Your Honor.  Thank

09:54:28  6  you.  We submit on our papers.  Thank you, Your Honor.

09:54:30  7          THE COURT:  All right.  The court then at this point

09:54:32  8  has before it Defendant's Motion for Judgment as Matter of Law

09:54:35  9  Under Rule of Civil Procedure 50(a), which I have reviewed at

09:54:42  10 length and entertained argument on, and Section B, that Voxer

09:54:49  11 failed to offer sufficient evidence of willful infringement.

09:54:54  12         I will address that first.  I grant that portion of

09:55:00  13 the motion and rule as a matter of law that there is no legally

09:55:11  14 sufficient evidence here of intent to willfully infringe.

09:55:18  15         I believe that discussions and the timeline on this

09:55:24  16 is far too attenuated to submit this issue to the jury.  Yes,

09:55:30  17 there were discussions.  Yes, there was knowledge on the part

09:55:36  18 of the defendants that there was a patent portfolio out there.

09:55:41  19 I think it is -- it is clear that the patents had not been

09:55:48  20 applied for in 2012 or 2016.  They certainly had not been

09:55:53  21 issued.  The provisional applications, as has been argued, and

09:55:59  22 that's what the court finds, don't reflect the claims.  There's

09:56:03  23 only the most general of evidence out there.

09:56:09  24         Yes, the court recognizes the law, that there is

09:56:12  25 often perhaps never smoking gun evidence of intent to infringe

09:56:19   1   of willfulness, and the court always considers circumstantial

09:56:24   2   evidence in that regard.  But I find that this is too weak a

09:56:30   3   circumstantial case to rise to legally sufficient evidence.

09:56:33   4         So I grant the motion as to the issue of willful

09:56:41   5   infringement and will not submit that to the jury.

09:56:44   6         I have gone over each and every of the other points

09:56:53   7   that are made in the defendant's motion, and I find that they

09:57:00   8   fail on those points, that there is adequate evidence in the

09:57:05   9   record where the court cannot say that a reasonable jury would

09:57:11   10  not have a legally sufficient basis to find for Voxer on those

09:57:19   11  issues.  So the other issues in the motion are overruled, and

09:57:27   12  the motion is denied as regards to the other parts.

09:57:32   13        Now, let me hear from Voxer on its motions that you

09:57:40   14  divided up.  I think there are four separate ones; is that

09:57:43   15  correct?  I want to make sure I didn't miss one.  You have

09:57:48   16  four; is that correct?

09:57:50   17        MR. STAKE:  That's correct, Your Honor.

09:57:51   18        THE COURT:  All right.  Then why don't you argue them

09:57:53   19  one at a time, but altogether, as opposed to arguing one and

09:57:58   20  then I go to Facebook and then we come back to you.  I think

09:58:05   21  it's clear, and I think it would just be easier if you argue

09:58:10   22  your motions together, and then I'll get a response together.

09:58:15   23        MR. STAKE:  Your Honor, thank you for the opportunity

09:58:19   24  to be heard.  We did -- we do appreciate the honor to submit

09:58:24   25  briefing on these four motions.  We are happy to rest on our

09:58:28  1   papers as to those four motions.

09:58:30  2         I think one that I would just highlight is the motion

09:58:33  3   for judgment as a matter of law on validity of the '270 patent.

09:58:37  4   For that patent it was Dr. Bhattacharjee.  He did not present

09:58:43  5   any invalidity analysis for that patent and confirmed that he

09:58:49  6   had no invalidity analysis.  So we believe that that one is --

09:58:53  7   that that one is appropriate to enter a judgment as a matter of

09:58:57  8   law on at this time.

09:58:59  9         THE COURT:  Let me look at that and see if I have any

09:59:03  10  questions.

09:59:16  11        Which one of your four motions does that go to?

09:59:26  12        MR. STAKE:  So that is Docket Number 320.  It's

09:59:28  13  Voxer's Motion For Judgment as a Matter of Law that the '270 is

09:59:31  14  not Invalid as Anticipated or Obvious.

09:59:33  15        THE COURT:  Okay.  Thank you.  All right.  So you

09:59:39  16  rest on your papers on those?

09:59:41  17        MR. STAKE:  Yes, Your Honor.

09:59:42  18        THE COURT:  All right.  Ms. Anderson, do you or

09:59:44  19  anyone at Facebook have a response?

09:59:44  20        MS. ANDERSON:  Thank you, Your Honor.  Mr. Paige will

09:59:44  21  address that.

09:59:45  22        THE COURT:  Mr. Paige does.

09:59:46  23        MR. PAIGE:  Thank you, Your Honor.  Good morning.

09:59:49  24  Gene Paige on behalf of Meta.

09:59:50  25        Your Honor, with respect to that motion for judgment

| | | |
|---|---|---|
| 09:59:52 | 1 | of law -- as a matter of law, Voxer isn't entitled to a |
| 09:59:58 | 2 | judgment of no invalidity the '270 patent.  There's no claim at |
| 10:00:03 | 3 | issue on validity.  As Voxer pointed out in the sidebar |
| 10:00:07 | 4 | yesterday, when resisting rebuttal on '557 invalidity, Facebook |
| 10:00:11 | 5 | didn't file a counterclaim for invalidity.  So there isn't a |
| 10:00:15 | 6 | claim at issue here.  This is a defense to their claim of |
| 10:00:18 | 7 | infringement.  And Voxer isn't entitled to anything in the |
| 10:00:24 | 8 | judgment on this.  It wasn't a disputed issue at trial, and no |
| 10:00:27 | 9 | evidence was presented one way or another on it. |
| 10:00:29 | 10 | It doesn't change the status quo, because there is a |
| 10:00:37 | 11 | presumption of validity in the first place, one that wasn't |
| 10:00:40 | 12 | addressed at trial.  So there is no basis to enter judgment on |
| 10:00:44 | 13 | what is an affirmative defense, not a claim.  And if Voxer is |
| 10:00:50 | 14 | somehow entitled to judgment on things that were not presented |
| 10:00:55 | 15 | at trial, were not at issue at trial, then certainly Facebook |
| 10:00:58 | 16 | would be entitled to a judgment of noninfringement of all |
| 10:01:02 | 17 | claims except the asserted claims in the '270 patent.  And |
| 10:01:05 | 18 | that's just not the way things are normally done. |
| 10:01:10 | 19 | THE COURT:  All right.  Anything else? |
| 10:01:12 | 20 | MR. PAIGE:  No, Your Honor. |
| 10:01:13 | 21 | THE COURT:  Mr. Stake, any response? |
| 10:01:14 | 22 | MR. STAKE:  Your Honor, two quick points.  First, we |
| 10:01:27 | 23 | believe judgment as a matter of law is appropriate here because |
| 10:01:30 | 24 | a reasonable jury would not have a legally sufficient |
| 10:01:33 | 25 | evidentiary basis to find that any asserted claim of the '270 |

10:01:36  1  patent is invalid as anticipated or obvious.  That's point

10:01:39  2  number one.

10:01:40  3       Point number two is that we understand that Facebook

10:01:44  4  is not seeking to include the invalidity of the '270 patent in

10:01:49  5  the verdict form.  So as long as that is the case, that takes

10:01:55  6  care of much of this issue.  The jury certainly should not be

10:01:58  7  given an opportunity to reach a verdict on invalidity of this

10:02:03  8  patent.

10:02:10  9       THE COURT:  Thank you.  All right.  I have reviewed

10:02:14  10 the four motions.  I'll run through them:  Voxer's Motion For

10:02:18  11 Judgment as Matter of Law that the '270 patent is Not Invalid

10:02:22  12 as Anticipated or Obvious; Voxer's Motion For Judgment as a

10:02:26  13 Matter of Law of Infringement of the '270 patent; Voxer's

10:02:33  14 Motion For Judgment as a Matter of Law of Infringement on the

10:02:37  15 '557 Patent; and Voxer's Motion For Judgment as a Matter of Law

10:02:43  16 that the '557 Patent is not Invalid as Anticipated or Obvious.

10:02:48  17      I have gone back through my notes of the trial also,

10:02:55  18 and much as I have found in the major part of the motion that

10:03:03  19 defendants file, I cannot say that a reasonable jury could not

10:03:10  20 have legally sufficient basis to find for Meta on any of the

10:03:16  21 issues raised by the plaintiff.  So the plaintiff's motion for

10:03:23  22 judgment as matter of law under Rule 50(a), the four of them,

10:03:27  23 are each overruled.

10:03:29  24      Now, that gets us to the Court's Charge.  Have

10:03:37  25 you-all had an opportunity to discuss this, and where are we on

| | | |
|---|---|---|
| 10:03:42 | 1 | that? |
| 10:03:46 | 2 | MR. STAKE:  Your Honor, Sam Stake on behalf of Voxer. |
| 10:03:48 | 3 | Mr. Silbert and I were able to make a good deal of |
| 10:03:51 | 4 | progress last night in narrowing any remaining disputes.  There |
| 10:03:55 | 5 | are just a couple of lingering issues that we are prepared to |
| 10:04:02 | 6 | essentially submit competing versions on to Your Honor and |
| 10:04:05 | 7 | leave to Your Honor's discretion. |
| 10:04:09 | 8 | I think there are essentially three that I would |
| 10:04:12 | 9 | address.  The first one is that Voxer wishes for Your Honor to |
| 10:04:18 | 10 | include a jury instruction on this judicial notice issue that |
| 10:04:23 | 11 | we raised yesterday.  I have a copy of that to submit to |
| 10:04:27 | 12 | Your Honor. |
| 10:04:27 | 13 | To recap, this is the question of taking judicial |
| 10:04:32 | 14 | notice of the public records of the five issued Voxer patents |
| 10:04:37 | 15 | before February 9th, 2012, which is when Mr. Deng, Facebook's |
| 10:04:43 | 16 | head of product, discussed the Voxer patents.  I think we |
| 10:04:48 | 17 | have -- we had oral argument on that yesterday, and we have a |
| 10:04:52 | 18 | version of that jury instruction to hand up to Your Honor for |
| 10:04:57 | 19 | your consideration. |
| 10:04:58 | 20 | THE COURT:  All right.  You may pass those up. |
| 10:05:09 | 21 | MR. SILBERT:  Your Honor, good morning.  David |
| 10:05:11 | 22 | Silbert for Defendant. |
| 10:05:12 | 23 | May I just ask about the best way to proceed?  Are we |
| 10:05:16 | 24 | going to take these issues *seriatim*?  And I assume, it sounds |
| 10:05:20 | 25 | like, Sam, you want to start with the judicial notice issue? |

| 10:05:24 | 1 | MR. STAKE:  That would be fine. |

MR. STAKE:  That would be fine.

MR. SILBERT:  Your Honor, would --

THE COURT:  Well, I'm not sure -- I want to make sure we're on the same page as what I perceive the kind of ground rules to be here.  I have started with what you presented as your proposed final jury instructions back at the beginning of trial.  We are making some adjustments in those even as we speak.

For instance, I think the word "foreperson" is a word whose time never should have come in the history of jurisprudence.  I realize the world we live in and we don't refer to "foreman" anymore, but I consider "foreperson" one of the more strained words, so we're going to use "presiding juror" throughout.  And we're making some other little changes like that.

But I think what I would like to do is kind of get an overview on whatever you have on where you areas of dispute are, and then I want to take a recess and consider these and look at what I'm doing and then come back and resolve them.  So we don't need to argue them all right now.

So I've got down as area of disagreement, one, the judicial notice issue.  And my presumption from looking at this Mr. Stake wants what he has presented me in the Court's Charge. You are opposed to anything in the charge about the judicial notice.  So you won't be submitting -- you're not concerned

10:07:16    1    about the way he's worded it because you don't think it ought
10:07:18    2    to be there at all, so you're not going to be submitting
10:07:21    3    competing language.
10:07:23    4            MR. SILBERT:  It is correct that we are opposed to it
10:07:25    5    being there.  With the Court's permission, when that issue is
10:07:29    6    argued, Ms. Parikh will argue it, and I don't actually know if
10:07:32    7    she's going to critique the actual wording of the instruction.
10:07:36    8    But our fundamental point is that we don't think that
10:07:38    9    instruction should be there.
10:07:40   10            THE COURT:  Well, Ms. Parikh, I'll give you a
10:07:41   11    heads-up.  On anything where you're going to have a problem
10:07:47   12    with the language at any point, then I want to see your
10:07:50   13    language, too.  So I would presume, in the absence of any
10:07:54   14    language that you have, that if I were to determine to submit
10:08:01   15    this instruction, you would object to it but you would not
10:08:05   16    propose competing language; is that correct?
10:08:08   17            MS. PARIKH:  Yes, Your Honor.  Meta proposes the
10:08:10   18    instruction in its entirety, as was discussed at length
10:08:14   19    yesterday, was premised on willfulness, and that is no longer
10:08:17   20    in the case.
10:08:17   21            THE COURT:  All right.  So what other issues do we
10:08:21   22    have?
10:08:21   23            MR. SILBERT:  Your Honor, may I raise a practical
10:08:23   24    issue of, I guess, version control?  And I apologize, but we
10:08:29   25    jointly have made some revisions.  There's I believe, by my

| | |
|---|---|
| 10:08:35 | 1 |
| 10:08:39 | 2 |

count, four that we would like to discuss with Your Honor some

of the language.  I don't think it's going to be too painful.

        But we did make some agreed changes in the

instructions, which I think would mean that the version we're

working off of isn't going to match the version Your Honor has

been making changes to.

        THE COURT:  Well, has that been e-mailed to us, where

is your version?

        MR. SILBERT:  I don't believe that it has.

        MR. STAKE:  We have a copy of that ready to go to

Your Honor.  There are a few areas of essentially cleaning up

the instructions and agreed-upon changes that we will e-mail to

Ms. Oakes.

        THE COURT:  Well, what I would think I would like to

do, then, before we get to further areas of disagreement is to

get that version set up in our computer, because that's the way

we're going to run it out eventually after we've made changes

and what have you.

        So I think what I would like for you to do is e-mail

your version to us.  And then I'll be taking a recess, and we

will -- we will combine that with what we're thinking about and

I'll get copies of that out to you-all.  Because I don't think

we're going to get anywhere if we're not dealing off the same

copy.

        MR. STAKE:  Your Honor, that is a sensible approach.

| | | |
|---|---|---|
| 10:10:02 | 1 | And in view of Your Honor's ruling on the willfulness issue, it |
| 10:10:06 | 2 | will give us an opportunity to clean up a few of the remaining |
| 10:10:09 | 3 | issues.  And I believe it will bring us closer to finality |
| 10:10:14 | 4 | here. |
| 10:10:14 | 5 | THE COURT:  All right.  So when -- you know, can I |
| 10:10:19 | 6 | expect something right now so we can go back in chambers and we |
| 10:10:22 | 7 | can start working on it from our point of view, or what are we |
| 10:10:24 | 8 | talking about on timeline? |
| 10:10:26 | 9 | MR. SILBERT:  I think from a timing perspective, if I |
| 10:10:30 | 10 | may make a suggestion, Your Honor, I think it would be best to |
| 10:10:33 | 11 | send the Court the version that we were working on as of this |
| 10:10:36 | 12 | morning right now and we could talk through the changes. |
| 10:10:39 | 13 | I'll reiterate, I don't think there were a lot of |
| 10:10:41 | 14 | disputed issues, and I think Your Honor -- on our end, and I |
| 10:10:45 | 15 | think Your Honor is going to be able to make decisions pretty |
| 10:10:48 | 16 | quickly on each one of them. |
| 10:10:49 | 17 | THE COURT:  All right.  Go ahead and send that to us. |
| 10:10:53 | 18 | MR. SILBERT:  Are you able to do that? |
| 10:10:54 | 19 | MR. STAKE:  Your Honor, if we may, could we just take |
| 10:10:57 | 20 | a few minutes to -- |
| 10:10:59 | 21 | THE COURT:  Sure. |
| 10:11:00 | 22 | MR. STAKE:  -- get this over to you? |
| 10:11:01 | 23 | THE COURT:  I'm just trying to figure out when you |
| 10:11:02 | 24 | want to do this, because I've got other things I can be working |
| 10:11:03 | 25 | on.  But it's -- I have got to have the charge in our word |

10:11:14  1  processing equipment so, as I make changes -- and there's going

10:11:17  2  to be probably some formatting changes because of the way I do

10:11:21  3  things, so I can do that.  So I need that as quickly as

10:11:25  4  possible, knowing the jury is going to be here in three hours.

10:11:28  5  So how much time are you talking about?

10:11:30  6          As I've told the lawyers that were at the bench a

10:11:33  7  couple of times during this trial, these things take much

10:11:35  8  longer with all the fancy equipment than I can ever imagine.

10:11:40  9  When I started trying lawsuits a long time ago, and I have now

10:11:50  10 had a law license 53 years, which is shocking to me, I swear

10:11:55  11 before we had this fancy equipment we got charges done more

10:11:58  12 quickly and copies circulated to all of the lawyers than we do

10:12:04  13 now.  So we can burn up three hours here in no time at all.

10:12:07  14         So I need to know -- I need do get it as quickly as

10:12:10  15 possible so we can start working on it on our part while you're

10:12:14  16 working on your part before we talk again.  So when am I going

10:12:19  17 to get something?

10:12:20  18         MR. STAKE:  Thirty minutes, Your Honor.

10:12:21  19         THE COURT:  Okay.  That's a long time.  But get it to

10:12:25  20 me as quick as we can.  We'll be in recess until I can get it

10:12:29  21 printed out and worked on myself.

10:12:34  22         MR. SILBERT:  Your Honor, I just put this out as an

10:12:37  23 option, because we are short on time.  And, obviously, whatever

10:12:39  24 the Court prefers, we are fine with.  But we do have hard

10:12:43  25 copies, and I wonder if it wouldn't make sense, given the time

10:12:47  1    constraints --

10:12:48  2             THE COURT:  Give me a hard copy, and then you-all do

10:12:53  3    what you're going to do.  And I'll take this back and start

10:12:59  4    going through it and seeing where we are.  So we'll just be at

10:13:04  5    ease while you-all are doing what you're doing and I'm doing

10:13:07  6    what I'm doing.

10:13:08  7             MR. SILBERT:  May I address one very brief

10:13:10  8    housekeeping issue?

10:13:11  9             THE COURT:  Yes.

10:13:11  10            MR. SILBERT:  We prepared a proposed order regarding

10:13:13  11   the provisional sealing that the Court had ordered before the

10:13:18  12   trial.  I have copies.  Voxer's counsel has confirmed that they

10:13:22  13   don't oppose signing it.

10:13:33  14            THE COURT:  I'll do that.

10:13:41  15            MR. SILBERT:  Your Honor, would it be helpful for me

10:13:43  16   to identify the I think four areas of dispute before

10:13:47  17   Your Honor?

10:13:47  18            THE COURT:  No.  Because I've got to get -- see, I've

10:13:50  19   got to get this in my format because it's not in my format.

10:13:54  20            You know, for instance, what I send to the jury is

10:13:56  21   not going to say "Final Joint Jury Instructions."  That's not

10:14:00  22   what I do.  I don't -- I'm not likely to use the intermediate

10:14:12  23   headings of "Jury Instruction 14," "Jury Charge," or anything

10:14:16  24   like that.  I'm likely to delete all of those.  As I said, one

10:14:22  25   of the things I know I'm going to do is we're going to refer to

10:14:24  1  the "presiding juror."  You know, I will give paragraph

10:14:32  2  headings, but I'm not going to call them a jury instruction

10:14:37  3  number.  And I'm going to look and see as we go through these,

10:14:41  4  you know, what language adjustments that I may have due to the

10:14:45  5  way I usually give things.

10:14:46  6         So the biggest thing is we've got a lengthy set of

10:14:50  7  instructions here, you know, about 40 pages worth, 39 pages

10:14:57  8  worth.  And that takes a good long time to get that and run out

10:15:02  9  and what have you.  And so I need to get this done as quickly

10:15:08  10  as I can because we can't go any further until this gets into

10:15:12  11  my machine.

10:15:13  12         MR. SILBERT:  Understood.

10:15:14  13         MR. STONE:  Your Honor, I've confirmed with my team,

10:15:15  14  and we'll have it you in the next 10 minutes.

10:15:17  15         THE COURT:  Okay.  That's good.  And everybody just

10:15:19  16  be at ease while we're working on this, because I don't know

10:15:22  17  when I'm going to back out and when I'm not.  So we're on it.

10:15:25  18     (Recess)

10:54:50  19     (Open court, no jury)

10:54:50  20         THE COURT:  All right.  Be seated, please.  What I

10:54:52  21  have done is looked at the most recent draft that you sent us,

10:55:00  22  and we'll work off of that.

10:55:08  23         But, at the time, I'm going to refer to the way I

10:55:13  24  generally give things and we'll work it out.  It doesn't mean

10:55:20  25  I'm wedded to any of this.  So take out your draft.  Let me go

10:55:24  1   through it.  The first page we're going to format into our way,

10:55:36  2   but there's no substantive changes.  And I'm going to -- after

10:55:45  3   we discuss your stuff, then I'll run out another draft the way

10:55:47  4   we do things.

10:55:49  5          I generally don't give the jury a table of contents,

10:55:52  6   but I'm open-minded on that.  Throughout the charge I'm not

10:55:58  7   going to say "Jury Instruction 14" or what have you.  I won't

10:56:03  8   give those numbers.  But I will give them, generally, a

10:56:10  9   lead-in, a caption.

10:56:12  10          Now, looking on your current draft, if you look on

10:56:16  11  pages 1 and 2, everywhere you use "counsel" or "attorneys," I'm

10:56:21  12  going to use "lawyers."  We always get bogged down in charges

10:56:27  13  where we call ourselves different ways, and I've found the

10:56:33  14  jurors are generally happy enough if I just say "lawyers."  And

10:56:37  15  sometimes we miss it, but I'm not going to use "counsel" or

10:56:41  16  "attorneys," I'm just going to use "lawyers."

10:56:43  17          And then page 2 "foreperson" becomes "presiding

10:56:47  18  juror."

10:56:49  19          Now, let me ask you a question about your pages 3

10:57:02  20  and 4.  Three is charts and summaries, and four is

10:57:06  21  demonstrative exhibits.  I guess we really need both of those,

10:57:20  22  but I don't know if there's any way we can combine them into

10:57:24  23  one.  They refer to the same thing.  But if we keep them the

10:57:29  24  way they are, and it's fine with me if we do, I'm going to --

10:57:40  25  I'm going to use the word "demonstrative" wherever we use

| | | |
|---|---|---|
| 10:57:45 | 1 | "exhibits" just because I want it clear to them. |
| 10:57:48 | 2 | So the demonstrative exhibits thing would read |
| 10:57:53 | 3 | "Certain demonstrative exhibits shown to you, such as |
| 10:57:55 | 4 | PowerPoint presentations, posters, or models are not themselves |
| 10:58:00 | 5 | evidence.  It's the parties' description of picture or model |
| 10:58:02 | 6 | used.  If your recollection of the evidence differs from the |
| 10:58:05 | 7 | demonstrative exhibit, rely on your recollection." |
| 10:58:08 | 8 | So, if you're comfortable, we'll do charts and |
| 10:58:12 | 9 | summaries and demonstratives. |
| 10:58:15 | 10 | MR. SILBERT:  David Silbert for Defendants, |
| 10:58:16 | 11 | Your Honor. |
| 10:58:16 | 12 | I was simply going to say we of course defer to the |
| 10:58:19 | 13 | court and to what plaintiffs want.  But I don't think in |
| 10:58:21 | 14 | looking at this the parties admitted any actual summary |
| 10:58:25 | 15 | exhibits, as I would think of a summary exhibit that summarizes |
| 10:58:30 | 16 | voluminous documents. |
| 10:58:30 | 17 | So I think on our part we would be okay doing away |
| 10:58:33 | 18 | with that instruction and simply reading the instruction on |
| 10:58:37 | 19 | demonstratives. |
| 10:58:38 | 20 | THE COURT:  I think that's right.  How do you feel |
| 10:58:40 | 21 | Mr. Stake? |
| 10:58:48 | 22 | MR. STAKE:  Your Honor, we had in mind here -- |
| 10:58:51 | 23 | THE COURT:  You're going to have to speak into a |
| 10:58:53 | 24 | microphone.  I don't care if you sit down, but I've got to be |
| 10:58:56 | 25 | able to hear you.  And there's one right in front of you if you |

10:58:58 1    don't want to come all the way up here.

10:59:03 2            MR. STAKE:  Your Honor, we had in mind here the sorts

10:59:05 3    of charts and summaries that came up in presentations by

10:59:09 4    experts.

10:59:12 5            THE COURT:  Well, but all that the jury is going to

10:59:15 6    see is what were actually admitted into evidence.

10:59:23 7            MR. STAKE:  And I'm not aware of any charts and

10:59:25 8    summaries that have been introduced into evidence.  And so

10:59:31 9    perhaps -- perhaps a reference by adding a reference to charts

10:59:34 10   and summaries in Jury Instruction 16, that would help to

10:59:40 11   clarify the point that the charts --

10:59:46 12           THE COURT:  What -- what charts and summaries other

10:59:50 13   than what were in the demonstratives did the jury ever see

10:59:58 14   during this case?  Just tell me because I can't remember.  I'm

11:00:00 15   not suggesting they didn't see any.  I just don't remember any.

11:00:04 16           MR. STAKE:  I believe Your Honor is correct, that

11:00:07 17   these are charts and summaries that appeared in demonstratives.

11:00:09 18           THE COURT:  So I think if we just say

11:00:12 19   "demonstratives," I think we're fine.

11:00:15 20           MR. STAKE:  Your Honor, that's fine.

11:00:25 21           THE COURT:  And I have gone through, like on page 7,

11:00:27 22   I cut willfulness.  Just because we've heard testimony from a

11:00:39 23   lot of people that can be accused of being nerds on some things

11:00:43 24   during this trial, when we go to page 8, I'm kind of a nerd on

11:00:48 25   editing, so I hyphenate "clear-and-convincing evidence."  I'm

| | | |
|---|---|---|
| 11:00:54 | 1 | into phrasal adjectives.  That doesn't affect anything. |
| 11:00:56 | 2 | Now, page 9.  Here is something we're going to come |
| 11:01:02 | 3 | back to.  But initially on page 9, I've gone through and |
| 11:01:06 | 4 | deleted the sentences on willfulness.  Such as the second |
| 11:01:12 | 5 | sentence in the paragraph after the bullet points and the |
| 11:01:17 | 6 | fourth sentence in that paragraph.  And then in the last full |
| 11:01:20 | 7 | paragraph on the page, I've deleted the last four lines. |
| 11:01:33 | 8 | On page 10, I found that the caption is a little |
| 11:01:43 | 9 | clunky, and I think I'm just going to say, "The role of a claim |
| 11:01:51 | 10 | of a patent," and I think that picks everything else up. |
| 11:01:57 | 11 | That's just a lead-in anyway. |
| 11:01:59 | 12 | Page 12, again, my nerdy editor stuff, I don't like |
| 11:02:05 | 13 | to put an "s" in parenthesis.  So in that paragraph after the |
| 11:02:11 | 14 | bullet points that say claims with "s" in parenthesis, I'm just |
| 11:02:16 | 15 | going to say "claim or claims." |
| 11:02:26 | 16 | There's a couple of times we say proven.  English |
| 11:02:34 | 17 | teachers are divided on whether or not you say "has proven."  I |
| 11:02:39 | 18 | say "has proved" because I think jurors understand that more. |
| 11:02:44 | 19 | Now, when we get to page 15, this brings up something |
| 11:02:53 | 20 | that I generally do, and I think it is better than the way you |
| 11:02:58 | 21 | have done it.  And that is, I think we ought to have at the |
| 11:03:06 | 22 | very beginning under burden of proof definitions of |
| 11:03:11 | 23 | preponderance of the evidence and clear and convincing evidence |
| 11:03:14 | 24 | as opposed to trying to stick it in here. |
| 11:03:19 | 25 | So I'm likely to cut, and also because I don't like |

```
11:03:23   1   the italicized i.e., where we say "Must prove by a
11:03:29   2   preponderance of the evidence, i.e., it is more like than
11:03:33   3   not" -- I'm going to cut that -- "must prove by a preponderance
11:03:36   4   of the evidence that Facebook performed those."
11:03:38   5          And then up at the beginning somewhere, and we'll go
11:03:42   6   back and I'll kind of walk through the outline of what I
11:03:45   7   usually do, I'm likely to have a burden of proof section that
11:03:54   8   reads, "In any legal action, facts must be proved by a required
11:03:58   9   amount of evidence known as the burden of proof.  The burden of
11:04:00  10   proof in this case is on Voxer on some issues and on Facebook
11:04:06  11   for other issues.  There are two burdens of proofs that you
11:04:10  12   will apply in this case.  One is the preponderance of the
11:04:11  13   evidence, and the other is clear and convincing evidence."
11:04:15  14          And then "Preponderance of the evidence.  Voxer has
11:04:17  15   the burden of proving patent infringement and damages by a
11:04:21  16   preponderance of the evidence.  To establish by a preponderance
11:04:24  17   of the evidence means to prove something is more likely so than
11:04:29  18   not so.  It is simply the greater weight of the credible
11:04:33  19   evidence.  If you find that Voxer has failed to prove any
11:04:36  20   element of its claim by a preponderance of the evidence, then
11:04:40  21   it may not recover on that claim."
11:04:42  22          And then "Clear and convincing evidence.  Facebook
11:04:46  23   has the burden of proving patent invalidity by clear and
11:04:49  24   convincing evidence.  When a party has the burden of proving
11:04:53  25   any claim or defense by clear and convincing evidence, it means
```

11:04:57  1   that the party must present evidence that leaves you with the

11:05:00  2   firm belief or conviction that it is highly probable that the

11:05:06  3   factual contentions of the claim or defense are true.  This is

11:05:09  4   a higher standard of proof than proof by a preponderance of the

11:05:13  5   evidence, but it does not require proof beyond a reasonable

11:05:16  6   doubt."

11:05:18  7         Something to that effect.  We can talk about the

11:05:19  8   language of that later.  But I do want to have the burden stuff

11:05:25  9   moved back up to its own sections at the beginning of the

11:05:29  10  Court's Charge.

11:05:31  11         MR. SILBERT:  Your Honor, I simply was going to say,

11:05:33  12  if it's helpful, that makes sense to us.  There are -- I don't

11:05:36  13  know if the Court was looking at those, but there are

11:05:38  14  instructions whose language match what the Court read very

11:05:42  15  closely at pages 7 and 8, without the introductory, I think,

11:05:47  16  comments about burdens of proof.

11:05:50  17         THE COURT:  Yeah.  No.  I saw that, and it's very

11:05:52  18  close.  But I think my point is to kind of roll them into

11:06:00  19  something that -- you'll see when I do this, but that's one of

11:06:05  20  the things we're going to do.

11:06:07  21         Now, while we're on 15, we've got -- Voxer wants the

11:06:15  22  language at the bottom of the page, "Direct infringement is a

11:06:19  23  strict liability claim.  A party can directly infringe a patent

11:06:22  24  without knowing of the patent or without knowing that what the

11:06:27  25  party is doing is patent infringement," and Facebook opposes.

| | | |
|---|---|---|
| 11:06:31 | 1 | So I don't want to hear much argument.  I want Voxer |
| 11:06:37 | 2 | to tell me what your authority for my putting that in there, |
| 11:06:42 | 3 | and I want Facebook to tell me what's your authority for my not |
| 11:06:46 | 4 | putting it in there. |
| 11:07:04 | 5 | MR. STAKE:  Your Honor, we believe that this strict |
| 11:07:06 | 6 | liability language is important to clarify the issue of jury -- |
| 11:07:11 | 7 | potential jury confusion, which is the notion that Facebook |
| 11:07:16 | 8 | would need to have known about -- |
| 11:07:18 | 9 | THE COURT:  No, no.  Tell me what your authority is. |
| 11:07:19 | 10 | I don't want any argument on it. |
| 11:07:21 | 11 | MR. STAKE:  Okay.  I have a case that I can have -- |
| 11:07:24 | 12 | THE COURT:  That's what I want to see. |
| 11:07:26 | 13 | MR. STONE:  Okay.  Can I have ... |
| 11:07:29 | 14 | THE COURT:  Yeah.  I don't have to see it this very |
| 11:07:31 | 15 | instant. |
| 11:07:33 | 16 | MR. STAKE:  Okay.  I have the cite for Your Honor. |
| 11:07:35 | 17 | THE COURT:  All right.  What is the cite? |
| 11:07:36 | 18 | MR. STAKE:  Okay.  It is *BMC Resources v. Paymentech*. |
| 11:07:44 | 19 | THE COURT:  All right. |
| 11:07:45 | 20 | MR. STAKE:  And this is 498 F-dot-three-d 1373. |
| 11:07:50 | 21 | THE COURT:  Now, do you mean Federal Third?  Is that |
| 11:07:52 | 22 | what you're saying? |
| 11:07:54 | 23 | MR. STAKE:  It's Federal Circuit. |
| 11:07:55 | 24 | THE COURT:  But you don't have to say |
| 11:07:58 | 25 | "F-dot-three-d."  You're saying Federal Third? |

| | | |
|---|---|---|
| 11:07:58 | 1 | MR. STAKE:  Federal Third.  Yes, your Honor. |
| 11:08:00 | 2 | THE COURT:  Okay.  I can understand that. |
| 11:08:03 | 3 | MR. STAKE:  Yes. |
| 11:08:03 | 4 | THE COURT:  All right.  And the page number? |
| 11:08:05 | 5 | MR. STAKE:  1381.  And it states that direct |
| 11:08:07 | 6 | infringement of a patent is a strict liability offense. |
| 11:08:11 | 7 | THE COURT:  Well, does it say that it has to go in |
| 11:08:13 | 8 | the Court's Charge? |
| 11:08:14 | 9 | MR. STAKE:  I don't believe that this was addressing |
| 11:08:16 | 10 | the Court's Charge. |
| 11:08:17 | 11 | THE COURT:  All right. |
| 11:08:19 | 12 | MR. STAKE:  It's a Federal Circuit decision. |
| 11:08:25 | 13 | MR. SILBERT:  Very briefly, Your Honor, we don't |
| 11:08:27 | 14 | believe this paragraph is necessary.  That said, we don't have |
| 11:08:32 | 15 | a strong opposition to it.  Our only opposition is we don't |
| 11:08:34 | 16 | like the term "strict liability claim" in a jury instruction. |
| 11:08:38 | 17 | I don't think that's helpful to the jury, it's a legal term, |
| 11:08:41 | 18 | and it has little bit of a nefarious air to it. |
| 11:08:44 | 19 | THE COURT:  Well, let's look at it this way.  If I |
| 11:08:47 | 20 | were just to strike that first line and say, "A party can |
| 11:08:52 | 21 | directly infringe a patent without knowing of the patent or |
| 11:08:56 | 22 | without knowing that what the party's doing is patent |
| 11:08:59 | 23 | infringement," you're comfortable with that?  It's you that |
| 11:09:02 | 24 | want the words "strict liability"? |
| 11:09:04 | 25 | MR. STAKE:  That's right.  We're just trying to avoid |

| | | |
|---|---|---|
| 11:09:06 | 1 | jury confusion on this issue of -- |
| 11:09:08 | 2 | THE COURT:  Well, I think I'm going to confuse them |
| 11:09:10 | 3 | more.  I'm not going to give that, because then I feel like I'm |
| 11:09:13 | 4 | going to have to define "strict liability" and we get into a |
| 11:09:17 | 5 | whole different thing.  I think the substance is picked up in |
| 11:09:22 | 6 | the language, so I'm going to do that. |
| 11:09:26 | 7 | MR. STAKE:  Thank you, Your Honor. |
| 11:09:27 | 8 | THE COURT:  Now, over on page 18, Facebook opposes |
| 11:09:43 | 9 | the blue language? |
| 11:09:59 | 10 | MR. SILBERT:  Your Honor, we think that for the Court |
| 11:10:03 | 11 | to call the claims of the '557 patents inventions, particularly |
| 11:10:11 | 12 | in an instruction on invalidity, is uncalled for and |
| 11:10:15 | 13 | prejudicial.  We have a contrary proposal that we've shared |
| 11:10:21 | 14 | with counsel that I'd like to hand up to the Court, if I may, |
| 11:10:26 | 15 | for this instruction. |
| 11:10:28 | 16 | It does two things.  Instead of saying, "The |
| 11:10:40 | 17 | inventions were invented" as an instruction from the Court, it |
| 11:10:45 | 18 | says, "The '557 patent claims priority to the date to which |
| 11:10:50 | 19 | they claim priority," which is really the issue and we think |
| 11:10:53 | 20 | much more appropriate language for a jury instruction. |
| 11:10:56 | 21 | The other thing it does is it indicates that the |
| 11:11:01 | 22 | Seckin reference is prior art, and it includes some statements |
| 11:11:04 | 23 | which are in front of Your Honor to the effect that all of the |
| 11:11:08 | 24 | disclosures, including the figures and text of Seckin are |
| 11:11:13 | 25 | considered part of the prior art. |

11:11:14    1          We believe this is necessary in light of the

11:11:17    2    cross-examination and questioning which we think might have

11:11:20    3    created some confusion.  There was some suggestion in the

11:11:23    4    questioning to the effect of comparing the claims of Seckin to

11:11:29    5    the patent, which is not the appropriate test for the jury, of

11:11:32    6    suggesting that because the Seckin application did not issue as

11:11:36    7    a patent, that somehow diminishes its status as prior art.  So

11:11:41    8    we'd simply like this instruction to clarify that all of the

11:11:44    9    text of Seckin is to be considered prior art.

11:11:47   10          THE COURT:  Well, let me ask you both:  Why do I need

11:11:50   11    and why does the jury need either one of your proposed

11:11:53   12    instructions?

11:11:54   13          Why does the jury need anything about "inventions

11:11:59   14    defined were invented on a certain date," and why do I get into

11:12:14   15    detail on the Seckin reference?

11:12:14   16          MR. STAKE:  Your Honor, we heard various arguments

11:12:15   17    from Facebook's counsel, including in opening statement and

11:12:20   18    elsewhere, that the fact that these patents were applied for in

11:12:23   19    2017 and '18 and issued in 2018 and '19 should somehow impact

11:12:29   20    the validity of these patents.  And so this is a -- this first

11:12:37   21    sentence is taken directly from the AIPLA jury instruction.

11:12:40   22          We don't believe that the invention date is -- is

11:12:43   23    disputed as to October 19th, 2007.  I don't -- and I don't

11:12:48   24    believe I've heard any opposition to the second sentence here

11:12:52   25    that we've proposed.

| | | |
|---|---|---|
| 11:12:54 | 1 | As to the rest of this instruction, I think this is |
| 11:12:59 | 2 | probably akin to the juror notebook issue, just where we'd be |
| 11:13:03 | 3 | concerned that this would put a thumb on the scale, so to |
| 11:13:08 | 4 | speak, as to this piece of prior art.  We think that the issue |
| 11:13:12 | 5 | of when this reference was publicly disclosed and these other |
| 11:13:18 | 6 | contentions here were developed in cross-examination, including |
| 11:13:22 | 7 | yesterday. |
| 11:13:22 | 8 | And so we would ask for just these first two |
| 11:13:27 | 9 | sentences with the invention language, and I would ask to hand |
| 11:13:32 | 10 | up this AIPLA model jury instruction. |
| 11:13:39 | 11 | THE COURT:  Would you not hand it up if you weren't |
| 11:13:41 | 12 | asked to hand it up?  Since we're talking about the way things |
| 11:13:47 | 13 | are worded, you kind of act like, well, now I've had my |
| 11:13:50 | 14 | argument but somebody else at my table wants me to show this to |
| 11:13:55 | 15 | you, so I'm just going to do it. |
| 11:13:57 | 16 | MR. STAKE:  Your Honor, would you like me to hand |
| 11:13:59 | 17 | this up to you. |
| 11:14:00 | 18 | (Laughter) |
| 11:14:00 | 19 | THE COURT:  Hand it to me. |
| 11:14:26 | 20 | So, Mr. Silbert, you know, this -- I presume that |
| 11:14:36 | 21 | these cases probably support the AIPLA model patent jury |
| 11:14:43 | 22 | instructions. |
| 11:14:47 | 23 | MR. SILBERT:  I haven't seen, Your Honor, what |
| 11:14:49 | 24 | counsel just handed you. |
| 11:14:51 | 25 | THE COURT:  Well, show him a copy of that.  Is this |

11:14:55  1   the only copy that lives?

11:15:02  2          MR. SILBERT:  The AIPLA, which is an independent body

11:15:08  3   of attorneys --

11:15:08  4          THE COURT:  I'm very aware of that.

11:15:10  5          MR. SILBERT:  -- has not been the primary source of

11:15:12  6   jury instructions.  As Your Honor knows, we've tried to use the

11:15:15  7   Northern District of California instructions.  I guess I'd

11:15:17  8   reiterate and I could read these cases, but I'd say we have a

11:15:21  9   pretty strenuous objection to the Court referring to the patent

11:15:27 10   claims as inventions at all, and particularly in a -- in an

11:15:31 11   instruction on invalidity.  And I just don't see why that's

11:15:34 12   necessary.

11:15:35 13          If they want to make a point about priority date,

11:15:38 14   it's perfectly accurate to say as -- and if it's necessary, and

11:15:42 15   I'm really not sure it's necessary, as the Court commented.

11:15:46 16   But to the extent it is necessary, it's perfectly accurate and

11:15:51 17   appropriate to say that the patents claim priority to a

11:15:54 18   particular date, and then the further explanation that that's

11:15:57 19   the date that the jury should consider for purposes of prior

11:16:01 20   art.

11:16:01 21          THE COURT:  All right.  I'm going to look at this.

11:16:03 22   Let me tell you what I'm leaning toward doing, is not using the

11:16:12 23   invention language, because that's really not the way I've ever

11:16:16 24   seen one of these cases tried, much less this one.  I've got a

11:16:21 25   world of respect for the AIPLA, but it seems like it does

11:16:27  1  insert something where we've argued all along about filings at

11:16:32  2  the patent office and what we do and that your patent contains

11:16:36  3  the invention.

11:16:36  4        I'm inclined, so you can think about this a little

11:16:40  5  bit and prepare your objections accordingly, to say, "The '557

11:16:45  6  patent claims priority to a provisional application filed on

11:16:49  7  October 19, 2007," which is the first sentence of what Facebook

11:16:55  8  wants, and then saying, "For the purposes of determining the

11:17:00  9  validity of the '557 patent, you may only consider prior art

11:17:04  10 that was publicly disclosed before October 19th, 2007" and not

11:17:09  11 say anything specific about the Seckin reference.  And you-all

11:17:15  12 can pick that up in argument and argue it that way.

11:17:18  13       And so that's -- I'm going to give some more thought

11:17:22  14 to this, but that's what I'm inclined to do.

11:17:47  15       You know, page 23, I don't really have a problem of

11:17:50  16 your level of ordinary skill in the art.  I just pass on this

11:17:55  17 as an editorial comment.  I think the person of skill in the

11:18:03  18 art is the single most confusing thing to juries in a patent

11:18:09  19 case, because I never have lawyers tell me we're of agreement

11:18:18  20 and you look at the jury and say, "A person of skill in the art

11:18:21  21 is so and so and this is what they've done."

11:18:24  22       When I ask people during Markman hearings, well, tell

11:18:27  23 me who the person of skill in the art is, people look at their

11:18:30  24 shoes and they dance around, and nobody ever wants to tell me

11:18:33  25 what a person of skill in the art is.

| | | |
|---|---|---|
| 11:18:35 | 1 | I don't think the jury here knows who a person of |
| 11:18:39 | 2 | skill in the art is.  But I think, since that's the way these |
| 11:18:47 | 3 | things go, your proposed paragraphs is as good as any.  But |
| 11:18:51 | 4 | I've always thought that we ought to confront the jury more |
| 11:18:58 | 5 | with exactly who is supposed to be analyzing this. |
| 11:19:01 | 6 | I have a farming patent right now which, believe me, |
| 11:19:04 | 7 | if it goes to trial is going to be a whole lot easier to try |
| 11:19:07 | 8 | than this case was, involving sesame seeds.  I mean, I can |
| 11:19:11 | 9 | grasp all of the things about this.  And I feel like at some |
| 11:19:15 | 10 | point, if we try that case, I'm just going to look at the jury |
| 11:19:16 | 11 | and say, "It's a farmer.  Just know that.  That's all you have |
| 11:19:20 | 12 | to worry about.  Forget all about these technical terms about |
| 11:19:24 | 13 | they grow or not.  What would have a farmer have known at the |
| 11:19:27 | 14 | time this seed was done? |
| 11:19:30 | 15 | All right.  Page 25.  I'm not going to say "The Court |
| 11:19:40 | 16 | will account for interest later, if appropriate."  I'm going to |
| 11:19:46 | 17 | say, "You must not add any amount of damages for interest."  I |
| 11:19:50 | 18 | may word it a little bit differently because I always put that |
| 11:19:53 | 19 | in, that they're supposed to just look at the damages and |
| 11:19:56 | 20 | they're not supposed to give any consideration to anything else |
| 11:20:00 | 21 | that is outlying out there.  So there will be some language in |
| 11:20:04 | 22 | one that I bring out that you will see that will say something |
| 11:20:07 | 23 | about not putting interest in there. |
| 11:20:20 | 24 | MR. SILBERT:  Thank you, Your Honor. |
| 11:20:21 | 25 | THE COURT:  Now, tell me about page 30, your proposed |

| | | |
|---|---|---|
| 11:20:23 | 1 | jury instruction 38. |
| 11:20:27 | 2 | MR. SILBERT:  This was an agreed instruction in the |
| 11:20:30 | 3 | set of agreed instructions that we submitted pretrial. |
| 11:20:35 | 4 | THE COURT:  Yes. |
| 11:20:36 | 5 | MR. SILBERT:  Voxer is now proposing to strike it. |
| 11:20:38 | 6 | We oppose striking it.  It's a correct statement of the law, as |
| 11:20:43 | 7 | everyone agreed when we submitted it as an agreed instruction. |
| 11:20:46 | 8 | And it's highly applicable in this case and all patent cases. |
| 11:20:50 | 9 | I think what Voxer is going to say is that Facebook |
| 11:20:53 | 10 | did not offer certain potential design-around, noninfringing |
| 11:21:00 | 11 | alternatives that we had described in discovery and, had |
| 11:21:03 | 12 | Your Honor given us a whole lot more time for this trial, I |
| 11:21:06 | 13 | think maybe we would have.  But that's something that hit the |
| 11:21:09 | 14 | cutting room floor.  But that doesn't matter for purposes -- |
| 11:21:12 | 15 | THE COURT:  You didn't use all the time I gave you. |
| 11:21:14 | 16 | MR. SILBERT:  I know.  I do know that. |
| 11:21:16 | 17 | THE COURT:  So that kind of falls hollow here. |
| 11:21:19 | 18 | MR. SILBERT:  Well, that I understand. |
| 11:21:20 | 19 | THE COURT:  But Voxer told me they were going to |
| 11:21:21 | 20 | finish in eight hours the first time around. |
| 11:21:23 | 21 | MR. SILBERT:  They did. |
| 11:21:24 | 22 | THE COURT:  And the second time they said, well, you |
| 11:21:25 | 23 | know, if you're going give them any more than that, give them |
| 11:21:29 | 24 | ten.  Well, you kind of went beyond ten, too. |
| 11:21:31 | 25 | MR. SILBERT:  Your Honor, I'd like to draw the |

11:21:33  1  Court's attention to just two sentences in this agreed

11:21:35  2  instruction.  One starts on the third line.  It says, "Voxer

11:21:39  3  has the burden to persuade you that no noninfringing

11:21:44  4  alternatives existed by a preponderance of the evidence."

11:21:46  5       So, first of all, it -- although we did introduce

11:21:50  6  evidence, which I'll get to in a second, it was not incumbent

11:21:54  7  on Facebook to introduce evidence that there are alternative --

11:21:57  8  noninfringing alternatives.  Voxer would have had to prove that

11:22:01  9  they didn't exist, first of all.

11:22:03  10       There was, in fact, a lot of testimony throughout the

11:22:06  11  trial by multiple witnesses of the existence of live streaming

11:22:09  12  technologies.  There was discussion of people watching concerts

11:22:13  13  by Madonna on Youtube, et cetera, with millions of viewers,

11:22:18  14  about RealNetworks.  All those --

11:22:19  15       THE COURT:  Don't leave out Severe Tire Damage.

11:22:22  16       MR. SILBERT:  And Severe Tire Damage.  Thank you very

11:22:25  17  much, Your Honor.  So that's point number one that makes this

11:22:28  18  relevant.  And, really, what the jury ought to be considering

11:22:31  19  for damages, if anything, is the difference, the delta, between

11:22:37  20  preexisting technologies and what Voxer says its patents cover.

11:22:42  21       And then the other sentence I point the Court to is

11:22:45  22  just the next sentence which makes that clear.  It says,

11:22:49  23  "Noninfringing technologies include, not only existing

11:22:52  24  technologies that do not infringe, but also technologies that

11:22:57  25  could reasonably have been developed that would not infringe."

| | | |
|---|---|---|
| 11:23:00 | 1 | And so the instruction is directly applicable to the |
| 11:23:05 | 2 | evidence in the case about preexisting streaming -- live |
| 11:23:12 | 3 | streaming technologies.  We think it is highly relevant and |
| 11:23:14 | 4 | really an important instruction that the jury needs to have if |
| 11:23:17 | 5 | they are going to think about damages. |
| 11:23:19 | 6 | THE COURT:  Do you have any authority for what you |
| 11:23:20 | 7 | just said? |
| 11:23:26 | 8 | MR. SILBERT:  Well, Your Honor, I think we could find |
| 11:23:27 | 9 | it.  This was an agreed instruction that we submitted as an |
| 11:23:33 | 10 | agreed statement of the law.  So, respectfully, I don't think |
| 11:23:40 | 11 | the accuracy of this instruction is in dispute.  I think their |
| 11:23:41 | 12 | argument -- and I don't want to anticipate Mr. Stake, but I |
| 11:23:47 | 13 | think their argument is going to be we didn't introduce these |
| 11:23:48 | 14 | particular potential design-arounds that we had talked about in |
| 11:23:52 | 15 | discovery.  And my point is that doesn't matter.  We -- it's |
| 11:23:56 | 16 | not incumbent on us to introduce anything. |
| 11:23:59 | 17 | THE COURT:  All right.  Mr. Stake? |
| 11:24:00 | 18 | MR. STAKE:  Your Honor, I think just two points here. |
| 11:24:02 | 19 | Voxer's view is that the predicate, you know, the |
| 11:24:07 | 20 | basis for these has not been -- these purported noninfringing |
| 11:24:11 | 21 | substitutes has not been presented to Your Honor sufficient to |
| 11:24:15 | 22 | give this instruction. |
| 11:24:16 | 23 | And point two is that this would cause -- as a |
| 11:24:18 | 24 | result, this would cause jury confusion.  We didn't hear any |
| 11:24:23 | 25 | testimony from Facebook's experts opining that there were |

11:24:30  1   substitutes for Voxer's technology or that these were

11:24:34  2   commercially or technologically sufficient to be noninfringing

11:24:40  3   or to be substitutes.

11:24:42  4          And, simply, you know, Facebook had the opportunity

11:24:45  5   to present these views of its experts that it presented in, for

11:24:49  6   example, the reports that it served, and it elected not to

11:24:55  7   present these positions.  And so it would be a major leap for

11:25:00  8   the jury to be asked to make some kind of determination on

11:25:06  9   noninfringing substitutes where there simply aren't -- isn't

11:25:10  10  sufficient expert testimony to support that or have them go

11:25:13  11  down that -- that road.

11:25:18  12         THE COURT:  Well, I'm not sure I would be arguing it

11:25:28  13  your way.  I'm not sure that I wouldn't be saying it ought to

11:25:31  14  be in there.  Because, if I were on the jury and reading this,

11:25:37  15  it would cause me to think, from Facebook's point of view, that

11:25:41  16  maybe they did infringe and now this is an excuse to get out of

11:25:45  17  it.

11:25:46  18         So, you know, I don't know that your positions are

11:25:51  19  really where they ought to be.  But if that's where we are,

11:25:57  20  I'll give some thought to it and either include it or not.  I'm

11:26:06  21  not sure it's something that I would really want if I were you,

11:26:09  22  but I understand your situation.

11:26:11  23         All right.  Now, I know what I'm going to draft on

11:26:13  24  that.  Let me talk to you a little bit about something that is

11:26:19  25  a little bit different than the way I've done it in the past.

11:26:23  1  We went through earlier as we went through this your -- let me

11:26:43  2  find it -- your summary of contentions.

11:26:52  3          And, as I said, all I'm going to do with that, or

11:26:55  4  would do with that, is take out the willfulness references.

11:27:05  5  But I have not in the past really put in a summary of

11:27:14  6  contentions, but it's fine to do it.  But what is kind of tied

11:27:23  7  to that and what you don't have in here is the stipulated

11:27:33  8  facts.  I usually put the stipulated facts in here because the

11:27:37  9  jury -- the jury doesn't have them in front of them.  I read

11:27:41  10 them to the jury at the beginning of trial, but I usually put

11:27:45  11 those in the Court's Charge.

11:27:49  12         And that, then, would get us into a little bit of a

11:28:03  13 deal on what we're going to do about how we handle claims

11:28:15  14 construction, which is kind of interesting here because I

11:28:17  15 didn't do the claim construction.

11:28:18  16         But normally what I would say, there would be

11:28:23  17 something to where I would have the claim term.  But since

11:28:28  18 we've got four claim terms that we say plain and ordinary

11:28:32  19 meaning on and two that we say preamble is limiting on, and

11:28:38  20 that's not really the way you handled it -- and I don't have a

11:28:48  21 problem with the way you handled it -- what do we do about

11:28:54  22 stipulated facts?  And do we -- are you comfortable with

11:28:58  23 leaving it your way on the way you-all have talked about plain

11:29:01  24 and ordinary meaning and what have you and not putting in

11:29:04  25 anything else about what claims construction would do?

| | | |
|---|---|---|
| 11:29:11 | 1 | MR. STAKE:  Your Honor, one initial comment from |
| 11:29:13 | 2 | Voxer.  Our understanding is that there was just one term that |
| 11:29:19 | 3 | was addressed in the claim construction order that is still at |
| 11:29:23 | 4 | issue here in this case.  This is the single term.  I think |
| 11:29:27 | 5 | it's "end-to-end connection."  That was the only one where |
| 11:29:30 | 6 | plain and ordinary meaning was decided.  The other terms that |
| 11:29:34 | 7 | were addressed are from other patents that are no longer being |
| 11:29:37 | 8 | asserted in the case. |
| 11:29:41 | 9 | THE COURT:  Well, you're right.  It's end-to-end |
| 11:29:43 | 10 | connection.  Well, it seems to me that we -- we don't make any |
| 11:29:54 | 11 | further reference to that, that you-all are comfortable with |
| 11:29:59 | 12 | the way you have it.  Am I right on that? |
| 11:30:01 | 13 | MR. STAKE:  That's fine, Your Honor. |
| 11:30:02 | 14 | THE COURT:  All right.  So what do we do about the |
| 11:30:07 | 15 | other stipulated facts?  Do you want a section on that in the |
| 11:30:18 | 16 | charge or not?  I will tell you the reason it's crawled its way |
| 11:30:24 | 17 | into my charges in patent cases and others is generally the |
| 11:30:27 | 18 | lawyers tell me that jurors sometimes don't know -- you know, |
| 11:30:32 | 19 | we tell them they're to consider the evidence and the exhibits |
| 11:30:35 | 20 | and stipulated facts, and that it's sometimes helpful for them |
| 11:30:39 | 21 | to know what the stipulated facts are. |
| 11:30:40 | 22 | The stipulated facts in this case, you know, may or |
| 11:30:49 | 23 | may not be helpful to the jury, may or may not be a big deal. |
| 11:30:52 | 24 | And it might be helpful to know these corporate things.  But I |
| 11:30:57 | 25 | don't -- I'm not committed to one way or the other.  I normally |

```
11:31:01   1   do it.  If you want it, I'll do it.  If you don't want it, I
11:31:04   2   won't do it.
11:31:05   3          MR. SILBERT:  Your Honor, it makes eminent sense as a
11:31:07   4   suggestion.  I'm going to confess that I just hadn't even
11:31:10   5   thought about it.  May I just confer with our team and make a
11:31:13   6   suggestion?
11:31:15   7          MR. STAKE:  Your Honor, we would be fine with reading
11:31:18   8   the stipulated facts.  They aren't very lengthy.  And the only
11:31:21   9   point here is there may have been a reference to a couple of
11:31:25  10   patents that are no longer asserted in the stipulated facts.
11:31:28  11   Let me see.
11:31:29  12          THE COURT:  Yeah.  We can --
11:31:31  13          MR. STONE:  In the version I'm looking at, I don't
11:31:33  14   see any reference to those.  I only the see '270 and '557.  But
11:31:36  15   that was the one -- the one note.
11:31:38  16          THE COURT:  Well, we would take out any reference to
11:31:41  17   the -- about the '030 and the '969.  There were stipulated
11:31:46  18   facts on that.
11:31:47  19          MR. SILBERT:  That's what my colleagues were saying,
11:31:49  20   that it was, I guess, an older version that still referred to
11:31:52  21   the patents that were no longer in the case.  But I think,
11:31:57  22   assuming we delete those references, I don't think we would
11:32:01  23   object to it.  I'm not sure we see a strong need for it, but I
11:32:04  24   don't think we'd object to it.
11:32:06  25          THE COURT:  All right.  Then what I'm likely to do is
```

11:32:08  1   take out -- I'll take out anything about claims construction,

11:32:11  2   and I'll take out the reference to the '030 and the '969.

11:32:16  3        Now, let me run through couple of other things that I

11:32:22  4   normally do that you'll see.  I generally give a rundown about

11:32:44  5   determining the credibility and truthfulness of the witnesses.

11:32:48  6   I say a pretty good amount about that.  I tell them a little

11:32:53  7   bit more about expert witnesses.  And so we're going to --

11:33:09  8   we'll massage that around a little bit.

11:33:11  9        So here's what we're going to do.  If you don't have

11:33:14  10  anything else right now, we're going to take what we just

11:33:17  11  discussed, and I'm going to incorporate it into our deal.  I'm

11:33:23  12  going to give it to you to look at.  The first one you get will

11:33:27  13  not be your take-it-or-leave-it, state your objections.  It

11:33:31  14  will be for you to look at, and we'll talk about it one more

11:33:35  15  time.  And if it's all right, fine.  If it's not, I'll take up

11:33:40  16  what your problems are with it, and then I'll go back and

11:33:43  17  decide what I'm going to do with it.  And then I'll bring you

11:33:46  18  your take-it-or-leave-it and state your objections.

11:33:49  19        MR. SILBERT:  Thank you very much, Your Honor.  I

11:33:50  20  could also report that -- and counsel can confirm -- that in

11:33:55  21  light of the court's ruling this morning regarding willfulness,

11:33:58  22  I understand that Voxer's prior request for judicial notice is

11:34:02  23  withdrawn.  So I don't think there's any other issues.

11:34:06  24        THE COURT:  That true?

11:34:08  25        MR. STAKE:  Confirmed, Your Honor.

| | | |
|---|---|---|
| 11:34:09 | 1 | THE COURT:  All right.  Very good.  All right.  We'll |
| 11:34:12 | 2 | go to work here. |
| 12:37:41 | 3 | (Recess) |
| 12:37:41 | 4 | (Open court, no jury) |
| 12:37:41 | 5 | THE COURT:  This is the verdict form that picks up |
| 12:54:57 | 6 | your revisions and puts it in our form.  So you can look that |
| 12:54:59 | 7 | over while we talk about it. |
| 12:55:14 | 8 | I've distributed to each side a copy of the proposed |
| 12:55:19 | 9 | charge for discussion purposes.  So just because it's an easy |
| 12:55:29 | 10 | default, I'll start with the plaintiff.  Comments? |
| 12:55:36 | 11 | MR. STAKE:  Your Honor, we have gone through a few |
| 12:55:39 | 12 | what I'd call "nits," just minor changes. |
| 12:55:41 | 13 | THE COURT:  There's always that, so run through them |
| 12:55:45 | 14 | with me. |
| 12:55:46 | 15 | MR. STAKE:  Okay.  Happy to.  On page 7 under Summary |
| 12:55:55 | 16 | of Contentions. |
| 12:55:59 | 17 | THE COURT:  All right. |
| 12:56:04 | 18 | MR. STAKE:  In the second to last sentence that |
| 12:56:06 | 19 | begins "Facebook also argues," after the asserted claims, we |
| 12:56:12 | 20 | would add "of the '557 patents are invalid." |
| 12:56:16 | 21 | THE COURT:  Just a minute.  I have to find you.  Oh. |
| 12:56:19 | 22 | In the next-to-the-last paragraph.  "Facebook also argues that |
| 12:56:24 | 23 | the asserted claims of the '557 patent"?  That's what you want |
| 12:56:30 | 24 | in it? |
| 12:56:30 | 25 | MR. STAKE:  Yes, Your Honor. |

| | | |
|---|---|---|
| 12:56:31 | 1 | THE COURT:  Any problem from the defendants? |
| 12:56:34 | 2 | MR. SILBERT:  No, Your Honor.  And we did compare |
| 12:56:36 | 3 | notes on these, and I believe everything Mr. Stake is going to |
| 12:56:39 | 4 | say is something we agreed to. |
| 12:56:41 | 5 | THE COURT:  All right.  Then I won't come back to |
| 12:56:43 | 6 | you.  But if you hear something that gives you pause, jump up. |
| 12:56:48 | 7 | MR. SILBERT:  We'll do that.  Thank you. |
| 12:56:50 | 8 | THE COURT:  All right.  Next, Mr. Stake? |
| 12:56:52 | 9 | MR. STAKE:  Then on the last line of page 7 just |
| 12:56:55 | 10 | below, where it states "The Voxer patents," we would again just |
| 12:57:00 | 11 | say "The '557 patent." |
| 12:57:02 | 12 | THE COURT:  "The asserted claims of the '557 patent"? |
| 12:57:08 | 13 | MR. STAKE:  Correct. |
| 12:57:10 | 14 | THE COURT:  Okay. |
| 12:57:18 | 15 | MR. STAKE:  On page 13 under the heading Patent |
| 12:57:22 | 16 | Invalidity Generally. |
| 12:57:27 | 17 | THE COURT:  Yes. |
| 12:57:28 | 18 | MR. STAKE:  We have two similar edits where we would |
| 12:57:32 | 19 | replace "Voxer patents" with "'557 patents" again. |
| 12:57:43 | 20 | '557 patent. |
| 12:57:44 | 21 | THE COURT:  No.  I'm just looking.  So it would be on |
| 12:57:47 | 22 | the second line.  And did you say there were two places that |
| 12:57:56 | 23 | appears? |
| 12:57:57 | 24 | MR. STAKE:  That's right.  In the next sentence. |
| 12:57:59 | 25 | THE COURT:  No -- where -- all right.  Go ahead. |

| | | |
|---|---|---|
| 12:58:03 | 1 | MR. STAKE:  Okay. |
| 12:58:04 | 2 | THE COURT:  Because all I've done is correct line 2 |
| 12:58:06 | 3 | right now. |
| 12:58:10 | 4 | MR. STAKE:  Pardon me.  Let me correct the record. |
| 12:58:13 | 5 | So line 2 we would leave as is. |
| 12:58:18 | 6 | THE COURT:  Oh.  The Voxer patents? |
| 12:58:22 | 7 | MR. STAKE:  Under the doctrine of equivalents, we |
| 12:58:24 | 8 | would leave that as is. |
| 12:58:24 | 9 | THE COURT:  No.  I'm in Patent Invalidity Generally. |
| 12:58:27 | 10 | MR. STAKE:  Okay.  In that one, in line 2 of that |
| 12:58:29 | 11 | section, we would replace "Voxer patents" with "'557 patents". |
| 12:58:33 | 12 | THE COURT:  All right.  And I thought you told me |
| 12:58:34 | 13 | there was two places in that paragraph.  Am I wrong? |
| 12:58:37 | 14 | MR. STAKE:  Yes.  That's right. |
| 12:58:38 | 15 | THE COURT:  Okay.  Now go to your next one. |
| 12:58:41 | 16 | MR. STAKE:  Okay.  The next one is in the next |
| 12:58:43 | 17 | sentence.  It should say, "To prove any claim of the '557 |
| 12:58:45 | 18 | patent is invalid." |
| 12:58:54 | 19 | THE COURT:  All right.  "To prove that any claim of |
| 12:58:55 | 20 | the '557 patent is invalid."  Got it. |
| 12:59:05 | 21 | MR. STAKE:  Yes.  Thank you.  On page 14 under the |
| 12:59:07 | 22 | heading Patent Invalidity - Obviousness, in the first line we |
| 12:59:11 | 23 | would again replace "Voxer patents" with "'557 patent". |
| 12:59:22 | 24 | THE COURT:  All right. |
| 12:59:28 | 25 | MR. STAKE:  And on page 16, which is a few pages into |

| | | |
|---|---|---|
| 12:59:34 | 1 | Instruction F -- |
| 12:59:37 | 2 | THE COURT:  Yep. |
| 12:59:38 | 3 | MR. STAKE:  -- it's before the numbered list 1 to 9, |
| 12:59:41 | 4 | the top of that page we would replace "Voxer patents" with |
| 12:59:43 | 5 | "'557 patent". |
| 12:59:53 | 6 | THE COURT:  All right. |
| 13:00:02 | 7 | MR. STAKE:  In the section on Damages - Introduction, |
| 13:00:05 | 8 | which is Section I, Facebook had requested a sentence on |
| 13:00:13 | 9 | interests that Your Honor indicated -- |
| 13:00:15 | 10 | THE COURT:  All right.  I put that in the -- in the |
| 13:00:17 | 11 | verdict form.  If you look at that new verdict form, you'll see |
| 13:00:21 | 12 | under damages, that's where I put that the jury is not to |
| 13:00:26 | 13 | consider interest.  Is it all right to have it in the verdict |
| 13:00:29 | 14 | form? |
| 13:00:29 | 15 | MR. SILBERT:  Yes. |
| 13:00:30 | 16 | THE COURT:  All right. |
| 13:00:30 | 17 | MR. SILBERT:  Thank you, Your Honor. |
| 13:00:31 | 18 | THE COURT:  Okay. |
| 13:00:36 | 19 | MR. STAKE:  Now, on page 22 there's an instruction |
| 13:00:39 | 20 | Damages - Comparable Agreements.  This is a section that the |
| 13:00:43 | 21 | parties have agreed to eliminate. |
| 13:00:45 | 22 | THE COURT:  Okay.  No problem. |
| 13:01:01 | 23 | MR. STAKE:  And on page 24 under Section P, Damages - |
| 13:01:08 | 24 | Date of Commencement of Damages, the parties have agreed to |
| 13:01:13 | 25 | delete the second sentence which begins, "If you find that the |

13:01:18  1  infringed Voxer patent" and ends with "that the infringement

13:01:21  2  began."

13:01:22  3              THE COURT:  All right.  So we take that whole

13:01:23  4  sentence out?

13:01:25  5              MR. STAKE:  Correct, Your Honor.

13:01:26  6              THE COURT:  So we have the first sentence and then go

13:01:28  7  right into, "If you find that the infringed Voxer patent was

13:01:33  8  granted, et cetera, et cetera."

13:01:35  9              MR. STAKE:  Correct.

13:01:35  10             THE COURT:  Okay.

13:01:37  11             MR. STAKE:  That's all that we had.  Our

13:01:39  12  understanding is this is not ...

13:01:40  13             THE COURT:  No.  But now that we have those little

13:01:44  14  things taken care, of let me hear do you have any big things

13:01:49  15  you want to suggest, or do you just -- is there anything we

13:01:55  16  ought to talk about?  Who knows?  You might convince me to

13:01:58  17  change something before you have to make your ...

13:02:01  18             MR. STAKE:  Your Honor, no major discussion

13:02:02  19  warranted, I believe.  But we did want to preserve our

13:02:05  20  objection as to the instruction and damages availability of

13:02:11  21  noninfringing substitutes for the reasons we gave earlier.

13:02:14  22             THE COURT:  Okay.  We'll get back to that.

13:02:16  23             All right.  Mr. Silbert?

13:02:18  24             MR. SILBERT:  Nothing further, Your Honor.  Thank

13:02:19  25  you.

```
13:02:19   1            THE COURT:  All right.  Then what we're going to do
13:02:21   2   is I'm going to make these changes.  Hopefully it won't take
13:02:25   3   long.  We'll come back, give you the final jury charge, and
13:02:29   4   then we'll be -- we'll bring in the jury and argue it.
13:02:32   5            Now, have you had a chance to look over that verdict
13:02:35   6   form, and is -- do you have any additional comments on it or is
13:02:40   7   it fine?  It pretty much incorporated everything you had in
13:02:44   8   your last one.  It just moved it to the way we do things.
13:02:48   9            And so you'll know, the reason I cut the sentence
13:02:51  10   that said that the jury foreman should hang on to the verdict
13:02:56  11   form and bring it to the courtroom, is when I'm told we have a
13:03:00  12   verdict, I will have a court security officer bring the verdict
13:03:03  13   form to me and I will look at it to make sure there's not some
13:03:07  14   clerical error or something in it that would cause me to want
13:03:10  15   to send it back to them before I notify you.  And so, if
13:03:13  16   there's not, I'm going to send it back to the jury, and then
13:03:16  17   when the jury comes in, the presiding juror will have it.
13:03:19  18            So there wasn't anything secretive about why I cut
13:03:24  19   that line out.  It's just I thought, you know, when the court
13:03:27  20   security officers says, Well, give me the form to show the
13:03:30  21   judge, the presiding juror might say, No, no.  The judge says I
13:03:33  22   can't give it to you.  I'm supposed to bring it in myself.  So
13:03:36  23   that's why I cut it out.
13:03:38  24            MR. STAKE:  Your Honor, Sam Stake for Voxer.
13:03:39  25            There was just one small change that I believe we
```

13:03:42 1   agreed on with Facebook's counsel on page 5 of the verdict

13:03:46 2   form.

13:03:47 3            THE COURT:  All right.

13:03:50 4            MR. STAKE:  We would have it just state "Facebook"

13:03:53 5   rather than "Facebook, Inc. and Instagram LLC."

13:03:58 6            THE COURT:  I think that's fine, and that's

13:04:00 7   consistent with what we've done before.  So we'll make that

13:04:05 8   change.

13:04:05 9            All right?

13:04:07 10           MR. SILBERT:  That's fine.

13:04:08 11           THE COURT:  We're good with that.  Then we're going

13:04:10 12  to get this in final form.  I'll come in and hear your formal

13:04:13 13  objections, and then we'll be ready to go.

13:04:17 14      (Recess)

13:18:59 15      (Open court, no jury)

13:18:59 16           THE COURT:  Will you distribute the final charge and

13:19:02 17  verdict form to the lawyers.

13:19:05 18           Beginning with the plaintiffs, if there are

13:19:07 19  objections to the jury charge, you may make them at this time.

13:19:29 20           MR. STAKE:  Your Honor same, Sam Stake for Voxer.

13:19:31 21           Voxer wishes to preserve its objection to instruction

13:19:36 22  and damages, availability of noninfringing substitutes, for the

13:19:39 23  reasons we've stated previously.  We further wish to preserve

13:19:45 24  all other objections that we have stated on the record thus

13:19:49 25  far.

13:19:50  1          THE COURT:  Those objections are noted by the court,

13:19:52  2  and they are overruled.

13:19:54  3          Any objections from the defendants?

13:19:57  4          MR. SILBERT:  Your Honor, David Silbert for

13:19:59  5  defendants.

13:19:59  6          We would preserve any objections previously stated,

13:20:02  7  but we have no additional objections to state at this time.

13:20:06  8          THE COURT:  Those likewise are noted and overruled.

13:20:08  9          Are you ready for me to read the charge and argue to

13:20:13 10  the jury?

13:20:15 11          MR. STONE:  Yes, Your Honor.

13:20:16 12          THE COURT:  All right.  For the plaintiffs, as I said

13:20:18 13  I'm going to break after your initial argument.  How long do

13:20:22 14  you intend to argue for the initial argument?

13:20:25 15          MR. STONE:  Approximately 40, 45 minutes, Your Honor.

13:20:28 16          THE COURT:  All right.  Then what we'll do is what I

13:20:33 17  told you earlier.  I'll read the charge to the jury, you'll

13:20:35 18  make your 45-minute argument, we'll take a brief recess.  Then

13:20:39 19  the defendants will make their argument, and you'll close.

13:20:47 20          MR. STONE:  Thank you, Your Honor.

13:20:47 21          THE COURT:  All right.  Bring in the jury.

13:22:55 22      (Open court, jury present)

13:22:55 23          **COURT'S INSTRUCTIONS TO THE JURY**

13:22:55 24          THE COURT:  We're now coming to an end and will soon

13:23:00 25  be putting this case in your hands.

1          So Members of the jury:  It is my duty and

2     responsibility to instruct you on the law you are to apply in

3     this case.  The law contained in these instructions is the only

4     law you may follow.  It is your duty to follow what I instruct

5     you the law is, regardless of any opinion that you might have

6     as to what the law ought to be.

7          Each of you is going to have your own printed copy of

8     these final jury instructions that I am giving you now, so

9     there is really no need for you the take notes unless you just

10    want to.

11         If I have given you the impression during the trial

12    that I favor either party, you must disregard that impression.

13    If I have given you the impression during the trial that I have

14    an opinion about the facts of this case, you must disregard

15    that impression.  You are the sole judges of the facts of this

16    case.  Other than my instructions to you on the law, you should

17    disregard anything I may have said or done during the trial in

18    arriving at your verdict.

19         You should consider all of the instructions about the

20    law as a whole with regard each instruction in light of the

21    others, without isolating a particular statement or paragraph.

22         The testimony of the witnesses and other exhibits

23    introduced by the parties constitutes the evidence.  The

24    statements of lawyers are not evidence; they are only

25    arguments.  It is important for you to distinguish between the

1   arguments of lawyers and the evidence on which those arguments

2   rest.  What the lawyers say or do is not evidence.  You may,

3   however, consider their arguments in light of the evidence that

4   has been admitted and determine whether the evidence admitted

5   in this trial supports the arguments.  You must determine the

6   facts from all of the testimony that you have heard and the

7   other evidence submitted.  You are the judges of the facts, but

8   in finding those facts, you must apply the law as I instruct

9   you.

10          You are required by law to decide the case in a fair,

11  impartial, and unbiased manner, based entirely on the law and

12  on the evidence presented to you in the courtroom.  You may not

13  be influenced by passion, prejudice, or sympathy you might have

14  for Voxer or Facebook in arriving at your verdict.

15          After the remainder of these instructions, you will

16  hear closing arguments from the lawyers.  Statements and

17  arguments of the lawyers, I remind you, are not evidence, and

18  they are not instructions on the law.  They are intended only

19  to assist the jury in understanding the evidence and the

20  parties' contentions.

21          A verdict form has been prepared for you.  You are to

22  take this verdict form with you to the jury room; and when you

23  have reached a unanimous decision or agreement as to the

24  verdict, you are to have your presiding juror fill in the

25  blanks in the verdict form, date it, and sign it.

1          Answer each question in the verdict form from the

2     facts as you find them to be.  Do not decide who you think

3     should win the case and answer the questions to reach that

4     result.  Again, your answers and your verdict must be

5     unanimous.

6          Do not let bias, prejudice, or sympathy play any

7     party in your deliberations.  A corporation and all other

8     persons are equal before the law and must be treated as equals

9     in a court of justice.

10          In determining the weight to give the testimony of a

11     witness, consider whether there was evidence that at some time

12     the witness said or did something, or failed to say or do

13     something, that was different from the testimony given at the

14     trial.

15          A simple mistake by a witness does not necessarily

16     mean that the witness did not tell the truth as he or she

17     remembers it.  People may forget some things or remember other

18     things inaccurately.  If a witness has made a misstatement,

19     consider whether that misstatement was an intentional falsehood

20     or simply an innocent mistake.  The significance of that may

21     depend on whether it has to do with an important fact or an

22     unimportant detail.

23          In any legal action, facts must be proved by a

24     required amount of evidence known as the "burden of proof."

25     The burden of proof in this case is on Voxer for some issues

1 and on Facebook for other issues.  There are two burdens of

2 proof that you will apply in this case.  One is the

3 preponderance of the evidence, and the other is

4 clear-and-convincing evidence.

5        Voxer has the burden of proving patent infringement

6 and damages by a preponderance of the evidence.  To establish

7 by a preponderance of the evidence means to prove something is

8 more likely so than not.  It is simply the greater weight of

9 the credible evidence.  If you find that Voxer has failed to

10 prove any element of its claim by a preponderance of the

11 evidence, then it may not recover on that claim.

12        Facebook has the burden of proving patent invalidity

13 by clear-and-convincing evidence.

14        When a party has the burden of proving any claim or

15 defense by clear-and-convincing evidence, it means that the

16 party must present evidence that leaves you with a firm belief

17 or conviction that it is highly probable that the factual

18 contentions of the claim or defense are true.  This is a higher

19 standard of proof than proof by a preponderance of the

20 evidence, but it does not require proof beyond a reasonable

21 doubt.

22        The evidence you are to consider consists of the

23 testimony of the witnesses, the documents and other exhibits

24 admitted into evidence, and any fair inferences and reasonable

25 conclusions you can draw from the facts and circumstances that

 1  have been proved.

 2          Generally speaking, there are two types of evidence.

 3  One is direct evidence, such as the testimony of an eyewitness.

 4  The other is indirect or circumstantial evidence.

 5  Circumstantial evidence is evidence that proves a fact from

 6  which you can logically conclude another fact exists.  As a

 7  general rule, the law makes no distinction between direct and

 8  circumstantial evidence but simply requires that you find the

 9  facts from a preponderance of all of the evidence, both direct

10  and circumstantial.

11          You alone are to determine the questions of

12  credibility or truthfulness of the witnesses.  In weighing the

13  testimony of the witnesses, you may consider the witness's

14  manner and demeanor on the witness stand, any feelings or

15  interest in the case, or any prejudice or bias about the case

16  that the witness may have, and any consistency or inconsistency

17  of the witness's testimony considered in the light of the

18  circumstances.  Has the witness been controlled -- pardon me.

19  Has the witness been contradicted by other credible evidence?

20  Has the witness made statements at other times and places

21  contrary to those made here on the witness stand?  You must

22  give the testimony of each witness the credibility that you

23  think it deserves.

24          Even though a witness may be a party to the action

25  and, therefore, interested in the outcome, the testimony may be

1  accepted if it is not contradicted by direct evidence or by any

2  inference that may be drawn from the evidence, if you believe

3  the testimony.

4         You are not to decide the case by counting the number

5  of witnesses who have testified on the opposing sides.  Witness

6  testimony is weighed; witnesses are not counted.  The test is

7  not the relative number of witnesses, but the relative

8  convincing force of the evidence.  The testimony of a single

9  witness is sufficient to prove any fact, even if a greater

10  number of witnesses testified to the contrary, if after

11  considering all of the other evidence, you believe that

12  witness.

13         When knowledge of technical subject matter may be

14  helpful to the jury, a person who has special training or

15  experience in that technical field is permitted to state an

16  opinion on those technical matters.  However, you are not

17  required to accept that opinion.  As with any other witness, it

18  is up to you to decide whether to rely on it.

19         Certain demonstrative exhibits shown to you, such as

20  PowerPoint presentations, posters, or models, are illustrations

21  of the evidence, but are not themselves evidence.  It is the

22  party's description, picture, or model used to describe

23  something involved in the trial.  Your recollection of the

24  evidence differs from the demonstrative exhibits -- if your

25  recollection of the evidence differs from the demonstrative

 1    exhibits, rely on your recollection.

 2          For the purposes of this action only, the parties do

 3    not contest the following.  These are stipulated facts:

 4          (a) This Court has jurisdiction over the parties and

 5    all claims and defenses in this action.

 6          (b) Voxer is a Delaware corporation with its

 7    principal place of business at 1999 Bryan Street, Suite 900,

 8    Dallas, Texas 75201-3140.

 9          (c) Voxer LLC is a Delaware limited liability company

10    and the legal owner by assignment of the Asserted Patents.

11    Voxer IP LLC is a wholly-owned subsidiary of Voxer, Inc.

12          (d) Meta Platforms, Inc. f/k/a Facebook, Inc., is a

13    Delaware corporation with a principal place of business at

14    1601 Willow Road, Menlo Park, California.

15          (e) Instagram LLC is a limited liability company and

16    a wholly-owned subsidiary of Meta Platforms. Inc.

17          (f) Defendants Meta Platforms, Inc. f/k/a Facebook,

18    Inc., and Instagram LLC own and operate the facebook.com and

19    instagram.com websites, and make available the Facebook Live

20    and Instagram Live services, as well as the Facebook and

21    Instagram applications for mobile devices.

22          (g) The application leading to the '270 Patent was

23    filed on May 2nd, 2017 and the '270 Patent was issued on

24    November 27th, 2018 by the U.S. Patent Office.

25          (h) For purposes of this litigation, the parties

1  agree that the '270 patent is entitled to a priority date of no

2  earlier than June 28th, 2007.

3          (i) The application leading to the '557 patent was

4  filed on October 16th, 2018, and the '557 patent was issued on

5  December 17th, 2019 by the U.S. Patent Office.

6          (j) For purposes of this litigation, the parties

7  agree that the '557 patent is entitled to a priority date of no

8  earlier than June 28th, 2007.

9          (k) On January 7th, 2020, Voxer filed this patent

10  infringement action against Defendants.

11          As I did at the start of this case, I will now give

12  you a summary of each side's contentions in this case.  I will

13  then provide you with detailed instructions on what each side

14  must prove to prevail on each of its contentions.

15          As I previously told you, Voxer seeks money damages

16  from Facebook for allegedly infringing the Voxer patents by

17  making, using, selling, and offering for sale methods that

18  Voxer argues are covered by one or more of the asserted claims

19  of those patents, which are:

20          Claims 34, 47, 48, and 51 of the '270 patent; and

21  Claims 1 and 9 of the '557 patent.

22          Voxer contends that Facebook directly infringes each

23  of these claims.  Facebook denies that it has infringed any of

24  the asserted claims of the Voxer patents.  Facebook also argues

25  that the asserted claims of the '557 patent are invalid.  I

1   will instruct you later as to the ways in which a patent may be

2   invalid.

3           Your job is to decide whether Facebook has infringed

4   the asserted claims of the Voxer patents and whether any of the

5   asserted claims of the '557 patent are invalid.  If you decide

6   that any asserted claim has been infringed and is not invalid,

7   you will need then to decide any money damages to be awarded to

8   Voxer to compensate it for the infringement.

9           Before you can decide many of the issues in this

10  case, you'll need to understand the role of the patent claims.

11  The patent claims are the numbered sentences at the end of each

12  patent.  The claims define a patent owner's rights under the

13  law.  The claims are important because it is the words of the

14  claims that define what the patent covers.  The figures and

15  text in the rest of the patent provide a description or

16  examples of the invention, and they provide a context for the

17  claims; but it is the claims that define the breadth of the

18  patent's coverage.

19          Therefore, what a patent covers depends, in turn, on

20  what each of its claims cover.

21          To know what a claim covers, a claim sets forth, in

22  words, a set of requirements.  Each claim sets forth its

23  requirements in a single sentence.  The requirements of a claim

24  are often referred to as "claim elements" or "claim

25  limitations."  When a method meets all of the requirements of a

1  claim, in other words, where it meets all of its limitations or

2  all of its elements, the claim is said to cover that method;

3  and that method is said to fall within the scope of the claim.

4  In other words, a claim covers a method where each of the claim

5  elements or limitations is present in that method.

6          You will first need to understand what each claim

7  covers in order to decide whether or not there is infringement

8  of that claim and to decide whether or not the claim is

9  invalid.  The first step is to understand the meaning of the

10 words used in the patent claim.

11          The law says that it is my role to define the terms

12 of the claims, and it is your role to apply my definitions to

13 the terms I have construed to the issues that you have been

14 asked to decide in this case.

15          The beginning portion of a claim, also known as the

16 preamble, often uses the word "comprising."  The word

17 "comprising," when used in the preamble, means "including but

18 not limited to" or "containing but not limited to."  When

19 "comprising" is used in the preamble, if you decide that an

20 accused method includes all of the requirements of that claim,

21 the claim is infringed.  This is true even if the accused

22 method contains additional elements.

23          You are to use the plain and ordinary meaning of the

24 words of the patent claims as understood by a person of

25 ordinary skill in the art, which is to say, in the field of

1  technology of the patent at the time of the invention.  The

2  meaning of the words of the patent claims must be the same when

3  deciding both issues of infringement and validity.

4          This case involves two types of patent claims:

5  independent claims and dependent claims.

6          An "independent claim" sets forth all of the

7  requirements which must be met in order to cover that claim.

8  Thus, it is not necessary to look at any other claim to

9  determine what an independent claim covers.  In this case, the

10  following claims are independent claims:

11          Claim 34 of the '270 patent; and Claim 1 of the '557

12  patent.

13          The remainder of the asserted claims in the Voxer

14  Patents are "dependent claims."  A dependent claim does not

15  itself recite all of the requirements of the claim but refers

16  to another claim for some of its requirements.  In this way,

17  the claim "depends" on another claim.  A dependent claim

18  incorporates all of the requirements of the claim or claims to

19  which it refers.  The dependent claim then adds its own

20  additional requirements.  To determine what a dependent claim

21  covers, it is necessary to look at both the dependent claim and

22  any other claim or claims to which it refers.  A method that

23  meets all the requirements of both the dependent claim and the

24  claim or claims to which it refers is covered by that dependent

25  claim.  In this case, the following claims are dependent

1  claims:

2          Claims 47, 48, and 51 of the '270 patent; and Claim 9

3  of the '557 patent.

4          The use of the terms "a" or "an" in a claim is a term

5  of art, which has a special meaning in the context of a patent

6  claim.  When used in a claim, the terms "a" or "an" means "one

7  or more."

8          The subsequent use of the definite article "the" or

9  "said" in a claim refers back to the same claim term and does

10  not change the general plural rule or similarly refers to "one

11  or more."

12          I will now instruct you on how to decide whether the

13  Voxer -- whether or not Voxer has proved that Facebook

14  infringed any of the asserted claims of the Voxer Patents.

15          Patent law gives the owner of a valid patent the

16  right to exclude others from importing, making, using, offering

17  to sell, or selling the claimed invention or performing a

18  method claimed in the patent within the United States during

19  the term of the patent.  Any person or business entity that has

20  engaged in any of those acts without the patent owner's

21  permission infringes the patent.

22          In determining infringement, you must compare

23  Facebook's accused methods to the asserted claims of the Voxer

24  patents infringement.

25          There are two types of "direct infringement": (1)

"literal infringement" and (2) "infringement under the doctrine of equivalents."  I will now instruct you on literal infringement, and then will provide an instruction on infringement under the doctrine of equivalents.

In order to prove literal infringement of an asserted patent claim, Voxer must prove by a preponderance of the evidence that Facebook performed within the United States an accused method that meets all of the requirements of the asserted claim and did so without Voxer's permission.  You must compare the accused methods with each and every one of the requirements of the asserted claim to determine whether all of the requirements of that claim are met.

You must determine, separately for each asserted claim, and separately for each accused method, whether or not there is infringement.  For dependent claims, if you find that a claim to which a dependent claim refers is not infringed, there cannot be infringement of that dependent claim.  On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the accused method meets the additional requirement or requirements of any claims that depend from the independent claim to determine whether those dependent claims have also been infringed.  This is because a dependent claim includes all of the requirements of any of the claims to which it refers, plus additional requirement or requirements of its own.

1          A party can directly infringe a patent without

2    knowing of the patent or without knowing that what the party is

3    doing is patent infringement.

4          If a company makes, uses, sells, or offers to sell

5    within the United States a method that does not literally meet

6    all of the elements of a claim and thus does not literally

7    infringe that claim, there can still be direct infringement if

8    that method satisfies the claim elements under the doctrine of

9    equivalents.

10         Under the doctrine of equivalents, a method infringes

11   a claim if the accused method contains elements or steps that

12   literally meet or are equivalent to each and every element of

13   the claim.  You may find that an element or step is equivalent

14   to an element of a claim that is not met literally if a person

15   having ordinary skill in the field of technology of the patent

16   would have considered the differences between them to be

17   "insubstantial" or would have found that the element or step:

18   (1) performs substantially the same function and (2) works in

19   substantially the same way (3) to achieve substantially the

20   same result as the element of the claim.

21         In order to prove infringement by "equivalents,"

22   Voxer must prove the equivalency of the element or step of the

23   claim element by a preponderance of the evidence.  Thus, each

24   element of a claim must be met by the accused method either

25   literally or under the doctrine of equivalents for you to find

 1   infringement.  If the accused method is missing an equivalent

 2   method step to even one method step of the asserted patent

 3   claim, the accused method cannot infringe under the doctrine of

 4   equivalents.

 5           Known interchangeability of the claim element and the

 6   proposed equivalent is a factor that can support a finding of

 7   infringement under the doctrine of equivalents.  In order for

 8   the elements or step to be considered interchangeable, the

 9   claim element must have been known at the time of the alleged

10   infringement by a person having ordinary skill in the field of

11   technology of the patent.  Interchangeability at the present

12   time is not sufficient.

13           Voxer contends that if you find Facebook does not

14   literally infringe the asserted claims, then Facebook infringes

15   the asserted claims of the Voxer Patents under the doctrine of

16   equivalents.

17           I will now instruct you on the rules you must follow

18   in deciding whether or not Facebook has proved that the

19   asserted claims of the '557 patent are invalid.  To prove that

20   any claim of the '557 patent is invalid, Facebook must persuade

21   you by clear-and-convincing evidence, that is, you must be left

22   with a clear conviction that the claim is invalid.  Otherwise,

23   you must conclude that Facebook has not proved that the claim

24   is invalid.

25           The '557 patent claims priority to a provisional

1  application filed on October 19th, 2007.  For purposes of

2  determining the validity of the '557 patent, you may only

3  consider prior art that was publicly disclosed before

4  October 19th, 2007.

5          In order for someone to be entitled to a patent, the

6  invention must actually be "new."  A patent claim is invalid if

7  the claimed invention is not new.  If an invention is not new,

8  we say that it is "anticipated" by the prior art.

9          Anticipation must be determined on a claim-by-claim

10  basis.  In order to show that a claim is anticipated, Facebook

11  must prove by clear-and-convincing evidence that all of the

12  requirements of the claim are present in a single piece of

13  prior art.  You may not find that prior art anticipates a

14  patent claim by combining two or more elements of prior art.

15          To anticipate the invention, the prior art does not

16  have to use the same words as the claim, but all of the

17  requirements of the claim must have been disclosed and arranged

18  as in the claim.  The claim requirements may either be

19  disclosed expressly or inherently, that is, necessarily

20  implied, such that a person having ordinary skill in the art in

21  the technology of the invention, looking at that one reference,

22  could make and use the claimed invention.

23          If a dependent claim is anticipated by the prior art,

24  then the claims from which it depends are necessarily

25  anticipated as well.

1          Facebook contends in this case that the asserted

2    claims of the '557 patent are invalid as being obvious.

3          Even though an invention may not have been

4    identically disclosed or described in a single prior art

5    reference before it was made by an inventor, the invention may

6    have been obvious to a person of ordinary skill in the field of

7    technology of the patent at the time the invention was made.

8          Facebook may establish that a patent claim is invalid

9    by proving, by clear-and-convincing evidence, that the claimed

10   invention would have been obvious to persons having ordinary

11   skill in the art at the time the invention was made in the

12   field of the invention.

13          In determining whether a claimed invention is

14   obvious, you must consider the level of ordinary skill in the

15   field of the invention that someone would have had at the time

16   the invention was made, the scope and content of the prior art,

17   any differences between the prior art and the claimed

18   invention, and, if present, so-called objective evidence or

19   secondary considerations, which I will describe shortly.  Do

20   not use hindsight; consider only what was known at the time of

21   the invention.

22          Keep in mind that the existence of each and every

23   element of the claimed invention in the prior art does not

24   necessarily prove obviousness.  Most, if not all, inventions

25   rely on the building blocks of prior art.

1          In considering whether a claimed invention is

2     obvious, you should consider whether, as of the priority date

3     of the asserted patents, there was a reason that would have

4     prompted a person of ordinary skill in the field to combine the

5     known elements in a way that the claimed invention does, taking

6     into account such facts as:

7          (1) Whether the claimed invention was merely the

8     predictable result of using prior art elements according to

9     their known function or functions;

10          (2) Whether the claimed invention provides an obvious

11     solution to a known problem in the relevant field;

12          (3) Whether the prior art teaches or suggests the

13     desirability of combining elements claimed in the invention;

14          (4) Whether the prior art teaches away from combining

15     elements in the claimed invention; and

16          (5) Whether it would have been obvious to try the

17     combinations of elements, such as when there is a design

18     incentive or market pressure to solve a problem and there are a

19     finite number of identified, predictable solutions.

20          To find it rendered the claimed invention obvious,

21     you must find that the prior art provided a reasonable

22     expectation of success.

23          In determining whether the claimed invention was

24     obvious, consider each claim separately and consider only what

25     was known at the time of the invention.  In determining whether

1  the claimed invention was obvious, do not use hindsight.  In

2  other words, you should not consider what a person of ordinary

3  skill in the art would know now or what has been learned from

4  the teaching of the '557 patent.  In making these assessments,

5  you should take into account any objective evidence, sometimes

6  called secondary considerations, that may shed light on whether

7  or not the claimed invention is obvious.  These include:

8          (1) Whether the claimed invention was commercially

9  successful as a result of the merits of the claimed invention

10  (rather than the result of design needs or market-pressure

11  advertising or similar activities);

12          (2) Whether the claimed invention satisfied a

13  long-felt need;

14          (3) Whether others had tried and failed to make the

15  claimed invention;

16          (4) Whether others invented the claimed invention at

17  roughly the same time;

18          (5) Whether others copied the claimed invention;

19          (6) Whether the claimed invention achieved unexpected

20  results;

21          (7) Whether the claim -- pardon me.  (7) Whether

22  others in the field praised the claimed invention;

23          (8) Whether persons having ordinary skill in the art

24  of the invention expressed surprise or disbelief regarding the

25  claimed invention; and

1          (9) Whether the inventor proceeded contrary to

2    accepted wisdom in the field.

3          While these objective indicia must be taken into

4    account, you must consider all of the evidence related to

5    obviousness before you reach a decision.

6          In determining whether the claimed invention was

7    obvious, consider each claim separately, but understand that if

8    a dependent claim is obvious, then the claims from which it

9    depends are necessarily obvious as well.

10         In deciding what the level of ordinary skill in the

11   field of the invention is, you should consider all of the

12   evidence introduced at trial, including but not limited to: (1)

13   the levels of education and experience of the inventor and

14   other persons actively working in the field; (2) the types of

15   problems encountered in the field; (3) prior art solutions to

16   those problems; (4) the rapidity with which inventions are

17   made; and (5) the sophistication of the technology.

18         In considering whether the claimed invention was

19   obvious, you must first determine the scope and content of the

20   prior art.  The scope and content of the prior art for deciding

21   whether the invention was obvious includes at least prior art

22   in the same field as the claimed invention.  It also includes

23   prior art from different fields that a person of ordinary skill

24   in the art would have considered when trying to solve the

25   problem that is addressed by the invention.

1          Where Facebook is relying on prior art that differs

2   from the prior art considered by the Patent and Trademark

3   Office, you should give that prior art more weight when you are

4   considering whether the challenger has carried its burden of

5   proving invalidity.

6          If you find that Facebook infringed any claim of the

7   Voxer patents and that Facebook has not proved that such claim

8   is invalid, you must then consider what amount of damages to

9   award to Voxer.  I will now instruct you on that measure of

10  damages.  By instructing you on damages, I am not suggesting

11  which party should win this case on any issue.  If you find

12  that Facebook has not infringed any valid claim of the asserted

13  patents, then Voxer is not entitled to damages.

14         The damages you award must be adequate to compensate

15  Voxer for the infringement.  They are not meant to punish

16  Facebook.

17         Voxer has the burden to establish the amount of

18  damages by a preponderance of the evidence.  In other words,

19  you should award only those damages that Voxer establishes that

20  are more likely than not it has suffered.  While Voxer is not

21  required to prove the amount of damages with mathematical

22  precision, it must prove them with reasonable certainty.  You

23  may not award damages that are speculative, damages that are

24  only possible, or damages that are based on guesswork.

25         In this case, Voxer seeks damages in the form of what

1    it contends to be a reasonable royalty.  You must be careful to

2    ensure that the award is no more and no less than the value of

3    the patented inventions.

4          Facebook may also present evidence as to what

5    damages, if any, it believes would be due should you find that

6    Facebook infringes any valid asserted claim of the asserted

7    patents.  Facebook's presentation of such evidence should not

8    be taken as an indication that Facebook believes that it

9    infringes or that the claims of the asserted patent are valid.

10         A royalty is a payment made to a patent holder in

11   exchange for the right to make, use, or sell the claimed

12   invention.  A reasonable royalty is the amount of royalty

13   payment Voxer and Facebook would have agreed to in a

14   hypothetical negotiation taking place at the time immediately

15   prior to when the infringement first began.

16         In considering this hypothetical negotiation, you

17   should focus on what the expectation of Voxer and Facebook

18   would have been had they entered into an agreement at that

19   time, and had they acted reasonably in their negotiations.

20         Unlike in a real-world negotiation, all parties to

21   the hypothetical negotiation are presumed to believe that the

22   patents are valid and infringed and that both parties were

23   willing to enter into an agreement.  The reasonable royalty you

24   determine must be a royalty that would have resulted from the

25   hypothetical negotiation and not simply a royalty either party

1  would have preferred.

2          Evidence of things that happened after the

3  infringement first began can be considered in evaluating the

4  reasonable royalty only to the extent that the evidence aids in

5  assessing what royalty would have resulted from a hypothetical

6  negotiation just prior to the first infringement.

7          A reasonable royalty award must be based on the

8  incremental value that the patented invention adds to the

9  accused services.  When the infringing methods have both

10 patented and unpatented features, measuring this value requires

11 a determination of the value added by the patented features.

12 The ultimate combination of the royalty base and royalty rate

13 must reflect the value attributable to the infringing features

14 of the Facebook services, and no more.

15          Any amount of damages must be based solely on the

16 value attributable to the patented invention, as distinct from

17 unpatented features of the accused services or other factors

18 such as marketing, advertising, or Facebook's size.

19          A royalty compensating the patent owner for damages

20 must reflect the value attributable to the infringing features

21 of the services -- pardon me.  Let me restate that.

22          A royalty compensating the patent owner for damages

23 must reflect the value attributable to the infringing features

24 of the services, and no more.  The process of separating the

25 value of the allegedly infringing features from the value of

1  all other features is called apportionment.  When the services

2  accused of infringement use both patented and unpatented

3  methods, your award must be apportioned so that it is based

4  only on the value of the patented methods, and no more.

5        In determining the amount of a reasonable royalty

6  that would have resulted from the hypothetical negotiations

7  between Voxer and Facebook, you may consider evidence on any of

8  the following factors, in addition to any other evidence

9  presented by the parties on the economic value of the patent:

10        These factors are:  The rates paid by Facebook and

11  similar parties in the industry to license other patents

12  comparable to the Voxer patents.

13        The nature and scope of the license, as exclusive or

14  non-exclusive, or as restricted or non-restricted in terms of

15  its territory or with respect to whom the services may be sold.

16        The commercial relationship between Voxer and

17  Facebook, such as whether or not they are competitors in the

18  same territory in the same line of business.

19        The effect of selling the patented methods in

20  promoting other sales of Facebook and the extent of such

21  collateral sales.

22        The duration of the Voxer patents and the term of the

23  license.

24        The established profitability of the methods

25  performed under the Voxer patents; their commercial success;

1   and their popularity.

2           The utility and advantages of the patented inventions

3   over the old modes or devices, if any, that had been used for

4   achieving similar results.

5           The nature of the patented inventions; the character

6   of the commercial embodiment of the inventions as owned and

7   produced by or for the licensor; and the benefits to those who

8   have used the inventions.

9           The extent to which Facebook has made use of the

10  inventions, and any evidence that shows the value of that use.

11          The portion of the profit or of the selling price

12  that may be customary in the particular business or in

13  comparable businesses that allow for the use of the inventions

14  or analogous inventions.

15          The portion of the profit that arises from the

16  patented inventions themselves, as distinguished from

17  unpatented features, such as the manufacturing process,

18  business risks, or significant features or improvements added

19  by the accused infringer.

20          The opinion and testimony of qualified experts.

21          The amount that Voxer and Facebook would have agreed

22  upon (at the time the infringement began) if both sides had

23  been reasonable and voluntarily trying to reach an agreement;

24  that is, the amount which a prudent licensee, who desired as a

25  business proposition to obtain a license to manufacture and

1  sell a particular article embodying the patented invention,

2  would have been willing to pay as a royalty and yet be able to

3  make a reasonable profit and which amount would have been

4  acceptable by a patentee who was willing to grant a license.

5        No one factor is dispositive, and you can and should

6  consider the evidence that has been presented to you in this

7  case on each of these factors.  You may also consider any other

8  factors which in your mind would have increased or decreased

9  the royalty the alleged infringer would have been willing to

10  pay and the patent owner would have been willing to accept,

11  acting as normally prudent businesspeople.

12        In determining a reasonable royalty, you should also

13  take into account whether Facebook could have implemented any

14  non-infringing technologies as an alternative to the patented

15  invention.  These are called non-infringing alternatives.

16  Voxer has the burden to persuade you that no non-infringing

17  alternative existed by a preponderance of the evidence.

18  Non-infringing technologies include not only existing

19  technologies that do not infringe, but also technologies that

20  could reasonably have been developed and that would not

21  infringe.  When a party can avoid a patent and replace an

22  infringing service with a non-infringing alternative, there is

23  little incentive for the party to take a license from the

24  patent owner rather than simply avoid the patent by

25  implementing a non-infringing alternative.  By the same

1    reasoning, if avoiding the patent would be difficult,

2    expensive, and time-consuming, the amount the party would be

3    willing to pay for a license may be greater.

4         A reasonable royalty can be paid either in the form

5    of a one-time lump-sum payment or as a "running royalty."

6    Either method is designed to compensate the patent holder based

7    on the infringer's use of the patented technology.  It is up to

8    you, based on the evidence, to decide what type of royalty, if

9    any, is appropriate in this case.

10        Reasonable royalty awards may take the form of a

11   lump-sum payment.  A lump-sum payment is equal to an amount

12   that the alleged infringer would have paid at the time of a

13   hypothetical negotiation for a license covering all use of the

14   licensed methods, both past and future.  When a lump sum is

15   paid, the infringer pays a single price for the license

16   covering both past and future infringing use.

17        Reasonable royalty awards may also take the form of a

18   running royalty based on the revenue from or the volume of use

19   of licensed methods.  A running royalty can be calculated, for

20   example, by multiplying a royalty base by a royalty rate.

21        In determining the amount of damages, you must

22   determine when the damages began.  If you find that the

23   infringed Voxer patent was granted after the infringing

24   activity began, damages should be calculated from the date the

25   patent issued.

1          It is now your duty to deliberate and to consult with

2   one another in an effort to reach a verdict.  Each of you must

3   decide the case for yourself, but only after an impartial

4   consideration of the evidence with your fellow jurors.  During

5   your deliberations, do not hesitate to reexamine your own

6   opinions and change your mind if you are convinced that you

7   were wrong.  But do not give up on an honest belief because the

8   other jurors think differently, or just to finish the case.

9          Remember at all times, you are the judges of the

10  facts.  You have been allowed to take notes during this trial.

11  Any notes that you took during this trial are only aids to

12  memory.  If your memory differs from your notes, you should

13  rely on your memory and not on the notes.  The notes are not

14  evidence.  If you did not take notes, rely on your independent

15  recollection of the evidence and do not be unduly influenced by

16  the notes of other jurors.  Notes are not entitled to greater

17  weight than the recollection or impression of each juror about

18  the testimony.

19         When you go into the jury room to deliberate, you may

20  take a copy of this charge, the exhibits that I have admitted

21  into evidence, and your notes.  You must select a presiding

22  juror to guide you in your deliberations and to speak for you

23  here in the courtroom.

24         During your deliberations, you may not communicate

25  any information about this case to anyone by any means.  For

1 example, do not talk face-to-face or use any electronic device

2 or media, such as the telephone, a cell phone, smartphone,

3 tablet or computer, the Internet, any Internet service, any

4 text or instant messaging service, any Internet chat room, blog

5 or website such as Twitter, LinkedIn, YouTube, Facebook,

6 Instagram, TikTok, or Snapchat or the like, or any other way to

7 communicate.  You may not communicate to anyone any information

8 about this case or conduct any research about this case until

9 this case is over and I accept your verdict.

10   In other words, you cannot talk to anyone on the

11 phone, correspond with anyone, or electronically communicate

12 with anyone about this case.  You can only discuss the case in

13 the jury room with your fellow jurors during deliberations.

14   Your verdict must be unanimous.  After you have

15 reached a unanimous verdict, your presiding juror must fill out

16 the answers to the written questions on the verdict form and

17 sign and date it.  Answer each question in the verdict form

18 from the facts as you find them.  Do not decide who you think

19 should win and then answer the questions to reach that result.

20 Your answers and your verdict must be unanimous.  After you

21 have concluded your service and I have discharged you, you are

22 not required to talk with anyone about the case.

23   If you need to communicate with me during your

24 deliberations, your presiding juror should write the inquiry

25 and give it to the court security officer.  After consulting

1  with the lawyers, I will respond either in writing or by

2  meeting with you in the courtroom.  Keep in mind, however, that

3  you must never disclose to anyone, not even to me, your

4  numerical division on any question.

5          And there's a place at the bottom for me to fill in

6  the date.  It will say, Submitted this blank day of September

7  22 at blank o'clock p.m., and I will sign it and instruct you

8  that you may then proceed to the jury room.

9          Now, you will have a verdict form that you must

10 follow.  Let me say little bit about the verdict form.  It

11 varies slightly from the verdict form that you have had in your

12 notebooks.  The form we gave you was to follow along during the

13 trial so you would know what you would be looking to answer.

14 But during every trial -- it's only television where a trial is

15 scripted where it always comes out exactly the way you're

16 looking for.  So there have been little changes as we've gone

17 along, so I've prepared a new verdict form.  And when you

18 retire to your jury room, Ms. Oakes, my courtroom deputy, will

19 give you each a copy of that new verdict form and pick up your

20 old verdict form so you won't get confused with what you're ave

21 having to answer.

22          The verdict form that whoever is elected your

23 presiding juror is the one then that should be filled out and

24 brought back to me.

25          The verdict form will read:  In answering the

1 following questions, you are to follow the instructions I have

2 given you in the Court's jury charge.  Your answers to each

3 question must be unanimous.  Some of the questions contain

4 legal terms that are defined and explained to you in detail in

5 the jury charge.  You should refer to and consider the jury

6 charge as your answer to these questions in the verdict form.

7          The asserted patents may be referred to as follows:

8          Patent Number 10,142, 270 may be referred to by the

9 shorthand term of the '270 patent.

10          And Patent Number 10,511,557 may be referred to by

11 the shorthand term the '557 patent.

12          Then the next page of the jury -- or the verdict form

13 reads:  We, the jury, unanimously agree to the answers to the

14 following questions and return them as our verdict in this

15 case.

16          Question 1: Infringement.

17          Did Voxer Inc. and Voxer IP LLC ("Voxer") prove, by a

18 preponderance of the evidence, that Meta Platforms, Inc.

19 (formerly known as Facebook, Inc.) and Instagram LLC

20 (collectively "Facebook") infringed one or more of the

21 following claims of the asserted patents?

22          You're instructed to check yes or no for each claim,

23 and you're instruct that "yes" is a finding for Voxer and "no"

24 is a finding for Facebook.  And then there are charts.

25          Claims 34, there's a column Facebook Live and another

1  column Instagram Live.  And you're given yes and no choices for

2  each of those defendants.  And the same is true as to Claim 47,

3  48, and 51 of the '270 patent.

4         Then the '557 patent is listed much the same way.

5  There's columns Facebook Live and Instagram Live, and Claim 1,

6  places to check either yes or no for each of the defendants,

7  and Claim 9 the same.

8         And then my instructions are:  If you answered "no"

9  to all the claims, please proceed to the final page of the

10  verdict form.

11         If you selected "yes" to any claim of the '557

12  patent, please proceed to directly to Question 2.

13         If you selected "yes" to any claim of the '270 patent

14  and no to all claims -- claims of the '557 patent, please

15  proceed to Question 3.

16         Question 2 is invalidity.

17         Solely with respect to the claims of the '557 patent

18  for which you answered "yes" in Question 1, did Facebook prove

19  by clear and convincing evidence that one or more of those

20  claims of the below listed patents are invalid?

21         Check yes or no for each claim that corresponds to a

22  "yes" answer in Question 1.  "Yes" is a finding for Facebook.

23  "No" is a finding for Voxer.

24         And it lists the '557 patent, Claim 1 and Claim 9,

25  and columns to check either yes or no for each claim.

1          Then my instructions are:  If you selected "no" to

2    any claim of the '557 patent, or if you found any claim of the

3    '270 patent infringed in response to Question 1, please proceed

4    to Question 3.

5          Otherwise, please proceed to the final page of the

6    verdict form.

7          Then Question 3 is damages.

8          What sum of money, if any, do you find Voxer has

9    proved it is entitled to for Facebook and Instagram's

10   infringement up through the date of this verdict?  Do not

11   include any interest on any amount of damages you find.

12         And there's blank preceded by a dollar sign, and

13   you're to fill that in in dollars and cents.

14         Question 4 refers back to Question 3.  Does this

15   number represent a running royalty or a one-time lump sum?

16   Please check one only.

17         And it gives you a blank to check "running royalty"

18   or and it gives you another blank to check "lump sum."

19         And then your instructions are to proceed to the

20   final page of the verdict form.

21         The final page of the verdict form reads:  You have

22   now reached the end of the verdict form and should review it to

23   ensure it accurately reflects your unanimous determinations.

24   The preceding -- the presiding juror should then sign and date

25   the verdict form in the spaces below.  Once this is done,

PLAINTIFF'S CLOSING                                    91

14:18:54   1   notify the court security officer that reach -- you have

14:18:57   2   reached a verdict.

14:18:58   3          And it has a space, Signed this *blank* day of

14:19:01   4   September 2022 at *blank* o'clock *blank* m., where your presiding

14:19:06   5   juror will fill in the date and time of your verdict and sign

14:19:09   6   the verdict form.

14:19:13   7          THE COURT:  Those will be the instructions of the

14:19:15   8   verdict form.  And, ladies and gentlemen, at this time we'll

14:19:17   9   proceed with opening arguments and we'll proceed first with the

14:19:21   10  opening argument of the plaintiffs.

14:19:28   11         MR. STONE:  Thank you, Your Honor.

14:19:29   12              **PLAINTIFF'S CLOSING ARGUMENT**

14:19:29   13         MR. STONE:  May it please the Court:

14:19:30   14         Good afternoon, ladies and gentlemen.  It's nice to

14:19:33   15  have a chance to speak directly to you again.  My colleague,

14:19:38   16  Mike Powell, and I look forward to summarizing our case to you

14:19:42   17  this afternoon.  But, before I do that, I just want to thank

14:19:46   18  you for the time that you've taken away from your lives to be

14:19:51   19  here.  I've seen that you've all been taking notes and paying a

14:19:54   20  lot of attention to all of the testimony, and I know that we've

14:19:57   21  given you a lot of information over the course of the last

14:20:00   22  week.  And I just wanted to say thank you again.  This matter

14:20:04   23  is obviously very important to my client Voxer, and so we

14:20:07   24  certainly appreciate your attention.

14:20:09   25         Now, what I'm going to do is go back over the road

14:20:12  1   map that I shared with you during my opening.  And, like the

14:20:16  2   judge said, there's four sources of evidence that are for your

14:20:20  3   consideration:  There's the witness testimony, there's the

14:20:23  4   exhibits, there's stipulations, and there's certain assumptions

14:20:28  5   or presumptions that the judge has talked to you about.

14:20:33  6          And I'm confident that, when you all get together in

14:20:36  7   the jury room after you've heard our closing arguments and you

14:20:39  8   reflect on the questions that you've been asked to answer about

14:20:43  9   whether Facebook and Instagram live infringed the '270 and '557

14:20:48  10  patents, that you will agree that they do and that Voxer is

14:20:52  11  entitled to a reasonable royalty as a result.

14:20:58  12         Now you heard from Mr. Katis about the genesis of his

14:21:01  13  idea that led to Voxer, the problems that he had with

14:21:05  14  battlefield radios that led him to pondering about whether or

14:21:08  15  not there was a better solution; a hybrid technology that could

14:21:13  16  bridge the gap with between purely live communications, like a

14:21:16  17  phone call, and purely time-shifted communications like text or

14:21:20  18  e-mail.  This is what Voxer would come to call "live

14:21:23  19  messaging."

14:21:25  20         And, to be clear, this wasn't live streaming.  You

14:21:28  21  heard both Mr. Katis and Mr. Ranney testify that their

14:21:32  22  invention was not live streaming.  And you certainly didn't see

14:21:35  23  the defendants rely on live streaming as prior art.

14:21:39  24         And you heard how Mr. Katis, after he got out of the

14:21:42  25  military, hired Mr. Ranney, a networking specialist, to help

PLAINTIFF'S CLOSING                                   93

14:21:47  1   him with the first company that Mr. Katis founded.  And you

14:21:51  2   heard how the two of them pondered the questions that Mr. Katis

14:21:54  3   had about this new hybrid technology.  And you'll recall that

14:21:58  4   Mr. Ranney, who joined Voxer as its chief technology officer,

14:22:02  5   spent lots of time with Mr. Katis and the other coinventors at

14:22:05  6   Voxer white-boarding how they would build their system.

14:22:09  7          And you heard Mr. Ranney testify that he wanted that

14:22:12  8   Voxer system to build -- to be scalable, a flexible network

14:22:17  9   that could easily expand to support the millions of users that

14:22:22  10  Voxer anticipated having, and ultimately did have, with it's

14:22:26  11  break-through live messaging technology.

14:22:29  12         And you heard from the beginning that Voxer had a

14:22:31  13  patent prosecutor, Jim Rose, on their team to help them

14:22:35  14  navigate the patent rules so they would have protection for the

14:22:39  15  ideas that they came up with related to live messages.  So that

14:22:43  16  when they disclosed those ideas, as you heard Mr. Katis said

14:22:46  17  that he did always when he had meetings with other companies,

14:22:49  18  those ideas could be protected.  And you heard that they did

14:22:54  19  get patents, many of them, that covered all aspects of the live

14:22:57  20  messaging technology.  You heard that Mr. Katis and Mr. Ranney

14:23:01  21  are named inventors or more than 150 patents.

14:23:08  22         And they described the process for you in their

14:23:10  23  testimony about how it was that they went about getting those

14:23:11  24  patents, including filing their two provisional patent

14:23:16  25  applications in 2007.  And you heard from Mr. Katis in his

PLAINTIFF'S CLOSING

14:23:19  1   testimony about what that first provisional disclosed, to do

14:23:23  2   for voice and video communications what e-mail, instant

14:23:26  3   messaging and devices like the Blackberry have done for written

14:23:30  4   correspondence.  And he also testified that users could send

14:23:35  5   quick voice and video messages at the click of a button to any

14:23:38  6   number of users, without necessarily interrupting others'

14:23:42  7   conversations or waiting for acknowledgment.

14:23:45  8        And in their second provisional filed on

14:23:47  9   October 19, 2007, you heard Mr. Katis and Mr. Ranney testify

14:23:53  10  how that described their inventions in more detail.  And you

14:23:56  11  heard the judge's instruction that the Voxer patents are

14:24:01  12  entitled to a priority date in 2007 and, in particular, that

14:24:05  13  the '557 patent is entitled to a priority date back to

14:24:09  14  October 19, 2007.

14:24:12  15       That's the date of the second provisional.  And

14:24:14  16  Mr. Ranney testified when he was on the stand that some of the

14:24:17  17  things disclosed in that second provisional, including the

14:24:20  18  target markets that they had envisioned for live messaging, and

14:24:25  19  that those could include public and social networks and media

14:24:28  20  industries.  And that he and Mr. Katis envisioned that live

14:24:32  21  messaging would be a natural for social networks using Voxer's

14:24:38  22  multiple conversation management system.

14:24:41  23       Now, you heard Mr. Katis and Mr. Ranney testify about

14:24:43  24  rolling out their Voxer app for iOS and Android in 2011 -- in

14:24:51  25  May for iOS and in November for Android.  And you heard that,

PLAINTIFF'S CLOSING

14:24:55   1   at the time they did that, Mr. Ranney testified that the app
14:25:00   2   did not support video, but from the very beginning, he wrote
14:25:04   3   that the code for the server side was already there.  And that
14:25:08   4   was not something that was ever challenged by Facebook.

14:25:12   5           Now to put back in perspective how things were when
14:25:17   6   Voxer rolled out its app in 2011, Mr. Ranney gave you testimony
14:25:22   7   about how phones back then couldn't support live video.  They
14:25:25   8   weren't powerful enough to do that.  And he also testified that
14:25:28   9   bandwidth on the networks wasn't fast enough to support live
14:25:32   10  video.  Voxer was ahead of its time, which explains the sheer
14:25:36   11  number of its patents.  And you heard Ms. Lawton say that Voxer
14:25:40   12  had actually more than 200 patents as a company.  Its new live
14:25:44   13  messaging technology just needed the market to catch up with it
14:25:48   14  so that it could roll out video.

14:25:50   15          Now, shortly after the app's release in 2011, you
14:25:53   16  heard that the Voxer app went viral.  You saw that the Voxer
14:25:57   17  app was often number one in the App Store, even ahead of
14:26:01   18  Facebook's social networking apps.  And in 2012, you heard
14:26:05   19  Mr. Katis testify that it was number 13 out of all apps in the
14:26:10   20  App Store.  And that by the end of 2012, Voxer had nearly
14:26:15   21  60 million total users.

14:26:18   22          Now, this success caught the attention of Facebook,
14:26:21   23  which in 2011 and 2012, reached out to Voxer on a number of
14:26:27   24  occasions to discuss the possibility of doing business
14:26:29   25  together.  Again, for perspective, back in 2011, Facebook's

PLAINTIFF'S CLOSING

14:26:33  1  Messenger app didn't even offer voice.  Voxer did, Facebook did

14:26:39  2  not.

14:26:40  3         And you heard that there were a series of meetings

14:26:42  4  between Voxer and Facebook, and you heard how, in all those

14:26:48  5  meetings, Mr. Katis would describe the origin story for Voxer's

14:26:52  6  live messaging technology as well as the patents that the

14:26:55  7  company had sought to protect that, and Mr. Ranney would

14:26:59  8  explain the technology in more detail.

14:27:02  9         And you heard Mr. Katis testify that he even told

14:27:06  10  Mr. Zuckerberg about Voxer's patents.  And you heard Mr. Ranney

14:27:10  11  testify that it was important to Voxer to get those patents

14:27:14  12  because they were in an industry, telecommunications, with

14:27:17  13  strong existing patents, and they wanted to make sure that they

14:27:20  14  had protection for their unique inventions.

14:27:24  15         Now, you heard about some of the meetings that

14:27:26  16  occurred between Facebook and Voxer, including the

14:27:29  17  February 8th, 2012 meeting between Peter Deng, Ben Davenport,

14:27:37  18  and Mike Schroepfer and Mr. Katis.  And internal documents from

14:27:41  19  Facebook after that meeting showed that Facebook viewed Voxer's

14:27:44  20  technology very positively.

14:27:47  21         In Exhibit 810, which is one of the exhibits admitted

14:27:50  22  into evidence, in an e-mail to Mr. Zuckerberg, Mr. Schroepfer,

14:27:55  23  Mr. Zoufonoun, and Mr. Davenport, Mr. Deng described Voxer as

14:27:59  24  having good product sense; that they were long-term thinkers

14:28:04  25  that wanted to take over the space between phone-to-phone and

PLAINTIFF'S CLOSING

14:28:06  1   text messaging; that they built good technology.  And he

14:28:11  2   emphasized that they had rebuilt -- they had built and rebuilt

14:28:16  3   their back end, which you heard from Mr. Ranney meant their

14:28:19  4   scalable server infrastructure.

14:28:22  5         And Mr. Deng went on to say that Voxer's systems

14:28:25  6   scaled well with their hyper growth late last year, referring

14:28:29  7   to 2011.

14:28:31  8         Now, on the very same day as that first meeting,

14:28:35  9   February 8th, 2012, from Zuckerberg replied to Mr. Deng, "I'm

14:28:40  10  not surprised the founders are smart," he wrote.  The product

14:28:45  11  seems generally well done.  It might be worth getting them on

14:28:48  12  board if the price is reasonable."

14:28:50  13        Now, the very next day, February 9, 2012, Mr. Deng

14:28:55  14  sent an e-mail to Sam O'Rourke, Amin Zoufonoun, and Ben

14:29:00  15  Davenport with the subject "Voxer patents."  Now, you didn't

14:29:04  16  see that e-mail, but you heard Mr. Deng's testimony about it

14:29:08  17  and the fact that this e-mail confirmed that Facebook was aware

14:29:12  18  of Voxer's patents at the time, which isn't a surprise, since

14:29:17  19  Mr. Katis told everyone that he met with that that was a key

14:29:21  20  part of Voxer's business plans, to patent their live messaging

14:29:25  21  technology.

14:29:27  22        Now you also heard from Mr. Katis that, at the time

14:29:30  23  of these meetings, Voxer was seeking funding that valued Voxer

14:29:35  24  at approximately the $200 million.  And internal Facebook

14:29:39  25  documents confirmed that Facebook was aware of that valuation

PLAINTIFF'S CLOSING                                              98

14:29:42  1   at the time.  And you also heard testimony yesterday from

14:29:46  2   Ms. Lawton that Houlihan Lokey had valued Voxer at around

14:29:53  3   200-million plus in 2013.

14:29:56  4        Now you also heard about a meeting that Voxer had

14:30:01  5   with Peter Deng again and Chris Daniels on March 6th, 2012 to

14:30:06  6   discuss the possible licensing of Voxer's technology.  And you

14:30:10  7   heard from Mr. Katis that there were many product and

14:30:13  8   engineering people there who had questions and that the bulk of

14:30:16  9   the questions were about video uses for the technology.

14:30:20  10       And Mr. Katis explained to them that he had been

14:30:23  11  thinking about that for a long time, dating back to the

14:30:25  12  provisional that you-all saw that mentioned social networks,

14:30:29  13  and he explained the use cases for live messaging and social

14:30:34  14  media and social networks.

14:30:36  15       And you can see here in Mr. Ranney's testimony he

14:30:39  16  confirmed that there were also lots of questions about video

14:30:43  17  and, in particular, could the Voxer technology support live

14:30:45  18  messaging at Facebook's scale.  And he told them, yes, it

14:30:49  19  could, that they had scaled it to the millions of people who

14:30:52  20  were now using Voxer, and that they just hadn't done it on

14:30:56  21  phones yet in part because of the technology limitations with

14:30:59  22  respect to phones then.

14:31:01  23       Now, mind you, Facebook didn't have voice for

14:31:03  24  Messenger at this time, and Facebook has brought no witness at

14:31:08  25  all to contradict any of this testimony that Mr. Ranney and

14:31:11  1   Mr. Katis offered.

14:31:13  2          Now, you also heard Mr. Katis testify about his

14:31:16  3   conversation that he had with Mr. Daniels as he left that

14:31:19  4   meeting, and that Mr. Daniels said that Facebook was trying to

14:31:23  5   decide if Voxer's technology was core and if Voxer was a

14:31:28  6   competitor.  And you heard that Mr. Katis was troubled by

14:31:32  7   Mr. Daniels' remark because Mr. Katis believed that, if

14:31:36  8   Facebook determined that Voxer and his technology was core,

14:31:40  9   then Facebook would not take a license from them and would

14:31:43  10  instead build their technology in-house.

14:31:51  11         Now, you'll recall soon after this meeting, Facebook

14:31:53  12  did reach out to Voxer to say they weren't interested, after

14:31:57  13  months of productive discussions.  Now, what Voxer didn't know

14:32:00  14  at the time was that Facebook internal documents showed that

14:32:03  15  Facebook had been having discussions about building a decent

14:32:06  16  version of Voxer for themselves.  And, of course, you heard,

14:32:09  17  although Voxer did not know that either, that Facebook was

14:32:12  18  aware of Voxer's patents dating back to the February 9, 2012

14:32:22  19  e-mail.

14:32:22  20         Now, in August of 2015, Facebook first introduced

14:32:25  21  Facebook Live.  And you heard testimony from a number of young

14:32:27  22  engineers who were involved in the roll out of that product,

14:32:31  23  and none of them had met with Voxer, and several of whom had

14:32:36  24  never met or even knew the senior Facebook executives that

14:32:38  25  Voxer had met.

14:32:39  1          But you didn't hear from anyone in management who

14:32:44  2    made the decision to pursue Facebook Live or when that decision

14:32:46  3    was even made.  You certainly didn't hear from the senior folks

14:32:49  4    who had met with Voxer, like those pictured here, including

14:32:53  5    Mr. Zuckerberg and Mr. Schroepfer.  None of them were here at

14:32:58  6    all.  And you didn't see any documents that describe why that

14:33:01  7    decision was made or who made it.

14:33:03  8          You heard Mr. Zuckerberg was there when The Rock and

14:33:10  9    Facebook rolled out its first Facebook Live broadcast, but he

14:33:11  10   wasn't here to explain Facebook's interactions with Voxer.

14:33:18  11          Now you'll recall that Mr. Katis testified that after

14:33:22  12   Facebook Live first rolled out, it made him think of that

14:33:26  13   ominous meeting he had with Chris Daniels, where Mr. Daniels

14:33:29  14   said that Facebook was considering whether Voxer was a

14:33:31  15   competitor and whether its technology was core.  And you heard

14:33:35  16   Mr. Katis testify that that was exactly what he was afraid of

14:33:39  17   when he saw Facebook Live.  Facebook had rolled out a product

14:33:45  18   that to him looked like Voxer's live messaging with video.

14:33:49  19          So Mr. Katis reached out to Facebook in early 2016,

14:33:52  20   telling them that he thought that his patents, the Voxer

14:33:55  21   patents, related to Facebook Live, and he sent materials to

14:34:00  22   Facebook describing all of those patents at that time, asking

14:34:03  23   Facebook to engage in licensing discussions.  But Facebook

14:34:07  24   wasn't interested.

14:34:08  25          So Voxer was compelled to file this lawsuit to

14:34:11  1  protect its patent rights, based on that bargain we talked

14:34:15  2  about that every inventor makes with the government to protect

14:34:18  3  what Mr. Ranney called "Voxer's unique technology."  They

14:34:23  4  disclosed their patents and, in so doing, Voxer had done the

14:34:26  5  right thing, affording it the protection of the 20 years that

14:34:30  6  you get after your inventions are disclosed to the patent

14:34:33  7  office.

14:34:34  8          So Voxer brought this case involving those two

14:34:40  9  patents that you've heard a lot about, the '270 patent and the

14:34:43  10  '557 patent.  And, as you see, the parties don't get that much

14:34:46  11  time in front of the jury to describe the nature of their case,

14:34:49  12  so the parties have to make decisions about which patents to

14:34:53  13  actually assert.  And these are the two that Voxer ended up

14:34:56  14  asserting for trial.

14:34:57  15          And Voxer submits that the evidence shows that

14:35:00  16  Facebook did the wrong thing.  They used Voxer's patented

14:35:07  17  technology rather than innovate.  And that is all that Voxer

14:35:10  18  needs to prove, because knowledge is not needed to prove direct

14:35:12  19  infringement.  So, even if Facebook never ever heard of Voxer

14:35:19  20  or any of its patents, because the evidence shows that each and

14:35:21  21  every element of the asserted claims is practiced by Facebook

14:35:27  22  and Instagram Live, they still infringe.

14:35:29  23          Now, let me walk through that evidence, the evidence

14:35:31  24  that confirms that.  Now, first on the '270 patent, you heard

14:35:36  25  from Dr. Mitzenmacher each of the elements of each of the

14:35:39  1  asserted claim of the '270 patent is found in Facebook and

14:35:43  2  Instagram Live, and Voxer submits that you can find that

14:35:46  3  Facebook infringes those two patents based on

14:35:52  4  Dr. Mitzenmacher's testimony.

14:35:53  5        Now, what did defendants try to prove?  Their key

14:35:56  6  noninfringement argument since the beginning of the trial has

14:35:59  7  been that they don't infringe because the '270 patent requires

14:36:05  8  guaranteed delivery.  But you heard Dr. Mitzenmacher testify

14:36:07  9  that nothing in the claims of the '270 patent requires

14:36:10  10 guaranteed delivery.  And you will have the claims yourselves

14:36:16  11 in the jury room, and you've been instructed that they're all

14:36:17  12 to be afforded and interpreted based on their plain and

14:36:20  13 ordinary meaning.  And you'll see that nothing in the plain and

14:36:24  14 ordinary language requires guaranteed delivery.

14:36:27  15       And on cross-examination you heard Dr. Bhattacharjee

14:36:32  16 agree that the claims of the '270 patent do not require

14:36:35  17 guaranteed delivery.  So that argument is dead on arrival.

14:36:39  18       Now, the defendants had another argument, that

14:36:42  19 Facebook and Instagram don't infringe because Facebook and

14:36:51  20 Instagram live don't ascertain the location of a recipient in

14:36:53  21 response to the receipt of an identifier.

14:36:55  22       But you heard Dr. Mitzenmacher testify about the

14:36:58  23 various identifiers that Facebook and Instagram Live use to

14:37:04  24 limit access to who can view live videos.  And you heard

14:37:07  25 Dr. Bhattacharjee testify that he agreed that this is a role

PLAINTIFF'S CLOSING                                    103

14:37:12  1    that those identifiers played.  And you also heard additional

14:37:15  2    testimony from him during cross-examination that there were

14:37:20  3    lots of other identifiers that might satisfy this claim

14:37:23  4    element, duck hunting, for example.

14:37:26  5          Now, you heard Dr. Mitzenmacher explain just

14:37:28  6    yesterday how you go from left to right in reading the series

14:37:31  7    of steps relating to this claim, and that after the recipient

14:37:40  8    identifier is received, then users -- a URL is provided only to

14:37:43  9    authorized recipients per the privacy selector, then the

14:37:47  10   recipient requests a valid URL, and the receipt IP address is

14:37:52  11   ascertained.  He walked you through the chain?

14:37:55  12         Now, what the defendants are doing is claiming that,

14:37:57  13   because there are additional steps, those extra steps in the

14:38:00  14   middle there that are not claimed, there's no infringement.

14:38:05  15   But that's not the law.  As the judge has already instructed

14:38:08  16   you, additional steps in a method claim cannot be pointed to to

14:38:14  17   avoid infringement.  And Dr. Bhattacharjee was asked about this

14:38:19  18   during his cross-examination, and he agreed.

14:38:24  19         So because the noninfringement arguments that the

14:38:27  20   defendants have advanced are lacking, when you look at the

14:38:29  21   verdict form and the infringement question directed to the '270

14:38:35  22   patent, we ask that you please check all of the boxes for each

14:38:38  23   of the asserted claims for Facebook and Instagram Live.

14:38:42  24         Now, there is no question relating to the invalidity

14:38:44  25   of the '270 patent.  You've heard that that's been dropped.

PLAINTIFF'S CLOSING

14:38:50   1   The defendants aren't even arguing this.  So you'll see no

14:38:53   2   question on your verdict form for you about the '270 patent and

14:39:01   3   invalidity.  The '270 patent is valid.

14:39:03   4          Now on the '577 patent.  You heard from

14:39:06   5   Dr. Mitzenmacher that each of the elements of each of the

14:39:08   6   asserted claims of the '557 patent are found in Facebook and

14:39:12   7   Instagram Live.  And Voxer submits that you can find that

14:39:16   8   Facebook infringes those two claims based on Dr. Mitzenmacher's

14:39:23   9   testimony.

14:39:23  10          Now, you heard from Dr. Mitzenmacher that Defendant's

14:39:25  11   only dispute concerning the '557 patent, which we've

14:39:29  12   highlighted here, was whether the selecting step took place on

14:39:35  13   the server.  But you heard from Dr. Jeffay and from

14:39:38  14   Dr. Mitzenmacher that, under the plain and ordinary language of

14:39:40  15   the claim, selecting occurs either on the server or on the

14:39:44  16   client, the Facebook app.  And there's no dispute that

14:39:51  17   selecting occurs.

14:39:52  18          And Dr. Jeffay admitted when he was on the stand that

14:39:54  19   discretion was not required for selecting.  Instead, again, the

14:39:58  20   only question was whether or not one of the two or more

14:40:03  21   degraded versions was selected.  And he also admitted that the

14:40:06  22   version was transmitted from the server to the client, just as

14:40:13  23   you see in Exhibit P-14 on the right-hand side with the arrow

14:40:16  24   sending the degraded version from the CDN to the player.

14:40:23  25          Now, you also heard Dr. Jeffay admit that, in

14:40:26  1  previous sworn testimony, he declared under oath that the

14:40:30  2  selecting step in the '557 patent could take place at the

14:40:34  3  client and, in so doing, he was acknowledging that the argument

14:40:37  4  Dr. Mitzenmacher made was correct.

14:40:41  5       So when you look at the verdict form and the

14:40:43  6  infringement question directed to the '557 patent, we ask that

14:40:46  7  you please check all of the boxes "yes" for Claims 1 and 9 for

14:40:52  8  Facebook and Instagram Live.

14:40:58  9       So, lastly, I want to talk about the other side's

14:41:00  10  invalidity for the '557 patent based on the Seckin patent

14:41:03  11  application.

14:41:04  12       And you'll recall again from the judge's instructions

14:41:06  13  that there are four sources of evidence, and one of them is

14:41:11  14  applicable presumptions.  And, as you might remember from the

14:41:14  15  patent video, patents are entitled to a presumption of validity

14:41:19  16  because patents that issue have already been through the patent

14:41:22  17  office.  And, like you heard in the video that the judge showed

14:41:27  18  you, the patent office works hard to evaluate patents and does

14:41:31  19  a good job making sure that patents that issue should issue.

14:41:37  20       And you heard from the judge's instructions that

14:41:39  21  Facebook has the burden of proving invalidity by clear and

14:41:42  22  convincing evidence, meaning that Facebook must present

14:41:46  23  evidence that leaves you with a firm belief or conviction that

14:41:50  24  it is highly probable that the factual contentions of the claim

14:41:55  25  or defense are true.  And Voxer submits that Facebook cannot

PLAINTIFF'S CLOSING                                    106

14:41:59  1  meet this heightened burden, and if you have any lingering

14:42:02  2  doubts, the presumption must stand.

14:42:07  3          Now, you heard Dr. Jeffay testify about the Seckin

14:42:09  4  patent application, and on cross he said he didn't consider

14:42:13  5  whether or not it had actually matured into a patent.  And then

14:42:17  6  you heard Dr. Mitzenmacher yesterday say that it had not, and

14:42:21  7  that was actually something relevant to consider about how

14:42:24  8  strong this prior art was.

14:42:26  9          And you heard Dr. Mitzenmacher explain that Seckin

14:42:32 10  does not invalidate the '557 patent because, unlike the video

14:42:37 11  message service infrastructure required by that patent,

14:42:41 12  Seckin's patent was only a one-way broadcast video message

14:42:45 13  service.  It was not bidirectional like live messaging, Voxer's

14:42:50 14  invention, requires.  By contrast, you did hear

14:42:55 15  Dr. Mitzenmacher testify that the '557 patent does disclose

14:43:02 16  bidirectional messaging, which is required.

14:43:05 17          Now, Dr. Jeffay did not dispute that Seckin's end

14:43:09 18  users cannot send messages to each other and acknowledged, in

14:43:15 19  essence, that it was unidirectional.  And based on that, Voxer

14:43:19 20  submits that it doesn't invalidate the '557 patent.

14:43:23 21          Now, finally with respect to Claim 9, you heard from

14:43:27 22  Dr. Mitzenmacher that Seckin additionally fails to meet this

14:43:31 23  element because it requires a second real-time streaming

14:43:34 24  protocol.  And that's another reason for you to reject the

14:43:39 25  invalidity argument advanced by Facebook.

14:43:42   1           So, because Defendants have not met the burden of

14:43:46   2   clear and convincing evidence on this point, they cannot

14:43:49   3   overcome the presumption that the '557 patent is valid.  And we

14:43:54   4   would ask you to check the boxes "no" on the verdict form

14:43:57   5   relating to the '557 patent invalidity question.

14:44:01   6           And now I'm going to turn over the mic to my

14:44:04   7   colleague, Mike Powell, who will be addressing damages and our

14:44:07   8   rebuttal case.  And since this will be the last time that I get

14:44:11   9   to address you directly, I just want to say thank you again for

14:44:14  10   your time.

14:44:30  11           MR. POWELL:  Thank you, Robert.

14:44:31  12           May it please the Court:

14:44:32  13           Good afternoon.  You know, today is a special day for

14:44:37  14   me.  Not only do I get the pleasure of presenting closing

14:44:41  15   arguments to you today, but it's also my 25th wedding

14:44:44  16   anniversary to my beautiful wife, who also happens to be a

14:44:48  17   lawyer.  We have so much to be thankful for, especially our

14:44:52  18   three healthy and happy children.

14:44:53  19           You know, I have sure enjoyed being with you-all here

14:44:56  20   in Austin this last week and a little bit extra, and I want you

14:45:00  21   to know before I begin that I, my client Voxer, the whole team

14:45:05  22   here, we've been looking forward to this day for a long, long

14:45:10  23   time.  So we appreciate your attention.

14:45:19  24           Now, you'll recall Dr. Ratliff's testimony a few days

14:45:22  25   ago, and it's my pleasure to summarize Voxer's damages claims

14:45:26  1    for infringement of the '270 and the '557 patents.  And,

14:45:32  2    frankly, Facebook and Instagram have made my job a lot easier

14:45:35  3    by electing not to present their own damages expert, an

14:45:38  4    opinion.

14:45:39  5         Instead, they chose to bring Ms. Kathy Lawton here

14:45:42  6    yesterday simply to nitpick and criticize Mr. Ratliff for not

14:45:47  7    doing things her way.  But, of course, there was no "her way"

14:45:50  8    because she had to admit on cross-examination that she had not

14:45:57  9    given us a reasonable royalty.  She had not done the work to

14:46:01  10   explain the hypothetical negotiation that is required by the

14:46:07  11   law as you were instructed just a few moments ago.

14:46:12  12        Now, you will recall Mr. Ratliff explaining the

14:46:16  13   *Georgia-Pacific* factors, and Your Honor instructed you on the

14:46:22  14   *Georgia-Pacific* factors just a few moments ago.  Now, you have

14:46:26  15   to have the facts of the case fit within the *Georgia-Pacific*

14:46:32  16   factors.  And Mr. Ratliff gave you five groups of those

14:46:37  17   factors, and he walked you through each group identifying for

14:46:41  18   you the evidence which either supported Voxer's case or not.

14:46:49  19        Now, recall the judge did instruct you that damages

14:46:52  20   must be apportioned.  Dr. Mitzenmacher and Mr. Ratliff did

14:46:57  21   their required apportionment, but neither of Drs. Jeffay or

14:47:04  22   Bhattacharjee, nor Ms. Lawton, did any apportionment

14:47:06  23   whatsoever.

14:47:07  24        And you know who else did not do apportionment:

14:47:11  25   Houlihan Lokey.  You'll recall Houlihan Lokey was presented by

14:47:15  1  the defense as another example of a licensing transaction that

14:47:19  2  you could consider in evaluating damages.

14:47:22  3          Now, you see while Ms. Lawton talked about the

14:47:24  4  Houlihan Lokey report, that report was prepared in June of

14:47:28  5  2017.  The hypothetical negotiation, as you have been

14:47:33  6  instructed by the judge, is deemed to take place in

14:47:35  7  November 2018, over a year later.

14:47:40  8          So, as we will see, while the Houlihan Lokey report

14:47:45  9  had patent license valuations that overwhelmingly support

14:47:49  10  Mr. Ratliff, had Voxer tried to present those valuations to

14:47:53  11  you, the jury, you can be sure that Facebook would have been

14:47:56  12  objecting.  They would have objected that those valuations are

14:47:59  13  irrelevant and should not be considered because they do not

14:48:02  14  reflect the hypothetical negotiation.  But you don't hear Voxer

14:48:09  15  object.  Voxer believes you, the jury, should have all the

14:48:12  16  evidence to consider.

14:48:15  17          But since Facebook and Ms. Lawton opened that door in

14:48:18  18  trial, those Houlihan Lokey valuations, the relevant ones, the

14:48:22  19  ones that are based on a running royalty of the type that the

14:48:26  20  evidence urges you to use here, those applied to -- the ones

14:48:32  21  that were apples to apples, if you were.  You may recall I used

14:48:35  22  that terminology.  Well, those show a different story.  Those

14:48:39  23  Houlihan Lokey valuations offer bookends to the reasonable

14:48:43  24  royalty range in this case and put Mr. Ratliff's reasonable

14:48:46  25  royalty smack dab in the middle.

14:48:50   1           Now, you'll recall this stream -- slide from

14:48:54   2   Mr. Ratliff's examination.  And there was additional testimony

14:48:58   3   and evidence admitted during trial that can also be considered

14:49:02   4   as what I might call a "gut check," evidence of Facebook's own

14:49:06   5   internal actual revenue data and its projections.  Now,

14:49:10   6   remember, the Facebook in-stream flywheel that Mr. Ratliff took

14:49:14   7   time to discuss with you, nobody can dispute -- nobody can

14:49:20   8   dispute time on Facebook's services means more money to

14:49:24   9   Facebook.  That was why Mr. Ratliff walked you through the

14:49:28   10   in-stream flywheel.

14:49:30   11           And Ms. Lawton had to agree with me on that point in

14:49:33   12   cross-examination.  Of course, Ms. Lawton also said it is not a

14:49:37   13   concern that Houlihan Lokey had relied on projections instead

14:49:41   14   of Facebook's actual revenue information.

14:49:46   15           Well, Mr. Ratliff told you last week that he did look

14:49:49   16   at Facebook's specifically tracked Facebook Live revenues.

14:49:54   17   They were over 1.4 billion.  That is the number Facebook's

14:49:58   18   Mr. Poffenberger said he did not have handy during my

14:50:02   19   cross-examination when he said he had only looked at numbers

14:50:05   20   through June of 2021.

14:50:08   21           And then on cross-examination of Mr. Poffenberger,

14:50:12   22   despite Facebook's objection, I was able to introduce

14:50:15   23   Plaintiff's Exhibit P-704.  Remember the rocket ship and

14:50:19   24   Facebook's target of 100 million watch hours which they hit way

14:50:24   25   ahead of schedule in March 2020 because of the pandemic

14:50:28   1   lockdowns.  We heard from Mr. Ratliff, and we saw on Facebook's

14:50:31   2   own words, they protected -- they projected internally to 5X

14:50:36   3   these numbers by 2023, which is just three short months from

14:50:41   4   today.

14:50:43   5          So simple math tells us that 5 times 362 million is

14:50:48   6   $1.81 billion in revenue specifically tracked to the Facebook

14:50:51   7   Live accused functionality.

14:50:55   8          So when -- so when we use this specifically tracked

14:51:00   9   revenue using Facebook's own numbers and plug it into

14:51:03   10  Mr. Ratliff's formula, this time eliminating the downward

14:51:07   11  adjustment step of technical apportionment, because this is

14:51:11   12  directly tracked revenue that is directly tied to the accused

14:51:15   13  Facebook Live functionality, and also eliminating the upward

14:51:18   14  adjustment for the was live derivative sales, since that is not

14:51:22   15  relevant if we are talking about specifically tracked revenue,

14:51:26   16  we get a reasonable royalty of 183 million on the low side

14:51:30   17  using actual numbers and 234 million on the high side using the

14:51:35   18  projected numbers.

14:51:38   19         By the way, ladies and gentlemen, this is precisely

14:51:41   20  why Mr. Ratliff's reasonable royalty got bigger after several

14:51:45   21  client application patents were voluntarily withdrawn by Voxer

14:51:50   22  before trial so that it could focus on the server patents and

14:51:53   23  have sufficient time with you to make its case.

14:51:55   24         You see, if Mr. Ratliff adjusted his reasonable

14:51:58   25  royalty downward to account for the client application patents

14:52:02  1  being withdrawn, he had to make an adjustment upward because

14:52:07  2  this trial was delayed nine months due to scheduling conflicts

14:52:11  3  at the court.  Now, when Mr. Ratliff added in the royalty for

14:52:16  4  that period of time, the number actually got bigger despite the

14:52:19  5  reduction in the royalty rate from the client application

14:52:23  6  patents dropping out of his analysis.

14:52:28  7        Now, of course, Ms. Lawton denied this, but the

14:52:30  8  evidence shows Ms. Lawton was simply wrong, which makes sense,

14:52:34  9  since she didn't bother to consult the book of wisdom she

14:52:37  10  talked about on this point and her client's corporate

14:52:39  11  representative, Mr. Poffenberger, refused to look at revenue

14:52:43  12  past June 2021, more than a year ago now.

14:52:46  13        So that brings us back full circle.  Mr. Ratliff has

14:52:50  14  offered the only reasonable royalty calculation that meets the

14:52:53  15  legal requirements you were just instructed on.  And in view of

14:52:58  16  this, ladies and gentlemen, Voxer asks that you find Facebook

14:53:01  17  and Instagram infringed the '270 and '557 patents; that the

14:53:06  18  '557 patent is valid; that in response to the question, "What

14:53:09  19  damages do you find?" please write in "$175 million," and check

14:53:15  20  the box running royalty since these patents continue until

14:53:19  21  2028.

14:53:20  22        Thank you.

14:53:22  23        THE COURT:  Ladies and gentlemen, at this time we'll

14:53:25  24  take a brief recess before we finish the arguments.  We'll be

14:53:28  25  in recess for 15 minutes.

14:53:30   1        (Jury recessed)

14:54:06   2            THE COURT:  This always happens.  It doesn't matter

14:54:08   3    how many eyes go over these things, whether it's all of my

14:54:11   4    staff and all of you, as I was reading the jury charge and the

14:54:14   5    verdict form, I found a couple of mistakes and perhaps you do,

14:54:23   6    too.  We will get these corrected in the finals that go to the

14:54:26   7    jury.

14:54:27   8            On page 3 of your jury charge in the first line, the

14:54:31   9    word "party" should be "part."  And in part B, the next to last

14:54:38   10   line of the paragraph, "significant" should have been

14:54:42   11   "significance."  And the verdict form on the last page in the

14:54:50   12   second line, "accurate" should be "accurately."

14:54:53   13           So we're going to correct those pages and we'll just

14:54:56   14   get corrected pages to you instead of doing the whole thing.

14:55:00   15   And then what will go to the jury will have those done.

14:55:04   16           So at this time we'll be in recess for 15 minutes.

14:55:08   17       (Recess)

15:13:27   18       (Open court, jury present)

15:13:27   19           THE COURT:  Mr. Van Nest, the defendants may present

15:13:29   20   closing argument.

15:13:30   21               **DEFENDANT'S CLOSING ARGUMENT**

15:13:30   22           MR. VAN NEST:  Thank you, Your Honor, and good

15:13:31   23   afternoon, ladies and gentlemen.  Bob Van Nest here again for

15:13:34   24   Facebook.

15:13:35   25           Thank you again for your jury service.  You've be

DEFENDANT'S CLOSING                                    114

15:13:38  1  very attentive group.  We've all been noticing the note-taking,

15:13:42  2  and we appreciate that very much.  And I want to begin by

15:13:45  3  saying, whatever verdict you reach, thank you on behalf of

15:13:48  4  Facebook for your service as jurors.

15:13:50  5          Now, I want to get right into the evidence.  The

15:13:56  6  testimony of these Facebook engineers -- and they're the ones

15:14:00  7  who built and maintain Facebook Live and Instagram Live -- was

15:14:03  8  clear, it was detailed, and it was completely unchallenged by

15:14:07  9  Voxer and its lawyers.

15:14:09  10         Dave Capra and Abhishek Mathur led the development

15:14:14  11  team, and they told you where the idea for Facebook Live came

15:14:17  12  from, how they built the product, and what technology they

15:14:20  13  used.  Nothing was copied from Voxer.  The Facebook engineers

15:14:24  14  did their own work.  That was undisputed testimony, not

15:14:28  15  challenged by the Voxer lawyers.

15:14:30  16         And the testimony of these engineers also proves

15:14:34  17  there's no infringement of either one of these patents, and

15:14:37  18  we're going to focus our discussion this afternoon on

15:14:40  19  infringement, because that's a really key issue in this case.

15:14:44  20  You didn't hear much about it in Voxer's opening.

15:14:47  21         The '270 patent requires using and receiving an

15:14:52  22  identifier that identifies a recipient of the video and using

15:14:57  23  that to ascertain a location for delivery of the video.  The

15:15:02  24  Facebook and Instagram Live privacy settings, which is what

15:15:07  25  they accuse of infringement, only establish who is eligible to

DEFENDANT'S CLOSING                                    115

15:15:11  1  receive a video, not who is going to receive a copy of one.

15:15:16  2  It's a broadcast system, not a messaging system.

15:15:20  3       There's no inbox for a Facebook Live video.  You

15:15:25  4  heard that testimony from Mr. Leland.  And the location for

15:15:29  5  delivering the video is not ascertained upon receiving any

15:15:33  6  privacy setting.  It's only known when the user or the user's

15:15:37  7  device requests the video.  It's a pull system.  That is

15:15:42  8  ascertained not based on any identifier, no privacy selector.

15:15:48  9  The privacy selectors have nothing to do with that.

15:15:51  10      And the '557 patent isn't infringed either because

15:15:55  11 the Facebook engineers, they confirmed and it's undisputed now,

15:16:00  12 that it's the client device -- the phone, your laptop -- not

15:16:04  13 the Facebook servers, that select the version of the video to

15:16:08  14 send.  They're the ones that make -- the client devices are the

15:16:13  15 ones that make the all-important selection, and so there's no

15:16:15  16 infringement of the '557 patent either because the

15:16:20  17 infrastructure, the Facebook servers, don't make that selection

15:16:24  18 and so they don't perform that critical step.

15:16:28  19      And, as I said in the opening, Voxer's technology

15:16:32  20 just wasn't right for the industry.  No one has taken a license

15:16:35  21 to it whatsoever.  Ms. Anderson is going to discuss that aspect

15:16:41  22 of the evidence once I finish.  She's going to talk to you

15:16:44  23 about the damage claim that Voxer's made and how inconsistent

15:16:49  24 it is with all of the evidence that you've heard about the

15:16:52  25 market.

DEFENDANT'S CLOSING

15:16:52  1          So here's our key points of evidence.  They haven't

15:16:56  2  changed since we started.  The Voxer engineers -- excuse me.

15:17:00  3  The Facebook engineers built Facebook Live.  They used their

15:17:03  4  own technology.  The technology is very different,

15:17:07  5  fundamentally different, from what's in Voxer's patents.

15:17:11  6          Now, Mr. Mathur went through this.  They started

15:17:14  7  Facebook Live, Coding Under the Stars.  They developed it

15:17:19  8  themselves.  It took almost a year to build it, of hard,

15:17:22  9  detailed engineering work.  And Mr. Mathur explained where it

15:17:26  10  came from.  Some of it was new code that they wrote, some of it

15:17:30  11  with was from Facebook's existing video, and some was from

15:17:33  12  open-source software that existed in the market.

15:17:36  13          Nothing was copied from Voxer.  They did their own

15:17:40  14  independent work.  And you heard Mr. Mathur tell you that he

15:17:44  15  never even heard of Voxer.

15:17:46  16          "In all of your work on building Facebook Live, did

15:17:49  17  the subject of Voxer ever come up?"

15:17:51  18          "No."

15:17:52  19          "Was there any mention of Voxer patents that you

15:17:54  20  personally heard of?"

15:17:56  21          "No."

15:17:56  22          Same thing for Mr. Capra.  No mention of Voxer, no

15:18:02  23  use of any Voxer technology.

15:18:04  24          Now, let me briefly touch on this.  I'm not sure why

15:18:10  25  they spent so much time talking about 2012.  2012 has

DEFENDANT'S CLOSING

15:18:15   1  absolutely nothing to do with what you guys have been asked to

15:18:19   2  decide.  2012 was two years before -- three years before the

15:18:25   3  launch of Facebook Live, and it was five years before either of

15:18:28   4  these patents was even applied for, and it had nothing to do

15:18:33   5  with video.  They were talking about VoIP, their walkie-talkie

15:18:39   6  patent, voice over the Internet.

15:18:41   7          This is the e-mail you saw in the opening.  You saw

15:18:44   8  it again during the course of the case.  It confirms that all

15:18:49   9  these folks were talking about was voice over the Internet.

15:18:51  10  And the Messenger app that you heard, it's not accused of

15:18:55  11  infringement.  It's a messaging service that Facebook makes

15:18:57  12  available with voice mail.  It's not a video product.  It's not

15:19:01  13  a part of the case.

15:19:01  14          And this was all confirmed by Mr. Davenport, who

15:19:06  15  testified by video last week.  "What we wanted was the ability

15:19:09  16  to run on background, which required VoIP status."  So the 2012

15:19:16  17  discussions we heard so much about have nothing to do with what

15:19:22  18  you are being asked to decide.

15:19:23  19          All right.  Let's get right into infringement.  The

15:19:26  20  '270 patent, no infringement.  Here's the jury instruction.

15:19:32  21  This is from page 11 of the instructions that Judge Yeakel read

15:19:35  22  you, and it just confirms what I told you in the opening.

15:19:38  23          Each and every one of the requirements of the

15:19:40  24  asserted claim has to be present in the Facebook and Instagram

15:19:44  25  Live products.  Every single element has to be there.  That was

DEFENDANT'S CLOSING                                                118

15:19:48   1   the whole point of the soccer ball and the football.  Three out

15:19:54   2   of four, not good enough; five out of six, not good enough.

15:19:58   3          All right.  Here are the elements where we start with

15:20:01   4   the '270, the elements of Claim 34, and there are two critical

15:20:04   5   requirements that are not performed by the Facebook servers,

15:20:07   6   and the evidence on that is essentially undisputed at this

15:20:11   7   point.

15:20:11   8          The two questions you have to answer on '270 are:

15:20:15   9   One, are the privacy settings, because that's what they accuse

15:20:21  10   as the recipient identifier -- are the privacy settings in

15:20:24  11   Facebook and Instagram Live or Instagram Direct a recipient

15:20:28  12   identifier that identifies a recipient of the video?

15:20:31  13          Question 2.  Do the Facebook and Instagram Live

15:20:35  14   ascertain a location to deliver the video in response to

15:20:39  15   receipt of a recipient identifier?

15:20:42  16          Now, these are each independent requirements.  If the

15:20:45  17   answer to either one of these is no, there's no infringement.

15:20:49  18   Either one of these.  And, in fact, the answer to both of them

15:20:53  19   is no, because here's the claim language.

15:20:57  20          The '270 patent requires receiving an identifier

15:21:01  21   transmitted by the sending device -- that's the person that

15:21:04  22   wants to broadcast, the broadcaster -- with an identifier

15:21:10  23   identifying a recipient of a video communication.  Here's the

15:21:13  24   key point.  It's not good enough that somebody down the line

15:21:17  25   that's part of a group or part of the public decides to ask

15:21:22   1   for, request, and watch the video.  The patent requires that,

15:21:25   2   when the video is received from the broadcaster, there be some

15:21:29   3   kind of an identifier, a recipient identifier, that identifies

15:21:34   4   who is going to receive -- who is going to receive the video.

15:21:40   5            Now, Dr. Bhattacharjee illustrated this in this

15:21:44   6   animation.  This is an illustration of how '270 works.  We have

15:21:48   7   our sending broadcaster on the left.  She's going to send, and

15:21:51   8   she chooses recipients, Sue, Alice, and Mike, and she sends

15:21:58   9   that video with the recipients -- I'm going to show it again --

15:22:01   10  over to the server.

15:22:02   11           When the server gets it, it then determines after

15:22:06   12  receiving it, what are the addresses?  What is the location to

15:22:11   13  which we're going to deliver the video?  And once the addresses

15:22:14   14  are determined, then the system delivers the video.

15:22:17   15  That's the point of having a recipient identifier.

15:22:21   16           Now, this is absolutely consistent with what the

15:22:24   17  patent describes.  This is an important passage.  It's at

15:22:29   18  column 22 of the patent.  I encourage you guys to read it.

15:22:33   19  It says:  "When a client transmits a message, the message

15:22:37   20  contains an identifier associated with the target recipient."

15:22:41   21  This is not an embodiment.  This is the only place in the

15:22:45   22  patent that describes this identifier, this all-important

15:22:48   23  identifier.  This is it.  And that's what it says.

15:22:50   24           So the message contains an identifier associated with

15:22:53   25  a target recipient.  And what happens next?  In response, the

DEFENDANT'S CLOSING

120

15:22:57 1  server finds a delivery route to a client associated with the

15:23:01 2  intended or targeted recipient.

15:23:03 3        Now, let's clear out one red herring right up front.

15:23:07 4  There is no requirement in Claim 34 of a guaranteed delivery,

15:23:14 5  because you can never guarantee delivery.  And we're not

15:23:17 6  arguing it because sometimes there are glitches or problems

15:23:18 7  with delivery.  That's not -- no.  That's not it, and that's

15:23:22 8  never a position that we took or that Dr. Bhattacharjee took.

15:23:27 9        You read the claims in light of the specification.

15:23:32 10 The point of this patent is to provide a messaging system where

15:23:38 11 you make your best effort to get something delivered to a

15:23:40 12 targeted recipient, just like the patent here says.

15:23:43 13       So the point isn't that there's no -- that there's no

15:23:47 14 guarantee in Facebook Live.  The point is there is no recipient

15:23:50 15 identifier because it's a broadcast system.

15:23:53 16       Here is what Voxer accuses of being a recipient

15:23:57 17 identifier.  They say the privacy selector there on the left

15:24:01 18 for Facebook Live and the privacy selector for Instagram Live

15:24:06 19 are the recipient.  They say those are identifying receipts.

15:24:10 20 But in these systems you now know these do not identify who is

15:24:15 21 going to receive it.  All they do is determine who is eligible.

15:24:23 22       If it's a public setting, everybody in the world is

15:24:25 23 eligible.  Obviously, they're not all being sent a video.  And

15:24:29 24 if it's a private setting, it's a group of people, but they're

15:24:30 25 not the recipients until they make a specific request to see

15:24:38  1  the video.  So these only determine eligibility, they do not

15:24:40  2  determine a recipient.

15:24:45  3        Now, here's how Dr. Bhattacharjee described the

15:24:48  4  system, and the engineers are absolutely consistent with this:

15:24:51  5  It's a broadcast system that does not use a recipient

15:24:55  6  identifier.  There's our sender.  He's going to broadcast a

15:25:02  7  live soccer game.  He sends his -- his broadcast, he sends his

15:25:06  8  video to the servers.  There are privacy selectors, but they

15:25:11  9  don't determine where it's going to go.  They don't determine,

15:25:14  10  they don't identify a recipient, because this is broadcast.

15:25:25  11  And in order to receive it, somebody has to see it on their

15:25:25  12  feed or wherever they see it or whatever notification, and they

15:25:28  13  have to make a specific request.  It's a pull system.

15:25:31  14        You heard about this HTTP request.  Only then -- only

15:25:36  15  then do the servers know what is the delivery address, because

15:25:40  16  the servers look at the address provided by the sender --

15:25:45  17  excuse me -- by the user and they send it back.

15:25:55  18        So, again, the privacy settings are not used, as

15:25:57  19  we'll see in just a minute, to determine a recipient and

15:25:58  20  they're not used to determine a location.  This is the way

15:26:03  21  Dr. Bhattacharjee described it.

15:26:05  22        He was asked:  "In your opinion, does setting the

15:26:07  23  privacy to a Facebook Live video to any of these options

15:26:14  24  identify a recipient?"

15:26:14  25        "No."

DEFENDANT'S CLOSING                                        122

```
15:26:15   1              Why not?  Because the privacy selector only serves to
15:26:19   2    restrict who may view it.  In order for the video to be
15:26:27   3    actually watched, for somebody to receive it, to become a
15:26:28   4    recipient, an eligible viewer must send a request and pull the
15:26:31   5    video.  And the privacy selector, the privacy settings in
15:26:35   6    Facebook Live and Instagram Live, tell us nothing about who
15:26:37   7    does that.
15:26:42   8              Now, the testimony from the engineers on this was
15:26:45   9    unequivocal.  Here's Mr. Leland.
15:26:46  10              "Does the privacy selector enable broadcasters to
15:26:47  11    determine who will ultimately get a copy of a Facebook Live
15:26:50  12    video?
15:26:53  13              "No."
15:26:53  14              "What does it do?"
15:26:55  15              "It allows the broadcaster to specify if they want to
15:26:57  16    restrict access to a group, who should the access be limited
15:27:00  17    to."
15:27:00  18              Most -- as Mr. Leland testified, most of these are
15:27:04  19    set public, so the whole world, anybody, online can have it.
15:27:08  20    Again, we asked him another question:
15:27:10  21              "Does Facebook allow broadcasters to dictate the
15:27:13  22    people to whom Facebook will actually send the video?"
15:27:16  23              "No."
15:27:16  24              "Why can't broadcasters specify who the video will be
15:27:21  25    sent to?"
```

DEFENDANT'S CLOSING

15:27:22   1            "Facebook does not provide an interface to do that."

15:27:24   2            That is undisputed, unchallenged testimony that there

15:27:30   3   is no recipient identifier in the Facebook Live system.   That's

15:27:33   4   what he's saying.

15:27:34   5            Does Facebook Live have anything like an inbox?

15:27:38   6   Dr. Mitzenmacher kept talking about e-mails that you get.   You

15:27:41   7   can get an e-mail and not open it.   That's not what we're

15:27:44   8   talking about.   Someone can send you an e-mail that you don't

15:27:53   9   get.   That's not what we're talking about.

15:27:53   10           In Facebook Live and Instagram Live, nothing is sent

15:27:55   11   until and unless the user device or the user asks for it and

15:28:00   12   requests it.   That is fundamentally different from what the

15:28:02   13   patent requires.

15:28:08   14           Now, the same is true from Instagram.   Here's

15:28:12   15   Mr. Stinson.   You heard from him last week.

15:28:13   16           "Which of these settings" -- this is public and

15:28:15   17   private now for Instagram.

15:28:16   18           "Which of these settings enables broadcasters to

15:28:19   19   determine who will request and view their live video?"

15:28:22   20           "Neither of these settings allow a broadcaster to do

15:28:24   21   that.   To receive a live video, it requires an explicit action

15:28:28   22   on the part of the viewer which the broadcaster would have no

15:28:31   23   control over."

15:28:32   24           Again, these are broadcast systems.   They are not

15:28:41   25   messaging systems using identifiers.   That's true even if

15:28:44  1   you're talking about Instagram Direct.  That's the little paper

15:28:50  2   airplane that was discussed by Dr. Mitzenmacher.

15:28:56  3          We asked Mr. Stinson, What happens if you're using

15:28:59  4   Instagram Direct?  If you use it, is the live video itself sent

15:29:04  5   to the user?  No, it's not.  The live video is not sent.  What

15:29:10  6   is sent at that point is an entry point.  The user or the

15:29:20  7   user's device still has to request it.  There's no recipient

15:29:21  8   identified even in Instagram Direct.

15:29:23  9          Does the Instagram Direct feature control who

15:29:26 10   ultimately ends up receiving an Instagram Direct video?  No.

15:29:30 11   It can't control who receives it because it can't control who

15:29:33 12   will actually tap on it.

15:29:37 13          There's one other thing that's important about

15:29:40 14   Instagram Live that's different from Facebook Live.  In

15:29:44 15   Instagram Live, the settings, as you heard from

15:29:46 16   Dr. Mitzenmacher and everybody else, they're default settings.

15:29:49 17   They apply to all your content, not just your video.  So the

15:29:53 18   patent requires that the message be associated with the -- that

15:29:57 19   the identifier be associated with a video message.  That is

15:30:00 20   not -- that never happens on Instagram Live because these are

15:30:04 21   default settings that apply to everything -- posts, texts,

15:30:09 22   everything you send -- not just live videos.

15:30:15 23          Now, the privacy settings aren't equivalent.  We may

15:30:19 24   hear on the rebuttal about equivalents because Dr. Mitzenmacher

15:30:22 25   talked about it.  But they're not equivalents.  A privacy

DEFENDANT'S CLOSING

15:30:28  1   setting is fundamentally different from this claim recipient

15:30:30  2   identifier.  The patent requires that you will identify those

15:30:35  3   who will receive the video.  That's the function that they're

15:30:38  4   talking about, and it results in reliable delivery to intended

15:30:42  5   recipients.

15:30:44  6           The Facebook privacy settings do not perform that

15:30:47  7   function, and they don't receive that result.  They only define

15:30:50  8   who is eligible to request it.  Eligibility is different from

15:30:55  9   being a recipient, and it results only in providing access, not

15:31:05  10  determining a recipient.

15:31:06  11          Now, there's a second question equally important on

15:31:08  12  '270.  And if either one of these is answered in the negative,

15:31:13  13  there's no infringement.  Do Facebook and Instagram Live

15:31:16  14  ascertain a location used to deliver the video in response to

15:31:20  15  receipt of the recipient identifier?

15:31:22  16          We are not talking about an extra step, which is what

15:31:26  17  Dr. Mitzenmacher wants to talk about.  This is a fundamentally

15:31:30  18  different step and a fundamentally different approach.  Let's

15:31:33  19  look at the claim because we start with the language of the

15:31:36  20  claim.

15:31:36  21          The claim requires ascertaining the location in

15:31:41  22  response to receipt of the identifier.  So what they're

15:31:44  23  claiming is that, in response to the privacy setting, the

15:31:49  24  Facebook and Instagram Live systems determine where to send the

15:31:56  25  video.  And we know that that is not true.  The Facebook and

15:31:59   1   Instagram Live servers have no idea where to send a video when

15:32:04   2   they get the privacy setting.

15:32:06   3          Why?  Because it's a broadcast system.  The message

15:32:10   4   is broadcast everywhere.  It isn't until a user or user's

15:32:14   5   device makes a specific request from a specific device that

15:32:20   6   Facebook's servers know where to send it.  You heard the

15:32:22   7   testimony about the fact that your IP address can change, are

15:32:28   8   you on Wi-Fi, are you on cell, are you in a coffee shop, are

15:32:31   9   you at home.  You move around with your phone or your tablet,

15:32:33   10  you're on different networks and different IP addresses.

15:32:37   11          So when the servers receive the privacy setting and

15:32:41   12  the original video broadcast, they don't know where to send it.

15:32:44   13  They need to have a request.  And this is critical, and the

15:32:48   14  testimony on this from Mr. Larumbe, who testified last week,

15:32:52   15  was undisputed.

15:32:53   16          "Does the CDN" -- the CDN is the Facebook server, the

15:32:59   17  content deliver network.  That's servers.

15:33:01   18          "Does the CDN ever receive any information regarding

15:33:04   19  where to send the video based on the broadcaster's privacy

15:33:08   20  settings?

15:33:09   21          "No, it doesn't."

15:33:09   22          "Do the privacy settings have any connection to the

15:33:12   23  server at all?"

15:33:13   24          "No.  They are completely independent systems."

15:33:18   25          In other words, it's not an extra step, it's a

15:33:21  1  different step that has nothing to do with the privacy

15:33:23  2  settings.  The servers don't know where to send a video until a

15:33:28  3  user makes a request, and that's not what the patent requires.

15:33:31  4        This is a slide shown last week by Dr. Mitzenmacher

15:33:38  5  from one of our engineers just confirming that the only way

15:33:42  6  Facebook Live and Instagram Live ever know where to send a

15:33:46  7  video is when the user or the user's device makes an HTTP

15:33:51  8  request that has an IP address in it and they send it back.

15:33:56  9        Dr. Mitzenmacher's on board with this, too.  I asked

15:33:59  10  him on cross:  "Based on your review of all this material, you

15:34:04  11  concluded that Facebook Live and Instagram Live use technology

15:34:08  12  typically thought of as a pull system, where client devices

15:34:12  13  make requests to servers which the servers respond to?"

15:34:16  14        "That's part of the technology.  The players will

15:34:20  15  make requests."

15:34:21  16        The IP address changes, so the servers wait until

15:34:27  17  there's a request from your phone or your tablet to receive it.

15:34:35  18        And these things aren't equivalent either.  There's a

15:34:39  19  fundamental difference between ascertaining a location when you

15:34:42  20  get the privacy setting and only determining the location later

15:34:48  21  when the user, whoever he or she is, makes a request.  It's

15:34:53  22  done in a different way, it produces a different result, it's

15:34:56  23  fundamentally different.  So there's no equivalence.

15:34:59  24        And that means, that both of these two issues -- the

15:35:05  25  evidence shows that on both of these issues, the Facebook

DEFENDANT'S CLOSING                                    128

15:35:10   1   servers don't perform the step required by Claim 34 and,

15:35:15   2   therefore, there is no infringement.

15:35:18   3           Voxer has the burden of proving infringement.  They

15:35:21   4   didn't do it.  They didn't do it.  They didn't show that

15:35:25   5   there's a user identifier -- a recipient identifier, and they

15:35:29   6   didn't show that the location to send the video is ascertained

15:35:33   7   in response to the privacy settings.

15:35:35   8           Let's talk about the '557 patent, and we're going to

15:35:40   9   get into some detail on that, too, because, again, the only

15:35:44   10  issue for you as jurors is to resolve this infringement

15:35:47   11  question.  And we'll talk about validity on '557 in a minute.

15:35:51   12          Here are the claims.  We start with the claims.

15:35:57   13          This claim claims a method for operating a video

15:36:02   14  message service infrastructure, and the steps are laid out.

15:36:07   15  And, yes, Voxer is right:  We're only contesting the selecting

15:36:11   16  step.  But it is now established in the evidence that the

15:36:15   17  selecting step is not performed by the servers.  You heard

15:36:19   18  Voxer's lawyers refer to these as the server patents.  These

15:36:22   19  patents are being read, or attempted to be, on the Facebook

15:36:27   20  servers.  They're all about the servers.

15:36:30   21          What's the issue on '557?  Do the Facebook servers

15:36:35   22  perform the step of selecting a version of the video based on

15:36:39   23  an ascertained bandwidth on the network?  Is that done by the

15:36:43   24  servers, or is it done somewhere else?  Well, this isn't a hard

15:36:48   25  one.  Let's start with the language of the claim.

15:36:55  1          It's a method for operating a video message service

15:36:58  2   infrastructure.  That's what the claim is about.  And it

15:37:01  3   requires that the video message service infrastructure, which

15:37:04  4   they claim is the server, selects one of the degraded versions

15:37:07  5   of the video media based on ascertained bandwidth.

15:37:11  6          This is the patent that talks about selecting a

15:37:14  7   version based on your Internet bandwidth.  You've got great

15:37:19  8   bandwidth, you can get a great resolution version of the video.

15:37:22  9   If your bandwidth is terrible, well, you'll have to suffer

15:37:25  10  something a little fuzzier.  We've all been through that.

15:37:28  11         Well, Dr. Mitzenmacher was crystal clear.  This is

15:37:31  12  his drawing that he put up last week, and he's done a labeling

15:37:34  13  for us.  In his view the video message service infrastructure

15:37:39  14  is limited to the Facebook servers in the orange box.  On the

15:37:43  15  right, the player, that's the client device.  That's your

15:37:46  16  phone, your tablet, your laptop.  They are two separate things.

15:37:51  17         The Facebook -- the video message service

15:37:54  18  infrastructure, according to Dr. Mitzenmacher, is the Facebook

15:37:58  19  Live servers, FBLS, right in the middle of the orange box.  And

15:38:04  20  he has the client, which is the player -- that's you or me or

15:38:09  21  anybody that's going to play the video -- on the right.

15:38:12  22         And you know what?  The patent requires that these be

15:38:16  23  separate things, because one of the claims -- one of the

15:38:20  24  elements of this very claim requires transmitting the actual

15:38:25  25  selected version from the video message service infrastructure

15:38:29  1  to a recipient device.  So the claim requires that they be

15:38:33  2  separate, that the infrastructure be one thing and that the --

15:38:39  3  that the client be another thing.

15:38:41  4         And so the issue is:  Do the servers provide this

15:38:45  5  selection, or is it done by the client device?  Well, again,

15:38:52  6  the testimony of the engineers from Facebook was absolutely

15:38:58  7  undisputed on this point.

15:39:00  8         We asked Mr. Larumbe:  "What role does the CDN" --

15:39:04  9  that's the Facebook server.  "what role does it play in

15:39:06  10  deciding which version of a video to deliver?"

15:39:09  11         "It doesn't play any role."

15:39:11  12         The viewer device selects and then specifies the

15:39:14  13  specific file name.  And then the CDN, that's the server, just

15:39:20  14  returns the file that the viewer device requested.

15:39:23  15         No role at all.  They didn't get up and cross-examine

15:39:28  16  this engineer on anything, let alone this opinion.  The only

15:39:34  17  Thing they established with Mr. Larumbe is he'd never met with

15:39:37  18  anybody from Voxer.  That was the cross-examination.  He never

15:39:41  19  met with anybody from Voxer.  Right.  That's our point too.

15:39:44  20         Now, why doesn't it play a role?  It doesn't play a

15:39:47  21  role because the servers in Facebook Live aren't even capable

15:39:50  22  of measuring the bandwidth between themselves and the client

15:39:55  23  device.  So it doesn't even have the information that you need

15:39:59  24  to make a selection.

15:40:00  25         We asked Mr. Larumbe:  "where is the network

15:40:03  1  bandwidth determined?

15:40:04  2       "The viewer device performs an estimation of the

15:40:07  3  bandwidth available."

15:40:09  4       Does the CDN -- that's Facebook server; that's what

15:40:12  5  they're accusing.  Does it know the network bandwidth between

15:40:17  6  itself?  No, it doesn't.  It's not even capable of making the

15:40:20  7  selection because it doesn't have the information.

15:40:22  8       Now, why did the Facebook engineers build a different

15:40:25  9  system?  Why did they build a system where the client device

15:40:29  10  makes it?  Mr. Larumbe told you that, too.  The benefit of

15:40:36  11  doing it this way is the viewer device -- your phone, your

15:40:38  12  laptop, your tablet -- has more information, much more about

15:40:41  13  itself.  It knows its screen resolution ability, the window

15:40:45  14  size, the network it's on.  And that information is in the

15:40:49  15  viewer device, and the server doesn't have it.

15:40:53  16       So this idea that the server is participating or

15:40:57  17  having anything to do is not true.  And even Dr. Mitzenmacher

15:41:01  18  admitted this.  On cross-examination he admitted:  "After

15:41:09  19  looking at the Facebook system and the Instagram system and all

15:41:12  20  the study you did, you said the user client must select a

15:41:16  21  version from the manifest."  And "version" there refers to a

15:41:20  22  version of the degraded video, exactly what we're talking about

15:41:24  23  on this patent.

15:41:25  24       "Yes.  That's right."

15:41:29  25       What is even their argument?  Their argument is,

DEFENDANT'S CLOSING

15:41:32  1  well, even though the client selects it, when it requests that

15:41:37  2  version, the server has to go find it.  It has to fetch it.

15:41:42  3  Remember, you saw that yesterday during his rebuttal testimony.

15:41:45  4  He's saying the server makes a selection because it fetches

15:41:49  5  what the client selected.  But he admits, "In normal

15:41:54  6  circumstances, the Facebook server will return the segment

15:41:58  7  selected by the client device, right?"

15:42:01  8          "Right."

15:42:03  9          It's the server that doesn't have discretion.  The

15:42:05  10  server has to return what the client selected.  When you go to

15:42:08  11  a restaurant and you order a meal, a wait person will bring you

15:42:14  12  the meal.  But you're the one that's selected the meal.  They

15:42:17  13  may have put it together and provided it, but you selected it.

15:42:20  14          I think the example Dr. Jeffay used was I go to a

15:42:24  15  truck dealership, and I pick out a Ford F-150 all-electric, I'm

15:42:29  16  making a selection.  The dealer may have to find it, but the

15:42:32  17  selection is made by the buyer.  And Dr. Mitzenmacher is trying

15:42:36  18  to pull a fast one on all of us when he says the servers

15:42:39  19  participate in this by pulling up the file.  All they do is

15:42:43  20  fetch or retrieve.  They fetch or retrieve the file that's

15:42:47  21  selected by the client device.

15:42:51  22          So, again, with respect to '557, Claim 1, it's not

15:42:59  23  satisfied.  This is a server patent.  The server has to perform

15:43:03  24  the step, and it hasn't performed the step.

15:43:07  25          Now, I want to go back to something that I passed

DEFENDANT'S CLOSING
133

15:43:12    1  over, and I'm going to put it back up here.  Let me see if I

15:43:14    2  can do this.  Yeah.  You may hear from Voxer, oh, it doesn't

15:43:17    3  matter where it's done.  Bologna.  These are server patents.

15:43:21    4  This claim is about a video service -- a video message service

15:43:26    5  infrastructure.

15:43:27    6          Dr. Jeffay was asked:  "Claim 1 of the patent doesn't

15:43:31    7  say that the selecting step cannot be performed by a

15:43:35    8  recipient?"

15:43:36    9          He testified, "It doesn't say that, but a person of

15:43:39   10  skill would understand that the selecting step happens inside

15:43:43   11  the infrastructure," which is what this patent is all about

15:43:48   12  anyway.

15:43:48   13          So, based on the undisputed testimony of the Facebook

15:44:03   14  engineers, Claim 1 of the '557 patent is not infringed.

15:44:06   15          Let me make a very important point, and it's actually

15:44:09   16  at page 11 of your jury instructions.  Both with respect to the

15:44:14   17  '270 and the '557, if you find that the independent claims are

15:44:20   18  not infringed, it's automatic that the dependent claims are not

15:44:23   19  infringed.  You don't have to work any further.

15:44:26   20          In other words, the law is:  If an independent claim

15:44:29   21  is infringed, any claim that's dependent on that -- excuse me.

15:44:32   22  If an independent claim is not infringed, any dependent claim

15:44:38   23  is also not infringed.  You'll find that on page 11 of the jury

15:44:41   24  instructions.

15:44:41   25          And it's true for both the '270.  If Claim 34, which

DEFENDANT'S CLOSING

15:44:46   1   I discussed a few minutes ago, is not infringed. The other

15:44:49   2   claims aren't infringed either. The same thing is true here

15:44:54   3   with respect to '557.

15:44:56   4           I'll pause a minute just to point out that not even

15:45:04   5   Mr. Katis thought that Facebook Live infringed his patents.

15:45:07   6           Remember that back in 2016 after he saw what -- how

15:45:13   7   Facebook Live worked, he went on the ski trip? He sent an

15:45:18   8   e-mail to Facebook saying hey, here's my IP. Here's our --

15:45:22   9   some of our key patents. And the response he got from Facebook

15:45:24   10   was, hey, you may have great IP, but all of our properties are

15:45:30   11   doing something completely different, something completely

15:45:34   12   different, and we currently have no plans to extend into

15:45:38   13   different territories, point-blank. They were honest. We are

15:45:42   14   different from you. And Mr. Katis apparently agreed with that.

15:45:46   15           All good, Stan. Would love to grab lunch again

15:45:50   16   sometime.

15:45:50   17           So even Mr. Katis didn't believe there was

15:45:52   18   infringement.

15:45:59   19           Now, I'm going to spend a few moments here talking

15:46:01   20   about the '557 patent, invalidity. But if you find as I think

15:46:04   21   the evidence shows that the '557 patent is not infringed, then

15:46:12   22   the verdict form allows you to skip over this issue. You only

15:46:16   23   get to this issue if you find infringement of the '557 which,

15:46:20   24   as I said, I don't believe you can because the servers don't

15:46:24   25   perform this critical step.

DEFENDANT'S CLOSING

15:46:26   1        But we're going to talk about this because it's on

15:46:29   2   the verdict form.  But, again, you'll notice when you get to it

15:46:32   3   that you don't have to answer it if you've found

15:46:34   4   noninfringement of the claim.

15:46:38   5        So now let's talk about the Seckin patent

15:46:43   6   publication.  Here it is.  It's claim DTX249.  It turns out

15:46:49   7   it's got a ribbon on it, too, just like the patents that Voxer

15:46:53   8   has.  That's Ms. Seckin's patent application.

15:46:56   9        And, as you can see, it was filed and published in

15:47:00  10   December of 2004.  Filed and published December of 2004.  And,

15:47:05  11   like the patents, it has claims, it has descriptions, it has

15:47:10  12   figures.  Some are handwritten.  But you saw some of it in

15:47:15  13   Dr. Jeffay's testimony, some of it from Dr. Mitzenmacher.  But

15:47:18  14   there it is.

15:47:19  15        Now, there's certain things about it that are

15:47:21  16   completely undisputed.  It is prior art to the '557.  No debate

15:47:25  17   about that.  The parties agree.  The patent application

15:47:30  18   publication qualifies as prior art even though it didn't become

15:47:33  19   a patent.  Everyone agrees with that, including

15:47:36  20   Dr. Mitzenmacher, as you heard yesterday.  No debate about

15:47:40  21   that.

15:47:41  22        The patent examiner did not consider the Seckin

15:47:43  23   publication in connection with Voxer's application.  You might

15:47:50  24   ask how can that be.  It's a patent application in the patent

15:47:53  25   office.  Well, these patents have some super high numbers on

15:47:56  1   them, right?  The patents we're talking about, the '270 and the

15:48:00  2   '557, they're in 10 million range.  So there are millions of

15:48:07  3   patents, both issued patents and applications.  And so it's not

15:48:10  4   unusual -- it is not unusual for patent examiners, if no one is

15:48:17  5   pointing out what's there, it's impossible for them to be aware

15:48:20  6   of everything.

15:48:21  7          But there's no dispute, because the '557 and every

15:48:25  8   patent lists on its cover page what has been considered.

15:48:29  9   There's usually a list of prior art references.  And so when

15:48:33 10   you look at the '557, you will see on the cover page there is

15:48:37 11   no mention of and no reference to the Seckin patent

15:48:40 12   application.

15:48:42 13          And, finally, the fourth thing that we established

15:48:45 14   with Dr. Mitzenmacher yesterday, what Seckin disclosed is not

15:48:49 15   limited to the claims.  What Seckin discloses is everything

15:48:55 16   inside, start to finish: all the text, all the figures, the

15:49:00 17   descriptions, all of that.  It's not limited to the claims.

15:49:04 18   The publication has a lot more in it than the claims.

15:49:09 19          Now, this is very important, and it's one of the

15:49:14 20   instructions that Judge Yeakel read just a few minutes ago.

15:49:18 21   It's at page 17 of the jury instructions, page 17.  And it says

15:49:24 22   that, where someone like Facebook is relying on prior art that

15:49:29 23   differs from the prior art considered by the patent office, you

15:49:33 24   should give that prior art more weight.  Well, that applies to

15:49:36 25   Seckin.

DEFENDANT'S CLOSING                              137

```
15:49:37   1            In other words, if the patent office already
15:49:40   2   considered it, as jurors, you're entitled to give it little
15:49:43   3   weight.  If the patent office didn't consider it and you're the
15:49:46   4   first ones to do so, then the reference is entitled to more
15:49:50   5   weight.
15:49:50   6            Here's the dates just to prove it up.  Seckin
15:49:58   7   December 2004, no dispute.  The earliest priority date for the
15:50:02   8   Voxer patents is June of 2007.  So we're talking about
15:50:07   9   2 1/2 years.
15:50:08  10            Now, I think this is a pretty easy one, too, because
15:50:14  11   there's only one debate.  Dr. Mitzenmacher, for all his trying,
15:50:19  12   only came up with one distinction.  There's no debate that this
15:50:25  13   publication talks about video, it talks about live video, it
15:50:32  14   talks about live streaming video to client devices on the
15:50:37  15   right.  These colors are kind of hard to see here, but we're
15:50:40  16   talking about that cloud has video in it.  You'll see this is
15:50:45  17   figure 2 of the patent.  You'll have it in the jury room, or
15:50:48  18   you'll get it on the electronic system.
15:50:51  19            And it's got live video content streamed through
15:50:54  20   servers and transcoders where bitrate versions are created.
15:50:59  21   And, just like in the '557, where there's a selection made by
15:51:05  22   the servers of which one to use.  It discloses every single
15:51:09  23   element limitation of Claim 1 of the '557 patent.  It's all
15:51:14  24   right there.  And you can see it.
15:51:18  25            You may remember Dr. Jeffay showed us this, which was
```

15:51:24    1    how it works.  If you read the descriptions, it's doing exactly

15:51:28    2    what '557 claims:  live content, the transcoder creates

15:51:33    3    different versions there in the different colors, and the

15:51:36    4    server decides where to send it.

15:51:38    5         So let's take a look at the scorecard on this one.

15:51:42    6    He didn't contest any of these elements.  The receiving,

15:51:46    7    generating, selecting, transmitting, all there.  All there.

15:51:50    8    His one beef was, well, wait a minute.  Seckin doesn't disclose

15:51:56    9    multidirectional, bidirectional.  Remember he showed you this

15:52:00   10    figure, and he drew on the figure.  This is from the '577.

15:52:05   11         Now, important point:  This is not the claims of the

15:52:07   12    '557.  You heard Dr. Mitzenmacher and the Voxer lawyers spend

15:52:12   13    the whole trial telling you you can't take an embodiment and

15:52:16   14    force it into the claim.  You've got to stick with the claim

15:52:19   15    language.

15:52:20   16         The claim language of the '557 has nothing to do with

15:52:25   17    bidirectional.  This is Dr. Mitzenmacher violating his own

15:52:29   18    ground rules, his own rule repeated over and over by the Voxer

15:52:32   19    lawyers.  You can't take an embodiment.  And he admitted on the

15:52:37   20    stand yesterday this is an embodiment.  It is not the claim.

15:52:42   21         I encourage you as jurors to read the claim.  There's

15:52:45   22    nothing in the claim about bidirectional.  You receive, you

15:52:54   23    create degraded versions, you select a good version, and you

15:52:57   24    send it to the recipient.

15:52:58   25         There's no requirement in the claim.  And when we're

15:53:00   1   looking at invalidity, it's just like infringement in this

15:53:03   2   respect.        You're going to compare the claims to what's

15:53:08   3   disclosed in Seckin.  If Seckin discloses every element, as I

15:53:12   4   just showed that it does, then it anticipates and renders this

15:53:19   5   patent invalid.  And the only issue that you have to decide on

15:53:23   6   this one is:  Does the claim of '557 require bidirectionality?

15:53:30   7   No.

15:53:30   8            Here's what Dr. Mitzenmacher showed you.  This is the

15:53:33   9   definition from '557 of what a message from the -- from the

15:53:37   10  patent.  It's an individual unit of communication from one user

15:53:43   11  to another.  It is one-directional.  This is the patent

15:53:47   12  defining what a message is, directly contradicting

15:53:50   13  Dr. Mitzenmacher.  And he knew it.

15:53:52   14           "We're in agreement that what you highlighted for the

15:53:54   15  jury, that's a one-way communication, correct?"

15:53:56   16           "Yes.  So if -- we can refer to that as a one-way if

15:54:02   17  you like."

15:54:02   18           The only other issue is Claim 9.  And on Claim 9 the

15:54:09   19  only additional element requires using two protocols, and

15:54:13   20  Dr. Jeffay, with 30 years of experience, told you it would be

15:54:18   21  obvious to someone skilled in the art.  That's not you or me or

15:54:23   22  anyone in the courtroom other than someone like Jeffay or

15:54:27   23  Mitzenmacher, who are experienced people.  That's what a person

15:54:30   24  of skill in the art is.  And Dr. Jeffay made very clear that

15:54:33   25  using one protocol to take the data in and another to send it

DEFENDANT'S CLOSING

15:54:37   1   out was no big deal.

15:54:38   2         I'll close with this quote that you heard yesterday.

15:54:43   3   Maybe it was -- yes.  It was yesterday.  Ms. Panttaja, one of

15:54:48   4   the inventors on the Voxer patent, she was on video.

15:54:52   5         We asked her:  "You were a coinventor?"

15:54:54   6         "It seems to say so."

15:54:55   7         "Could you take a look at Independent Claim 1?"

15:54:57   8         She looked at Claim 1.

15:54:59   9         "Sitting here today, can you tell us what the

15:55:03   10  advancement of this claim is over the prior art?"  What's new?

15:55:06   11        "No, I can't."

15:55:09   12        No.  They haven't explained it either.  They haven't

15:55:12   13  explained -- other than this bidirectional argument that

15:55:16   14  Dr. Mitzenmacher is trying to run, they haven't explained what

15:55:19   15  the '557 does over and above any prior art.

15:55:23   16        So I'll say thank you.  I appreciate your time and

15:55:25   17  attention.  I'm going to turn the floor over to Ms. Anderson,

15:55:29   18  who is going to talk about -- there's our checkmarks on

15:55:34   19  invalidity.  That's a "yes" not a "no."

15:55:36   20        She's going to talk about this.  Voxer's technology

15:55:40   21  was not right for Facebook or anyone else.  Thank you.

15:55:45   22        MS. ANDERSON:  Good afternoon, ladies and gentlemen.

15:56:12   23        My name Christa Anderson.  And on behalf of Facebook

15:56:16   24  and Instagram, I'd like to thank you again for the time and

15:56:19   25  attention you've given to this matter over these many days.

DEFENDANT'S CLOSING

15:56:22  1          As Mr. Van Nest mentioned, I will be addressing the
15:56:27  2  subject of damages in the last 15 or so minutes of this
15:56:30  3  presentation for the defendants.  But before I dive in, I'd
15:56:34  4  just like to make an important note.  That although I am going
15:56:38  5  to be discusses damages, it is not because Facebook and
15:56:42  6  Instagram concede that there is any infringement of any patents
15:56:46  7  in this case.
15:56:48  8          So why am I going to be discussing it with you?  It's
15:56:51  9  because this is the last chance we will ever get to talk to you
15:56:55 10  about the facts in this case, and we want to provide you an
15:56:58 11  overview of some important evidence we think would be helpful
15:57:02 12  to you, were you to find infringement.  We want to make sure we
15:57:07 13  give you some overview before you go into your discussions.
15:57:11 14          And, according to the evidence that has been
15:57:13 15  presented during the course of this trial, we submit that the
15:57:19 16  strong weight of the evidence clearly supports a finding of
15:57:23 17  noninfringement or invalidity on the patents in this case.
15:57:26 18          We also believe that the evidence clearly supports a
15:57:31 19  finding that any reasonable royalty, any damages in the case,
15:57:35 20  is nowhere near the $174 million running royalty being demanded
15:57:42 21  by Voxer in this matter.
15:57:45 22          Instead, the evidence presented during the course of
15:57:49 23  this trial supports a finding that any reasonable royalty in
15:57:53 24  this matter would be a lump-sum royalty in an amount towards
15:57:58 25  the lower end of the range developed by Voxer's own hired

15:58:03  1  valuation expert before this case was ever filed, which found a

15:58:08  2  range of between 5- and 22.9-million for the entire Voxer

15:58:14  3  patent portfolio.

15:58:16  4          So let's begin our discussion with touching briefly

15:58:24  5  on some important principles you heard during the jury

15:58:30  6  instructions about the subject of damages.

15:58:32  7          In a patent case, damages are not meant to punish.

15:58:40  8  Instead, damages are measured as a reasonable royalty for the

15:58:43  9  patented inventions.  That reasonable royalty can be no more

15:58:48  10  and no less than the value of just the patented inventions at

15:58:53  11  issue.  As you've heard and as indicated on the screen, a

15:58:59  12  reasonable royalty is what the parties would have agreed to at

15:59:03  13  a hypothetical negotiation in November of 2018.

15:59:11  14          And, as both experts agree, both Voxer's expert and

15:59:14  15  as Facebook's experts agreed on the stand, that negotiation is

15:59:18  16  presumed to be a "cards up."  The parties each know the

15:59:22  17  relevant information going into that hypothetical negotiation.

15:59:29  18          Now, during this trial you have heard evidence, most

15:59:34  19  of it undisputed, about what the parties would have known when

15:59:41  20  they entered into that hypothetical negotiation in 2018 for a

15:59:47  21  license to the two patents that are at issue in this case.

15:59:49  22          A review of that evidence demonstrates that the

15:59:51  23  hypothetical negotiation between these two parties would have

15:59:55  24  resulted in a lump sum royalty payment in an amount much, much

16:00:01  25  less than was demanded by Voxer in this case.

DEFENDANT'S CLOSING                               143

16:00:07   1          So what is that evidence?  What would both parties

16:00:09   2   have known when they sat down to this hypothetical negotiation?

16:00:14   3          Well, as an initial matter, both parties sitting down

16:00:21   4   in 2018 in a hypothetical negotiation would have known that no

16:00:24   5   company has ever taken a patent license to any of the patents

16:00:27   6   in this case.  In other words, Voxer had no successful history

16:00:33   7   of licensing its patents.

16:00:35   8          Here we have on the screen the testimony of

16:00:38   9   Mr. Ratliff confirming what he wrote in his report, that he was

16:00:40   10   aware of no Voxer licenses to the patents-in-suit or any

16:00:45   11   evidence of the patents-in-suit having been licensed.

16:00:48   12          I'd also note that Mr. Ratliff acknowledged during

16:00:53   13   his testimony that some licenses that Mr. Katis referenced

16:00:57   14   early in the case when he was testifying were not patent

16:01:04   15   licenses.  Instead, they were user licenses, the kind you might

16:01:06   16   click on to subscribe to a service.  Those are not at issue in

16:01:10   17   this case.

16:01:11   18          Now, during the hypothetical negotiation, sitting

16:01:16   19   down in 2018, both parties would have known about the 2017

16:01:23   20   Houlihan Lokey valuation.  As you may recall from the evidence,

16:01:27   21   Voxer hired a well-respected valuation expert known as

16:01:32   22   Black Stone first, and they changed their name to Houlihan

16:01:34   23   Lokey, to examine the value of Voxer's patent portfolio.  And,

16:01:40   24   in particular, Houlihan Lokey examined what the patents would

16:01:44   25   be valued for Facebook, given the value of Facebook Live to

DEFENDANT'S CLOSING

16:01:48  1  their business.

16:01:51  2          And we see here on the screen an e-mail discussed by

16:01:54  3  Ms. Lawton during her testimony, an e-mail from Voxer's own

16:01:59  4  CEO, Irv Remedios, instructing Houlihan Lokey to take a look at

16:02:05  5  just that, just the issue of the valuation for Facebook, given

16:02:08  6  the value of Facebook Live to that business.

16:02:10  7          And Houlihan Lokey did that valuation work at Voxer's

16:02:17  8  request.  As you have heard from Ms. Lawton, Houlihan Lokey

16:02:22  9  applied a generally accepted valuation method and determined

16:02:26  10  the value of that whole patent portfolio to Facebook's --

16:02:32  11  Facebook Live product was valued at between 5 million and

16:02:36  12  22 million.  You see it highlighted on the screen.

16:02:40  13          It's important to note here that this valuation was

16:02:44  14  for a patent portfolio license on 209 patents and patent

16:02:50  15  applications, which included the patent family at issue here,

16:02:54  16  regarding the '270 and '557 patents that were issued beginning

16:02:58  17  the following year.  And included applications using the same

16:03:03  18  specification as those patents and included the actual

16:03:06  19  application for the '270 patent.  In other words this 5

16:03:12  20  million-to-22.9 million valuation is for far, far more patent

16:03:17  21  rights than what would be at issue in the hypothetical

16:03:21  22  negotiation for just two patents in this case.

16:03:27  23          And while Voxer's lawyers have argued that somehow

16:03:29  24  these numbers should have been bigger and they crossed them out

16:03:33  25  and wrote a bigger number on top, we know from Ms. Lawton's

1  testimony that that reflected a misunderstanding on Voxer's

2  counsel's part of how to apply principles, including principles

3  of net present value.  We have here in front of us on the

4  screen the Houlihan Lokey valuation that they made at Voxer's

5  request just a year before the hypothetical negotiation.

6       What else do we know about this negotiation?  Well,

7  we know that both parties entering this cards-up negotiation

8  would realize that lump-sum royalties, not a running royalty

9  were going to be the rule of day at this negotiation.  In

10 particular, you heard undisputed evidence in this case.  Both

11 Mr. Ratliff and Ms. Lawton looked at all the Facebook patent

12 licenses in the case, about 150.  Not a single one was a

13 running royalty license.  It was standard practice, as you

14 heard from Ms. Lawton, in the relevant industry to enter

15 lump-sum royalties.  And even Voxer's own patent valuation

16 expert, Houlihan Lokey, in the screen we just reviewed, that

17 was a lump-sum royalty valuation.

18      So what does this all mean?  This means that sitting

19 down at this negotiation, this hypothetical negotiation, the

20 parties would have been focused in the range of the Houlihan

21 Lokey valuation.  You see here on the screen I've indicated on

22 the screen in green bars $5 million and $22.9 million as the

23 range of the Houlihan Lokey valuation.

24      And indicated above, that's for 209 patents and

25 patent applications.  And that was performed before there was a

16:05:24   1   lawsuit and lawyers involved.  This is prelitigation, just a

16:05:28   2   year before the state of the hypothetical negotiation.

16:05:30   3          In contrast, you see Mr. Ratliff's number indicated

16:05:35   4   in the red bar on the right is far off from the reality of what

16:05:42   5   would have happened in such a negotiation.  His enormous

16:05:46   6   figure, 107.4 million, for only two patents developed after the

16:05:50   7   filing of litigation.

16:05:51   8          Why are those numbers so far off from reality?  Well,

16:05:57   9   among other things, because we learned through the evidence

16:06:02  10   that, in fact, Mr. Ratliff made a number of errors in his

16:06:06  11   calculation.  Let's talk about this.

16:06:08  12          You may recall this slide from viewing Ms. Lawton's

16:06:12  13   testimony.  She went over those with you, and she described

16:06:16  14   some of those errors.  Number one, usage-based royalty.  This

16:06:20  15   is the issue of a running royalty.  It's another way of saying

16:06:24  16   a usage-based royalty.  And she explained to you, as we've just

16:06:28  17   gone over in the evidence, there's no evidence in the record to

16:06:30  18   support applying a running royalty to this case.

16:06:33  19          Second, Ms. Lawton explained to you that Mr. Ratliff

16:06:37  20   failed to do an economic analysis of the incremental value of

16:06:43  21   the patents.  He chose to rely on the subjective technical

16:06:49  22   analysis Dr. Mitzenmacher, and Dr. Mitzenmacher did not drill

16:06:53  23   down on what did the patented inventions actually contribute to

16:06:58  24   the value of the server.  Instead, he just assumed the entire

16:07:02  25   value of the server was attributable to the patented inventions

DEFENDANT'S CLOSING

16:07:06 1  in this case.  That is not supported by evidence in this

16:07:09 2  matter, and you heard the critiques, for example, from

16:07:12 3  Dr. Jeffay about the problems with Dr. Mitzenmacher's valuation

16:07:17 4  technical apportionment.

16:07:18 5       Third, Mr. Ratliff had errors in his calculation

16:07:25 6  regarding the third item, Facebook Live profitability.

16:07:27 7       You remember, perhaps, from Mr. Poffenberger's

16:07:30 8  testimony yesterday, and he went over a lot of this with us.

16:07:37 9  He showed that Mr. Ratliff had actually ignored the significant

16:07:40 10 difference between the lower revenues for watch time on

16:07:43 11 Facebook Live videos as opposed to other Facebook revenues that

16:07:47 12 artificially inflated Mr. Ratliff's numbers.

16:07:51 13      Mr. Ratliff also admitted he ignored a report in

16:07:55 14 evidence that demonstrated that Facebook Live had an

16:08:00 15 insignificant effect on revenues.  He simply ignored it as part

16:08:06 16 of his analysis.

16:08:07 17      And we also learned that Mr. Ratliff misunderstood

16:08:09 18 the meaning of numbers, including a 44 percent number which

16:08:13 19 I'll get to in a moment -- ignored numbers that even

16:08:15 20 Mr. Ratliff admitted had been important to his analysis.

16:08:19 21      And, finally, number four on our screen, profit to

16:08:23 22 Voxer.  Mr. Ratliff assumed as part of his hypothetical

16:08:28 23 negotiation analysis that the parties would sit down and agree

16:08:35 24 that, at this negotiation, Voxer would be entitled to the

16:08:40 25 entire profit margin resulting from that analysis, as if

16:08:44  1  Facebook would sit down to such a one-sided deal at this

16:08:47  2  hypothetical negotiation.  There's no evidence in the record to

16:08:50  3  support this notion.

16:08:51  4          And I'd like to take a quick moment just to take a

16:08:57  5  closer look at one of those errors made by Mr. Ratliff.  You

16:09:00  6  may recall this slide with the green bars indicating 44 percent

16:09:05  7  on the right.  And you may recall that Mr. Ratliff said the

16:09:08  8  only number in all of this that ultimately matters was

16:09:12  9  44 percent in 2018.  And he said that was -- that 44 percent of

16:09:18  10 Facebook's total ad revenues in 2018 came from video.  That's

16:09:23  11 what Mr. Ratliff said.

16:09:25  12         Here's his testimony on that matter, again,

16:09:28  13 confirming what he had testified to in this trial about the

16:09:31  14 44 percent number.

16:09:33  15         However, you recall Mr. Poffenberger's testimony

16:09:39  16 yesterday, and explained Mr. Ratliff was mistaken.  Facebook

16:09:44  17 provided Voxer and Mr. Ratliff with the actual data on video

16:09:49  18 revenues, but Mr. Ratliff did not use it.  Instead, Mr. Ratliff

16:09:52  19 used numbers that concerned video format ads, which are

16:09:58  20 basically commercials running in a news feed, that have nothing

16:10:02  21 to do with Facebook Live or prerecorded video content.

16:10:05  22         This wasn't a small error.  Mr. Poffenberger

16:10:08  23 explained, instead of that 44 percent figure in 2018, the

16:10:13  24 actual number for video revenues was 5.5 percent.  What this

16:10:22  25 means, ultimately, is that Mr. Ratliff used a number that was

16:10:25  1   almost 10 times the real number.  He used 44 instead of 5.5.

16:10:31  2              And we see Mr. Poffenberger's testimony on the

16:10:34  3   screen.

16:10:34  4              So bearing these facts all in mind and the evidence

16:10:38  5   shows that a hypothetical negotiation between these parties in

16:10:42  6   November of 2018, cards up over two patents in this case, would

16:10:49  7   result in a lump-sum royalty in an amount that is at the low

16:10:52  8   end, at the range of the 5 million to 22.9 million dollars

16:10:56  9   circled in blue on this screen before you.

16:11:00  10             It's the valuation reached by Voxer's own valuation

16:11:05  11  experts before the case was filed, just a year before the

16:11:07  12  hypothetical negotiation date.  It's tethered to the reality of

16:11:11  13  the parties.  It's tethered to what happened before there was

16:11:15  14  any litigation.  And it encompasses -- those numbers encompass

16:11:21  15  209 patents and patent applications.

16:11:24  16             In contrast, Mr. Ratliff's $174 million running

16:11:29  17  royalty, which would amount over time to more than $400 million

16:11:35  18  as a running royalty is premised on a series of errors.  It is

16:11:39  19  inconsistent with the evidence in this case.

16:11:42  20             In this battle, ultimately of Voxer's own experts,

16:11:45  21  the accurate assessment, the one that is far more reliable than

16:11:50  22  Mr. Ratliff's is the one submitted by Houlihan Lokey indicated

16:11:55  23  in the range in the green on the screen before you.

16:11:57  24             Ladies and gentlemen, that brings us to the

16:12:02  25  conclusion of Facebook and Instagram's closing argument in this

```
16:12:07  1  matter.  As we will not have another opportunity to address
16:12:15  2  you, we submit that the evidence in this case does support and
16:12:18  3  proves that Facebook did not infringe any patents in this case;
16:12:24  4  that one patent at issue is invalid.
16:12:27  5           But, that said, regardless of your verdict, we thank
16:12:30  6  you for the time and attention you have given to this matter
16:12:35  7  over time.  It is important to the parties.  Thank you.
16:12:40  8           THE COURT:  Plaintiffs may close.
16:12:43  9               PLAINTIFF'S REBUTTAL ARGUMENT
16:12:43 10           MR. POWELL:  Thank you, Your Honor.
16:12:44 11           Could we pull up DTX392 at page 47, please.  And
16:12:52 12  could you highlight the bottom where it says "Total
16:12:55 13  consideration for patent value," all the way over.
16:12:58 14           And the ladies and gentlemen of the jury will recall
16:13:01 15  this exhibit that the defendants just showed you.  And remember
16:13:06 16  it's in millions.  It's up in the upper left hand.
16:13:09 17           So the actual total value of Voxer's patent in this
16:13:12 18  document is 127 million.  They had other scenarios which were
16:13:18 19  presented just a short while ago by me which actually have this
16:13:22 20  number closer to 160 million in one scenario and over
16:13:25 21  200 million in another scenario.  So don't be fooled that,
16:13:29 22  somehow, 5 to 22 is the right number.  The right number is
16:13:33 23  actually elsewhere in the document.
16:13:36 24           The other thing about Houlihan Lokey I want to make
16:13:38 25  sure is clear, although I did mention it a short minute ago,
```

16:13:42  1   Houlihan Lokey did not perform a hypothetical negotiation

16:13:45  2   analysis for this case.

16:13:47  3        As the defense lawyers just acknowledged, that came

16:13:50  4   over a year before the hypothetical negotiation, which means it

16:13:54  5   doesn't satisfy the court's requirement in the jury

16:13:56  6   instructions that you were just read.  It doesn't analyze the

16:14:01  7   Georgia-Pacific factors.  It doesn't analyze the

16:14:04  8   patents-in-suit.  It doesn't go through all of the categories

16:14:08  9   and groups of considerations that Mr. Ratliff did.  So that

16:14:11  10  opinion, if you want to call it that, really is not capable of

16:14:15  11  being considered by the jury for this case.

16:14:18  12       And that leaves you on the damages side only with

16:14:22  13  Mr. Ratliff's fully supported analysis under the

16:14:25  14  Georgia-Pacific factors and his conclusion as to what the

16:14:28  15  reasonable royalty would be.

16:14:29  16       Now, another thing to clear up real quickly is the

16:14:34  17  identifier.  And the ladies and gentlemen of the jury will

16:14:35  18  recall, in my cross-examination of defense experts, we talked

16:14:43  19  about the identifier of hunting and fishing.

16:14:46  20       Facebook would have you believe that the identifier

16:14:49  21  required in the patent claims is something like a social

16:14:51  22  security number, something that identifies a unique individual

16:14:54  23  and guarantees that you can get something to them.  Nothing

16:14:57  24  could be further from the truth.  The patent claims are quite

16:15:00  25  broad, and identifiers can be anything that associates that

16:15:04  1   video communication with a potential recipient.

16:15:07  2         So your identifier might be cooking.  My identifier

16:15:11  3   might be hunting and fishing.  So if there's a cooking video

16:15:15  4   that gets broadcast through the Live platform, it may find you.

16:15:19  5   If there's a hunting video broadcast through the Live platform,

16:15:22  6   it may find me.

16:15:23  7         And one thing to remember that's important here:  The

16:15:26  8   patents deal with time-shifting.  So they want to say the

16:15:29  9   delivery has to happen -- that's not quite right.  It has to

16:15:33  10  happen eventually under certain of the claims.  But under other

16:15:38  11  claims, it never has to happen, or it can happen a day, a week,

16:15:42  12  a month, years later.

16:15:43  13        And, for infringement, we would find that as soon as

16:15:47  14  it happens, we can call that an infringing use.  But to say it

16:15:51  15  has to identify someone to the level of a social security

16:15:53  16  number is just frankly wrong.

16:16:01  17        Now, another thing that you heard the defendants just

16:16:03  18  say is that their system is pull and ours is push.  Well,

16:16:06  19  that's also irrelevant.  Why?  Because of the extra step

16:16:09  20  instruction that you just heard from the judge.  An extra step

16:16:14  21  in an accused process cannot be a basis for finding no

16:16:19  22  infringement.  So whether it's a pull or push system isn't the

16:16:23  23  question.  The question is whether the claim elements are

16:16:25  24  satisfied.

16:16:26  25        And just because they want to interject an extra step

PLAINTIFF'S REBUTTAL

16:16:29   1   where, after the recipient is notified, the client has to make

16:16:31   2   a request, that's not a noninfringement position.  That's just

16:16:35   3   a design option that they put into their system that's not

16:16:38   4   required by the patent.

16:16:43   5         We also heard about the Seckin patent publication.

16:16:46   6   And please remember, Seckin is not a patent.  That means it's

16:16:50   7   not even an invention.  And "invention" is a special word.

16:16:54   8   Invention is a special word given to innovations that make it

16:16:58   9   through the patent office and issue in a patent.  Then you can

16:17:01   10  call it an invention.  That's not what Seckin is.

16:17:05   11        And you heard Dr. Mitzenmacher talk about why that

16:17:07   12  lessens its value as prior art.  So the value is lessened.  The

16:17:13   13  burden is really high, clear and convincing.  And if you

16:17:18   14  believe any of Dr. Mitzenmacher's testimony on Seckin, then

16:17:20   15  that's going to leave you with lingering doubts.  And that

16:17:24   16  means you don't achieve the level of overcoming the

16:17:27   17  presumption.

16:17:28   18        And there's something really interesting about Seckin

16:17:30   19  not being a patent.  If it were a patent, how would the Voxer

16:17:34   20  patents have issued over it?  If it's the same thing, how would

16:17:38   21  Voxer have gotten a patent in the first place?  If Seckin was

16:17:42   22  an invention from 2004, how did patent applications with a

16:17:46   23  priority date of 2007 ever issue?  It just doesn't make sense.

16:17:50   24  It doesn't add up.

16:17:52   25        The reason the Voxer patents issued, Seckin is

PLAINTIFF'S REBUTTAL

16:17:54  1  something completely different.  We looked at it on my

16:17:56  2  cross-examination of Dr. Jeffay.  It's an algorithm.  Seckin

16:18:02  3  didn't invent an infrastructure.  Seckin tried to get a patent

16:18:06  4  on something called a DBA algorithm.  That's not what we're

16:18:10  5  here to discuss, and that's why it has no relevance to the

16:18:12  6  asserted patents.

16:18:14  7          Now a couple of other things.  If we could pull up

16:18:17  8  PDX5.7.  This is a slide I used in cross-examination.  This is

16:18:28  9  Facebook's system.  And if we can blow up the live streaming

16:18:29  10  infrastructure.

16:18:30  11          And recall, I asked the experts about infrastructure,

16:18:33  12  architecture, can they be used interchangeably?  And

16:18:36  13  essentially, that's how it's been treated in this trial.  And

16:18:40  14  what we can see here -- and, unfortunately, it's not really

16:18:46  15  good quality, so hopefully on the monitor in front of you you

16:18:49  16  can see.

16:18:49  17          The left side, red, is a broadcast client.  That's a

16:18:52  18  client device.  Everything between there and the blue playback

16:18:57  19  client is server architecture.  So between those two bookends

16:19:00  20  is server.  But all of it is the infrastructure.

16:19:03  21          So when we look at '557 patent's message -- it's

16:19:06  22  called video message service infrastructure, it includes

16:19:10  23  end-to-end, every component, the application on the devices,

16:19:14  24  the servers in the middle, the application on the other device.

16:19:18  25  Facebook controls it all from start to finish.  That means

16:19:23   1   that, in Claim 1 of the '557 patent, the video message

16:19:28   2   infrastructure includes servers and it includes clients.

16:19:32   3         Now, the defense wants to suggest, well, how can it

16:19:34   4   send something to itself?  Again, they're trying to use common

16:19:39   5   concepts such as can a computer make a choice, can a server

16:19:46   6   send something to itself.  Of course it can.  Look at how many

16:19:50   7   servers are in this infrastructure.  Clients can be in the

16:19:54   8   millions.  So a client can send something to the server, the

16:19:58   9   server can send something to the client, the client can send

16:20:01   10  something to another client.  It's all within the

16:20:03   11  infrastructure.

16:20:04   12        So don't be fooled that, for some reason, this patent

16:20:07   13  claim requires there to be two separate entities, one under the

16:20:11   14  control of somebody else.  It's just not accurate because the

16:20:15   15  patents are given broad construction, we're not importing

16:20:19   16  limitations from the specification, which is what the defense

16:20:21   17  would like to do.

16:20:25   18        All right.  Now, a couple of other things that

16:20:29   19  started early on in the defense's argument.  I want to make

16:20:33   20  this clear.  It does not matter if Facebook did not copy

16:20:38   21  Voxer's technology.  It does not matter if they never heard

16:20:43   22  about Voxer.  It does not matter if they knew about Voxer's

16:20:47   23  patents or not.  Because this is a strict liability claim.

16:20:51   24        And, once they implemented the system -- and even

16:20:54   25  though the patents came later, once they implemented the system

16:21:00  1  and it's infringing, whether they knew about it or not does not

16:21:03  2  matter.  This is not required, that they had to have prior

16:21:06  3  notice of the patents to find infringement.

16:21:14  4      Let's see.  Oh, another important point that you

16:21:15  5  didn't hear the defense talk about:  Where are Facebook's

16:21:17  6  patents for the live streaming infrastructure?  You haven't

16:21:21  7  seen any.  They haven't presented a single patent on their live

16:21:26  8  streaming infrastructure.

16:21:29  9      Why?  Voxer has the patents.  They have two -- over

16:21:32  10  200 of them.  Facebook can't get patents on their live

16:21:36  11  streaming infrastructure.  Voxer already patented that

16:21:38  12  invention.  So that's an important distinction that you

16:21:42  13  obviously don't hear the defendants focusing on.

16:21:47  14      Okay.  Let's talk about some other things, and let me

16:21:51  15  kind of raise the discussion up a little bit as we approach the

16:21:54  16  conclusion of this trial.

16:21:57  17      And now, ladies and gentlemen, we have covered quite

16:22:02  18  a bit of ground in the past several days.  We're now closing in

16:22:06  19  on the finish line.  Of course, nobody gets to the finish line

16:22:09  20  without your help in deliberation.

16:22:12  21      That's an interesting word "deliberation," not one we

16:22:16  22  typically use in everyday parlance.  But for purposes of today,

16:22:20  23  and as the judge has instructed, it means to give all of the

16:22:24  24  evidence a, quote, impartial consideration with your fellow

16:22:27  25  jurors.  That's the task ahead of you.  And Voxer believes, if

16:22:32  1    you do that, you will see this through to the finish line and

16:22:35  2    award it the $175 million reasonable royalty it has proven that

16:22:41  3    it is entitled to.

16:22:43  4            And here's something I want you to think about as you

16:22:46  5    go through that process:  For whose benefit did Voxer bring

16:22:51  6    this lawsuit?  Voxer brought this lawsuit for Matthew Ranney,

16:22:57  7    Mr. Katis, and all the former and current Voxer employees that

16:23:02  8    knew they brought live messaging to the world and that they did

16:23:07  9    it before anyone else.

16:23:08  10           And you know who else believed Voxer's technology was

16:23:11  11   a step above everything else?  Our friends at Houlihan Lokey,

16:23:15  12   the firm that Facebook's own damages expert, Mr. Cathy Lawton

16:23:18  13   talked to you about yesterday.

16:23:20  14           If we could go to my first slide.

16:23:22  15           This is in the Houlihan Lokey report.  It's defense

16:23:25  16   Exhibit 392.  As we see here, Houlihan Lokey places Voxer's

16:23:30  17   live messaging technology at the top of this heap of the best

16:23:34  18   of the best of social media communications and traditional

16:23:39  19   media companies.  Houlihan Lokey identifies Voxer as resting

16:23:43  20   atop even Facebook Live.  They're right there in the middle.

16:23:46  21   So Voxer is on top of Facebook Live, which we have -- which as

16:23:52  22   we've seen this week, launched an infringing live video

16:23:56  23   messaging infrastructure in 2015.

16:23:59  24           Remember The Rock video that Facebook played during

16:24:03  25   trial?  That's 2015.  Voxer's top-of-class hybrid messaging

PLAINTIFF'S REBUTTAL

16:24:07  1  system that combines asynchronous and synchronous conversations

16:24:12  2  is the top of its field, according to Houlihan Lokey.

16:24:16  3      Now, one thing I need to make sure we all understand.

16:24:22  4  Facebook makes money from its Facebook and its Instagram Live

16:24:27  5  video messaging services.  As we learned during

16:24:30  6  cross-examination of Ms. Lawton, Facebook, quote, Instead of

16:24:33  7  paying to use Facebook and other products and services we

16:24:37  8  offer, by using the Facebook products covered by these terms,

16:24:40  9  you agree that we can show you ads that businesses and

16:24:44  10  organizations pay us to promote on and off the Facebook company

16:24:47  11  products, end quote.

16:24:49  12      Now, we also learned that Facebook, "uses your

16:24:53  13  personal data, such as information about your activity and

16:24:56  14  interests, to show you ads that are more relevant to you," an

16:25:00  15  identifier: cooking, hunting, fishing.  That's how they show

16:25:05  16  you ads.  It's all how they show you live videos that you're

16:25:09  17  going to be interested in.  And Facebook decides who gets to

16:25:12  18  see it.  You heard testimony on that during this trial.

16:25:16  19      Now, Facebook's corporate representative tried to say

16:25:20  20  Facebook doesn't make money on its news feed from live content

16:25:24  21  or video content.  On cross-examination, however,

16:25:27  22  Mr. Poffenberger acknowledged what Mr. Ratliff had told you

16:25:30  23  days before about Facebook's video-first strategy.

16:25:34  24  Mark Zuckerberg had bragged about it to the press.  Video being

16:25:38  25  50 percent of all time spent on Facebook and Instagram

PLAINTIFF'S REBUTTAL

| | | |
|---|---|---|
| 16:25:42 | 1 | services.  Hard to imagine Mr. Zuckerberg being happy if it |
| 16:25:46 | 2 | didn't make them money. |
| 16:25:48 | 3 | And you will recall Mr. Ratliff informing you, and |
| 16:25:52 | 4 | we've seen versions of this slide.  He informed you just -- in |
| 16:25:57 | 5 | just a few months, live video will be 25 percent of all |
| 16:26:01 | 6 | Facebook video watch time over all surfaces.  So it's an |
| 16:26:09 | 7 | incredibly fast-growing business and important piece of |
| 16:26:12 | 8 | Facebook's business model. |
| 16:26:13 | 9 | Now, you will recall Mr. Ratliff testifying about the |
| 16:26:15 | 10 | competitive landscape that Facebook faces with companies like |
| 16:26:19 | 11 | TikTok, Twitch, Youtube, Amazon, the same companies you saw on |
| 16:26:23 | 12 | the Houlihan Lokey slide just a moment ago.  If Facebook |
| 16:26:27 | 13 | falters on its video-first and live video offerings, it will |
| 16:26:31 | 14 | not remain competitive in the social networking space and it |
| 16:26:34 | 15 | will lose subscribers to other social media companies.  This |
| 16:26:38 | 16 | will cost Facebook in terms of lost ad revenue.  So Live is |
| 16:26:42 | 17 | critical to Facebook's -- Facebook's future. |
| 16:26:48 | 18 | Now, when Facebook's expert Dr. Bhattacharjee |
| 16:26:50 | 19 | admitted the asserted claims of the '270 patent did not require |
| 16:26:53 | 20 | guaranteed delivery, he cut Facebook's entire noninfringement |
| 16:26:58 | 21 | theory from the case.  Think about it, ladies and gentlemen. |
| 16:27:01 | 22 | Because Facebook designed its system so it could censor these |
| 16:27:06 | 23 | video communications, they want you to find they don't |
| 16:27:09 | 24 | infringe. |
| 16:27:10 | 25 | As you heard from each and every technical witness, |

16:27:12   1   and as the Court's jury instructions tell you, intervening

16:27:16   2   unclaimed steps in the accused process do not preclude a

16:27:19   3   finding of infringement.  They're trying to run a gimmick here.

16:27:24   4   The extra steps do not matter.  As long as the enumerated steps

16:27:28   5   are performed, Facebook could add hundreds or thousands of

16:27:32   6   additional steps, and nothing changes.  It's still infringes.

16:27:41   7           As you heard, Voxer's beginnings were on a

16:27:44   8   battlefield in Afghanistan.  Following the 2011 terrorist

16:27:49   9   attacks on the World Trade Center in New York City, Tom Katis

16:27:53  10   took that cowardly attack as a call to arms, and he reenlisted

16:27:58  11   in the Armed Forces to defend and protect his country, to

16:28:02  12   protect yours and mine, all of ours, our right to free speech.

16:28:05  13           So, yes, the Voxer patented method does not include

16:28:08  14   the step of big brother type censorship because Voxer never

16:28:12  15   considered using its live messaging platform to inhibit free

16:28:17  16   speech.  Rather, Voxer sought to promote free speech through

16:28:22  17   its game-changing live messaging inventions.

16:28:24  18           Now, you have probably heard "presumed innocent until

16:28:26  19   proven guilty."  This is a precept of American jurisprudence.

16:28:30  20   It's what ensures that innocent men and women do not get

16:28:35  21   wrongly incarcerated.  Well, in this case there's a very

16:28:36  22   important presumption as well.  You've heard about it here

16:28:38  23   today, the presumption of invalidity.

16:28:40  24           A lot of work by the inventors and especially by the

16:28:43  25   United States Government Patent Office went into making sure

16:28:46  1  these two issued patents were new and inventive and deserving

16:28:50  2  of protection under the law.  That is why they are presumed

16:28:53  3  valid and why Facebook's challenges to them must be rejected,

16:28:57  4  because if you credit any of Dr. Mitzenmacher's testimony, you

16:29:04  5  must have lingering doubts.

16:29:07  6          And Facebook now admits they have no defense

16:29:10  7  regarding the validity of the '270 patent.  None.  They had

16:29:12  8  years, years to scorch the earth looking for prior art.  Not

16:29:17  9  one.  And Seckin anticipates the '557, why don't they assert it

16:29:21  10 against the '270?  They know it doesn't reach all the elements

16:29:25  11 of either patent.

16:29:28  12         They found not a single prior art reference even

16:29:31  13 worthy of showing you all, not one.  So the '270 patent is now

16:29:35  14 admitted to be valid, and the presumption of validity is now

16:29:38  15 more than just a presumption, it's a fact.  It's a fact.

16:29:43  16         Remember Matt Ranney.  Mr. Ranney didn't have to come

16:29:46  17 here and testify.  He left Voxer years ago.  He now lives in

16:29:50  18 Pennsylvania.  But he, unlike Mark Zuckerberg, Mike Schroepfer,

16:29:53  19 and Peter Deng, he made the trip out here to talk to you.  He

16:29:57  20 left his family back in Pittsburgh to come share his story.

16:30:04  21         Sadly, his story so far is not a terribly happy one.

16:30:08  22 You heard him testify he left Voxer because it had no future in

16:30:12  23 light of Facebook's taking the market opportunity for live

16:30:15  24 video messaging from Voxer without compensating Voxer for the

16:30:18  25 use of its patented technology.

16:30:20   1          When Mr. Ranney and Mr. Katis started Voxer, they

16:30:24   2   could see the future of video messaging.  They even laid out

16:30:28   3   the conversation management system in their first provisional

16:30:31   4   patent application that foretold the future of social media.

16:30:36   5          The Facebook and Instagram Feed, which I suspect many

16:30:39   6   of you scroll through quite often, that is a conversation

16:30:44   7   management system just like what Mr. Ranney and Mr. Katis

16:30:47   8   sketched out back in early 2007 and put in their first

16:30:51   9   provisional patent application that was filed on June 28, 2007.

16:30:59  10          Then they met the Panttajas, the engineers who helped

16:31:02  11   them figure out the architecture for that conversation

16:31:05  12   management and live messaging system.  Their collective work is

16:31:09  13   reflected in the second provisional patent application that

16:31:13  14   Voxer filed on October 19, 2007.  You know that date,

16:31:17  15   October 19, 2007.  That's the priority date for both patents.

16:31:23  16   And that is the date that tells you, the jury, whether proper

16:31:28  17   prior art is relevant to the validity of the patent or not.

16:31:31  18          And there's only one piece of prior art.  We've

16:31:32  19   talked about the Seckin publication.  It's not a patent.  It's

16:31:36  20   an application.  Yes, an application.  Ms. Seckin did not get a

16:31:40  21   patent.  Her application failed, something you heard Dr. Jeffay

16:31:45  22   testify he wasn't even aware of.  He asserted it as a basis of

16:31:50  23   his opinion and didn't even bother to check if it was an issued

16:31:53  24   patent, which is quite strange because patent filings are

16:31:57  25   public record and are easily looked up.

16:31:59  1          Now, you also heard testimony from Dr. Jeffay that

16:32:02  2     patents have a 20-year term and that term is measured from the

16:32:06  3     first original patent application.  This one Voxer filed on

16:32:09  4     February 8th, 2008.  So that means the '557 and the '270

16:32:13  5     patents, they don't expire until 2028, almost six years from

16:32:19  6     now.  And this is why February 8, 2008 is important, but it's

16:32:23  7     also why a running royalty, not a lump-sum royalty, is

16:32:27  8     appropriate in this case.  These patents have legs.  They're

16:32:30  9     going to be around for six more years.  And if you find that

16:32:33  10    Facebook infringes and they want to keep using the patented

16:32:36  11    invention, well, they'll have to keep paying.

16:32:42  12         And you heard testimony from Facebook's engineers,

16:32:45  13    that they started working on Facebook Live sometime in 2014.

16:32:48  14    And, as Dr. Jeffay testified, because it is undisputed that the

16:32:51  15    '557 and '270 patents are entitled to claim priority back to

16:32:56  16    October 19, 2007, both patents are deemed filed on that date.

16:33:01  17    They're deemed filed on that date.  This is important.

16:33:05  18         Even though it seems odd that the '270 and the '557

16:33:08  19    patents were filed after Facebook launched its live messaging

16:33:12  20    infrastructure in 2015, under the law, as this Court has

16:33:17  21    instructed you, both patents are deemed to have been filed in

16:33:20  22    2007.  That means, even though the patents technically had not

16:33:24  23    been filed and even if Facebook did not know about them, they

16:33:27  24    still owe a royalty if you find infringement.

16:33:30  25         You might question, is that fair?  Well, as this

16:33:35  1  Court instructed you, patent infringement is what is called a

16:33:38  2  strict liability offense.  In both tort and criminal law,

16:33:43  3  strict liability exists when a defendant liable for committing

16:33:46  4  an action regardless of what his or her intent or mental state

16:33:51  5  was when committing the action.

16:33:54  6          An example, selling alcohol to a minor, that's a

16:33:58  7  strict liability offense.  Speeding is another one.  Whether

16:34:01  8  you knew you were speeding or not, you're going to get that

16:34:05  9  ticket.

16:34:07 10          Now, you'll recall that you had to hear from

16:34:10 11  Peter Deng during Facebook's case instead of ours because

16:34:13 12  Facebook had objected.  They sure did not want you to hear that

16:34:17 13  they looked at Voxer's patents back in February 2012.

16:34:21 14          MR. VAN NEST:  Objection, Your Honor:  That's

16:34:22 15  improper argument.

16:34:23 16          THE COURT:  Sustained.  The jury will disregard the

16:34:25 17  last statement.

16:34:26 18          MR. POWELL:  Facebook -- you'll recall the business

16:34:36 19  discussions between Facebook and Voxer.  Facebook wanted you to

16:34:39 20  believe that they simply determined they didn't need Voxer's

16:34:42 21  walkie-talkie voice messaging app, so they cut off discussions.

16:34:47 22          Well, we know that's not the case.  They cut off

16:34:50 23  discussions with Voxer because Facebook determined Voxer's

16:34:53 24  technology was not only core, it was patented.  And after

16:34:56 25  looking at its first issued patent, they realized Voxer had

16:35:00  1  patented Facebook's future.

16:35:01  2          Voxer asks that you, ladies and gentlemen of the

16:35:03  3  jury, send Facebook a message.  You may get -- they may get to

16:35:07  4  read our e-mails and intercept our videos, but they can't walk

16:35:12  5  all over somebody's United States patent rights without being

16:35:15  6  held accountable.

16:35:16  7          Just as Mr. Katis fought as a soldier for our right

16:35:19  8  to free speech, Voxer now asks you and each of you to fight as

16:35:23  9  a juror for its property right and find that Facebook has

16:35:25 10  infringed both patents.  Hold them accountable.  Facebook did

16:35:30 11  not just take Voxer's technology and trample on its patents.

16:35:33 12  They stole its future.

16:35:36 13          I urge you, ladies and gentlemen, please give

16:35:38 14  Matt Ranney and the other former Voxer employees their future

16:35:42 15  back.  Find Facebook and Instagram have infringed the '270 and

16:35:46 16  '557 patents, find Facebook has failed to overcome the

16:35:51 17  presumption of validity on the '557 patent, and award Voxer the

16:35:56 18  $175 million reasonable royalty it has proven it is entitled

16:36:01 19  to.

16:36:01 20          For myself, my client, its founders, Mr. Katis,

16:36:07 21  Mr. Ranney, the Panttajas, for all of the Voxer employees and

16:36:12 22  their families, sincerely, we thank you for your time and

16:36:15 23  consideration.

16:36:17 24          THE COURT:  Ladies and gentlemen of the jury, you've

16:36:20 25  now heard the entire case, including the closing arguments, and

16:36:24  1   the case will pass into your hands.

16:36:27  2          So let me give you a few instructions.  You may only

16:36:30  3   talk about this case when all eight of you are present together

16:36:35  4   in your jury room.  You can't break up into small groups and

16:36:38  5   discuss it.  Or if you were to take a luncheon break or evening

16:36:42  6   break or something like that, you can't discuss it in small

16:36:44  7   groups.  You can only discuss the case when you're all present

16:36:48  8   in your jury room.

16:36:51  9          Up until this point, I pretty much controlled your

16:36:54  10  time.  But now the case passes into your hands, as does your

16:36:59  11  time.  You can deliberate when you want to deliberate.  For

16:37:04  12  instance, it's a little after 4:30 today.  If you want to

16:37:08  13  deliberate some into the evening, you may, but you do not have

16:37:11  14  to.  You can come back in the morning if you would rather do

16:37:15  15  that.

16:37:16  16         What I ask you to do is, when you recess, I want you

16:37:22  17  to do two things for me, and that is to select your presiding

16:37:28  18  juror and let us know who that is, and then determine what your

16:37:34  19  initial work schedule's going to be.  If you're going to stay

16:37:38  20  here a while tonight and then come back at a certain time

16:37:40  21  tomorrow, tell me that.  And you'll do this through the note

16:37:44  22  process that we've talked about.  If you just want to select

16:37:48  23  the presiding juror and recess for the evening and come back

16:37:51  24  tomorrow and start your deliberations you may do that.

16:37:55  25         You can come back as early or as late as you want to.

16:37:59  1   I will ask you -- or I would like you during the day, as you're

16:38:03  2   deliberating tomorrow, that from time to time let me know when

16:38:07  3   you're going to have a lunch break or when you're going to

16:38:10  4   recess later, depending on how long your deliberations take,

16:38:14  5   because the lawyers are going to be interested in what you're

16:38:17  6   doing and when you're going to be doing it.  I'm going to be

16:38:20  7   interested in that because I have other things to do.  So we

16:38:23  8   just need to kind of keep track of what schedule we're on.  But

16:38:27  9   what that schedule is solely yours.

16:38:29  10          So, remember the instructions that I've given you now

16:38:34  11  and what the written instructions are.  And you're excused to

16:38:40  12  commence your work as a jury.

16:38:42  13      (Jury recessed)

16:39:19  14          THE COURT:  What I want from you-all, and you may

16:39:20  15  have already done it or not, Ms. Oakes needs the hot numbers of

16:39:26  16  at least one lawyer from each side who are going to be present

16:39:29  17  if we get a note or if we get a verdict.  And one is enough.

16:39:39  18  But if you want more people here during that, that's fine, but

16:39:42  19  they're going to have to hang out together because I'm not

16:39:45  20  going to keep the jury waiting if we get a note or get a

16:39:48  21  verdict while we round up this whole side of the courtroom and

16:39:52  22  round up this whole side of the courtroom.  So make sure

16:39:54  23  Ms. Oakes knows what the phones are and where she can get ahold

16:39:59  24  of you.

16:40:00  25          And what we're going to automatically do is send

16:40:05  1  enough copies of the jury charge and the verdict form back to

16:40:08  2  the jury to where they can all have one.  And then I'm -- I

16:40:14  3  think they'll take me at my word and let me know the

16:40:16  4  original -- the first schedule and the presiding juror.  So if

16:40:21  5  you want to hang around and see what we get from them.

16:40:24  6          I want to thank you-all.  It's been a long seven

16:40:27  7  trial days, but I think you've tried a good case.  I've enjoyed

16:40:33  8  being with you.

16:40:34  9          MR. VAN NEST:  Thank you, Your Honor.

16:40:35  10          MR. STONE:  Thank you, Your Honor.

16:40:36  11          MR. VAN NEST:  Your Honor, I have one comment and

16:40:38  12  objection I'd like to place in the record, in addition to my

16:40:43  13  thanks, of course.

16:40:44  14          But during Mr. Powell's rebuttal closing, he said

16:40:48  15  Facebook doesn't have patents.  Whether Facebook has patents or

16:40:53  16  not is irrelevant.  It was improper, highly prejudicial, and I

16:40:59  17  would ask the Court to give a curative instruction to the

16:41:02  18  jurors that, whether Facebook has patents or not is irrelevant

16:41:06  19  to any issue to be resolved in the case.  It's not something we

16:41:11  20  even debated.  It's not something we even discussed.  It's not

16:41:15  21  relevant.  It was improper.  And I'd ask the court to give a

16:41:19  22  curative instruction that, whether Facebook has patents or not

16:41:22  23  is irrelevant.

16:41:24  24          MR. POWELL:  Your Honor, I think we can check the

16:41:25  25  transcript.  I believe I said they didn't present any patents

16:41:29  1   during this trial.

16:41:32  2         THE COURT:  Well, Ms. Rodriguez, if you can check and

16:41:34  3   see.  About when did that occur in the argument?

16:41:37  4         MR. VAN NEST:  It happened during the rebuttal here,

16:41:39  5   within the few minutes of the Mr. Powell's conclusion.

16:41:42  6         While we're waiting to hear what we're going to hear,

16:41:45  7   let's see what we can find.

16:51:25  8         THE COURT:  Your presiding juror is Deborah

16:51:28  9   Lancaster, who was the woman that sat on the end of the front

16:51:30  10  row here throughout the trial.  They are breaking for the

16:51:34  11  evening.  They'll be back at 9:00.  They're going to lunch

16:51:38  12  between 12:00 and 1:00.  They've even told me what the

16:51:44  13  afternoon and midmorning breaks will be.  It would be what

16:51:46  14  we're doing.  It would be 10:30 and 3:30.  That's even more

16:51:49  15  information than I wanted from them.  I just care when they're

16:51:49  16  going to be in the courthouse.  And an evening recess is to be

16:51:54  17  determined.

16:51:54  18        So nothing's going to happen to you before

16:51:58  19  nine o'clock in the morning or a little bit thereafter.

16:52:01  20        MR. VAN NEST:  Your Honor, we found the passage in

16:52:03  21  the closing in which counsel told jurors that Facebook hasn't

16:52:12  22  presented any patents.  You didn't see any patents on their

16:52:17  23  live streaming system.  Or court reporter could read the Q and

16:52:25  24  A.  But, obviously, not --

16:52:29  25        THE COURT:  Well, it's not going to be Q an A.

| | |
|---|---|
| 16:52:32 | 1 |
| 16:52:32 | 2 |
| 16:52:34 | 3 |

16:52:32   1  There's only --

16:52:32   2        MR. VAN NEST:  It's A.  It's only A.

16:52:34   3        MR. POWELL:  Just so the Court's aware, Facebook

16:52:35   4  has 62 patents on their exhibit list, so they could have tried

16:52:39   5  to introduced them in this trial.  They chose not to.  I think

16:52:42   6  it's a relevant point to make to the jury.  They had an

16:52:45   7  opportunity to present, just like they had an opportunity to

16:52:47   8  present additional prior art.  They chose not to.  It's their

16:52:50   9  choice.  I can tell the jury what happened, what they didn't

16:52:52  10  see.

16:52:53  11        I just -- I was very careful not to say they don't

16:52:56  12  have patents on this system.  I knew better than to say that.

16:53:00  13  But to tell the jury they haven't seen any in this proceeding,

16:53:02  14  I think that's fair game.

16:53:03  15        MR. VAN NEST:  It's not.  We stipulated -- they made

16:53:06  16  a motion in limine to exclude it, and we stipulated to it, and

16:53:10  17  it was out of the case.  And it wasn't relevant to anything.

16:53:14  18  They asked us not to present it, and we agreed.  And now he's

16:53:18  19  told the jury that there's something significant about the fact

16:53:22  20  that they didn't see any Facebook patents on our live streaming

16:53:27  21  system and that we didn't present any.  Well, they're the ones

16:53:31  22  that moved to exclude it, and we stipulated to it.

16:53:34  23        MR. POWELL:  We did not stipulate.  That's not true,

16:53:36  24  Your Honor.  They withdrew it.  That's it.  There's no

16:53:39  25  agreement.  There's no stipulation.  Not that I'm aware of.

16:53:44  1          THE COURT:  Well, you know it better than I know it,

16:53:46  2  because I wasn't in any of the discussions.

16:53:48  3          MR. POWELL:  I mean, if they want to try and argue we

16:53:50  4  agreed, we can take a look at that.  I'm not aware of any

16:53:53  5  agreement on that ground.  We all withdrew our motions in light

16:53:56  6  of Your Honor's comments.

16:53:57  7          THE COURT:  Here's what I want you to do.

16:54:00  8          Ms. Rodriguez will give you, if you need it, copy of

16:54:05  9  what exactly was said.  The jury is going home.  Mr. Van Nest,

16:54:11  10  prepare for me no argument -- listen to me -- just on paper

16:54:15  11  exactly what curative instruction you would have me give the

16:54:18  12  jury.  And you-all both look through your records and your

16:54:22  13  files and see if there was a stipulation or discussion and what

16:54:25  14  have you, and we can talk about it -- give me a time in the

16:54:31  15  morning when you want to talk about it.

16:54:33  16          MR. VAN NEST:  Nine o'clock.

16:54:34  17          THE COURT:  I'll be here at 9:00.

16:54:36  18          MR. POWELL:  I'm fine with 9:00, Your Honor.

16:54:37  19          THE COURT:  Okay.  We'll talk about it at 9:00, and

16:54:39  20  I'll decide if I'm going to give a curative instruction.

16:54:42  21          MR. VAN NEST:  Thank you, Your Honor.

16:54:42  22          MR. POWELL:  That works for the plaintiff.  Thank

16:54:43  23  you.

16:54:47  24          THE COURT:  All right.  Thank you-all.

16:54:51  25      (End of transcript)

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

1  **UNITED STATES DISTRICT COURT     )**

2  **WESTERN DISTRICT OF TEXAS         )**

3       I, Arlinda Rodriguez, Official Court Reporter, United

4  States District Court, Western District of Texas, do certify

5  that the foregoing is a correct transcript from the record of

6  proceedings in the above-entitled matter.

7       I certify that the transcript fees and format comply with

8  those prescribed by the Court and Judicial Conference of the

9  United States.

10      WITNESS MY OFFICIAL HAND this the 29th day of

11  September 2022.

12

13                                /S/ Arlinda Rodriguez
                                  Arlinda Rodriguez, Texas CSR 7753
14                                Expiration Date:  10/31/2023
                                  Official Court Reporter
15                                United States District Court
                                  Austin Division
16                                501 West 5th Street, Suite 4152
                                  Austin, Texas 78701
17                                (512) 391-8791

18

19

20

21

22

23

24

25